UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SHAHEAN ATKINSON,

                                            Plaintiff,

                                                                    9:15-CV-0065
v.
                                                                    (MAD/TWD)
HUNTINGTON, et. al.,

                                            Defendants.
_____

APPEARANCES:                                OF COUNSEL:

SHAHEAN ATKINSON
Plaintiff *pro se*
13-A-3032
Wyoming Correctional Facility
P.O. Box 501
Attica, NY 14011

LEMIRE, JOHNSON & HIGGINS LLC               Gregg T. Johnson, Esq.
Counsel for the Defendants                  Bradley J. Stevens, Esq.
P.O. Box 2485
2534 Route 9
Malta, NY 12020

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## **ORDER and REPORT-RECOMMENDATION**

        This *pro se* civil rights action, commenced by Plaintiff Shahean Atkinson pursuant to 42

U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Glenn

T. Suddaby, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.

L.R. 72.3(c).  Plaintiff claims that while he was confined at Warren County Correctional Facility

("Warren County C.F."), Defendants violated his Fourteenth Amendment rights.  (*See generally*

Dkt. No. 1.) Plaintiff seeks declaratory relief, injunctive relief and compensatory damages. *Id.* at 7-8.

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 41, 51.) Plaintiff filed papers in opposition to the motion and cross moved to amend the complaint. (Dkt. No. 50.) For the reasons that follow, the Court recommends that the motion for summary judgment (Dkt. No. 41) be granted in its entirety and orders that plaintiff's cross motion to amend the complaint be denied.

## I.    FACTUAL BACKGROUND

On April 9, 2013, Plaintiff was booked into the Warren County C.F. after being charged with criminal possession of a controlled substance in the third degree.[1] (Dkt. No. 41-2 at 3.)[2] Upon intake, Plaintiff acknowledged, in writing, that he received a copy of the Warren County C.F. Inmates Rules and Regulations book, Inmate Orientation, and Housing Unit Orientation for Warren County C.F. *Id.* at 6, 8.    During his confinement at Warren County C.F., Plaintiff filed ten to fifteen grievances. (Dkt. No. 52 at 54.)

On May 2, 2013, Defendant Corrections Officer Steven Huntington ("Huntington") transported Plaintiff, and other inmates, from Warren County C.F. to Glens Falls City Court. (Dkt. No. 41-16 at 2.) During the transport, Plaintiff argued with another inmate and laughed when Huntington told him to be quiet. (Dkt. No. 52 at 57.)   Huntington told Plaintiff that he

---

[1] Plaintiff was housed as a pretrial detainee. (Dkt. No. 41-19 at 6, n. 1.)

[2] Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

would write him a ticket if he did not keep quiet. (Dkt. No. 52 at 62.) Plaintiff asked Huntington how he would feel if Plaintiff called him a "cracker." *Id*. at 114.

It is at this point that the parties' versions of the relevant events diverge. Plaintiff maintains that Huntington threatened and harassed him during the transport to court. (Dkt. No. 52 at 55.) Plaintiff claims that when they arrived at the courthouse, Huntington punched him and "grabbed the back of his hair and slammed him into the wall." *Id*. at 59, 62, 65. Plaintiff asserts that he was handcuffed "too tightly" for two hours and despite his complaints, the restraints were not eased. *Id*. at 74. Plaintiff contends that Huntington assaulted him again upon their return to Warren County C.F. *Id*. at 71-72. Plaintiff "clenched" his fists while Huntington attempted to remove his handcuffs and maintains that Huntington used "body blows" to repeatedly strike Plaintiff's lower back and ribs causing him to bleed when he urinated. (Dkt. No. 52 at 55, 71-72, 75.)

Huntington, by contrast, submitted an affidavit in which he denies having assaulted Plaintiff. (Dkt. No. 41-16.) Huntington claims that he did not use any force during Plaintiff's transport to and from the Glens Falls City Court. *Id*. at 2. Upon returning to Warren County C.F., Huntington asserts that Plaintiff clenched his fists while he attempted to remove his handcuffs. *Id*. Huntington claims that Plaintiff's handcuffs were removed without force, however, Huntington prepared an Unusual Incident Report due to the fact that Plaintiff was attempting to intimidate him and "stare him down." *Id*.; Dkt. No. 41-3 at 2.

Plaintiff was seen by the Warren County medical staff for complaints of wrist pain related to his handcuffs. (Dkt. No. 52 at 76.) Plaintiff claims that he sustained "welts" and "lines" on

his wrists, however, the nurse did not detect any injury to plaintiff's hands. (Dkt. No. 52 at 76.) Neither Plaintiff nor the nurse observed any other injury to his body. *Id*.

On May 2, 2013, Plaintiff filed a grievance (No. 2013-496) complaining that Huntington harassed him and threatened him. (Dkt. No. 41-6 at 3.) Plaintiff claimed that Huntington handcuffed his wrists too tightly, making his hands swell and wrists hurt. Plaintiff did not complain that Huntington punched him or otherwise used physical force. (Dkt. No. 52 at 82; Dkt. No. 41-6 at 4.)

On May 3, 2013, Plaintiff was interviewed by Sergeant Barrett E. Spring ("Spring")[3] and Defendant Corrections Officer Bryan Rainville ("Rainville") regarding his grievance against Huntington. (Dkt. No. 52 at 83; Dkt. No. 41-17; Dkt. No. 41-18.) During the interview, Plaintiff told Spring and Rainville that he feared for his life and, in response, Plaintiff was placed in protective custody. (Dkt. No. 52 at 83, 95; Dkt. No. 41-18 at 3; Dkt. No. 41-17 at 2.)

Plaintiff and Defendants disagree on the events that transpired after Plaintiff was placed in protective custody. Plaintiff maintains that between 12:00 a.m. and 2:00 a.m. on May 4, 2013[4], Rainville and other unidentified officers, removed Plaintiff from his cell, "trashed" his cell, and forced Plaintiff to engage in an unhygienic strip search. (Dkt. No. 50 at 7; Dkt. No. 52 at 105-107.) Plaintiff claims that he was handcuffed and "sucker punched" in his right eye by

---

[3] Spring is not a named defendant herein.

[4] The record does not contain clear, undisputed facts related to the date of this alleged incident. During Plaintiff's deposition, he testified that the incident occurred "a day or two after he went to PC." (Dkt. No. 52 at 106.) In opposition to Defendants' motion, Plaintiff now states, for the first time, that the incident occurred after he was placed in protective custody on May 3, 2013 during the "night between the hours of 12 am and 2 am." (Dkt. No. 50 at 7.) It is not clear whether the incident occurred on May 3, 2013, or May 4, 2013. For the purposes of this report, the court will assume that the incident occurred on May 4, 2013, between 12:00am and 2:00am.

Rainville. *Id.* at 107. Conversely, Rainville asserts that he never used physical force on Plaintiff. (Dkt. No. 41-17 at 3.)

On May 4, 2013, Plaintiff filed a grievance (No. 2013-501) complaining that he suffered from retaliation due to his prior grievance against Huntington. (Dkt. No. 41-6 at 12.) Plaintiff did not reference Rainville in the grievance. *Id.* at 12-13.

On July 9, 2013, Plaintiff was released into the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). (Dkt. No. 41-13 at 3.) On July 30, 2014, two investigators from the Inspector General's Office interviewed Plaintiff at Bare Hill Correctional Facility regarding his complaints of harassment against staff at Warren County C.F. (Dkt. No. 41-13.) The investigators reported that Plaintiff claimed that Rainville punched him in the face with closed fists and that Huntington "shoved" him. *Id.* at 3-4.

## II. PROCEDURAL HISTORY

Plaintiff filed his Complaint and applied for leave to proceed *in forma pauperis* in this action on January 20, 2015. (Dkt. Nos. 1 and 6.) In a Decision and Order filed on February 9, 2015 (the "February Order"), the Court reviewed the Complaint in accordance with 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. (Dkt. No. 8.) Upon review of the allegations, the Court directed Huntington and Rainville to respond to plaintiff's excessive force claims. (Dkt. No. 8 at 8, 13.) On December 14, 2015, Defendants filed the motion for summary judgment now before me for Report and Recommendation. (Dkt. No. 41.)

## III. APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). The nonmovant must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment. *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Salahuddin v. Coughlin*, 999 F. Supp. 526, 535 (S.D.N.Y. 1998) ("pro se

6

parties are to be given special latitude on summary judgment motions.") (citations and internal quotation marks omitted).  However, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).[5]

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In opposing Defendants' summary judgment motion, Plaintiff failed to respond to the Statement of Material Facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3).[6] Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under N.D.N.Y. L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[7] and (2) the

---

[5] Copies of unpublished decisions cited herein will be mailed to Plaintiff as a *pro se* litigant.  *See Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[6] L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts.  Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."

[7] L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, *see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[8]  *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted).  In deference to Plaintiff's *pro se* status, I have opted to review the entire record in determining if there are material facts in dispute.

A party opposing summary judgment is required to submit admissible evidence.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).  Where, as here, the Court elects to conduct an independent review of the record on a motion for summary judgment, a plaintiff's verified complaint should be treated as an affidavit.[9]  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

---

[8]  Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion.  (Dkt. No. 41 at 2-5.)

[9]  Plaintiff's Complaint was properly verified by declaration under 28 U.S.C. § 1746.  *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. §1746).

Plaintiff's unsworn statements are generally inadmissible in opposition to a motion for summary judgment. *See, e.g.*, *Witzenburg v. Jurgens*, No. CV-05-4827, 2009 WL 1033395, at *11 (E.D.N.Y. April 14, 2009) (holding that unsworn declarations are inadmissible for purposes of Rule 56 and cannot be considered by the court in deciding the motion for summary judgment). Even so, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider unsworn submissions in opposition. *See, e.g., Hamm v. Hatcher,* No. 05 Civ. 503, 2013 WL 71770, at *7 (S.D.N.Y. Jan. 7, 2013) (to afford *pro se* plaintiff special solicitude, the court considered unsworn statements in his opposition papers but only to the extent based on personal knowledge or supported by other admissible evidence in the record, on the assumption that if the allegations were sufficient to raise an issue of fact, plaintiff would be given the opportunity to submit an affidavit properly attesting to the allegations); *Robles v. Khahaifa*, No. 09CV718, 2012 WL 2401574, at *7 (W.D.N.Y. June 25, 2012). In deference to Plaintiff's *pro se* status, the Court will consider Plaintiff's unsworn affidavit. (Dkt. No. 50.)

## IV. ANALYSIS

Defendants move for judgment as a matter of law and dismissal of all of Plaintiff's allegations. Defendants argue that Plaintiff's claims must be dismissed on multiple grounds: (1) failure to exhaust his administrative remedies; (2) the absence of any evidence from which a reasonable factfinder could conclude that Plaintiff sustained anything other than *de minimis* injuries as a result of alleged incidents in May 2013 involving Huntington; (3) the record evidence fails to give rise to a genuine dispute of material fact regarding whether Rainville violated Plaintiff's Fourteenth Amendment rights; and (4) qualified immunity. (*See generally* Dkt. No. 41-19.)

## A.     Exhaustion of Administrative Remedies

Defendants argue that the excessive force claims against Huntington and Rainville must be dismissed because Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA").[10]  (Dkt. No. 41-19 at 15-16.)

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (2006).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined.  *Jones v. Bock*, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)).  If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies.  *Woodford*, 548 at 8.

Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available

---

[10] Defendants do not argue that Plaintiff failed to exhaust his administrative remedy with respect to his excessive force claim based upon handcuffing.  In Grievance # 2013-496, Plaintiff complained that his "handcuffs [were] so tight that my hands get swolled [sic] and my wrist hurts."  (Dkt. No. 41-6 at 4.)  The merits of that claim are discussed *infra*.

administrative remedies.[11] *See Murray v. Palmer*, No. 9:03 CV 1010 (GTS/GHL), 2010 WL

1235591, at *4 (N.D.N.Y. Mar.31, 2010); *Bailey v. Fortier*, No. 9:09-CV-0742 (GLS/DEP),

2012 WL 6935254, at *6 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the

burden of proving its elements by a preponderance of the evidence); *see also Andrews v.

Whitman*, No. 06 2447, 2009 WL 857604, at *6 (S.D.Cal. Mar.27, 2009) (defendant must prove

non-exhaustion of administrative remedies by a preponderance of the evidence).

If a defendant meets that burden, however, a plaintiff's failure to exhaust does not end the

review. For more than ten years, courts in this district have been guided by the Second Circuit's

decision in *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004). Under *Hemphill*, the Second

Circuit established a three-part inquiry to determine whether, *inter alia*, a plaintiff's failure to

exhaust available administrative remedies could nevertheless be justified by "special

circumstances." *Hemphill*, 380 F.3d at 686.

However, in *Ross v. Blake*, the Supreme Court rejected the "special circumstances"

exception applied by many circuits, holding "[c]ourts may not engraft an unwritten 'special

circumstance' onto the PLRA's exhaustion requirement." *Ross*, 136 S. Ct. at 1862; *see Williams

v. Corr. Officer Priatno*, ___ F.3d ___, No. 14-4777, 2016 WL 3729383, at *4 (2d Cir. July 12,

2016) ("[T]o the extent that our special circumstances exception established in *Giano v. Goord*,

380 F.3d 670, 675-76 (2d Cir. 2004), and *Hemphill*, 380 F.3d at 689-91, permits plaintiffs to file

a lawsuit in federal court without first exhausting administrative remedies that were, in fact,

---

[11] Here, Defendants preserved the exhaustion defense by asserting it in their answer.
(Dkt. No. 15 ¶13.)

available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.") (emphasis in original).

"Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are 'available' to him." *Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) (citing *Ross*, 136 S. Ct. at 1862). To guide courts in this analysis, the Supreme Court identified three kinds of circumstances in which an administrative remedy, "although officially on the books," is not "available." *Ross*, 136 S. Ct. at 1859.

First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end-with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. In light of the above, the Court must now consider whether Plaintiff exhausted his available administrative remedies before commencing this action.

Defendants have not presented any evidence about the existence or requirements of the administrative review process at Warren County C.F. *Compare Sipe v. Harder*, No. 9:08 CV 1365 (FJS/ATB), 2010 WL 3418382 (N.D.N.Y. Aug. 4, 2010) (Broome County Correctional Facility defendants moving for summary judgment on exhaustion grounds provided affidavit from administrator describing facility's grievance procedure). Rather, Defendants rely

entirely on Plaintiff's admission in his deposition that there is a prisoner grievance procedure at the Warren County C.F. and that he had full knowledge of the process having filed approximately 15 grievances.[12]  (Dkt. No. 41-19 at 15-16; Dkt. No. 52 at 53-54, 82.)

Plaintiff admits that he did not accuse Huntington of using excessive force in his grievances but explains that his omission was due to threats on his life.  (Dkt. No. 52 at 82.)  Specifically, Plaintiff claims that C.O. Marlo Barboza ("Barboza") threatened his life.[13]  (Dkt. No. 52 at 82.)  Plaintiff also maintains that he prepared a grievance against Rainville but that Rainville confiscated and destroyed the grievance.  (Dkt. No. 52 at 109.)  Defendants argue that there is no evidence that any of the Defendants took any action to inhibit or prevent Plaintiff from exhausting his available administrative remedies.  The Court agrees.

Here, the record is devoid of evidence that Defendants "thwarted" Plaintiff "from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *See Ross*, 136 S.Ct. at 1860.  During his deposition, Plaintiff identified two grievances he wrote against Huntington and testified as follows:

> Q.   And did you ever write a grievance on Officer Huntington?
> A.   Yeah.
> Q.   How many?
> A.   To my knowledge, one, maybe two, maybe if that.  I know I
>       wrote one.  I remember that first one.
> Q.   And what was the substance of those grievances?

---

[12] Plaintiff acknowledged that he received a copy of Warren County C.F. Inmate Rules and Regulations upon entered Warren County C.F.  (Dkt. No. 41-2.)  During his deposition, Plaintiff testified that he did not receive a rule book but only signed the intake form because he was "under duress" (Dkt. No. 52 at 33.)  Nevertheless, Plaintiff testified that "an older guy" explained the grievance procedure.  (*Id*. at 53.)  Moreover, on May 4, 2013, Plaintiff filed a grievance (No. 2013-501) and cited to the rule book.  (Dkt. No. 41-6 at 12.)

[13] Barboza is not a defendant herein.

| | |
|---|---|
| A. | About him [expletive] with me, him and that police guy Willette. |
| Q. | And - - |
| A. | With the little name-calling, racial statements and all that. |
| Q. | So for the racial statements.  Anything else? |
| A. | No.  I didn't put in the hit part, because they both said if I said something about the hit [expletive] she was going to make sure I leave in a pine box, and try to make it seem like I killed myself.  So somebody - - I asked for a grievance and one of the COs called and told her I wanted a grievance.  And she came to my dorm, like, Oh, you write a grievance.  And she asked me what for.  I told her.  She's like, well, if you write a grievance, if you say anything about them putting their hands on you, believe you me, you're gonna leave in a small [expletive] body bag, I'm gonna guarantee you, make it look like you killed yourself. |
| Q. | Who said that? |
| A. | Barboza.  She [threatened] my life on multiple occasions. |

(Dkt. No. 52 at 81-82.)

With respect to Rainville, Plaintiff claims that he attempted to file a grievance against Rainville for the use of excessive force but that Rainville confiscated and destroyed the grievance.  (Dkt. No. 52 at 109).  Plaintiff made no further attempts to grieve anything against Rainville because Barboza threatened his life.  (*Id*. at 110.)

Bearing in mind that a dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson*, 477 U.S. at 248, and that all ambiguities and inferences must be drawn in Plaintiff's favor, as the non-moving party, the evidence is insufficient to raise a triable issue of fact as to Plaintiff's failure to exhaust.  The record lacks any facts related to the alleged threats by Barboza including where, when, and how many times Barboza allegedly threatened Plaintiff.  Further, Plaintiff has failed to produce any evidence establishing when he attempted to file a grievance against

Rainville or when Rainville confiscated the grievance. Despite Barboza's alleged threats of harm and Rainville's purported actions, Plaintiff continued to file grievances. (Dkt. No. 52 at 85, 87, 109; Dkt. No. 41-6 at 12-13.) Plaintiff attempted to file more grievances but was "forced" to void "four or five" grievances and claims that grievances are "missing" from the record before the Court. (Dkt. No. 50 at 5; Dkt. No. 52 at 86.) Plaintiff's actions and testimony indicate that he was not deterred from engaging in the grievance process at Warren County C.F. *See, e.g., Winston v. Woodward*, No. 05 Civ. 3385(RJS), 2008 WL 2263191, at *8 (S.D.N.Y. May 30, 2008) (rejecting inmate's allegations that the defendants' "threats and retaliation" rendered administrative remedies "functionally unavailable to him" where inmate was utilizing the inmate grievance procedure to file an appeal); *cf. Ziemba v. Wezner*, 366 F.3d 161, 162-64 (2d Cir. 2004) (district court directed to consider whether defendants were estopped from asserting exhaustion defense where inmate alleged that he was beaten, threatened, denied grievance forms, and transferred to another prison).

Here, because the Defendants' conduct did not "thwart" Plaintiff from filing his grievances, Plaintiff's administrative remedies were in fact, available. *Cf. Shultz v. Pugh*, 728 F.3d 619, 620 (7th Cir. 2013) ("A remedy is not available, therefore, to a prisoner prevented by threats or other intimidation by prison personnel from seeking an administrative remedy."); *Tuckel v. Grover*, 660 F.3d 1312, 1323 (11th Cir. 2011) ("[W]hen a prison official inhibits an inmate from utilizing an administrative process through threats or intimidation, that process can longer be said to be 'available.'").

In light of the above, the Court finds that Plaintiff failed to exhaust his administrative remedies before commencing this action. Accordingly, the Court recommends granting Defendants' motion for summary judgment on this issue.

**B.      Excessive Force Claims**

Even if Plaintiff had exhausted his administrative remedies, Defendants would be entitled to summary judgment dismissing the excessive force claims against them. Pretrial detainees, like other inmates, enjoy protection against the use of excessive force and may recover damages for its violation under 42 U.S.C. § 1983. *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992). The Fourteenth Amendment due process clause protects pretrial detainees from "the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, ___U.S.___, 135 S.Ct. 2466, 2473 (June 22, 2015) (citing *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). To bring a claim of excessive force under section 1983, "a pretrial detainee must only show that the force purposely or knowingly used against him was objectively unreasonable to prevail on an excessive force claim." *Kingsley*,135 S.Ct at 2473. "[I]f the use of force is deliberate   i.e., purposeful and knowing   the pretrial detainee's claim may proceed." *Id*. Thus, a pretrial detainee can make a showing if the force "was taken with an expressed intent to punish" or "by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental purpose or that it is excessive in relation to that purpose." *Id.* at 2473 (citing *Block v. Rutherford*, 468 U.S. 576, 585-86 (1984) (additional citation omitted)).

In applying the due process standard, a Court "must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 135 S.Ct at 2473-74 (quoting *Graham*, 490 U.S. at

396).  Additionally, "a court must take account of the legitimate interests in managing a jail,

acknowledging as part of the objective reasonableness analysis that deference to policies and

practices needed to maintain order and institutional security is appropriate."  *Id*. at 2476.  Despite

the fact that

> objective reasonableness depends on the facts and circumstances of
> each case, courts may consider a number of factors, including: The
> relationship between the need for the use of force and the amount of
> force used; the extent of the plaintiff's injury; any effort made by the
> officer to temper or to limit the amount of force; the severity of the
> security problem at issue; the threat reasonably perceived by the officer;
> and whether the plaintiff was actively resisting.

*Musaid v. Manka*, 13-CV-7880, 2016 WL 540806, at *4 (S.D.N.Y. Feb. 9, 2016) (quoting

*Kingsley*, 135 S.Ct. at 2473).

With respect to Plaintiff's claims related to handcuffing, "[w]hile handcuffs must be

reasonably tight to be effective, overly tight handcuffing may constitute excessive force."  *See

Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp.  2d 459, 468 (S.D.N.Y. 2008).  "[I]n

evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the

handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the

handcuffs were too tight; and 3) the degree of injury . . . ." *Id*. (citations omitted).  To sufficiently

plead an excessive force claim based upon handcuffing, the plaintiff must allege more than a

temporary injury.  *Jackson v. City of New York*, 939 F. Supp. 2d 219, 231 (E.D.N.Y.  2013).

Defendants argue that summary judgment is warranted due to Plaintiff's inconsistent and

fabricated testimony.  (Dkt. No. 41-19 at 18.)  Defendants' arguments hinge on Plaintiff's

credibility.  In general, of course, "[c]redibility determinations . . . are jury functions, not those of

judge."  *Anderson*, 477 U.S. at 255, *see also Rule v. Brine, Inc*., 85 F.3d 1002, 1011 (2d Cir.

1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). There is, however, a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005); *Blake v. Race*, 487 F.Supp.2d 187, 202 (E.D.N.Y. 2007). In *Jeffreys*, the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," "the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony." *Jeffreys*, 426 F.3d at 554. The *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. *Id*. at 551-52. In this district, in order to apply the *Jeffreys* exception, a defendant must establish that: (1) the plaintiff relies "almost exclusively on his own testimony;" (2) the plaintiff's testimony must be "contradictory or incomplete"; and (3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Benitez v. Ham*, No. 9:04-CV-1159 (NAM/GHL), 2009 WL 3486379 at *20-21 (N.D.N.Y. Oct. 21, 2009).

Here, the only version of events that supports Plaintiff's claim is his own testimony and verified complaint. During his deposition, Plaintiff testified that he was assaulted by Huntington at Glens Falls City Court. Plaintiff alleges that Huntington punched him and "grabbed the back of his hair and slammed him into the wall." (Dkt. No. 52 at 59, 62, 65.) Plaintiff maintains that Huntington assaulted him again when they returned to Warren County C.F. (*Id*. at 55, 59, 72.) Plaintiff testified that Huntington "punched" him four or five times in the lower back, kidney and ribs and described the assault as a "body blows" causing him to bleed when he urinated. (Dkt. No. 52 at 55, 72, 123.)

Plaintiff's version of events in his testimony and allegations are contradicted by declarations provided by Defendants, declarations by witnesses, and, indeed, by his own grievances and opposition papers.[14] In moving for summary judgment, Defendant Huntington declares that he did not utilize any force on Plaintiff during his transport to and from the Glens Falls City Court. (Dkt. No. 41-16 at 2.) Huntington avers that during the transport to court, Plaintiff began arguing with another inmate and ignored orders to stop. *Id*. Upon arriving at court, Plaintiff failed to follow Huntington's order to kneel on a bench so that the handcuffs and shackles could be removed. *Id*. Huntington removed the handcuffs and noticed that Plaintiff's fists were clenched and claims that Plaintiff "attempted to intimidate me by staring me down." *Id*. Defendant Rainville maintains that he interviewed Plaintiff regarding a grievance he filed against Huntington and discussed the need for protective custody. (Dkt. No. 41-17 at 2.) Rainville asserts that he never used any physical force on Plaintiff and did not observe any staff use excessive force. *Id*. at 3. Huntington and Rainville did not observe any injuries on Plaintiff. *Id*.; Dkt. No. 41-16 at 3. In further support of the motion, Spring provided an affidavit reporting that he interviewed Plaintiff after he returned from Glen Falls City Court after Huntington reported that Plaintiff was in a verbal altercation with another inmate during the transport and that Plaintiff attempted to intimidate Huntington with "closed fists." (Dkt. No. 41-18 at 2.) Spring interviewed Plaintiff and Plaintiff asked to see medical for pain in his wrists related to handcuffing. (*Id*. at 2-3.) Spring notified the nurse who reported that Plaintiff had already been

---

[14] Defendants contend that Plaintiff's deposition testimony as at odds with his statements to the investigators. (Dkt. No. 41 at 17.) However, the record does not contain a declaration or affidavit from either investigator and the Incident Report prepared by the investigators is not in proper admissible form.

examined and did not appear to have any abrasions or lacerations from the handcuffs or any other injuries. *Id*. at 3. Spring prepared an Unusual Incident Report (#2013-0603) related to the incident and noted that he observed no injuries. (Dkt. No. 41-18 at 3; Dkt. No. 41-13 at 10-11.) The next day, Spring, accompanied by Rainville, interviewed Plaintiff regarding the grievance. (Dkt. No. 41-18 at 3.) Spring did not observe any injuries on Plaintiff and did not observe any staff use any excessive force. *Id*. at 4. In further support of the motion for summary judgment, Defendants provided medical records maintained by Warren County C.F. (Dkt. No. 41-8.) There are no records indicating that Plaintiff required medical treatment around the time of the alleged incident. *See id*.

In opposition to the motion, Plaintiff maintains that the medical records submitted by Defendants in support of the motion are incomplete. (Dkt. No. 50 at 4-5.) Specifically, Plaintiff claims that missing medical records between May 2, 2013, and May 4, 2013, "around the time the plaintiff was assaulted," document injuries including headaches, dizzy spells, and blood in his feces. (Dkt. No. 50 at 5.) However, during his deposition, Plaintiff testified that at the time he was allegedly assaulted, he did not see any bruising on his back and did not suffer any other injuries as a result of the alleged assault. (Dkt. No. 52 at 75-77.)

Plaintiff's deposition testimony also conflicts with the grievances Plaintiff filed. As discussed *supra*, absent from the grievance that Plaintiff filed on the day of the incident is any claim that Plaintiff was punched, assaulted, or beaten. (Dkt. No. 41-6 at 3-4.) Plaintiff made no reference to any injury including blood in his urine. *Id*. Similarly, the grievance filed on May 4, 2013, lacks any reference to excessive force by Huntington or Rainville. (Dkt. No. 41-6 at 12-13.) Under *Jeffreys*, no reasonable juror would credit Plaintiff's testimony.

Summary judgment would be warranted even if the *Jeffreys* exception did not apply.  By

Plaintiff's own account, he did not suffer any injuries as a result of the alleged incident:

> Q.	Now, when you saw the nurse, you said the handcuffs were tight, was there any -- did it draw blood or anything?
> A.	No. It was just real red and it was welt up real bad. The lines was real bad.
> Q.	What do you mean by welt?
> A.	Like if somebody was to hit you with a belt, or something, you welt up.
> Q.	Okay. What did the nurse say about your injuries?
> A.	She's like, Oh, it will be all right. She looked at it. And said, It will be all right. She didn't even look. She glanced at it. Looking and glancing are two different things. He was right there.  He was right there with here, right beside her.
> Q.	Did the nurse look at anything else on you?
> A.	No, because I looked -- when I was in the cell I looked at my back. I didn't see no bruises.  I didn't see no bruises.  So I really thought nothing of it. I'm like, Okay, he knew what he was doing. He must have knew what he was doing by hitting me where he was hitting me because no bruise did pop up.
> Q.	Did you say anything else to the nurse about any other injuries or conditions you had?
> A.	No. I was just upset. I was just upset, period. Like -- I'm just like, Oh,  man, I don't even like living that day, man.  I knew I had to prepare myself to relive that day, but every time I think about that shit, that shit its bad, like

(Dkt. No. 52 at 75-77.)

Plaintiff has not produced any evidence of any injury.  In opposition to the motion,

Plaintiff annexed his medical records from February 2015 through January 2016, and argues that

he sustained additional injuries as a result of the incident.  The Court has thoroughly reviewed

the submissions and even assuming the records were in admissible form, the records do not

support Plaintiff's claim that his arthritis, pain in his wrist and right shoulder, headaches, and

difficulty "using the bathroom" are causally related to the alleged incidents in 2013.  (Dkt. No.

50-1; Dkt. No. 52 at 78, 122-123.) At best, the injuries that Plaintiff sustained are of the type that have been held to be *de minimus* and indicative that excessive force was not used. *See Brown v. City of New York*, No. 14 Civ. 2700, 2015 WL 427942, at *5 (E.D.N.Y. Feb. 2, 2015) (granting summary judgment dismissing excessive force claims after the plaintiffs conceded that they suffered no physical injuries); *cf. Simpson v. Saroff*, 741 F.Supp. 1073, 1078 (S.D.N.Y. 1990) (finding that handcuffing gives rise to a claim of excessive force where an individual suffers an injury as a result of being handcuffed).

Based upon the foregoing, the Court concludes that there is no evidence in the record upon which a jury could reasonably find that Huntington and Rainville violated Plaintiff's Fourteenth Amendment rights and recommends that Huntington and Rainville be granted summary judgment on this issue.[15]

### C.      Plaintiff's Cross Motion to Amend the Complaint

In his opposition to Defendants' motion, Plaintiff asks the Court for permission to amend the Complaint to include a cause of action against Barboza and Glens Falls Police Officer Gerald Willette ("Willette"). (Dkt. No. 50 at 8.) Plaintiff claims, without support, that Barboza and Willette assaulted him. *Id*. Plaintiff also seeks to add a claim for deliberate indifference to his serious medical needs against the Warren County C.F. staff. *Id*.

Federal Rule of Civil Procedure 15(a) provides that the court should grant leave to amend "freely . . . when justice so requires." Fed.R.Civ.P. 15(a)(2). The decision to grant or deny a motion to amend is committed to the sound discretion of the trial court. *Ruffolo v.*

---

[15] In light of my recommendations that Defendants' motion be granted in its entirety based on the merits, I find it unnecessary to address Defendants' alternative qualified immunity arguments.

*Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).[16] An amendment which is futile, such as a proposed amended complaint seeking to assert claims barred by the statute of limitations, must be denied. *See Malesko v. Corr. Servs. Corp.*, 229 F.3d 374, 382  84 (2d Cir. 2000), *rev'd on other grounds*, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). Similarly, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo*, 987 F.2d at 131 (citing *Foman*, 371 U.S. at 182).

Plaintiff's original Complaint named Barboza and Willette as Defendants. (Dkt. No. 1.) In the February Order, the Court dismissed Plaintiff's claims against Barboza and Willette. (Dkt. No. 8.) Plaintiff was advised that should he seek to pursue one or more claims dismissed by the Court, he must file an amended complaint. (Dkt. No. 8 at 13, n. 7.) Despite that Order, Plaintiff never moved to amend his pleadings to assert the aforementioned claims until faced with a summary judgment motion and, indeed, only filed the within request on the day that his response to the summary judgment motion was due. *See Porter v. Selsky*, 287 F.Supp.2d 180, 188 (W.D.N.Y. 2003) (finding undue prejudice to the defendants if the plaintiff's motion to amend, made on the day that the response to a summary judgment motion was due, was granted). Accordingly, due to the prejudicial impact on Defendants, Plaintiff's cross motion to amend to include Barboza and Willette as defendants is denied.

---

[16] As the Second Circuit has stated, "[w]e review denial of leave to amend under an 'abuse of discretion' standard . . . When the denial of leave to amend is based on a legal interpretation, such as a determination that amendment would be futile, a reviewing court conducts a de novo review." *Hutchison v. Deutsche Bank Securities Inc.*, 647 F.3d 479, 490 (2d Cir. 2011) (citation omitted).

As to Plaintiff's deliberate indifference claims related to his medical needs, Plaintiff fails to identify any specific individual as personally involved in these alleged constitutional deprivations. Consequently, the proposed amendment would be subject to dismissal for failure to give notice and identify facts that would entitle Plaintiff to relief. This portion of Plaintiff's motion is denied as futile. *See* Federal Rule of Civil Procedure 8(a)(2).

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 41) be **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's cross motion to amend the complaint (Dkt. No. 50) be **<u>DENIED</u>**; and it is further

**ORDERED** that in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam), the Clerks Office provide Plaintiff with copies of the following unpublished decisions: *Cole v. Artuz*, 1999 WL 983876 (S.D.N.Y. Oct. 28, 1999); *Witzenburg v. Jurgens*, 2009 WL 1033395, (E.D.N.Y. April 14, 2009); *Hamm v. Hatcher,* 2013 WL 71770 (S.D.N.Y. Jan. 7, 2013); *Robles v. Khahaifa*, 2012 WL 2401574 (W.D.N.Y. June 25, 2012); *Murray v. Palmer*, No. 9:03 CV 1010 (GTS/GHL), 2010 WL 1235591, at *4 (N.D.N.Y. Mar.31, 2010); *Bailey v. Fortier*, 2012 WL 6935254 (N.D.N.Y. Oct. 4, 2012); *Andrews v. Whitman*, 2009 WL 857604, at *6 (S.D.Cal. Mar.27, 2009); *Williams v. Corr. Officer Priatno*, 2016 WL 3729383 (2d Cir. July 12, 2016); *Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100 (S.D.N.Y. July 19, 2016); *Sipe v. Harder*, 2010 WL 3418382 (N.D.N.Y. Aug. 4, 2010); *Winston v. Woodward*, 2008 WL 2263191 (S.D.N.Y. May 30, 2008); *Musaid v. Manka*, 2016 WL 540806 (S.D.N.Y.

Feb. 9, 2016); *Benitez v. Ham*, 2009 WL 3486379 (N.D.N.Y. Oct. 21, 2009); *Brown v. City of New York*, 2015 WL 427942 (E.D.N.Y. Feb. 2, 2015).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: August 19, 2016
Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

2009 WL 857604
Only the Westlaw citation is currently available.
United States District Court,
S.D. California.

David Raymond ANDREWS, Plaintiff,

v.

M.C. WHITMAN; G.J. Janda; M.E. Bourland;
T. Ochoa; C. Butler; W.C. Roberts; F. Rutledge;
California Department of Corrections, Defendants.

No. 06–2447–LAB (NLS).
|
Dkt. Nos. 78, 94, 96.
|
March 27, 2009.

West KeySummary

**1**   **Civil Rights**

👉   Criminal Law Enforcement;Prisons

A state prisoner's objection to the dismissal
of his civil rights action on the grounds
of his civil rights action on the grounds
that defendants were required to prove non-
exhaustion by clear and convincing evidence
was overruled. The prisoner alleged he was
sexually assaulted, prison officials retaliated
against him, and he was prevented from fully
exhausting his claim. The prisoner failed to
submit the proper reports about the incident
or any charges of staff misconduct even
though the forms were made available, and
that was sufficient to show the prisoner failed
to exhaust his administrative remedies by a
preponderance of the evidence, the correct
legal standard. 28 U.S.C.A. § 1915(a).

Cases that cite this headnote

**Attorneys and Law Firms**

David Raymond Andrews, Crescent City, CA, pro se.

Stephen A. Aronis, Office of the Attorney General, San
Diego, CA, for Defendants.

**ORDER OVERRULING OBJECTIONS TO
REPORT AND RECOMMENDATIONS;**

**ORDER ADOPTING REPORT
AND RECOMMENDATIONS;**

**ORDER DENYING MOTION FOR LEAVE TO
FILE SECOND AMENDED COMPLAINT; AND**

**ORDER OF DISMISSAL**

LARRY ALAN BURNS, District Judge.

**I. Procedural History**

 **\*1**  Plaintiff, a prisoner proceeding *pro se* and *in forma
pauperis,* filed his original complaint in this civil rights
action on November 3, 2006. Defendants moved to
dismiss, and on March 28, 2008, the Court issued an order
(the "Dismissal Order") dismissing certain claims with
prejudice and others without prejudice.

The Dismissal Order dismissed with prejudice all
claims against the California Department of Corrections
and Rehabilitation ("CDCR") and Plaintiff's Eighth
Amendment claims that Defendants transferred him back
into the general prison population in 2006. All other
claims were dismissed without prejudice, and Plaintiff was
permitted to file an amended complaint. The Dismissal
Order also cautioned Plaintiff that he was not to add
unexhausted or otherwise non-meritorious claims and
that if he did so, they would be subject to *sua sponte*
dismissal under 28 U.S.C. § 1915(a).

Plaintiff then filed his First Amended Complaint
("FAC"), and Defendants filed a motion to dismiss (the
"Motion to Dismiss"). The FAC is 63 pages long, with an
additional 62 pages of exhibits attached. Pursuant to 28
U.S.C. § 636 and Civil Local Rule 72.1(d), the Motion to
Dismiss was referred to Magistrate Judge Nita L. Stormes
for report and recommendation. On October 8, 2008,
Judge Stormes issued her report and recommendation
(the "R & R") finding Plaintiff had failed to exhaust his
administrative remedies and recommending Defendants'
Motion to Dismiss be granted on that basis or, in the
alternative, because the FAC fails to state a claim. The

R & R recommended not charging Plaintiff with a strike under 28 U.S.C. § 1915(g).

Defendants filed objections, requesting that the FAC be dismissed for failure to state a claim and charged with a strike. Plaintiff then filed a series of motions, including a "Motion to Strike the Defendants' Affirmative Defense of Failure to Exhaust Administrative Remedies," (Dkt. no. 94), an "Ex Parte Request to File a Second Amended Complaint," (Dkt. no. 96), and a "Motion to Strike the Defendants' Objection to the Report and Recommendation." (Dkt. no. 104). Because the first two of these motions go to the substance of the R & R, the Court construes them as objections to the R & R. The Court ruled separately on the third motion (Dkt. no. 104), which was based on matters not directly related to the R & R or the substance of the Motion to Dismiss. Plaintiff filed his objections to the R & R on December 12, 2008, and on December 19, 2008, he filed a reply to Defendants' objections.

## II. Legal Standards

A district judge "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions" on a dispositive matter prepared by a magistrate judge proceeding without the consent of the parties for all purposes. Fed.R.Civ.P. 72(b); *see also* 28 U.S.C. § 636(b)(1). An objecting party may "serve and file specific written objections to the proposed findings and recommendations," and "a party may respond to another party's objections." Rule 72(b).

 **\*2** In reviewing an R & R, "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (when objections are made, the court must make a de novo determination of the factual findings to which there are objections). "If neither party contests the magistrate's proposed findings of fact, the court may assume their correctness and decide the motion on the applicable law." *Orand v. United States,* 602 F.2d 207, 208 (9th Cir.1979). Objections must, however, be specific, not vague or generalized. *See* Fed.R.Civ.P. 72(b) (2) (requiring "specific" objections); *Palmisano v. Yates,* 2007 WL 2505565, slip op. at \*2 (S.D.Cal. Aug. 31, 2007).

The Court has reviewed de novo the legal standards set forth in the R & R, and finds them to be correct. The Court will therefore apply the standards set forth there without again citing them at length here.

## III. Screening

Because Plaintiff is a prisoner and proceeding *in forma pauperis,* the Court is obligated pursuant to 28 U.S.C. §§ 1915(e) (2) and 1915A, and 42 U.S.C. § 1997e(c) to dismiss the FAC to the extent it is frivolous or malicious, seeks monetary relief against a Defendant who is immune, or fails to state a claim. As noted, the Dismissal Order dismissed with prejudice all claims against the CDCR. Without leave, Plaintiff has again named the CDCR as a Defendant. The Court therefore **REAFFIRMS** its previous dismissal of these claims and will not consider them further.

The FAC raises claims against Defendants in both their individual and official capacities (FAC at 4), and Defendants have raised Eleventh Amendment immunity. (Mem. in Supp. of Motion to Dismiss, 8:5–22.) The R & R recommends dismissing these claims to the extent Plaintiff seeks damages, and the Court agrees. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 66, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (holding that the Eleventh Amendment bars damages actions against state officials acting in their official capacity).

## IV. Exhaustion of Administrative Remedies

### A. Requirements and Legal Standards

Exhaustion of available administrative remedies is a prerequisite to bringing suit under the Prison Litigation Reform Act ("PLRA"). 42 U.S.C. § 1997e(a). *Porter v. Nussle,* 534 U.S. 516, 524–25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Claims must be exhausted before filing suit; exhaustion after filing suit will not suffice. *McKinney v. Carey,* 311 F.3d 1198, 1198 (9th Cir.2002).

Defendants may raise this defense in a non-enumerated motion under Fed.R.Civ.P. 12(b), and bear the burden of raising and proving non-exhaustion. *Wyatt v. Terhune,* 315 F.3d 1108, 1119 (9th Cir.2003). To prevail, Defendants must show Plaintiff had available administrative remedies he did not utilize. *Id.* They may go beyond the pleadings and provide evidence to support their argument, but Plaintiff must be provided an

opportunity to develop the record to refute Defendants' showing. *Id.* at 1120 n. 14. The Court may consider the parties' submissions outside the pleadings and decide disputed issues of fact. *Id.* at 1119–20 (citing *Ritza v. Int'l Longshoremen's & Warehousemen's Union,* 837 F.2d 365, 369 (9th Cir.1988) (per curiam)).

**\*3** The exhaustion requirement takes on particular significance in this case because Defendants submitted evidence Plaintiff never properly exhausted *any* claims he now raises. The Court denied without prejudice Defendants' earlier motion to dismiss on the basis of non-exhaustion, finding they had not provided adequate details or evidence to refute Plaintiff's claim they thwarted his efforts to file his administrative complaint, or to explain how they were able to send Lt. Stratton to investigate Plaintiff's complaint against Sgt. Galban. In this renewed motion, Defendants again contend Plaintiff failed to properly exhaust his administrative remedies by pursuing an administrative complaint against Defendant Galban for allegedly assaulting Plaintiff, and against other Defendants for actions they allegedly took in the aftermath. As the Court explained in its Dismissal Order, Plaintiff could not have exhausted his administrative remedies for later alleged violations of his rights. (Dismissal Order at 7:1–27.)

To properly exhaust, a prisoner must complete the administrative review process according to the applicable rules. *Woodford v. Ngo,* 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). In California, this means

a prisoner must first attempt to informally resolve the problem with the staff member involved in the action or decision being appealed. [15 Cal.Code Regs.] § 3084.5(a). If unsuccessful, the prisoner must then submit a formal appeal on an inmate appeal form (a "602") to the institution's Appeals Coordinator or Appeals Office. *Id.,* § 3084.5(b). If the appeal is again unsuccessful, he or she must submit a formal appeal for second level review, *id.,* § 3084.5(c), which is conducted by the institution head or designee. *Id.* § 3084.5(e)(1). The third or "Director's Level" of review "shall be final and exhausts all administrative remedies available in the Department [of Corrections]." *See* Cal. Dep't. of Corrections Operations Manual, § 54100.11, "Levels of Review[.]"

*Nichols v. Logan,* 355 F.Supp.2d 1155, 1161 (S.D.Cal.2004).

Because a plaintiff must follow applicable regulations, using some alternative means or procedure to lodge or pursue a complaint does not satisfy exhaustion requirements. Under 15 Cal.Code Regs. § 3084.2 prisoners must use Form 602 to advance their grievances. The Cal. Dep't of Corrections Operations Manual, § 54100.25.1, requires use of the form even when allegations of staff misconduct are being separately investigated. (Grannis Suppl. Decl., ¶ 6.)

The Supreme Court has recognized this requirement may create harsh results, but has also emphasized the relative informality and simplicity of California's system, *Woodford,* 548 U.S. at 103, as well as the important concerns underlying the exhaustion requirement. *Porter,* 534 U.S. at 524–25.

Plaintiff need only exhaust *available* remedies, however. Any theoretically available remedies Defendants prevented him from pursuing, such as by withholding required forms or refusing to process forms, need not be exhausted. *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003) (citing *Miller v. Norris,* 247 F.3d 736,740 (8th Cir.2001) (holding that remedies prisoner officials prevent a prisoner from utilizing are not "available" for § 1997e(a) purposes)).

**B. The R & R's Findings**
**\*4** The R & R focuses on Plaintiff's claim that Sgt. Galban sexually assaulted him and prison officials retaliated against him. Plaintiff claims he either exhausted these and other claims or filed them but was prevented from fully exhausting them, and that Lt. Stratton investigated them. As the R & R correctly points out, the questions now before the Court concerning exhaustion are 1) whether whatever complaint Lt. Stratton investigated satisfied the exhaustion requirement, and 2) whether Defendants prevented Plaintiff from utilizing administrative remedies.

Previously, Defendants submitted evidence Plaintiff never submitted a Form 602 complaining of sexual assault and retaliation. In the Motion to Dismiss, they again submit evidence, but also provide detailed explanation of what happened. The R & R reviews this evidence in great detail. (R & R, 10:6–12:15.) In essence, Defendants have presented evidence to show Plaintiff never submitted a Form 602 complaint, and Lt. Stratton was investigating

a spoken, not written, complaint. (Stratton Decl. ¶¶ 3, 6.) They also present evidence to show charges of serious staff misconduct may be investigated even when not submitted on the required Form 602, but a separate investigation does not substitute for the normal appeal process. (Grannis Suppl. Decl. ¶ 6.) Plaintiff himself, when communicating with officials, described his complaint as a "citizen's complaint," [1] not a 602 appeal or any equivalent term, and specifically cites 15 Cal.Code Regs. § 3391(d). (Stratton Decl. ¶ 5, Ex. C.)

Defendants have submitted evidence showing a search was made for all 602 appeals Plaintiff submitted from November 1, 2002 to November 3, 2006, the date the original complaint was filed in this matter. (Edwards Suppl. Decl., ¶ 4.) Most of the appeals were screened because Plaintiff had attempted to bypass steps in the appeals process or because of other procedural defects he could have remedied but never did. (Id.)

Two 602 appeals are of particular interest. First, on November 6, 2005 Plaintiff appealed procedural irregularities in the October 7, 2005 disciplinary hearing, of which he said he was notified November 3, 2005. (Edwards Suppl. Decl., ¶ 4(c) and Ex. B.) Plaintiff's description of the problem, set forth on the form, describes only failure to hold an adequate hearing, appeals the finding of "guilty," and requests only the opportunity to appear and present evidence at a new hearing. (Id., Ex. B.) The evidence shows this appeal was granted on April 10, 2006 and Plaintiff was provided with a new hearing as he requested. (Id.) The evidence indicates he lodged no appeal concerning the new hearing. This particular 602 appeal would have put prison officials on notice of a possible procedural due process violation, but as the R & R correctly noted, the FAC does not raise such a claim. (R & R at 19:16–23; see also FAC at 25–26 (discussing events of early October, 2005), 29 (briefly discussing events of November, 2005).) The appeal did not identify the basis for any claim raised in the FAC. See Griffin v. Arpaio, 557 F.3d 1117, 2009 WL 539982, slip op. at *2–*3 (9th Cir. Mar. 5, 2009) (explaining that, to exhaust administrative remedies, a grievance must contain sufficient details to put prison officials on notice of the nature of the wrong for which redress is sought).

**\*5** Second, Plaintiff maintained to the Director's Level a 602 appeal complaining against unspecified officials concerning a different disciplinary proceeding. The disciplinary proceeding concerned charges of refusing a cellmate, and began May 10, 2006. The appeal, which was denied at the Director's Level, was not exhausted until November 30, 2006, nearly a month after Plaintiff filed this action. (Edwards Suppl. Decl. ¶ 4(g); Grannis Decl. ¶ 7(a).) Also, the R & R correctly notes this appeal would not have put Defendants on notice regarding allegations that Sgt. Galban sexually assaulted Plaintiff and staff prevented him from filing a complaint about it. (R & R, 13:5–22.)

The evidence therefore shows no appeals that would have put prison officials on notice of the grievances underlying claims raised in the FAC, either those involving Sgt. Galban, or official retaliation, or any other claim. (Edwards Suppl. Decl. ¶ 4.) Furthermore, the evidence shows Plaintiff was able to submit multiple 602 appeals, which were considered and, in one case, granted. (Id.)

The R & R also credited declarations showing Plaintiff never submitted a Third Level appeal against any Defendant. (R & R, 12:1–3.) Thus, even if Plaintiff had submitted an appeal on a Form 602 concerning his claims raised in the FAC, the R & R found he had not pursued it through all required levels.

The R & R found administrative remedies were available. On its face, the evidence indicates the screening out of certain appeals was not arbitrary, contrary to applicable rules, or designed to thwart Plaintiff's ability to bring or maintain appeals. (Edwards Suppl. Decl. ¶ 4.) Plaintiff says officials initially refused to provide him with a blank Form 602 so he could file a grievance and initially refused to allow him to file a grievance other than on a Form 602. (FAC at 17, 20, 24–25.) The FAC makes clear, however, that Plaintiff obtained this form from the prison library. (Id. at 26.)

Thus, assuming the R & R's findings of facts are correct, Plaintiff had administrative remedies available for claims he raises in the FAC but failed to exhaust them as to any claim raised in the FAC.

## C. Plaintiff's Objections to the R & R

As discussed above, Plaintiff filed extensive and detailed objections to the R & R, most of which are irrelevant to the issue of exhaustion, and many of which are irrelevant to any material issue. The objections go line by line through the R & R, critiquing each sentence or

paragraph. In large part, the objections find fault with the level of factual and legal detail provided in the R & R, or quibble baselessly with its wording. The Court will not address these objections, which have no bearing on the outcome of this case and which are thus moot. In only a few instances, which are addressed below, are Plaintiff's objections relevant to the issue of exhaustion of administrative remedies.

**1. Objection: The R & R Applied the Wrong Legal Standards**

**\*6** Plaintiff lodges two general objections regarding the standards the R & R applied. First, he argues the R & R was bound to apply the Rule 12(b)(6) standard to Defendants' defense of non-exhaustion by accepting his pleadings as true and drawing inferences in his favor rather than considering evidence. (*See, e.g.,* Obj. to R & R at 13, 29 ("The R & R assumes a matter in dispute.").)

As discussed above, this objection relies on the wrong standard. In deciding a non-enumerated Rule 12 motion to dismiss for failure to exhaust available administrative remedies, the Court may consider the parties' submissions outside the pleadings and decide disputed issues of fact. *Wyatt,* 315 F.3d at 1119–20. Defendant has been afforded an opportunity to develop the record, and has done so by pointing to and discussing extensive documentation to support his arguments. *Id.* at 1120 n. 14.

Second, Plaintiff argues Defendants were required to prove non-exhaustion by clear and convincing evidence (Obj. to R & R at 35–36 ("They are required to establish by clear and convincing proof ...."); 44 ("The Defendants have not submitted clear and convincing proof of unexhausted available remedies and this is what is required in order to satisfy the allocated burden of proof.")

It would be extraordinary if defendants in civil actions were required to prove the nonoccurrence of an event by clear and convincing evidence, especially because weightier matters such as liability and jurisdiction need only be proved by a preponderance of the evidence. Thus, not surprisingly, the R & R did not state what standard it was applying. The correct standard is, however, that Defendants must prove non-exhaustion of administrative remedies by a preponderance of the evidence. *See Kelley v. DeMasi,* 2008 WL 4298475, slip op. at \*4 (E.D.Mich, Sept. 18, 2008) (citing *Lewis v. District of Columbia,* 535

F.Supp.2d 1, 5 (D.D.C.2008)). *See also Dale v. Poston,* 548 F.3d 563, 564 (7th Cir.2008) (noting with approval that jury was asked to determine whether defendants in PLRA case had proven non-exhaustion by a preponderance of the evidence). The R & R did not err.

These objections are therefore **OVERRULED.**

**2. Objection: The R & R Relied on Inadmissible Evidence**

Plaintiff argues in various places that the R & R relied on incompetent evidence submitted by Defendants. He contends Lt. Stratton would have had no personal knowledge of the matters attested to in his declaration, such as who submitted which reports or who received various letters attached as exhibits to his declaration. (Obj. to R & R at 30–31.) He also claims, without much explanation, that Lt. Stratton would not have had time to conduct an actual investigation. (*Id.* at 35.)

These objections are largely frivolous and those that are not are trivial. Lt. Stratton would have had personal knowledge of what kind of investigation he was asked to conduct, what paper documentation he was provided, what he and Plaintiff talked about, and what reports he submitted after interviewing Plaintiff. (*id.,* ¶¶ 3, 4.) The letters he was provided (*id.,* Ex. C) are attached as exhibits, with addressed and postmarked envelopes, and their contents speak for themselves. Plaintiff does not question the authenticity of any letter he wrote or sent. The letter from Warden L.E. Scribner, which is also attached, is substantially similar to the letter Plaintiff himself attached as FAC Ex. 31, [2] and in any event is offered merely to show what Plaintiff was told and not for the truth of the matters asserted therein.

**\*7** Lt. Stratton also provided a factual basis, grounded primarily in his own experience, for his conclusions that Plaintiff filed no Form 602 appeals relating to accusations against Sgt. Galban, or against other staff for failing to process complaints of staff misconduct. (Stratton Decl. ¶ 6.) The only possibly incompetent testimony consists of characterizations of the attached letters and a report of a brief conversation with an administrator, but these are merely cumulative of other evidence and do not affect the outcome.

These objections are therefore **OVERRULED.**

### 3. Objection: Defendants Are Estopped from Arguing Non–Exhaustion

Plaintiff has filed a separate motion to strike ("Motion to Strike") which, as noted above, the Court construes as part of Plaintiff's objections. The objections themselves repeatedly make reference to the estoppel argument. (*See, e.g.,* Obj. to R & R at 57.) The motion itself, however, provides the most detailed argument.

Plaintiff claims Defendants misled him into believing his claims were exhausted, and no more remedies were available. (Motion to Strike at 3; Obj. to R & R at 53.) In support of his position, he cites Cal. Evid.Code § 623 (concerning estoppel) and *Brown v. Valoff,* 422 F.3d 926, 935 (9th Cir.2005). (Motion to Strike at 2.)

Plaintiff cites a particular letter in support of this argument, a letter from Warden Scribner, dated January 27, 2006, stating that Plaintiff's allegations were not sustained and further questions should be referred to administrative assistant R. Madden. (Obj. to R & R at 38, 53 (citing FAC, Ex. 31).) Plaintiff contends this letter reliably informed him that no remedies were available. *See Brown,* 422 F.3d at 935 and n. 10.

Plaintiff misreads the letter, however. It informs him Warden Scribner was responding to a "recent letter" from Plaintiff in which Plaintiff says that on October 18, 2005 he submitted a "written Citizen's Complaint in regards to Correctional Sergeant S. Rutledge." (FAC Ex. 31.) The letter further informs Plaintiff:

> A "fact-finding" was conducted into these and related allegations that you had previously made. The result of the "fact-finding" was that the allegations are NOT SUSTAINED, and that staff have acted and treated you in a professional manner.

*Id.*

This letter does not, as Plaintiff argues, inform him no remedies are available for him to exhaust. Rather, it tells him Warden Scribner was responding to a letter concerning a citizen's complaint sent to the Director of Corrections—not a 602 appeal pursued through established channels. Plaintiff's letter of complaint is apparently the letter attached as Exhibit C to the Stratton Declaration, which is discussed above.

Plaintiff's letter charges that the complaint was never processed, that Plaintiff spoke to officials, and that no appropriate response was forthcoming. (Stratton Decl. ¶ 5, Ex. C.) It therefore requests a Director's Review and an investigation. (*Id.*) Whatever Plaintiff may have intended to say or do, the letter he addressed to the Director of Corrections is not a 602 appeal, and Warden Scribner's reply can only reasonably be construed as discussing an investigation made pursuant to other kinds of complaints, outside the established grievance process. It does not, as Plaintiff believes, inform him that remedies for the type of injury he alleges are unavailable through the established grievance process. It neither forbids nor discourages filing a 602 appeal.

**\*8** In a sense Plaintiff seems to be arguing that after receiving this letter there was no point in filing a 602 appeal. The Supreme Court's holding in *Woodford,* 548 U.S. at 94–95, however, explains why this argument must fail. The Supreme Court's holding makes absolutely clear a prisoner must follow the established prison grievance system, not some other system of his own devising. Nor may a prisoner satisfy the exhaustion requirement by bypassing the administrative process or violating its requirements until his complaint at last falls flat. *Id.* at 95, 97.

This objection is therefore **OVERRULED.**

### 4. Objection: The R & R Should Have Considered FAC Exhibit 45

This is the most substantial of Plaintiff's objections. Plaintiff points to a 602 form attached as Exhibit 45 to the R & R (the "Retaliation 602"). In the area of the form where Plaintiff was asked to describe the problem, he wrote:

> Emergency Appeal Pursuant to CCR Title 15, 3084.7. Circumstances are such that regular appeal time presents a threat to my safety. Classification committee CHo'd me to general population double cell. The action places me at risk. I have attempted to make a complaint against corrections

officers and have been issued CDC
115's and 128's in retaliation.

(FAC Ex. 45.) In the area where he was to indicate the actions he was requesting, he wrote: "Stay of release to GP double cell and new Committee hearing and audit of my file." (*Id.*) The form is dated December 15, 2005 and date-stamped as having been received by the appeals office on December 21, 2005.

Plaintiff repeatedly cites to the Retaliation 602 as evidence Defendants made administrative remedies unavailable to him. (Obj. to R & R at 18, 36–37 (accusing Appeals Coordinator D. Edwards of omitting pertinent details in his declaration and arguing this appeal was "undu[ ]ly rejected under the direction of the Defendants"), 40.)

This 602 form, if it had been properly filed and the appeal pursued, would have exhausted Plaintiff's retaliation claim and possibly notified Defendants of other claims in the FAC. Edwards' supplemental declaration (Dkt. no. 78–6) submitted in support of Defendants' Motion to Dismiss explains why it was not: "On December 21, 2005, my office received an appeal from Inmate Andrews which was screened out on December 22, 2005, because he could only submit one non-emergency appeal per week." (Edwards Suppl. Decl., ¶ 4(d).)

The declaration's previous paragraph, 4(c), identifies the other non-emergency appeal Plaintiff submitted, a 602 appeal concerning a disciplinary matter which had previously been submitted on November 6, 2005 and was resubmitted on December 15, 2005. This is attached as Exhibit B to the supplemental declaration. This other appeal is dated as having been resubmitted on December 15, 2005 and is date-stamped as having been received in the appeals office on December 21, 2005. [3] It was this appeal that was eventually granted at the second level.

**\*9** These two 602 forms, then, were signed by Plaintiff and received by the appeals office on the exact same days. The Retaliation 602, which was screened out the day after it was received, is accompanied by a letter explaining:

The enclosed documents are being returned to you for the following reasons:

***You may only submit one (1) non-emergency appeal within a seven-calendar day period.***

***Furthermore, you failed to attach a copy of your most recent CDC 128G Classification chrono to the appeal. This appeal does not meet the Emergency Appeal requirement set forth in [15 Cal Code Regs. § 3084.7]. Resubmit this appeal after 12/29/05.***

(FAC, Ex. 44 (emphasis in original).)

The Supreme Court's holding in *Woodford* explains:

Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.

548 U.S. at 90–91. If, as the letter indicates, the Retaliation 602 was properly screened out for either of the reasons set forth in the rejection letter, Plaintiff failed to comply with procedural rules and Defendants cannot rightly be blamed for screening it out rather than processing and acting on it.

Although the Retaliation 602 asserts it is an emergency, the record as a whole makes clear it is not. Since at least September, 2005, Plaintiff had been telling prison officials he thought he would not be safe if he were moved to a double cell in the general population, and had been disciplined for refusing to leave administrative segregation. (*See, e.g.,* FAC, Ex. 32–33.) This particular request has every appearance of a repetition of older claims. The additional claim that officers were retaliating against him by issuing CDC 115's and 128's, though new, is likewise not an emergency. There is no suggestion that having the allegedly false reports dismissed or stopping the filing of new reports was a matter of any urgency, and Plaintiff did not ask for any relief concerning this charge.

Applicable regulations deal with the obvious potential for the submission of excessive appeals by prisoners by requiring the suspension of second and subsequent non-emergency appeals filed within the same seven-day calendar period. 15 Cal.Code Regs. § 3084.4(a)(1). Because neither 602 appeal received on December 21, 2005 was an emergency appeal, one of the two was therefore improperly filed and required to be screened out. By

submitting two non-emergency appeals on the same day, Plaintiff was failing to comply with applicable rules.

Accepting the resubmitted 602, which had obviously been pending longer than the Retaliation 602 and which was not primarily a rehash of earlier complaints, was proper. On top of this, Plaintiff failed to attach his Classification chrono to the Retaliation 602 so the reviewing officer would have relevant information concerning his placement. Plaintiff was also specifically told he could cure his errors by resubmitting his Retaliation 602 after December 29, 2005, but he did not do so. And finally, a notice at the bottom of the rejection letter explains the procedure for correcting a screening error; thus, if he thought the wrong appeal was screened out he could have attempted to correct his error, though the pleadings make clear he did not do so.

**\*10** The Court therefore holds Plaintiff did not properly submit his Retaliation 602, which was correctly screened out. Although he had the opportunity to do so, he never resubmitted it. Plaintiff thus failed to exhaust claims raised in this Form 602, and he—not prison officials—was responsible for this.

This objection is therefore **OVERRULED.**

### 5. Objection: The FAC Did Allege a Due Process Claim
The R & R found Plaintiff had not alleged a due process claim in the FAC. (R & R at 19:16–23.) Plaintiff objects that he did in fact bring equal protection and due process claims. (Obj. to R & R at 48) and in his Motion to Amend suggests he stands ready to plead due process violations. (Motion to Amend, ¶ 20.) As discussed above, the only potential claim Plaintiff exhausted before filing suit was a possible procedural due process claim arising from a disciplinary hearing, log number 09–05–B08, which he complained he was not permitted to attend or present evidence at, although he had not waived these rights. (*See* Edwards Suppl. Decl., ¶ 4(c) and Ex. B (Form 602, submitted December 15, 2005, and related documents).) He also alleges other possible due process or equal protection claims, but clearly he has not exhausted any of these.

Even if Plaintiff could show his procedural due process rights were violated and even if he could show he was injured by the violation, neither the FAC nor the objections nor his Motion to Amend give any suggestion

he is attempting to bring a claim based on this disciplinary hearing. Rather, he complains of "false writings." (Obj. to R & R at 48.) The "false writing" is identified as Grannis' declaration, which Plaintiff believes wrongly includes a reference to an ultimate finding of a disciplinary violation. (*Id* ., Motion to Amend ¶ 19.) The Grannis declaration Plaintiff is referring to, however, mentions a later conviction, log number 05–A5–06–005, dated May 10, 2006, and not the earlier disciplinary hearing. (Grannis Suppl. Decl. ¶ 4(a).) Plaintiff also refers generally to Defendants' refusal to report complaints of staff misconduct to the office of internal affairs, a duty he argues is statutorily mandated for prisoners' protection. (Obj. to R & R at 48.)

Plaintiff also vaguely refers to "other procedural and substantive due process violations," and says he has "irrefutable evidence of exhaustion and prevented availability," but says he is "unsure how to plead" them. (Motion to Amend, ¶ 20.) Whatever due process violations the objections may be referring to, it is clear they do not refer to the one possible claim the Court has identified as exhausted, because Plaintiff was able to summarize that claim easily in a Form 602.

Whether the Court construes this as an objection or a request for leave to amend, it must fail. Objections must be specific, not vague and general, and Plaintiff has not shown he can successfully amend to add the claims he wishes to bring. If anything, his Motion to Amend suggests the amendment would be insufficient because, even now, Plaintiff does not know what shape his amendments would take.

**\*11** These objections are therefore **OVERRULED.**

### 6. Objection: Lt. Stratton's Report Was Improperly Withheld
Plaintiff objects to Lt. Stratton's assertion of privilege in his declaration. (Obj. to R & R at 32, 56.) Apparently he means two things by this: first, that the omission of some information renders Lt. Stratton's declaration suspect, and second, that the investigative reports Lt. Stratton refers to should have been disclosed.

Lt. Stratton's declaration refers to reports from "a full fact-finding review into Inmate Andrews' allegations" of an assault by Sgt. Galban and subsequent retaliation and cover-up. "Privilege" is a misnomer here; Lt. Stratton

actually said the reports were confidential, though he cited evidence he found (or looked for and did not find), on which he based his report. Lt. Stratton is correct in stating that reports concerning an investigation of a law enforcement officer's alleged misconduct are treated as confidential. *See, e.g., Williams v. Malfi,* 2008 WL 618895, slip op. at *8 n. 11 (C.D.Cal. Jan. 25, 2008) (discussing procedures used to safeguard confidential law enforcement personnel files before disclosing them to litigants). In any event, it is the evidence underlying the report, and not the report itself that Lt. Stratton mentions.

To the extent Plaintiff is objecting to Defendants' failure to produce these files during discovery, he does not show he ever sought these reports, and in any case his objection comes much too late.

This objection is therefore **OVERRULED.**

### 7. Objection: Plaintiff Should Be Permitted to Amend to Add Claims and Defendants

The R & R recommended denying Plaintiff leave to amend his complaint a second time to add multiple Defendants. Plaintiff then filed a motion for leave to amend (Dkt. no. 96) ("Motion to Amend"), which the Court construes as part of his objections. He also included this in his objections to the R & R. (Obj. to R & R at 24, 49.)

Plaintiff's Motion to Amend is based on claims that he could not properly file the FAC because he was "under distress and fear" and he would now like to add claims he omitted in the FAC. He describes in great detail the emotional turmoil he suffered when, in connection with a transfer, his legal materials were lost. (*See* Decl. in Supp. of Motion to Amend, ¶ 5.) He mentions loss of his legal materials as a factor in his failing to file as good an amended complaint as he had hoped to. Then, unexpectedly, his materials turned up before the Court adopted the first report and recommendation in its Dismissal Order. (*Id.,* ¶ 7.) For some reason, however, Plaintiff claims this was no real help to him, and merely caused him additional stress and delay. (*Id.,* ¶ 9.)

Plaintiff also discusses the Dismissal Order, which the Court initially issued, then withdrew and modified. He says the issuance of the modified order caused him additional turmoil and distress because, he claims, the modified order "completely changed its previous

determinations [and] I was required to start completely over." (*Id.,* ¶ 8.)

**\*12** With regard to the Court's order, this is completely untrue. Plaintiff's claimed turmoil, fear, and distress is either exaggerated or else a gross overreaction. The second, corrected Dismissal Order was issued a mere ten days after the first. It dismissed more claims than the first did, and left unaltered the Court's dismissal of Plaintiff's due process and equal protection claims. Therefore, it is difficult to see how Plaintiff lost very much of his work, if he lost any at all. A reasonable response would have been to leave the initially undismissed claims alone and work on the dismissed ones. When the second order replaced the first, Plaintiff would have realized he had more work than he originally thought, but he would not have had to throw his work out entirely. Even assuming Plaintiff worked assiduously in those ten days, the emotional stress of losing the benefit of some of that work would not reasonably cause emotional disability as Plaintiff now claims it did.

If Plaintiff needed more time to amend, he could have sought it, as evidenced by the fact that his unopposed motion for an extension of time in which to file his FAC was granted. If he filed the FAC too hastily and made errors, he could have sought leave to correct them in light of the Court's order granting him more time in which to amend. Plaintiff identifies no adequate reason to treat the original complaint and FAC as trial runs and allow him to amend again.

In the FAC, Plaintiff attempts to add Defendants, accusing them of being complicit in some kind of conspiracy against him to manipulate cell assignments to cause him harm. (FAC at 55.) He also seeks to add officials whom he accuses of retaliating against him by transferring him to Pelican Bay State Prison. (FAC at 56.) He mentions these claims in his objections to the R & R as well. (Obj. to R & R at 24, 49.) All these proposed claims are unexhausted, so granting leave to add them would be futile.

These objections are therefore **OVERRULED.**

### V. Defendants' Objections

Defendants object to the R & R's recommendation that the FAC be dismissed because Plaintiff has not exhausted

administrative remedies, rather than for failure to state a claim, and that Plaintiff not be charged with a strike.

As provided in 28 U.S.C. § 1915(g),

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

Here, the FAC is being dismissed without leave to amend for failure to exhaust administrative remedies, not on the grounds that it is frivolous, or malicious, or fails to state a claim.

**\*13** Defendants have not cited any authority, however, nor is the Court aware of any, requiring the Court to first reach the issue of whether a complaint states a claim before reaching the exhaustion question, when the same motion urges dismissal on both grounds. *See, e.g., O'Neal v. Price,* 531 F.3d 1146, 1154 n. 9 (9th Cir.2008) (citing with approval the observation of *Tafari v. Hues,* 473 F.3d 440, 444 (2d Cir.2007) that an appeal may be dismissed as premature even though it later proves to be frivolous).

The Ninth Circuit has apparently not addressed the issue of whether dismissal for failure to exhaust administrative remedies counts as a strike under § 1915(g), although a number of other circuits have. *See Daniels v. Woodford,* 2008 WL 2079010, slip op. at \*5 (C.D.Cal., May 13, 2008) (citing cases). *Compare also Kalinowski v. Bond,* 358 F.3d 978, 979 (7th Cir.2004) (holding dismissal for failure to exhaust constitutes strike under § 1915(g)); *Steele v. Federal Bureau of Prisons,* 355 F.3d 1204, 1213 (10th Cir.2003) (same); *Rivera v. Allin,* 144 F.3d 719, 731 (11th Cir.1998) (same); and *Patton v. Jefferson Correctional Ctr.,* 136 F.3d 458, 460 (5th Cir.1998) (same) *with Owens v. Isaac,* 487 F.3d 561, 563 (8th Cir.2007) (holding dismissal for failure to exhaust does not count as a strike); *Green v.*

*Young,* 454 F.3d 405, 406 (4th Cir.2006) (same); *Snider v. Melindez,* 199 F.3d 108, 115 (2nd Cir.1999) (same).

The Ninth Circuit's favorable citation of *Snider* and its progeny *Tafari* in *O'Neal* at 1154 n. 9 for a related point, together with the court's reasoning in *Daniels* persuade the Court dismissal for failure to exhaust should not be counted as a strike under § 1915(g).

Defendants' objections are therefore **OVERRULED.** Bearing in mind future rulings may clarify the law on this point, however, neither Defendants nor any other parties are barred from seeking to have this dismissal counted as a strike for § 1915(g) purposes as appropriate at a later time.

**VI. Conclusion and Order**

For the reasons set forth above, the Court **ADOPTS** the R & R, with the additional explanations set forth above. Plaintiff's request for judicial notice of 15 Cal Code Regs. § 3401.5 is **GRANTED.** All claims against Defendants for money damages are **DISMISSED WITH PREJUDICE.** The Court also **REAFFIRMS** its previous dismissal of all claims against the CDCR. In all other respects the FAC is hereby **DISMISSED WITHOUT PREJUDICE** but **WITHOUT LEAVE TO AMEND,** for failure to exhaust administrative remedies. Plaintiff's request for leave to add claims and Defendants is **DENIED.** Defendants' request that Plaintiff be charged with a strike under § 1915(g) is **DENIED WITHOUT PREJUDICE.**

**IT IS SO ORDERED.**

DAVID RAYMOND ANDREWS, Plaintiff,

v.

M.C. WHITMAN, Corrections Counselor; G.J. JANDA, Chief Deputy Warden; M.E. BOURLAND, Chief Deputy Warden; T. OCHOA, Chief Deputy Warden; C. BUTLER, Captain; W.C. ROBERTS, Captain; F. RUTLEDGE, Sergeant; CALIFORNIA DEPARTMENT OF CORRECTIONS, a public entity; ET ALIA UNIDENTIFIED DEFENDANTS, Defendants.

**REPORT AND RECOMMENDATION FOR ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

NITA L. STORMES, United States Magistrate Judge.

**\*14** David Raymond Andrews (Plaintiff), a California prisoner proceeding pro se, filed an initial complaint under 42 U.S.C. sections 1983 and 1985 on November 3, 2006. The Court dismissed the complaint without prejudice and granted Plaintiff leave to amend. Plaintiff filed a first amended complaint (FAC) against officials at Calipatria State Prison. He alleges that defendants California Department of Corrections and Rehabilitation (CDCR), T. Ochoa, M. Whitman, C. Butler, S. Rutledge III, G. Janda and W.C. Roberts (Defendants) violated his rights to due process, equal protection, petition the court, and to be free from cruel and unusual punishment. FAC at 5.

Defendants filed a motion to dismiss the FAC on these bases: (1) Plaintiff failed to exhaust the required administrative remedies under the Prison Litigation Reform Act (PLRA); (2) the FAC fails to state a claim against any Defendant; and (3) Defendants are entitled to qualified immunity. Defendants also renewed their request that Plaintiff be charged a "strike" for filing a frivolous and malicious lawsuit, pursuant to 28 U.S.C. § 1915(g). Plaintiff opposes.

This Court has reviewed all the pleadings and filings in this case, and **RECOMMENDS** that Defendants' motion be **GRANTED**.

### BACKGROUND

#### The Original Complaint.

Plaintiff's original complaint centered on his allegations that on September 15, 2005, Sergeant Galban sexually abused and threatened Plaintiff in housing unit B–5. Compl. at 7. Over the next several days Plaintiff was shuttled between administrative segregation and the general population due to his threat to the safety and security of the institution. Compl. at 7–8, 15. Plaintiff detailed his thwarted attempts to file an administrative complaint regarding Sergeant Galban's conduct. He alleged due process, equal protection, eighth amendment and first amendment retaliation claims against Defendants.

#### Order Dismissing the Original Complaint.

The Court issued an order on March 28, 2008 that dismissed all the original claims in the complaint, including some with prejudice. [Doc. No. 70.] It dismissed Plaintiff's due process, equal protection and first amendment retaliation claims and one eighth amendment claim without prejudice. The Court dismissed with prejudice the remaining eighth amendment claims involving Defendants' transfer of Plaintiff back into the general population in 2006.

Regarding exhaustion, the Court found that Plaintiff could not have exhausted claims relating to Defendants' transfer of Plaintiff back to the general prison population in 2006. The Court found that exhaustion would have been impossible because Plaintiff alleged he filed an administrative complaint on October 18, 2005, before the claims based on acts in 2006 could have arisen. Mar. 28 Order, p. 7. The Court determined that because Plaintiff could not now exhaust those 2006 claims, he could not have leave to amend them for this suit. *Id.*

**\*15** The Court also noted that Plaintiff did not state any claims against defendant Bourland because Bourland was never served in the action. Mar. 28 Order, p. 8. It also dismissed the CDCR as a Defendant on sovereign immunity grounds. *Id.*

Finally, the Court denied without prejudice Defendants' motion to dismiss for failure to exhaust because Defendants had not met their burden of proving non-exhaustion. Mar. 28 Order, p. 9.

#### Plaintiff's First Amended Complaint.

In general, Plaintiff realleges in the FAC his over-arching claim that Calipatria prison staff prevented him from filing a complaint against Sergeant Galban in 2005 for sexual misconduct, and for a conspiracy to organize stabbings and assaults of selected prisoners by inmates. FAC at 7. He claims Defendants engaged in cruel and unusual punishment by first placing him in Calipatria's administrative segregation and then eventually placing him in the Security Housing Unit (SHU) at Pelican Bay State Prison. Plaintiff alleges that every administrative act—including issuing and hearing various rules violation reports regarding Plaintiff's failure to abide by prison policies and procedures—was done in retaliation for his pursuing a complaint against Sergeant Galban. His allegations span events occurring from 2005 to 2008.

Plaintiff attaches several exhibits to the FAC. Those exhibits show, among other things, results of investigations into Plaintiff's complaints, rules violation reports, reasons for disciplinary decisions and placement notices.

Here, the Court assumes the following alleged facts in the FAC as true. [1]

### 1. Events Before October 18, 2005.

Plaintiff was assaulted, stabbed and hospitalized in August 2003. FAC at 13. But Plaintiff does not identify who stabbed or assaulted him, nor implicates any Defendants in the matter. *Id.* As with the original complaint, Plaintiff does not appear to sue over this incident.

In the days following the incident with Sergeant Galban on September 15, 2005, various prison officials —including some not named as defendants—refused to process Plaintiff's complaint against Sergeant Galban. FAC at 16–20. Plaintiff requested a full Institution Classification Committee (ICC) hearing to discuss the incident. FAC at 16. He complains of correctional officers crafting false rules violation reports during this period. *See, e.g.,* FAC at 21. Also during this time Plaintiff was placed in the "hole" (administrative segregation). FAC at 17.

Plaintiff was transferred back to the general population on September 29, 2005, where he was ridiculed and threatened. FAC at 22–25. The threats and retaliation caused him permanent psychological trauma and suffering, mental stress disorder and a nervous breakdown. FAC at 23.

On September 30, 2005, defendant Roberts refused to take Plaintiff's statement regarding his complaint against Sergeant Galban. FAC at 24. Plaintiff appeared before the ICC again on October 6, 2005. FAC at 25. The ICC was hostile toward Plaintiff and refused to document or acknowledge the circumstances of his complaint. FAC at 25. That day, defendant Whitman directed the drafting of a false rules violation report that falsely accused Plaintiff of refusing to leave administrative segregation on September 29, 2005. FAC at 26. The rules violation report

was executed and delivered to Plaintiff on October 7, 2005. FAC at 26.

**\*16** On October 11, 2005, Plaintiff obtained a 602 administrative grievance form from the prison library. FAC at 26.

Plaintiff received his fourth placement notice for administrative segregation on October 11, 2005. FAC at 26. He said defendant Whitman wrote the notice in retaliation for Plaintiff obtaining forms 1858 and 602 from the law library earlier that day. FAC at 26.

At another ICC hearing on October 14, 2005, Plaintiff was unduly accused of several rule violations and threatened with being deemed a program failure. FAC at 27.

### 2. Submission of Complaint.

On October 18, 2005, defendant Rutledge came to investigate Plaintiff's complaint against Sergeant Galban. FAC at 26–27. Plaintiff says he gave Rutledge a handwritten complaint that day. FAC at 27. Plaintiff never specifies whether the complaint was on the 602 form he had acquired. The complaint was never processed. FAC at 28–29.

Many of Plaintiff's allegations throughout the FAC allege that Defendants thwarted his attempts to follow up with or prosecute his written complaint.

### 3. Events After October 18, 2005.

Certain prison officials, including some not named as defendants, altered some of Plaintiff's rules violation reports. FAC at 21–22. Plaintiff did not learn of these acts until November 3, 2005. FAC at 21.

Plaintiff appeared before the ICC on December 8, 2005. He told them that any reports of rule violations were written in retaliation for inquiring about the status of the complaint he gave to defendant Rutledge on October 18, 2005. FAC at 29–30. Plaintiff's complaint regarding Sergeant Galban was ignored and he was placed one step closer to being "deemed a program failure." FAC at 30.

On December 14, 2005, Lieutenant Stratton told Plaintiff he was investigating the complaint against Sergeant

Galban, and that he would send Plaintiff a copy of the results of his investigation. FAC at 30–31. Plaintiff appeared before the ICC on December 15, 2005. FAC at 31. Defendant Bourland "pretended" to read from a piece of paper that allegedly reported the results of Stratton's investigation and the finding of no misconduct. FAC at 31. Plaintiff saw the paper Bourland was referring to and thought it was actually a blank sheet. FAC at 31. Plaintiff eventually saw the results of Stratton's investigation and believes the papers are false and purposefully misrepresented the actual circumstances. FAC at 38.

Plaintiff alleges that after the ICC hearing Defendants transferred him "to Facility C in order to provide Sergeant Galban with easier access to Plaintiff." FAC at 32, 34. The transfer, however, apparently did not occur. On December 28, 2005 Plaintiff "was issued an administrative segregation unit placement notice despite never having left." FAC at 32, 34.

Within four days of the December 15 hearing, Plaintiff submitted additional grievances—including one mailed to the Director of Corrections in Sacramento—complaining about (1) the conspiracy to set Plaintiff up; (2) Sergeant Galban's sexual misconduct; (3) Defendants' refusal to receive, file or record Plaintiff's complaints; and (4) Defendants' issuance of false rules violations reports. FAC at 33–34.

**\*17** At another ICC hearing on December 29, 2005, Plaintiff was threatened with being placed for two years minimum in the Security Housing Unit (SHU) unless he stopped submitting complaints about Sergeant Galban. FAC at 34. After the hearing, Plaintiff was given a contrived, backdated rules violation report by a non-defendant written in retaliation for his complaints. FAC at 35. Plaintiff was unjustly found guilty of this rules violation report on January 23, 2006. FAC at 37.

In February 2006, in retaliation for his complaint against Galban, Defendants caused guards to send dangerous and aggressive inmates to Plaintiff's cell door so they could terrorize him. FAC at 39. These events emotionally traumatized Plaintiff to the point of insanity. FAC at 40.

On June 12, 2007, a non-defendant correctional officer twisted Plaintiff's arm and threatened him to not file an opposition to Defendants' first motion to dismiss

filed in this case or to file complaints against any other correctional officer. FAC at 41. The officer threatened Plaintiff 12 other times over the next month. FAC at 41. Then, in retaliation for filing his opposition to the first motion to dismiss, Plaintiff was transferred to the SHU in Pelican Bay State Prison. FAC at 42.

#### 4. Conspiracy Allegations.

Plaintiff alleges each Defendant is a member of the Green Wall prison guard gang and has entered a secret agreement to conspire with the other Defendants to terrorize Plaintiff. FAC at 45–56. He alleges Defendants acted "in a deliberate and calculated campaign of intimidation, threat, collusion, complicity, deceit, false record production." FAC at 46. Specifically, he alleges they organized the production of false records, used inmates to inflict cruel and unusual punishment of terror, intimidation and assault, and—with deliberate indifference to Plaintiff's safety—conspired to injure and/or murder him by using "pencil whipping" techniques and assenting to cell assignments that exposed Plaintiff to substantial risk of injury. FAC at 45–46, 47–51.

#### 5. Claims Against the CDCR.

Plaintiff renews his claims against the CDCR. FAC at 9. He alleges the CDCR engages in coverups of interdepartmental practices and retaliated against Plaintiff. FAC at 53–54.

#### 6. Plaintiff's Injuries.

Plaintiff alleges—though not in relation to any specific claim—that he suffered physical injury in the form of "permanent impairment of ability, bone fracture permanent disfigurement and continuing physical and emotional pain and suffering." FAC at 57. He claims Defendants' evil motives exacerbated his emotional pain and suffering, which includes "permanent stress disorder, extreme anxiety, panic attacks, uncontrollable physical tremors, intermittent convulsive muscle contractions, hyperventilation and social phobia." FAC at 57–58.

#### 7. Plaintiff's Attempt to Substitute In Defendants.

Plaintiff alleges the unidentified Defendants are members of the Green Wall prison gang. FAC at 52. He then tries to amend his complaint to also include these correctional officers as Defendants: Galban, Keener, Reynolds, German, Sanchez, Catlett, Heuy, Imada, Sanders, Malcomb, Colio, Trujillo and Pagaza for being complicit in the conspiracy to manipulate Plaintiff's cell assignments to cause him harm. FAC at 55. Plaintiff does not allege specific actions by these Defendants nor relates them to any specific claim.

**\*18** Plaintiff also attempts to add Deputy Director T. Schwartz and Classification Services Chief E. Arnold for transferring him to the SHU in Pelican Bay State Prison in retaliation for exercising his first amendment rights. FAC at 56.

### 8. Prayer for Relief.

Plaintiff requests this relief: a declaration that Defendants' acts and omissions violated Plaintiff's rights; nominal damages in the amount of $1.00; compensatory damages in the amount of $10,000.00 against each Defendant; punitive damages in the amount of $10,000.00 against each Defendant; and costs. FAC at 61. He also seeks a preliminary and permanent injunction ordering Defendants to, essentially, stop fabricating papers and allegations against Plaintiff, stop exposing Plaintiff to dangerous or violent inmates in a non-general population housing unit, refrain from retaliatory actions, expunge any negative entries in Plaintiff's record, and instill a plan where the CDCR itself no longer directly receives complaints against any CDCR employees. FAC at 61–63.

### *DISCUSSION*

### I. *Eleventh Amendment.*

The Eleventh Amendment prohibits damages actions against state officials acting in their official capacities. See *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). It does not, however, "bar actions against state officers in their official capacities if the plaintiffs seek only a declaratory judgment or injunctive relief." *Chaloux v. Killeen,* 886 F.2d 247, 252 (9th Cir.1989) (internal quotations omitted). Nor does it bar damages actions against state officials in their personal capacities. See *Hafer v. Melo,* 502 U.S. 21,

31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). The Eleventh Amendment prohibits only damages actions against the "official's office"—actions that are in reality suits against the state itself—rather than against its individuals. See *id.* at 26; *Will,* 491 U.S. at 71; *Stivers v. Pierce,* 71 F.3d 732, 749 (9th Cir.1995).

Here, Plaintiff sued Defendants in their individual and official capacities for both money damages and injunctive and declaratory relief. FAC at 4, 61. Because of the bar on damages actions against individuals acting in their official capacities, this Court **RECOMMENDS** that Defendants' motion to dismiss Plaintiff's claims for money damages against Defendants in their official capacities be **GRANTED**.

### II. *Exhaustion of Administrative Remedies.*

### A. The PLRA.

Exhaustion is a prerequisite to bringing suit under the PLRA. 42 U.S.C. § 1997e(a); *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Lira v. Herrera,* 427 F.3d 1164, 1169 (9th Cir.2005). In a non-enumerated Rule 12(b)[2] motion to dismiss for failure to exhaust administrative remedies, defendants "have the burden of raising and proving exhaustion." *Wyatt v. Terhune,* 315 F.3d 1108, 1119 (9th Cir.2003). Defendant, and not plaintiff, bears the burden of proving the plaintiff had available administrative remedies that he or she did not utilize. *Id.*

**\*19** To show failure to exhaust, defendants may go outside the pleadings and submit supporting affidavits or declarations. *Id.* The plaintiff, however, must be provided an opportunity to develop a record to refute defendants' prima facie showing of non-exhaustion. *Id.* at 1120 n. 14. In a non-enumerated Rule 12(b) motion to dismiss, the court may look at both parties' submissions outside the pleadings to resolve factual issues regarding exhaustion. *Id.*

The PLRA requires that a plaintiff exhaust only "available" administrative remedies. 42 U.S.C. § 1997(e) (a). For example, if an inmate's appeal is granted at a lower level, the inmate need not appeal because there is nothing left to exhaust. See *Brady v. Attygala,* 196 F.Supp.2d 1016, 1022–23 (C.D.Cal.2002) (finding further exhaustion not required where appeal was granted at the

second level); *Gomez v. Winslow,* 177 F.Supp.2d 977, 985 (N.D.Cal.2001) (allowing an inmate to file suit where he had "won" his inmate appeal by receiving a "partial grant" at the second level). Also, refusing to give an inmate grievance forms could raise the inference the prisoner "exhausted" his administrative remedies. *See Mitchell v. Horn,* 318 F.3d 523, 529 (3rd Cir.2003) (reversing a district court's dismissal of a section 1983 case because it did not consider Plaintiff's allegation that prison officials refused to provide him with the grievance forms); *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001) (concluding that any remedy prison officials prevent a prisoner from utilizing is not an "available" remedy as section 1997(e)(a) defines that term).

**B. The Exhaustion Process.**

"Any inmate ... may appeal any departmental decision, action, condition, or policy perceived by those individuals as adversely affecting their welfare." Cal.Code Regs. tit. 15 § 3084 .1(a). An inmate must complete these steps to exhaust at the administrative level: (1) attempt to informally resolve the problem with the staff member involved, *Id.* at § 3084.5(a); (2) submit a grievance on the CDCR inmate 602 form, *Id.* at § 3084.5(b); (3) appeal to the institution head or his/her designee for a second level of review, *Id.* at § 3084.5(c); and (4) appeal to the Director of CDCR or his/her designee for a third and final level of review, Cal. Dept. of Corr. Operations Manual § 54100.11; *Nichols v. Logan,* 355 F.Supp.2d 1155, 1161 (S.D.Cal.2004). Prisoners must submit their appeal within 15 working days of the event or lower decision being appealed. Cal.Code Regs. tit. 15 § 3084.6(c).

To properly exhaust, a prisoner must complete the administrative review process according to the applicable rules, including meeting deadlines and complying with other critical procedural rules. *Woodford v. Ngo,* 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). If a prisoner concedes that he or she did not exhaust, that concession is a valid ground for dismissal so long as no exception to exhaustion applies. *Wyatt,* 315 F.3d at 1120.

**C. Plaintiff's Attempt to Exhaust.**

**\*20** In the original complaint, Plaintiff alleged he submitted a complaint regarding Sergeant Galban's conduct but that the complaint was never processed.

In their first motion to dismiss, Defendants presented evidence that Plaintiff did not submit a 602 form regarding Sergeant Galban's alleged misconduct or Defendants' subsequent alleged misconduct. *See* Edwards Supp'l Decl. ¶ 7, Grannis Supp'l Decl. ¶¶ 4–5. But Defendants left unexplained other issues regarding exhaustion. First, Defendants did not refute the allegation they thwarted Plaintiff's efforts to file his administrative complaint. Second, they did not explain how—if no complaints were received—they learned of Plaintiff's complaint against Sergeant Galban and sent Lieutenant Stratton to investigate it. Mar. 28 Order, p. 8, ll.24–26. The Court denied without prejudice Defendants' motion to dismiss for failure to exhaust because Defendants did not meet their burden of showing non-exhaustion. Mar. 28 Order, pp. 8–10.

Now, the remaining questions regarding exhaustion are: (1) whether the complaint Lieutenant Stratton investigated satisfied the administrative requirements against the Defendants; and (2) whether Defendants made the required administrative remedies unavailable to Plaintiff.

**1.** *Lieutenant Stratton's Investigation of Plaintiff's Complaint.*

Defendants submit new evidence in this motion to dismiss the FAC to rebut Plaintiff's assertion that he submitted a written complaint regarding Sergeant Galban's conduct. Most relevant, they bring forth the Declaration of Lieutenant Stratton, who explains he was investigating a verbal—and not a written—complaint regarding the alleged incident with Sergeant Galban. On December 14, 2005, Lieutenant Stratton, at the direction of Captain Roberts, interviewed Plaintiff regarding his verbal allegations about the incident with Sergeant Galban. Stratton Decl. ¶ 3. At the time, no paper documentation supported Plaintiff's claims. *Id.* During the interview Stratton advised Plaintiff of the CDCR appeals process and how to properly use the 602 form. *Id.* After the interview, Stratton recommended a single-cell placement and a mental health review for Plaintiff. Stratton Decl. ¶ 4; *see* FAC attachment pp. 25–26.

Next, Plaintiff sent letters to the CDCR Director on December 15 and December 18, 2005 claiming he submitted a citizen's complaint to Sergeant Rutledge in October 2005. Stratton Decl. ¶ 5, Ex. C. The CDCR

Director re-directed the letters to Calipatria's warden, who then tasked Stratton with conducting a fact-finding review into Plaintiff's complaints. Stratton Decl. ¶¶ 5–6, Ex. C. While Stratton did not disclose the full report of that investigation to this Court because of its confidential nature, he shares these specific results from his fact-finding review:

> Andrews did not file a CDCR Form 602 related to his allegations against Sergeant Galvan, or against other staff for their alleged refusal to process his complaints of staff misconduct. I know this for three reasons. First, my confidential reports do not contain any notation indicating an Administrative Appeal Log Number associated with the underlying allegations. It is my practice and custom to record the corresponding Administrative Appeal Log Number for each administrative appeal I am assigned to investigate. The lack of an Administrative Appeal Log Number in my confidential reports indicates that Inmate Andrews did not file a CDCR Form 602 to advance these allegations. Second, Inmate Andrews' own hand-written documentation, in his letter to the Director of CDCR, dated September 15, 2005, shows that he alleges he submitted a citizen's complaint, reference in the California Code of Regulations, Title 15, section 3391(d), to Sergeant Rutledge, rather than a CDCR Form 602. Third, as part of my fact-finding review, I contacted H. Fasolo, then the Appeals Coordinator at Calipatria, who informed me that although Inmate Andrews had previously made use of the administrative appeals process, he had not filed any administrative appeal regarding his allegations against Sergeant Galvan or other

prison officials related to the alleged misconduct.

**\*21** Stratton Decl. ¶ 6.

Plaintiff rebuts Stratton's assertions. While he acknowledges that Stratton interviewed him on December 14, Plaintiff says the interview occurred based on previously-submitted written, and not verbal, complaints. Andrews Decl., p. 2. The next day, Plaintiff appeared before the ICC and learned the investigation of his complaints was completed on December 14. *Id.*

Defendants submit two other declarations in further support of their argument that Stratton investigated a verbal, non–602 form complaint. First, Sergeant Rutledge does not ever remember Plaintiff or any inmate presenting him with a 602 form, or any other written complaint, alleging that another sergeant committed sexual assault. Rutledge Decl. ¶ 2. If Rutledge had received a written complaint, he would have forwarded it to his lieutenant or captain for investigation. Rutledge Decl. ¶ 3. Further, it is not unusual for prison officials to investigate allegations of staff misconduct even when those complaints are not submitted on the required 602 form. Supp. Grannis Decl. ¶ 6. A complaint not presented on the required form may be investigated where they allege serious violations of prison procedures and regulations and contain sufficient detail to be investigated. *Id.*

Investigating a non–602 form complaint does not supplant the required administrative exhaustion process. *Id.* First, the CDCR Department Operations Manual § 54100.25.1 requires inmates to use the 602 form even when allegations of staff misconduct are being separately investigated. *Id.* Second, inmates are routinely advised during the investigation that they have the right to, and should, pursue the administrative grievance process so that they can properly advance their claims. *Id.* Finally, staff complaints investigated outside the administrative appeals process rarely go beyond the institution where they arise. *Id.*

The Court finds that Defendants have presented sufficient evidence to explain how Lieutenant Stratton came to investigate Plaintiff's complaint without Plaintiff's submission of a 602 form. The newly-submitted Stratton Declaration complements the initial Declarations of Grannis, the Chief of the Inmate Appeals Branch, and Edwards, the Appeals Coordinator at Calipatria. These

declarations revealed (1) Plaintiff did not submit a Third Level inmate appeal to the CDCR office against any of the defendants in this lawsuit, or against any prison officer or official concerning any staff conspiracy to cover up staff misconduct (Grannis Decl. ¶¶ 7, 8, 10); and (2) after a search in the Inmate/Parolee Appeals Tracking System for all appeals Plaintiff filed from November 1, 2002 to the date of the initial complaint, no appeal was submitted against defendants Whitman, Janda, Ochoa, Butler or Rutledge, or against any prison officer or official concerning any staff conspiracy to cover up staff misconduct (Edwards Decl. ¶¶ 4, 5). Further, in a supplemental declaration, Edwards explains the subjects of the nine appeals that Plaintiff filed at the second level of formal appeal, describes Plaintiff's letter to the Office of the Director of the CDCR relating to a citizen's complaint Plaintiff allegedly filed against Calipatria prison staff, [3] and affirms Defendants did not locate any appeals alleging that Sergeant Galban sexually assaulted Plaintiff or otherwise acted inappropriately toward him. Edwards Supp. Decl. ¶¶ 4–7.

**\*22** The totality of the new plus the previously-submitted evidence provided together in this renewed motion to dismiss leads this Court to conclude that Plaintiff did not submit the required 602 form as the administrative grievance process requires. Therefore, Plaintiff could not have exhausted any of the claims in this lawsuit, unless exhaustion was made unavailable to Plaintiff.

### 2. Whether Defendants Made Administrative Remedies Unavailable.

Plaintiff alleges that on October 18, 2005, he gave Sergeant Rutledge a written complaint that Defendants never processed. At issue is whether Defendants thwarted Plaintiff's efforts to file that complaint.

Even if the Court assumes that Plaintiff alleges the complaint he submitted was on a 602 form, Defendants presented evidence that they never received it. Sergeant Rutledge explained that he never received a complaint from Plaintiff regarding a prison official's sexual misconduct. Rutledge Decl. ¶¶ 2–3. Even if Plaintiff had submitted a 602 form complaint to Rutledge, by at least December 14, 2005 Plaintiff was on notice the complaint was never received or processed. First, he never received a 602 form in return informing him about proceeding to the next level. Second, Lieutenant Stratton

told Plaintiff on December 14 there was no written record of his complaint and advised him to comply with the administrative grievance process and how to properly use the 602 form. Stratton ¶ 3. Third, Plaintiff was aware of the administrative grievance process during this relevant time, as he submitted three other administrative appeals from November to December 2005. Edwards Supp. Decl. ¶¶ 4(b),(c),(d).

Finally, Plaintiff appears to claim that one of the administrative appeals he advanced through all three formal levels of review satisfies the exhaustion requirement here. *See* Director's Level Decision, FAC attachment p. 2. Plaintiff's administrative complaint for Log No. CAL 06–01961 related to Plaintiff being written-up for a rules violation for his refusal to accept a cellmate. *Id.* While in that appeal Plaintiff complained about staff manipulating Plaintiff's cell placements so that he would be with inmates who would attack him at a staff member's direction, that allegation alone is not sufficiently tied to Plaintiff's over-arching claim at the root of the FAC—that Sergeant Galban sexually assaulted Plaintiff in 2005 and the Calipatria prison staff prevented him from filing a complaint regarding that sexual misconduct.

Though the complaint about staff manipulation may relate to some of Plaintiff's conspiracy claims in the FAC, those FAC claims appear to tie together to a conspiracy against Plaintiff *in retaliation* for his filing, or attempting to file, a complaint against Sergeant Galban. But in the exhausted appeal, Plaintiff did not allege any sexual assault or attempts to thwart Plaintiff's efforts to file a complaint regarding Sergeant Galban. Neither did Plaintiff mention a conspiracy. Finally, Plaintiff did not receive a final decision regarding this appeal until November 30, 2006. Grannis Supp. Decl. ¶ 4(a). Plaintiff had already filed this lawsuit on November 3, 2006. Therefore, even if the administrative appeal could be construed as exhausting Plaintiff's claims—which is not the case—Plaintiff brought the lawsuit prior to exhausting that claim.

**\*23** For the foregoing reasons, this Court **RECOMMENDS** that Defendants' motion to dismiss based on exhausted be **GRANTED.**

### III. *Rule 12(b)(6)* Motion.

Defendants seek to dismiss Plaintiff's FAC for failure to state a claim on these grounds: (1) the first amendment retaliation claims are barred by the favorable termination doctrine; (2) Plaintiff fails to allege a lack of probable cause in his retaliation claim; (3) Plaintiff does not allege any eighth amendment cruel and unusual punishment claims; and (4) Plaintiff does not state a fourteenth amendment equal protection claim.

### A. Legal Standard.

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the plaintiff's claims. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001). The Court must assume all material factual allegations of the complaint as true and all reasonable inferences to be drawn from them. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 338 (9th Cir.1996). Dismissal is proper only where there are insufficient facts to support a cognizable legal theory. *Navarro,* 250 F.3d at 732 (citation omitted).

### B. First Amendment Retaliation Claim.

Plaintiff alleges Defendants retaliated against him for attempting to prosecute his complaint regarding the alleged incident with Sergeant Galban. He alleges Defendants manufactured false disciplinary charges and rules violation reports against him, which led to Plaintiff's confinement in administrative segregation. In the initial Report and Recommendation, this Court recommended finding that Plaintiff adequately stated a first amendment retaliation claim. Defendants objected to this finding, arguing that Plaintiff failed to show his disciplinary convictions were invalid, thereby not fulfilling the requirements of the favorable determination doctrine under *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). They also objected that Plaintiff failed to allege the absence of probable cause under *Hartman v. Moore,* 547 U.S. 250, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). The district judge sustained these objections and dismissed Plaintiff's first amendment claims with leave to amend. Mar. 28 Order, p. 6. The Court specifically directed Plaintiff to respond to these two objections. *Id.*

### 1. *Favorable Termination Doctrine.*

The "favorable termination" requirement applies to civil rights actions filed against state actors under 42 U.S.C. § 1983. *Heck,* 512 U.S. at 483–484. The doctrine bars a plaintiff from suing, under any constitutional theory, "for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," unless the plaintiff first "proves that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 487. The favorable determination doctrine may also apply to an inmate's claims that challenge a disciplinary proceeding that has affected the fact or duration of the inmate's confinement. *Edwards v. Balisok,* 520 U.S. 641, 646–647, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997). But insofar as the disciplinary action affects only a condition of confinement—which includes any deprivation that does not affect the fact or duration of a sentence—the favorable termination doctrine does apply. *Ramirez v. Galaza,* 334 F.3d 850, 856 (9th Cir.2003) (finding the favorable termination doctrine did not apply to a challenge to a prison disciplinary sanction of administrative segregation).

**\*24** Here, Plaintiff alleges he suffered prison disciplinary convictions in retaliation for attempting to exercise a constitutional right. As a result of these convictions, Defendants imposed the punishment of sending Plaintiff to administrative segregation. In the FAC Plaintiff never alleges that the fact or duration of his sentence was affected. Defendants generally argue that the rules violation convictions "resulted in forfeiture of behavioral credits and thus impacted his term of incarceration." Reply, p. 4, ll.26–28. Defendants, however, do not cite to any specific reports that show Plaintiff lost good-time credits. And upon reviewing the attachments to Plaintiff's complaint, this Court has not found an express forfeiture of behavioral credits. *See, e.g.,* FAC Attachment p. 4 (based on Plaintiff's continued refusal to share a cell with another inmate the ICC recommended Plaintiff be sent to the SHU); FAC Attachment p. 12 (stating that as a result of being placed in administrative segregation Plaintiff's credit earning was "subject to change").

Plaintiff has not plead, Defendants have not pointed out, and the Court has not found, an express revocation or impact on the length of Plaintiff's sentence due to

his placement in administrative segregation. Because Plaintiff alleges only a deprivation of the conditions of his confinement, as opposed to the duration of his sentence, the favorable termination doctrine does not apply.

### 2. *Absence of Probable Cause.*

In *Hartman,* the Supreme Court held that, under either a *Bivens* or a section 1983 action based on a malicious or wrongful criminal prosecution, the plaintiff must plead and show the absence of probable cause for prosecuting the underlying criminal charges. *Hartman,* 547 U.S. at 252, 263–266. Specifically, the plaintiff must show the absence of probable cause against criminal investigators for inducing a prosecution in retaliation for protected speech. *Id.* This pleading element applies only to "a particular subcategory of retaliation claims: retaliatory prosecution claims." *Skoog v. County of Clackamas,* 469 F.3d 1221, 1233 (9th Cir.2006).

Defendants did not present, and this Court has not found, a Ninth Circuit case that applies the lack of probable cause element to a retaliation claim in the prison disciplinary context. Further, this Court finds that imposing such a requirement in the prison context would probably be futile. First, Plaintiff already must prove that he suffered an "adverse action"—here, the rules violation reports—that did not have a "legitimate correctional purpose" or advance any "legitimate correctional goal." *Rhodes v. Robinson,* 408 F.3d 559, 567–568 (9th Cir.2005). In other words, Plaintiff must prove that Defendants launched their disciplinary proceedings to punish him for exercising his first amendment right to file a complaint, that the proceedings had a "chilling effect" on him, and that Defendants had no other legitimate purpose or goal in conducting those proceedings, so that their only purpose was to squelch his free speech. In practical terms, satisfying these elements under *Rhodes* essentially shows there was no probable cause to launch the disciplinary proceedings. [4]

**\*25** Based on the lack of authority before it, this Court declines to impose the additional element of pleading lack of probable cause. The requirement under *Hartman* applies to a particular subcategory of criminal prosecutorial retaliation claims based on malicious or wrongful criminal prosecutions. This Court will not recommend applying that requirement to a general retaliation claim in the prison context.

In sum, the FAC adequately addresses Defendants' two objections. First, Plaintiff never pleads that the discipline imposed affected the length of his sentence, so the favorable termination doctrine does not apply. Second, Plaintiff does not allege that the prison disciplinary proceedings were, by nature, malicious or wrongful criminal prosecutions, and this Court has not aware of any relevant authority so stating. Therefore, if the district court rejects this Court's recommendation to grant Defendants' motion to dismiss based on exhaustion, this Court **RECOMMENDS** that Defendants' motion to dismiss Plaintiff's first amendment retaliation claims be **DENIED.**

### C. Eighth Amendment Claims.

Judge Burns' Order addressing the eighth amendment claims in the initial complaint broke down the claims between (1) those based on Defendants' transfer of Plaintiff back to the general population in 2006; (2) conspiracy claims against the named and Doe Defendants; and (3) Defendants' failure to protect Plaintiff from further attacks.

### 1. *Claim Previously Dismissed with Prejudice.*

This Court has already dismissed, with prejudice, Plaintiff's eighth amendment claims based on Defendants transferring Plaintiff back to the general population in 2006. Mar. 28 Order at 10. Plaintiff could not have exhausted these claims because he alleges the acts took place long after he submitted a complaint. Thus, these claims could not have been exhausted. This Court **RECOMMENDS** that the district court **AFFIRM** its prior order that Plaintiff's eighth amendment claims based on Defendants transferring Plaintiff back to the general population in 2006 are **DISMISSED with prejudice.**

### 2. *Conspiracy Claim.*

A plaintiff must plead conspiracy claims with enough specificity to put defendants on notice of the claims against them. *Burns v. County of King,* 883 F.2d 819, 821 (9th Cir.1989). Regarding the conspiracy claims in the initial complaint, Judge Burns found that Plaintiff did not allege any specific facts other than the existence of the Green Wall gang and Officer Galban's assault on him.

Mar. 28 Order, p. 4. He did not allege who conspired to attack him, how the conspiracy resulted in Officer Galban's attack, or that Officer Galban was a member of the gang. *Id.* Judge Burns found that no Defendant or potential Defendant had been given adequate notice of the conspiracy claims against them and dismissed those claims without prejudice. *Id.* at 4–5.

In the FAC, Plaintiff alleges that each Defendant is a member of the Green Wall prison guard gang and has entered a secret agreement to conspire with the other Defendants to terrorize Plaintiff. FAC at 45–56. More specifically, he alleges they organized the production of false records, used inmates to inflict cruel and unusual punishment of terror, intimidation and assault, and—with deliberate indifference to Plaintiff's safety—conspired to injure and/or murder him by using "pencil whipping" techniques and assenting to cell assignments that exposed Plaintiff to substantial risk of injury. FAC at 45–46, 47–51. Plaintiff attaches to the FAC the rules violation and investigatory reports that he alleges are false. Plaintiff does not, however, provide any new details of any alleged conspiracy that resulted in Officer Galban's attack.

 **\*26** This Court finds that Plaintiff has not provided enough new details to sufficiently plead a conspiracy by Defendants to violate Plaintiff's eighth amendment rights. He does not allege who specifically conspired to attack him or how the conspiracy resulted in Sergeant Galban's alleged assault. He does not tie Sergeant Galban to the conspiracy. He does not allege how the production of false records and inmate intimidation resulted in him suffering from cruel and unusual punishment. While he says he suffered physical injury, he does not tie that injury to any specific claim or incident. FAC at 57. And through the FAC, the only injury he says he suffered was in 2003, related to an alleged stabbing by inmate Smith. Plaintiff, however, does not implicate any Defendants in the matter and does not appear to sue over this incident.

Defendants, therefore, are not on notice of any events they participated in that caused any physical injuries to Plaintiff. Therefore, if the district court declines to dismiss this action based on exhaustion, this Court **RECOMMENDS** that Defendants' motion to dismiss Plaintiff's eighth amendment claims based on a conspiracy be **GRANTED** and the claims be **DISMISSED with prejudice.**

### 3. *Failure to Protect Claim.*

The district judge found that Plaintiff did not adequately allege an eighth amendment claim for Defendants' failure to protect Plaintiff from further attacks because Plaintiff did not allege any facts showing there was any substantial risk after the attack by Galban, that Plaintiff was attacked again or otherwise suffered other harm, or that Defendants actually inferred Plaintiff was at further risk. Mar. 28 Order, p. 5. The Court gave Plaintiff leave to amend this claim. *Id.*

A plaintiff may plead an eighth amendment claim for cruel and unusual punishment by alleging failure to take reasonable measures to protect an inmate from serious risk to health and safety. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A prisoner claiming such an eighth amendment violation must show: (1) the deprivation he suffered was "objectively, sufficiently serious" (objective element); and (2) the defendant possessed a sufficiently culpable state of mind (subjective element). *Id.* at 834. Where the claim is predicated upon the failure to protect, the deprivation is deemed to be sufficiently serious if there was a substantial risk that the prisoner would suffer serious harm. *Id.* Regarding the subjective element, a prison official can only be held liable if he (1) is aware of the facts from which he could infer a substantial risk of serious harm, and (2) actually drew that inference. *Id.* at 837.

Plaintiff first alleges he was transferred back to the general population on September 29, 2005, where he was ridiculed and threatened. FAC at 22–25. The attachments to the FAC, however, contradict this allegation. [5] Further, Plaintiff alleges the threats and retaliation due to this move caused him permanent psychological trauma and suffering, mental stress disorder and a nervous breakdown. FAC at 23. Even if the Court assumes the move back to the general population to be true, this general allegation of harm does not amount to the required showing that Plaintiff suffered a deprivation that was objectively, sufficiently serious or that Defendants possessed a culpable state of mind when they transferred Plaintiff back to the general population.

 **\*27** On his second attempt at this eighth amendment claim, Plaintiff does not adequately allege he suffered any harm that would rise to a deprivation of a constitutional right or that Defendants inferred he was at risk of

suffering such a deprivation. If the district court declines to dismiss this action based on exhaustion, this Court **RECOMMENDS** that Defendants' motion to dismiss Plaintiff's eighth amendment claim for failure to protect be **GRANTED** and the claim be **DISMISSED with prejudice.**

**D. Fourteenth Amendment Claims.**

Judge Burns dismissed Plaintiff's due process and equal protection claims with leave to amend. Mar. 28 Order, p. 10. Plaintiff, however, did not reallege those claims. He only generally alleges on one page of the FAC that Defendants acted "for the purpose of denying Plaintiff the equal protection and due process of law as contemplated in the fourteenth amendment." FAC, p. 3. Plaintiff does not allege any of the other elements required to plead such claims. Therefore, if the district court declines to dismiss this action based on exhaustion, this Court **RECOMMENDS** that Defendants' motion to dismiss Plaintiff's fourteenth amendment claims for equal protection and due process be **GRANTED** and the claims be **DISMISSED with prejudice.**

**IV.** *Remaining Issues.*

**A. Qualified Immunity.**

State officials are protected from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To analyze a qualified immunity claim, a court must first determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the defendants violated the claimant's constitutional rights. *See id.; Robinson v. Solano County,* 278 F.3d 1007, 1013 (9th Cir.2002) (en banc); *Valdez v. Rosenbaum,* 302 F.3d 1039, 1044 (9th Cir.2002). The second step requires determining "whether the right was clearly established." *Saucier,* 533 U.S. at 201. The relevant inquiry focuses on "what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards." *Id.* at 208. The plaintiff bears the burden of proving that the right

allegedly violated was clearly established at the time of the violation. *See Sorrels v. McKee,* 290 F.3d 965, 969 (9th Cir.2002).

Here, Plaintiff has adequately alleged a first amendment claim. During the time period of the alleged acts, an inmate's right to be free of retaliation for filling out an administrative grievance was clearly established by existing case law. The question, however, of whether any or all of the Defendants could reasonably have believed that their conduct was lawful is more properly resolved on a motion for summary judgment or at trial, when Defendants are entitled to present evidence on their behalf and the Court may properly consider such evidence. Thus, for the purposes of the instant motion, the Court cannot resolve the issue of whether any or all of the Defendants is entitled to qualified immunity as to the first amendment claim. Further, if the district court adopts this Court's recommendation as to the exhaustion issue, then the question of qualified immunity becomes moot. Therefore, the Court **RECOMMENDS** that Defendants' claim that they are entitled to qualified immunity be **DENIED without prejudice.**

**B. Claims Against the CDCR.**

 **\*28** **AFFIRM** that Plaintiff's claims against the CDCR are **DISMISSED** with prejudice, per Judge Burns' Order of March 28, 2008 Order at 10.

**C. Attempt to Amend the Complaint to Add Additional Defendants.**

To the extent on page 55 of the FAC Plaintiff intends to identify defendants previously sued as Does, or to add 20 new defendants, he was not granted permission to add those defendants. *See* Mar. 28 Order, p. 11 (granting leave only to amend claims and not to add new defendants). Further, a review of the docket shows that Plaintiff has not served, and cannot serve, those proposed defendants within 120 days of filing the complaint, as required by Rule 4(m). Finally, even if Plaintiff could add those new defendants, such an act would be futile because this Court recommends dismissing Plaintiff's FAC for failure to exhaust. This Court **RECOMMENDS** that Plaintiff's attempt to add 20 new defendants to this action be **DENIED.**

**D. Request to Charge Plaintiff with a Strike.**

Defendants again urge the Court to charge Plaintiff with a strike under 28 U.S.C. § 1915(g). They argue Plaintiff filed the lawsuit to punish prison officials for their efforts to hold Plaintiff accountable for his refusal to accept a cellmate, and that it has created a tremendous amount of work for the Court and the Defendants. They also argue that Plaintiff's false accusation that Defendants prevented him from exhausting his administrative remedies goes to the malicious nature of the lawsuit.

An inmate may be charged with a strike if a complaint is dismissed for being frivolous, malicious, or for failing to state a claim. An inmate charged with three strikes cannot bring further civil rights actions. 28 U.S.C. § 1915(g).

This action appears to be Plaintiff's first section 1983 action to proceed in this Court. [6] Upon reviewing the file in this case, Plaintiff's claim that he attempted to exhaust his administrative grievance, but was prevented from doing so, does not appear to rise to the level of maliciousness that Defendants claim. And, there is no sufficient showing that Plaintiff intended to punish prison officials by bringing this suit. Further, Defendants had the burden to prove the defense of non-exhaustion. They did not do so in their first motion to dismiss, which is what brought this case to another round of briefing for a second motion to dismiss. Considering all these facts, the Court **RECOMMENDS** that Defendants' request to charge Plaintiff with a strike be **DENIED.**

**E. Plaintiff's Request for Judicial Notice.**

Plaintiff asks that this Court take judicial notice of 15 Cal.Code Reg. § 3401.5. Federal Rule of Evidence 201 allows a court to take judicial notice of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." "A court shall take judicial notice if requested by a party and supplied with the necessary information. Fed.R.Evid. 201(c). The Court **RECOMMENDS** that Plaintiff's request for judicial notice of 15 Cal.Code Reg. § 3401.5 be **GRANTED,** as its content is capable of accurate determination.

*CONCLUSION*

**\*29** For all of the above reasons, the Court **RECOMMENDS** the following:

1. Defendants' motion to dismiss Plaintiff's claims for money damages against Defendants in their official capacities be **GRANTED.**

2. Defendants' motion to dismiss based on exhausted be **GRANTED.**

3. If the district court rejects this Court's recommendation to grant Defendants' motion to dismiss based on exhaustion, this Court **RECOMMENDS** that Defendants' motion to dismiss Plaintiff's first amendment retaliation claim be **DENIED.**

4. **AFFIRM** that Plaintiff's eighth amendment claims based on Defendants transferring him back to the general population in 2006 are **DISMISSED** with prejudice, per Judge Burns' Order of March 28, 2008 Order at 10.

5. If the district court declines to dismiss this action based on exhaustion, this Court **RECOMMENDS** that Defendants' motion to dismiss Plaintiff's eighth amendment claim based on a conspiracy be **GRANTED** and the claim be **DISMISSED with prejudice.**

6. If the district court declines to dismiss this action based on exhaustion, this Court **RECOMMENDS** that Defendants' motion to dismiss Plaintiff's eighth amendment claim for failure to protect be **GRANTED** and the claim be **DISMISSED with prejudice.**

7. If the district court declines to dismiss this action based on exhaustion, this Court **RECOMMENDS** that Defendants' motion to dismiss Plaintiff's fourteenth amendment claims for equal protection and due process be **GRANTED** and the claims be **DISMISSED** with prejudice.

8. If the district court declines to dismiss this action based on exhaustion, this Court **RECOMMENDS** that Defendants' claim that they are entitled to qualified immunity be **DENIED without prejudice.**

9. **AFFIRM** that Plaintiff's claims against the CDCR are **DISMISSED with prejudice,** per Judge Burns' Order of March 28, 2008 Order at 10.

10. Plaintiff's attempt to amend the complaint to add 20 new defendants to this action be **DENIED.**

11. Defendants' request to charge Plaintiff with a strike be **DENIED.**

12. Plaintiff's request for judicial notice of 15 Cal.Code Reg. § 3401.5 be **GRANTED.**

This report and recommendation of the undersigned Magistrate Judge is submitted pursuant to 28 U.S.C. § 636(b)(1) to the United States District Judge assigned to this case.

**IT IS ORDERED** that no later than *October 31, 2008* any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than *November 10, 2008.* The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst,* 951 F.2d 1153 (9th Cir.1991).

**\*30 IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 857604

Footnotes

1    Regulations provide for the submission of citizens' complaints, 15 Cal.Code Regs. § 3391, but only by non-inmates.

2    The wording in the body of each letter is identical. The letter submitted as an exhibit to the Stratton declaration appears to be an administrative file copy; it uses different type for the date, a designation indicating Warden Scribner's signature on the original was administratively affixed, and identifying numerical information near the top.

3    The declaration erroneously indicates this appeal was received on December 22, 2005, but the date stamp indicates the correct date was December 21. (Edwards Suppl. Decl., ¶ 4(c).) This appears to be a typographical error because other than this, all nine appeals are listed in chronological order.

1    In a Rule 12(b)(6) motion to dismiss, the court must accept as true all material allegations in the complaint, and the reasonable inferences drawn from them, in the light most favorable to the plaintiff. *Thompson v. Davis,* 295 F.3d 890, 895 (9th Cir.2002).

2    Unless otherwise noted, all future references to "Rule(s)" reference the Federal Rules of Civil Procedure.

3    Only non-inmates may file a citizen's complaint. *See* 15 Cal.Code Regs. § 3391(b), (c). Therefore, Plaintiff's allegation that he filed a citizen's complaint could not in any way be construed to supplant the required administrative grievance process that employs the 602 form.

4    This Court has already addressed Plaintiff's satisfying the pleading requirements for a first amendment retaliation claim under *Rhodes. See* Aug. 16, 2007 Rep. & Rec.

5    A report from the Departmental Review Board notes that it was not until September 19, 2006 that Plaintiff was released from administrative segregation, and that he refused to leave it. FAC Attachment, pp. 4, 5.

6    In 2006 Plaintiff filed a different section 1983 action that the Court dismissed sua sponte for lack of proper venue. *See Andrews v. Coyle,* 06cv2278 BEN (JMA).

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 6935254
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
|
Oct. 4, 2012.

**Attorneys and Law Firms**

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Everton Bailey, a federal prison inmate, has commenced this *Bivens*[1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative remedies, I recommend that his

complaint be dismissed on this procedural basis, without addressing its merits.

I. *BACKGROUND*

Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84.[2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see also* VanWeelden Decl. (Dkt. No. 10–4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face.[3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–14; Tr. 32, 84–85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59–60, 85.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 *et seq.; see also Macias v. Zenk,* 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution

of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint. [4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances. [5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for commencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit

team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor. [6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was required to visit inmates in the SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being

met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No." [7] *Id.*

## II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Officer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties. [8] , [9]

## III. *DISCUSSION*

### A. *Governing Legal Principles*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at \*4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,*

495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements. [10], [11] *Id.*

B. *Burden of Proof*

Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003)); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for example—that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R.R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

*6 Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at * 4 and n. 17 (N.D.N.Y. Mar.31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

C. *Application of Governing Legal Principles*

1. *Availability of Administrative Remedy*

In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion

analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

### 2. *Presentation of Defense/Estoppel*

**\*7** The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff cannot fail to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)."). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at \*3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at \*5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at \*4 (citing *Bennett v. James,* 737 F.Supp.2d

219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and cooperate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at \* 3. Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

### 3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at \*10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at \*10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at \*6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from

relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

**\*8** During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

## IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).*

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6935254

## Footnotes

1    *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2    The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. ____".

3    According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

4    Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

5    Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr. 43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

6    Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

7    During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

8    The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco,* 814 F.2d 859, 862 (2d Cir.1987). At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

**9**     Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

**10**    In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantially exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford* would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

**11**    In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by McRae v. City of Hudson, N.D.N.Y., January
21, 2015

2009 WL 3486379
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Henry BENITEZ, Plaintiff,
v.
HAM, et al., Defendant.

No. 9:04–CV–1159.
|
Oct. 21, 2009.

**Attorneys and Law Firms**

Henry Benitez, Malone, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Timothy P. Mulvey, Esq., of Counsel,
Syracuse, NY, for Defendants.

### *ORDER*

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge George H. Lowe,
duly filed on the 30th day of September 2009. Following
ten days from the service thereof, the Clerk has sent me the
file, including any and all objections filed by the parties
herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. Defendants' motion for summary judgment (Dkt.
No. 92) is GRANTED IN PART AND DENIED IN
PART. The following claims are dismissed pursuant to
Defendants' motion for summary judgment: (1) the Eighth

Amendment claims against Defendants Weissman and
Richards arising from their treatment of Plaintiff's severe
body itch, left wrist, and right ankle; (2) the claims
against Defendant Ham; (3) the claims against Defendants
Brousseau and Donelli for their handling of Plaintiff's
grievance regarding Defendant Ham; (4) the retaliation
claim against Defendants Nephew, Desotelle, and Snyder
based on their filing of misbehavior reports against
Plaintiff; (5) the claims against Defendants Brousseau,
Donelli, Girdich, and Eagen regarding their handling of
Plaintiff's grievances regarding the events of January 2
and 3, 2003; (6) the claim against Defendant LaClair; (7)
the claims against Defendant Bullis; and (8) the Eighth
Amendment claim against Defendants Weissman and
Girdich for approving the imposition of the loaf diet.

It is further ordered that the following claims are dismissed
sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B): (1)
Plaintiff's retaliation claim against Defendants Weissman
and Richards; and (2) the claim against Defendant Selsky.

It is further ordered that the following claims survive
summary judgment and sua sponte review and proceed to
trial: (1) the conspiracy claim against Defendants Wright,
Snyder, and Duprat; (2) the excessive force claim against
Defendants Snyder, Duprat, Bogett, and Wright; (3)
the retaliation claim against Defendants Snyder, Duprat,
Bogett, and Wright arising from the use of excessive force;
(4) the retaliation claim against Wright arising from his
filing of a misbehavior report against Plaintiff; (5) the
failure to intervene claims against Defendants Bezio and
Duprat; (6) the retaliation claim against Defendant Bezio;
and (7) the Eighth Amendment claims against Defendants
Hensel, Goodwin, Kuhlman, and Costello.

3. The Clerk of the Court shall serve a copy of this Order
upon all parties and the Magistrate Judge assigned to this
case.

**IT IS SO ORDERED.**

### *REPORT–RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me for
Report and Recommendation by the Honorable Norman

A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Henry Benitez alleges that 21 employees of the New York Department of Correctional Services ("DOCS") violated his constitutional rights by subjecting him to excessive force, denying him medical care, falsifying misbehavior reports, denying him assistance to prepare for a disciplinary hearing, and imposing a loaf diet on him as punishment. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 92.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. FACTUAL AND PROCEDURAL SUMMARY

**\*2** Unless otherwise noted, the facts in this summary are taken from Plaintiff's verified complaint [1]. Plaintiff, a New York state prisoner, was transferred to Upstate Correctional Facility on September 14, 2002. (Dkt. No. 1 ¶ 8.) Plaintiff alleges that he was suffering from "ongoing severe pain in his left hand wrist and right ankle due to nerve damage." (Dkt. No. 1 ¶ 9.) From the time he arrived at Upstate, he made "numerous requests" to Defendant Drs. Evelyn Weissman and Richards to receive a medication called Atarax that had been prescribed to him previously at Auburn Correctional Facility, an MRI of his left wrist and right ankle, and a referral to an orthopedist. (Dkt. No. 1 ¶ 12.) Plaintiff alleges that Defendants Weissman and Richards refused his requests for Atarax, the MRI, and the referral "in retaliation for his having filed numerous formal grievances against them [and other Upstate medical staff members] within a period of two years, and for the purpose of preventing [Plaintiff] from demonstrating in a civil rights action against prison officials the extent of the injuries of his left hand and right foot." (Dkt. No. 1 ¶ 12–13.) Plaintiff alleges that, as a result, he continues to experience severe pain in his left wrist and right ankle, numbness in different areas of his left hand and right foot, an inability to walk or stand for longer than ten minutes, and ongoing severe body itch. (Dkt. No. 1 ¶ 14.)

Regarding Plaintiff's requests for Atarax, Dr. Weissman declares that Atarax is

> non-formulary, which means we do not regularly stock that medication, and special approval must be obtained to issue that medication.

However, Vistaril and Hydroxyzine is the substitute we use for the same purpose as Atarax. Hydroxyzine is the generic form of Atarax. I prescribed Vistaril for [P]laintiff on October 2, 2002 ... Dr. Richards requested approval for Atarax in April 2004 and it was suggested that [P]laintiff try Claritin, which had become a formulary (regularly stocked) drug. Dr. Richards requested approval for Atarax again in June 2004, and the response was that if the generic (Hydroxyzine) had not worked, it was unclear that the branded drug Atarax would work ... Plaintiff's complaints of itching were not ignored, and he [was] constantly given medication for itching.

(Weissman Aff. ¶¶ 4–10.)

As to Plaintiff's other claims, Dr. Weissman declares:

> Regarding [P]laintiff's claim that his request for an MRI was denied, Dr. Richards and I felt, in our medical judgment, an MRI was not warranted. However, because his pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003. Regarding [P]laintiff's claim that his request for an orthopedic consult was denied, that is incorrect. Dr. Richards requested an orthopedic consult for [P]laintiff on August 19, 2003 and [P]laintiff saw an orthopedist on September 4, 2003. The orthopedist ... did not suggest an MRI and determined that [P]laintiff was improving and "... there is not much else that I can suggest for Henry to improve or accelerate his healing. For the time being, I am just going to suggest that he be patient."

**\*3** (Weissman Aff. ¶¶ 11–13.)

Plaintiff was transferred to Elmira Correctional Facility Reception Center on November 7, 2002, for a court appearance. Upon arrival, Plaintiff informed Defendant Correction Officer Ham that he suffered "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage, and that the handcuffs and leg irons ... were too tight and causing him swelling and enormous

pain." Ham observed that Plaintiff's hands were swollen. However, he refused to remove or loosen the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred to Five Points Correctional Facility three hours later. (Dkt. No. 1 ¶ 9.)

Plaintiff was returned to the Elmira Correctional Facility Reception Center on November 14, 2002. At that time, Plaintiff again informed Defendant Ham that the restraints were too tight and were causing him swelling and extreme pain. Defendant Ham "again verbally acknowledged that [Plaintiff]'s hands were ... swollen" but refused to remove the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred out of the facility three hours later. (Dkt. No. 1 ¶ 10.)

On January 2, 2003, Defendant Correction Officers Nephew and Desotelle strip-frisked Plaintiff[2] in preparation for transferring Plaintiff for a court appearance. Defendant Sgt. Snyder was also in the room. When they had completed the search, Defendant Nephew ordered Plaintiff to put on his coat. Plaintiff told Nephew that wearing the coat would "severely aggravate his continuing body itch stemming from his hepatitis virus." (Dkt. No. 1 ¶ 15.) Defendant Snyder called Plaintiff a "spick" and threatened to forcibly put the coat on Plaintiff. Plaintiff told Defendants Snyder, Nephew, and Desotelle that he would sue them if they used force. (Dkt. No. 1 ¶ 15.)

Shortly thereafter, Defendant Lt. Wright approached Plaintiff and asked him if he had spit at staff. Before Plaintiff could respond, Defendant Wright ordered several guards to get a video camera and put a "spittle mask" on Plaintiff. After the guards did so, Defendant Wright escorted Plaintiff to his cell. He asked Plaintiff to explain what had happened in the frisk room. Plaintiff said that Defendant Wright would not believe his account of the incident, accused Defendant Wright of interfering with his court trip and unjustifiably putting a spittle mask on him, and said he would sue Defendants Wright and Snyder. Defendant Wright told Plaintiff that "transportation vans don't have cameras. You're going to learn not to spit ... [at] staff and ... threaten us with lawsuits." (Dkt. No. 1 ¶ 16.)

After Defendant Wright left Plaintiff's cell, Defendant Capt. Bezio approached and asked Plaintiff to explain what happened in the frisk room. Plaintiff told Defendant

Bezio what had happened, denied that he had threatened to spit at a staff member, and asked Defendant Bezio to protect him while he was being transported to court. Defendant Bezio told Plaintiff to be "up and ready to go to court" and that "people don't like to get spat ... on."[3] (Dkt. No. 1 ¶ 19.)

**\*4** On January 3, 2003, Defendant Correction Officer Duprat escorted Plaintiff to the transportation van. Defendant Duprat told Plaintiff to "remember what we told you about the van."[4] As they were walking, Plaintiff saw Defendant Bezio and told him that Defendant Duprat had threatened to "employ physical abuse" against him in the van. Defendant Bezio shrugged his shoulders. (Dkt. No. 1 ¶ 20.) Defendant Duprat drove Plaintiff in a van to a different building, where he called Defendant Snyder "to arrange a beating" of Plaintiff. After the phone call, Defendant Duprat drove Plaintiff back to the first building. When they arrived, Defendant Snyder entered the rear section of the van and told Plaintiff that "you like ... suing us. Wright, my boss, doesn't like that and sent this as a reminder." Defendant Snyder then punched and slapped Plaintiff, who was in handcuffs and leg irons, in the face and the back of his head, knocking him unconscious. When Plaintiff revived, Defendants Duprat and Correction Officer Bogett entered the rear section of the van and punched and slapped Plaintiff several times in the head, chest, and right ear. When Plaintiff began to bleed from his right inner ear, Defendants Duprat and Bogett tied a spittle mask on Plaintiff's head. (Dkt. No. 1 ¶¶ 21–22.)

When Plaintiff arrived at Five Points Correctional Facility later that day, he notified Defendant Nurse Hensel that he had been bleeding from his inner right ear due to a beating by Upstate officials, that he was suffering severe pain in his head and right ear, and that he wanted to be examined by a doctor. Defendant Hensel refused to examine Plaintiff, made no record of his complaints, and refused to schedule Plaintiff to see a doctor.[5] (Dkt. No. 1 ¶ 23.)

Plaintiff's medical record from Five Points indicates that on January 3, 2003, the day he arrived, Plaintiff was seen by Nurse Nancy O'Connor Ryerson. She noted that Plaintiff arrived via van with cuffs and chains and spit net, and that he complained of pain and itching. "It was noted that he takes Naprosyn and Benadryl, and he was escorted to 12 Building. Apparently Naprosyn was not

sent with him and it is a medication for which he would need a prescription from a doctor. Since this was not an emergency, the procedure is to place the inmate on the regular physician call-out list for an appointment. Nurse Ryerson also noted that he was Hepatitis C positive." (Bannister Aff. ¶ 5.)

On January 4, 2003, Plaintiff notified Defendant Nurse Goodwin [6] that he needed emergency medical treatment because of severe pain in his liver, left wrist, and right ear, and that he wanted medicine for his severe body itch. Defendant Goodwin refused to examine Plaintiff, made no record of his complaints, and did not provide any treatment to Plaintiff. (Dkt. No. 1 ¶ 24.)

Plaintiff's medical records from Five Points indicate that on January 4, 2003, Plaintiff was seen by Nurse "Goon" at his cell after security staff told the nurse that Plaintiff stated his asthma was acting up. Nurse "Goon" 's note indicated that Plaintiff never acknowledged shortness of breath and that she checked Plaintiff's transfer form and the computer and found that he had no history of asthma. (Bannister Aff. ¶ 6.)

**\*5** On January 5, 2003, Plaintiff alleges that he informed Defendant Nurse Kuhlman [7] that he had been bleeding from his inner right ear and that he was suffering from an ongoing, extreme body itch due to his hepatitis C and B virus. Defendant Kuhlman told Plaintiff that she would review his medical chart and return to him. Defendant Kuhlman refused to examine Plaintiff, made no record of his medical complaints, and refused to provide treatment. (Dkt. No. 1 ¶ 25.)

Plaintiff's medical records from Five Points show that Defendant Kuhlman saw Plaintiff on January 5, 2003. Her note indicates that she went to his cell for his 4:00 p.m. medications and he complained about the way she distributed the medication [8]. He stated that the nurse would be getting a grievance. He was uncooperative and argumentative. (Bannister Aff. ¶ 7.)

On January 6, 2003, Plaintiff informed Defendant Nurse Costello that he needed treatment due to great pain in his right ear and his ongoing severe body itch. Defendant Costello refused to examine Plaintiff's right ear, made no record of his medical complaint, and refused to promptly provide medical treatment. (Dkt. No. 1 ¶ 26.)

Plaintiff's medical records from Five Points show that Defendant Costello saw him on January 6, 2003. She noted that he was complaining that he needed an emergency prescription for severe headache and severe itching. She noted that he requested a prompt examination by a physician. She instructed him that she would have to find the chart or the transfer paperwork because nurses cannot give medications until they verify allergies and prescription orders. (Bannister Aff. ¶ 8.)

Plaintiff's medical records from Five Points show that he was seen again the next day by Defendant Costello. Plaintiff's chart was still not available, and he again requested a prescription for itching, Hepatitis C, and a physical exam. Defendant Costello again noted that she would have to verify his requests and then possibly schedule an appointment. (Bannister Aff. ¶ 9.)

Plaintiff's medical records from Five Points show that he was seen later that day by non-defendant Nurse Gardner at the request of security staff. Plaintiff stated "I was knocked out and beaten everywhere" and claimed that he had a lump on his head. Nurse Gardner examined him and noted no redness, bruising, or bump on head. (Bannister Aff. ¶ 10.)

Plaintiff alleges that Wright, Nephew, Desotelle, and Snyder retaliated against him for his threat to sue them by filing false misbehavior reports. (Dkt. No. 1 ¶¶ 17–18.) Defendant Correction Officer LaClair was assigned to assist Plaintiff with preparing for the subsequent disciplinary hearing. (Defs.' Ex. 14.)

According to a misbehavior report filed by Defendant LaClair, when he went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get him what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant La Clair "informed him the interview was over and left the area." (Defs.' Ex. 15 at 2–3.) Plaintiff alleges that Defendant LaClair "falsified [the] misbehavior report against [Plaintiff] in order to refrain" from assisting Plaintiff. (Dkt. No. 1 ¶ 35.)

**\*6** On January 15, 2003, Defendant Bullis arrived at Plaintiff's cell and informed him that he would conduct the disciplinary hearing that day. He asked Plaintiff whether

he wanted to attend the hearing. Plaintiff said that he did not because Defendant LaClair had not assisted him, but asked Defendant Bullis to interview Defendant LaClair and an inmate witness about the events leading to Defendant LaClair's refusal to provide assistance. Plaintiff asked Defendant Bullis not to impose a loaf diet as a punishment if he found Plaintiff guilty because the loaf diet caused Plaintiff severe abdominal pains and constipation due to his hepatitis. (Dkt. No. 1 ¶ 36.)

Defendant Bullis did not interview Defendant LaClair or the inmate witness. He found Plaintiff guilty and imposed a penalty of 21 days of the loaf diet. (Dkt. No. 1 ¶ 37.) Plaintiff alleges that Defendants Weissman and Girdich "maliciously" approved the penalty in "reckless disregard" of the pain it would inflict on Plaintiff. (Dkt. No. 1 ¶ 38.) Plaintiff alleges that "[d]ue to the danger that the ... loaf diet posed" to his well-being, he refused to eat it. As a result, he lost 33 pounds and suffered severe abdominal pains and emotional distress that exacerbated his hepatitis. (Dkt. No. 1 ¶ 39.)

Plaintiff alleges that Defendants Brousseau, Donelli, Selsky, Girdich, and Eagen mishandled the grievances and appeals he filed or attempted to file regarding his claims. (Dkt. No. 1 ¶¶ 28–34, 40.)

Plaintiff filed this lawsuit on October 6, 2004. The parties proceeded to discovery, which proved contentious. Plaintiff successfully moved to compel responses to his discovery requests, and thereafter filed four motions for sanctions seeking Defendants' compliance with the order compelling discovery. (Dkt.Nos.56, 73, 94, 103.) I granted each of those motions in part. (Dkt. Nos.62, 79, 99, 107.) As is relevant here, I ruled that because not all of the pages of the Five Points Movement and Control Log Book for November 14, 2003, had been provided to Plaintiff before the original was destroyed, Plaintiff could ask the Court to draw factual inferences favorable to him. (Dkt. No. 99 at 2.) I ruled that because Defendants could not locate the SHU log book for January 2003, Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing pages for January 14, 2003" in opposition to Defendants' motion for summary judgment. (Dkt. No. 99 at 1–2.) I noted that Defendants had told Plaintiff that photographs taken of him on January 10, 2003, would be produced but that, without explanation, Defendants could no longer find the photographs. Accordingly, I ruled that Plaintiff could ask

the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 99 at 2–3.) I ordered that if photographs taken of Plaintiff on January 3, 2003, no longer existed, Plaintiff could similarly request favorable inferences. (Dkt. No. 99 at 3.)

**\*7** On March 16, 2009, Plaintiff again moved for sanctions. (Dkt. No. 103.) I noted that the photographs from January 3 and 10, 2003, were still missing. (Dkt. No. 107 at 1.) I reiterated that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 107 at 2.)

Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 92.) Plaintiff has opposed the motion. (Dkt. No. 109.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [9] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [10]

In determining whether a genuine issue of material [11] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [12]

## B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), as a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. [13] For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

**\*8** Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [14] or (2) a challenge to the legal cognizability 14 of the claim. [15]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [16] The main purpose of this rule is to "facilitate a proper decision on the merits." [17] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [18]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556–57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not *shown*—that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [19] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [20] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [21] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [22] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [23] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [24] In addition, an opportunity to amend is not required

where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[25]

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[26] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[27] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[28] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[29]

### III. ANALYSIS

#### A. Weissman/Richards Health Care

Plaintiff alleges that Defendant Drs. Weissman and Richards violated his Eighth Amendment right to adequate medical care by prescribing an ineffective medication for his body itch, refusing to order an MRI of his left wrist and right ankle, and refusing to refer him to an orthopedist. (Dkt. No. 1 ¶ 12.) Defendants move for summary judgment of these claims, arguing that (1) Plaintiff did not suffer from a serious medical need; and (2) Defendants were not deliberately indifferent. (Dkt. No. 92–10 at 13–14.)

#### 1. *Eighth Amendment Standard*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and

must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corr. Med. Dept.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

**\*10** The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* A "serious medical need" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3)

the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

If the claim is that treatment was provided that was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment medical care claim, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105; *Wilson v. Seiter,* 501 U.S. 294, 302–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835; *Ross v. Giambruno,* 112 F.3d 505, at *2 (2d Cir.1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a

constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703 (citation omitted). Medical decisions that are contrary to accepted medical standards may constitute deliberate indifference if "the doctor has based his judgment on something other than sound medical judgment." *Stevens v. Goord,* 535 F.Supp.2d 373, 385 (S.D.N.Y.2008) (citation omitted). For instance, a doctor may be deliberately indifferent if he opts for an easier and less efficacious treatment plan "not on the basis of [his or her] medical views, but because of monetary incentives." *Chance,* 143 F.3d at 704.

### 2. *Atarax*

**\*11** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to prescribe *Atarax.* (Dkt. No. 1 ¶¶ 1, 12.) Defendants move for summary judgment, arguing that Plaintiff's claim regarding the *Atarax* medication fulfills neither the objective nor the subjective prong of a viable Eighth Amendment claim. (Dkt. No. 92–10 at 13–14.)

Regarding the objective prong, the parties' briefs focus entirely on whether Plaintiff suffered from a serious medical need.[30] Applying the analytical framework described above, I must first address whether Plaintiff was actually deprived of adequate medical care. I find that there is a triable issue of fact that the refusal to prescribe *Atarax* constituted a denial of adequate or reasonable care. I base this finding on the fact that Defendant Dr. Richards twice requested approval to prescribe *Atarax,* noting that he had already tried treating Plaintiff with Hydroxyzine, Vistril, Allegra, and Zytrec "all of which worsened [Plaintiff's] condition." (Weissman Aff. Ex. A–9.)

Because Plaintiff alleges that he was provided with inadequate treatment, rather than completely deprived of treatment, the next inquiry is whether the *deprivation*

was sufficiently serious. This requires an analysis of what harm, if any, the failure to prescribe Atarax caused or will cause Plaintiff. Here, there is simply no evidence before the Court that being deprived of Atarax harmed or threatened to harm Plaintiff. Rather, the evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation. Therefore, I find that Plaintiff has not raised a triable issue of fact regarding the objective prong of his Eighth Amendment claim regarding Defendant Weissman and Richards' failure to prescribe Atarax.

Having found that there is not a triable issue of fact as to the objective prong, it is not necessary to analyze the subjective prong. However, I will briefly address the parties' contentions for the sake of completeness. Defendants argue that the refusal by Defendants Weissman and Richards to prescribe Atarax was not deliberate indifference because the decision of "which medicine to prescribe for a particular condition amount[s] to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92–10 at 13–14.) Defendants' argument regarding deliberate indifference is based entirely on the affidavit of Dr. Weissman. [31] Interestingly, in contrast to her statements regarding Plaintiff's orthopedic care (discussed below), Dr. Weissman does *not* state that the decision not to prescribe Atarax was based on her medical judgment. Rather, she states that Atarax is a "non-formulary" medication and "special approval must be obtained to issue that medication." (Weissman Aff. ¶ 4.) Dr. Weissman does not say who was authorized to approve the use of non-formulary drugs. Dr. Richards twice requested approval to prescribe Atarax to Plaintiff. (Weissman Aff. ¶¶ 7–8, Ex. A–9 and A–10.) In one of these requests, he stated that the other medications he had tried "worsened" Plaintiff's condition. (Weissman Aff. Ex. A–9.) His requests were denied. (Weissman Aff. ¶¶ 7–8, Ex. A–9 and A–10.) This sequence of events raises two interesting and related issues: does the acquiescence of Dr. Weissman and Dr. Richards to a course of treatment for Plaintiff with which they disagreed constitute deliberate indifference? [32] Or does the fact that the decision not to prescribe Atarax was made by someone other than Dr. Weissman and Dr. Richards indicate that they were not personally involved with, and thus not liable for, the decision? See *Johnson v. Wright*, 412 F.3d 398 (2d Cir.2005) (claims against administrators who refused

to approve treatment requested by treating physicians survived summary judgment; treating physicians were not named as defendants). The parties have not addressed these issues, and, due to my finding that there is no triable issue of fact as to the objective prong and in the absence of briefing, I decline to do so.

### 3. *MRI and Orthopedic Referral*

**\*12** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to take MRIs of his left wrist and right ankle or to refer him to an orthopedist who could determine if medical footwear was necessary to correct his right foot problem. (Dkt. No. 1 ¶ 12.) Defendants argue that (1) any deprivation was not sufficiently serious to trigger Eighth Amendment scrutiny; and (2) they were not deliberately indifferent. (Dkt. No. 92–10 at 13–14.) Defendants are correct.

Even if one assumes that the deprivation was sufficiently serious to trigger Eighth Amendment scrutiny, the evidence does not raise a triable issue of fact that Defendants were deliberately indifferent. Regarding the MRIs, Dr. Weissman declares that "Dr. Richards and I felt, in our medical judgment, that an MRI was not warranted." Because Plaintiff's "pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003." (Weissman Aff. ¶ 11.) In September 2003, Dr. Richards referred Plaintiff to an orthopedist for treatment of his left wrist because, after completing physical therapy, Plaintiff was "still having [a] considerable amount of pain." (Weissman Aff. Ex. A–13.) The orthopedist examined Plaintiff and reported that Plaintiff "seems to be improving at this point and unfortunately, there is not much else I can suggest for Henry to improve or accelerate his healing." (Weissman Aff. Ex. A–14.)

Plaintiff filed a grievance a year after seeing the orthopedist complaining that Dr. Richards and Dr. Weissman "willfully refused to examine my injuries, to provide medical treatment for said injuries, and to order an MRI test of said injuries conducted ... in an attempt to prevent me from proving the precise nature and extent of my injuries in a court of law and, thus, to dissuade me from suing." (P.'s Decl. in Opp'n to Aff. of Evelyn Weissman, Ex. D.) Plaintiff argues that this grievance proves that he "continued to complain to these

defendants about continuing severe pain in his left wrist and right ankle for more than one year after he had been evaluated by the orthopedist." (Dkt. No. 109 at 24–25.) The grievance Plaintiff cites does not mention any "continuing severe pain in his left wrist and right ankle." Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims against Defendants Weissman and Richards. [33]

**B. Ham/Grievances**

Plaintiff alleges that Defendant Ham violated his Eighth Amendment rights by refusing to loosen or remove his restraints on November 7 and 14, 2002. (Dkt. No. 1 ¶¶ 9–10.) He further alleges that Defendants Brousseau and Donelli violated his constitutional rights by refusing to forward his grievance regarding Defendant Ham for an investigation. (Dkt. No. 1 ¶¶ 28–29.) Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham; (2) Plaintiff's allegations are not "sufficiently serious" to implicate the Eighth Amendment; and (3) Plaintiff's allegations regarding the handling of his grievance do not raise a constitutional claim. (Dkt. No. 92–10 at 21–23, 38.)

*1. Exhaustion of Administrative Remedies*

**\*13** Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham. (Dkt. No. 92–10 at 21–23.) I find that there is a triable issue of fact that Plaintiff's failure to receive a final decision on the merits of his grievance regarding Defendant Ham was justified.

The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [34] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [35] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program. [36]

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. [37] First, an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. Third, a grievant may appeal to the central office review committee ("CORC") within seven (7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process. [38] If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

Here, Plaintiff declares that on the day of the first incident with Defendant Ham, he asked a Five Points Correctional Facility officer for a grievance form. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 17.) The officer did not give Plaintiff a form and told Plaintiff that he would need to file his grievance at Elmira Correctional Facility, where the incident had occurred. *Id.* Although an April 16, 2004, revision to the inmate grievance procedure specified that grievances "may only be filed at the facility where the inmate is housed even if it pertains to another facility," (*Id.,* at Ex. A), the procedures in effect at the time Plaintiff asked for a form to file a complaint against Defendant Ham were silent as to which facility should handle a particular grievance. Even if one assumes that the Five Points officer's advice was correct under DOCS practice at the time, it is difficult to see how Plaintiff

could have filed a grievance at Elmira. Plaintiff was only at Elmira Correctional Facility for a few hours after receiving these instructions from the officer, during which time he was handcuffed and shackled. (Dkt. No. 1 ¶ 10.)

**\*14** On December 8, 2002, Plaintiff filed a grievance at Upstate Correctional Facility regarding Defendant Ham's actions. (Dkt. No. 92–4, Ex. 4.) Defendant Brousseau, the IGP supervisor, returned the grievance to Plaintiff because Plaintiff failed to submit it within fourteen days of the incident. [39] *Id.*

On December 18, 2002, Plaintiff submitted a grievance complaining that Defendant Brousseau's refusal to accept the previous grievance violated his constitutional right of access to the courts because it prevented him from exhausting his claims against Defendant Ham. (Dkt. No. 92–4, Ex. 4.) The IGRC denied Plaintiff's grievance on December 26, 2002. *Id.* The IGRC stated that Defendant Brousseau's refusal was proper because Plaintiff "did not present any mitigating circumstances that would warrant accepting the [untimely] complaint ... [Plaintiff] had been back at the facility since 11/15/02 and had filed one grievance during this time period, this shows he had ample opportunity to file this complaint in a timely manner." *Id.* The grievance to which the IGRC's decision referred was a grievance regarding Defendant Richards' denial of Atarax. (Dkt. No. 92–4, Ex. 3.) Because that event occurred at Upstate Correctional Facility, there was no ambiguity about where Plaintiff's grievance should be filed.

Plaintiff appealed the IGRC's determination to the Superintendent. (Dkt. No. 92–4, Ex. 4.) Defendant Donelli affirmed the IGRC's determination on January 15, 2003. *Id.*

Defendants assert that Plaintiff "did not appeal [Defendant Donelli's decision] to the CORC." (Dkt. No. 92–3, Stmt. Pursuant to Rule 7.1(a)(3) ¶ 8.) For this proposition, they cite Exhibit 4 and to the Affidavit of Karen Bellamy. *Id.* Exhibit 4 shows that Plaintiff signed an "Appeal Statement" stating that he wished to appeal Defendant Donelli's decision to CORC. (Dkt. No. 92–4, Ex. 4.) The Appeal Statement was signed by a grievance clerk. *Id.* That exhibit also shows that Defendant Brousseau responded to an inquiry regarding the status of the grievance by stating that the grievance had been received by CORC and was being processed. *Id.*

However, the record before the Court does include any final disposition from CORC of Plaintiff's appeal. The appeal does not appear in a list provided in the Affidavit of Karen Bellamy of grievances on which Plaintiff received a final decision from CORC. (Bellamy Aff. Ex. B.) Thus, Plaintiff never received a decision from CORC and did not exhaust his administrative remedies. *See Mendez v. Artuz, No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, at \* 4, 2002 WL 313796, at \* 2 (S.D.N.Y. Feb.27, 2002).* Even if CORC had acted on Plaintiff's appeal, I assume that CORC would have upheld the IGRC's finding and denied Plaintiff's grievance as untimely. In that event, I would find that Plaintiff had not exhausted his administrative remedies because "courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004).

**\*15** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his administrative remedies. [40] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [41] Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [42] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [43] Justification "must be determined by looking at the circumstances which might understandably lead ... uncounseled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Here, the silence of the regulations regarding which facility was the proper venue for Plaintiff's grievance, the bad advice that Plaintiff received from the officer at Five Points, and Plaintiff's inability to follow that advice because he was shackled during

his entire tenure at Elmira create a triable issue of fact that Plaintiff's failure to file a timely grievance regarding Defendant Ham's actions was justified. I therefore find that summary judgment is not appropriate on the grounds that Plaintiff failed to exhaust his administrative remedies.

### 2. *"Sufficiently Serious"*

Defendants argue that there is not a triable issue of material fact regarding Plaintiff's Eighth Amendment claim against Defendant Ham because "Plaintiff's alleged 'enormous pain' is nothing more than *de minimis* for Constitutional purposes." (Dkt. No. 92–10 at 22–23.)

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. *See Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994). When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantoness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and quotation marks omitted).

> **\*16** In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments

necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9 (officers who punched and kicked handcuffed and shackled inmate used unconstitutional force although inmate required no medical attention) (citations omitted); *Davidson,* 32 F.3d at 30 n. 1 (officers who placed handcuffs too tightly on inmate in retaliation for filing lawsuits used unconstitutional force where inmate suffered permanent scarring and numbness); *compare Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, at *24, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness and swelling and no improper or wanton motive was suggested for the officers' actions). [44]

Plaintiff does not allege that he was permanently injured as a result of Defendant Ham's actions. Plaintiff states that he suffered "enormous pain" and "severe swelling" as a result of being shackled so tightly. (Dkt. No. 109 at 38.) Although this would not end the Eighth Amendment inquiry if Defendant Ham's actions had been more egregious, there is simply no evidence in the record that Defendant Ham applied restraints to Plaintiff "maliciously and sadistically to cause harm" or in a way that was "repugnant to the conscience of mankind." Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims against Defendant Ham.

### 3. *Grievances*

Plaintiff alleges that Defendants Brousseau and Donelli "refused to forward" his complaint regarding Defendant Ham's actions "for an investigation" (Dkt. No. 1 ¶¶ 28–29), thus violating his First Amendment right to petition the government. (Dkt. No. 109 at 50–51.) Defendants argue that Plaintiff's allegation fails to state a constitutional violation. (Dkt. No. 92–10 at 38.) Defendants are correct.

> The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and

consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

**\*17** *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–370 (W.D.N.Y.2005). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham.

**C. Frisk Room Incident/Aftermath/Grievances**
Plaintiff alleges that he threatened to sue Defendants Nephew, Desotelle, and Snyder if they used force to put on his coat. (Dkt. No. 1 ¶ 15.) Plaintiff alleges that, in retaliation for this threat, (1) Defendant Wright conspired with Defendant Snyder to subject Plaintiff to excessive force; (2) Defendants Duprat, Snyder, and Bogett used excessive force on Plaintiff; (3) Defendants Wright, Nephew, Desotelle, and Snyder falsified misbehavior reports against Plaintiff; and (4) Defendant Bezio failed to intervene to prevent the use of excessive force.[45] (Dkt. No. 1 ¶¶ 16–22.) He further alleges that Defendants Brousseau and Donelli would not allow Plaintiff to file a grievance regarding these events. (Dkt. No. 1 ¶¶ 30–31.) Finally, he alleges that Defendants Girdich and Eagen denied the grievance he filed regarding Defendant Brousseau and Donelli's refusal to process Plaintiff's grievance. (Dkt. No. 1 ¶¶ 32–34.)

*1. Exhaustion of Administrative Remedies*
Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding any of these claims. (Dkt. No. 92–10 at 25–26, 31.) Plaintiff declares that on January 13, 2003, he attempted to submit a grievance to Defendant Brousseau regarding the claims. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 26.) Plaintiff declares

that Defendant Brousseau "refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27.

On April 3, 2003, Plaintiff submitted a grievance complaining that Defendant Brousseau had refused to accept his January 13 grievance. (Dkt. No. 92–4, Ex. 8.) Plaintiff requested "[t]hat Ms. Brousseau submit the grievance complaint in question to the IGRC. Alternatively, that I be allowed to resubmit a copy of the grievance complaint in issue to the IGRC before moving for judicial intervention." *Id.* CORC denied the grievance on May 28, 2003, stating that it had "not been presented with sufficient evidence to substantiate any malfeasance" by Defendant Brousseau. *Id.*

As discussed above, Second Circuit precedent holds that a defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner,* 366 F.3d 161, 163–64 (2d Cir.2004). A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Thus, Plaintiff's declaration that Defendant Brousseau refused to accept his grievance raises a triable issue of fact that Defendants are estopped from asserting the exhaustion defense. Therefore, I recommend that the Court reject Defendants' argument that they are entitled to summary judgment as a result of Plaintiff's failure to exhaust his administrative remedies.

*2. Conspiracy*
**\*18** Defendants move for summary judgment of Plaintiff's conspiracy claim.[46] They argue that (a) Plaintiff has not shown that there was any meeting of the minds; and (b) the claim is barred by the intracorporate conspiracy doctrine.[47] (Dkt. No. 92–10 at 31–32.)

*a. Meeting of the Minds*
Defendants argue that Plaintiff has not provided any factual basis for a finding that Defendants had a "meeting of the minds" as required for a conspiracy claim. (Dkt. No. 92–10 at 31–32.) I find that Plaintiff has raised a triable issue of fact.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Plaintiff has raised a genuine issue of material fact as to all of the elements of his § 1983 conspiracy claim. Plaintiff states in his verified complaint that Defendant Wright told him that " '[t]ransportation vans don't have cameras. You're going to learn not to spit ... [at] staff and not threaten us with lawsuits.' " (Dkt. No. 1 ¶ 16.) The next day, Defendant Duprat called Defendant Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) Defendant Snyder entered the transportation van in which Plaintiff was sitting, said "Wright, my boss, doesn't like [you suing us] and sent this as a reminder," and then punched and slapped Plaintiff until Plaintiff lost consciousness. (Dkt. No. 1 ¶¶ 21–22.) A reasonable jury could, if it found Plaintiff's testimony credible, return a verdict for Plaintiff on his conspiracy claim based on this evidence.

b. *Intracorporate Conspiracy Doctrine*
Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. (Dkt. No. 92–10 at 32.) Under that doctrine, employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97–cv–1337, 1999 U.S. Dist. LEXIS 3164, at *5, 1999 WL 151702, at *2 (W.D.N.Y. Mar.17, 1999). "This doctrine applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied the doctrine to § 1983 cases. [48] The district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983 without discussing whether it was appropriate to do so. In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006), the Southern District

squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases because "the doctrine's logic is sound" and not "a single case within the Second Circuit [has] held the doctrine inapplicable to Section 1983 claims." I will assume that the doctrine applies in § 1983 cases.

**\*19** Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06–2951, 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05–CV–1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005). I find that the exception applies here because, as in *Medina,* Defendants allegedly conspired to retaliate against Plaintiff for his exercise of his right to access the courts. Therefore, I recommend that the Court deny Defendants' motion for summary judgment of the conspiracy claim against Defendants Wright, Snyder, and Duprat.

3. *Excessive Force*
Defendants move for summary judgment of Plaintiff's excessive force claims. They argue that there is no "objective evidence" that any excessive force was used. (Dkt. No. 92–10 at 33–35.) Specifically, Defendants argue that:

> [P]laintiff alleges that ... [D]efendants Snyder, Bogett, and Duprat punched him, slapped him, knocked him unconscious, and caused his ear to bleed. There is no objective evidence to support this conclusory allegation. An unusual incident report was generated because of [P]laintiff's behavior on January 3, 2003, but the report specifically states that no force was used on [P]laintiff. To the extent [P]laintiff is claiming the alleged force

was used in the van, after the incidents described in the unusual incident report, there is no objective evidence to support this conclusion either. Plaintiff's medical records for January 3, 2003, upon arrival at Five Points C.F. indicate "arrived via van with cuffs & chains and spit net-complains of pain and itching," that [P]laintiff was escorted to 12 building, and that [P]laintiff was given Naprosyn and Benadryl. There is no indication of bleeding, or that [P]laintiff reported being assaulted in the January 3, 2003 entry, or the entries for January 4, 5, and 6, 2003. Plaintiff does report being "knocked-out and beaten everywhere" on January 7, 2003, while still at Five Points C.F., but without any record of reporting this type of conduct for the four (4) days prior to January 7, 2003, it is not credible that the incident to which [P]laintiff is referring occurred on January 3, 2003. Moreover, the January 7, 2003, entry does not indicate whether [P]laintiff was claiming to have been "knocked out and beaten everywhere" by staff or other inmates. Plaintiff has no objective evidence to support his claim of excessive force.

**\*20** (*Id.* at 34–35, citations omitted.)

Defendants refer to Plaintiff's allegations as "conclusory." "Conclusory" means to "express[ ] a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dictionary* 284 (7th ed.1999). Plaintiff's allegations are not conclusory. Rather, Plaintiff describes the incident in detail. The ultimate determination of whether or not Defendants used excessive force, then, will rest largely on the finder of fact's judgment regarding Plaintiff's credibility.

Defendants, naturally, do not find Plaintiff credible. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Defendants do not explicitly say so, their argument that "Plaintiff has no *objective* evidence" is apparently an attempt to invoke a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race,* 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffreys,* the Second Circuit held that in the "rare circumstance where

the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys,* 426 F.3d at 554.

The narrow holding of *Jeffreys* is not applicable here for three reasons. First, in order for the *Jeffreys* exception to apply, the plaintiff must rely "almost exclusively on his own testimony." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff is not relying "almost exclusively on his own testimony." Rather, because of Defendants' conduct during discovery, Plaintiff is relying on his own testimony plus adverse inferences drawn in his favor. As a consequence of Defendants' conduct during discovery, I ordered that Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing photographs of January 3 and 10, 2003." (Dkt. No. 107 at 2.) Plaintiff requests that the Court draw the following inference in his favor: "That were the Defendants to provide the Court with the missing photographs taken of [Plaintiff] at Five Points C.F. on January 3, 2003, such photographs would reveal that [Plaintiff] had bruises and lacerations on his face, right ear, and chest." (Dkt. No. 109 at 46–47 n. 15.) The Court grants Plaintiff's request and draws the inference in his favor.

Second, in order for the *Jeffreys* exception to apply, Plaintiff's testimony must be "contradictory or incomplete." *Jeffreys,* 426 F.3d at 554. Here, Plaintiff's testimony is neither contradictory nor incomplete. In *Jeffreys,* the plaintiff, who alleged that police officers had beaten and defenestrated him, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Here, in contrast, Plaintiff has never given a contradictory account of the events in the transportation van on January 3, 2003. Although Defendants stress that Plaintiff's medical records do not show that Plaintiff reported the incident upon arrival at Five Points, Plaintiff states in his verified complaint that he informed Defendant Hensel on the day of the incident that he had been beaten by Upstate guards. He further alleges that Defendant Hensel made

no record of his complaint. (Dkt. No. 1 ¶ 23.) Plaintiff's claim regarding Nurse Hensel is corroborated by the log book entry that shows that he was taken to see Nurse Hensel on January 3, 2003, and the fact that Defendants did not provide the Court with a medical record of that visit with Plaintiff's other Five Points Medical Records. (Defs.' Resp. to P's 1st Req. for Produc. of Docs., Ex. E at 11; Bannister Aff.) As Defendants admit, Plaintiff's medical records show that within four days of the incident he reported that he had been "knocked-out and beaten everywhere." (Bannister Aff. ¶ 10.) In addition, unlike in *Jeffreys,* Plaintiff has specifically identified the officers whom he alleges beat him.

**\*21** Third, the *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys,* 426 F.3d at 551–52. Here, Plaintiff's version of events has not been contradicted by an affidavit from any of the officers whom he alleges used excessive force because Defendants' motion for summary judgment is not supported by any affidavit from Defendants Snyder, Duprat, or Bogett. The only proof offered by Defendants that they did *not* use excessive force is a notation on a January 3, 2003, unusual incident report stating "Use of Force: No." (Dkt. No. 92–5, Ex. 16.)

Accordingly, I find that Plaintiff has presented sufficient "objective evidence" to raise a triable issue of fact that Defendants Snyder, Duprat, and Bogett subjected him to excessive force. [49] I therefore recommend that the Court deny Defendants' motion for summary judgment of this claim.

#### 4. *False Misbehavior Reports*

Plaintiff alleges that Defendants Nephew, Desotele, Snyder, and Wright filed false misbehavior reports against him "in retaliation for his having threatened to sue them." (Dkt. No. 1 ¶¶ 17–18.) Defendants argue that (a) Plaintiff forfeited his claim by refusing to attend the disciplinary hearing on the charges; and (b) they would have issued the misbehavior reports regardless of any alleged retaliatory motive. (Dkt. No. 92–10 at 25–29.)

#### a. *Forfeiture*

Defendants argue that Plaintiff "cannot establish a prima facie case of retaliation, because although he claims the misbehavior report[s were] 'falsified,' he has forfeited his opportunity to present any evidence calling into question the truth of the misbehavior report[s] by refusing to attend the disciplinary hearing." (Dkt. No. 92–10 at 26.) Defendants cite *Brewer v. Kamas,* 533 F.Supp.2d 318 (W.D.N.Y.2008). In order to analyze *Brewer,* a review of Second Circuit precedent governing prisoners' allegations regarding false misbehavior reports is required.

A prisoner's claim that a correctional officer filed a false misbehavior report may implicate two separate constitutional provisions: (a) the Fourteenth Amendment right to procedural due process; or (b) the right not to be retaliated against for exercising First Amendment rights such as the right of access to the courts or the right to petition the government for redress of grievances.

In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural due process liability. *Freeman,* 808 F.2d at 953–54.

**\*22** Two years after its *Freeman* opinion, the Second Circuit addressed the second variety of false misbehavior claim—a claim that an officer filed a false misbehavior report in retaliation for the exercise of constitutionally protected rights—in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). In *Franco,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for his cooperation with an investigation by the state Inspector General into incidents of inmate abuse at Attica Correctional Facility. *Franco,* 854 F.2d at 586. The defendants moved for summary judgment, arguing that Plaintiff could not state a claim because he had

received a disciplinary hearing that complied with *Wolff v. McDonnell* and resulted in a guilty finding based on "some evidence." *Id.* The trial court granted the defendants' motion, relying on *Freeman. Id.* The trial court noted, however, "that under [t]his reading of *Freeman*, the mere provision of procedural due process could eliminate all liability in any case in which prison officials had intentionally filed false and unfounded charges." *Id.* The Second Circuit settled "the substantial and troublesome questions raised in th[e] case" by holding that "[a]lthough our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's First Amendment rights of access to the courts and to petition for redress of grievances. *Id.* at 590 (citations omitted). Accordingly, the Second Circuit reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at 590–91.

In *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995), the Second Circuit again clarified that the holding in *Freeman* is doctrinally different and distinct from the type of retaliation claim discussed in *Franco.* In *Jones,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for filing an administrative complaint against one of their colleagues. *Jones,* 45 F.3d at 678. At his disciplinary hearing, the prisoner was denied the opportunity to call witnesses. *Id.* He was found guilty and sentenced to serve 120 days in the SHU. *Id.* After he had served his SHU sentence, DOCS official Donald Selsky reversed the decision and expunged it from the prisoner's record. *Id.* at 679. The prisoner filed suit. *Id.* The trial court granted the prison officials' motion for summary judgment, finding that the prisoner's allegations against the corrections officers failed to state a claim under *Freeman* and that the prisoner's allegations against the hearing officer failed because any procedural due process defects in the hearing had been cured by Selsky's reversal of the decision. *Id.*

**\*23** On appeal, the Second Circuit stated that *Freeman* did not provide the "proper framework" for a decision in the case for both "factual and doctrinal reasons." *Jones,* 45 F.3d at 679. Factually, the case was distinguishable "if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him." *Id.* Doctrinally, the Second Circuit stated that "we have held

that a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances, and that this right is distinct from the procedural due process claim at issue in *Freeman.*" *Id.* at 679–80. The Second Circuit vacated the trial court's judgment and remanded for further proceedings. *Id.* at 680.

This brings us to *Brewer.* In *Brewer,* a prisoner alleged that correction officers filed false misbehavior reports against him in retaliation for filing grievances. *Brewer,* 533 F.Supp.2d at 323. The prisoner refused to attend his disciplinary hearing and was found guilty. *Id.* He sued the officers in federal court. *Id.* at 324. The officers moved for summary judgment. *Id.* The court granted the motion, finding that the prisoner could not establish that the disciplinary charges were false because (1) he refused to attend his disciplinary hearing; (2) he offered no "explanation as to why he chose not to attend the hearing so as to rebut the charges, or why it was otherwise constitutionally deficient"; and (3) he did not "offer ..., in opposition to [d]efendants' motion, any evidence calling into question the truth of the ... charges." *Id.* at 330. (citation omitted). Based on these three factors, the court stated that the plaintiff "was provided with the requisite opportunity to rebut the alleged false disciplinary charges, as required by due process, and Plaintiff, by failing to do so, has waived his right to further challenge the validity" of the misbehavior report. *Id.* (citation omitted).

*Brewer* is not applicable here for three reasons. First, the case is factually distinguishable. In *Brewer,* the prisoner did not offer any explanation for his refusal to attend the hearing, did not explain why the hearing was constitutionally deficient, and did not offer any evidence calling into question the truth of the charges. *Brewer,* 533 F.Supp.2d at 330. Here, Plaintiff has explained that he did not attend the hearing because Defendant LaClair refused to assist him prepare a defense, has argued that the hearing was constitutionally deficient because Defendant Bullis did not call Defendant LaClair and an inmate as witnesses, and has offered his own testimony under penalty of perjury to rebut Defendants' version of the events leading to the misbehavior reports.

Second, Defendants overstate the holding of *Brewer.* The court did not hold that the prisoner had forfeited his opportunity to present evidence calling into question the

truth of the misbehavior report simply by refusing to attend the disciplinary hearing. Rather, the court held that the prisoner had waived his right for three reasons, with the refusal to attend being only one of them. *Brewer,* 533 F.Supp.2d at 330.

 **\*24** Third, because the prisoner in *Brewer* asserted a retaliation claim rather than a procedural due process claim, the precedent relied upon by the *Brewer* court is puzzling. The portion of the decision cited at length by Defendants relies on (1) *Freeman,* which is a procedural due process case; (2) language from *Jones* that discusses the ways in which *Jones* was *factually* distinguishable from *Freeman,* rather than the language in *Jones* clarifying that a retaliation claim is *doctrinally* different from the type of procedural due process claim at issue in *Freeman;* and (3) quotes from *Franco* that summarize the procedural due process holding in *Freeman,* rather than quotes from *Franco* discussing the proper analysis of a retaliation claim. Thus, although the prisoner in *Brewer* raised a retaliation claim, the court analyzed it as a procedural due process claim.

Because I find that *Brewer* is factually distinguishable from Plaintiff's case, that the holding in *Brewer* is not as broad as Defendants suggest, and that *Brewer's* legal analysis rests on a line of cases to which the Second Circuit has referred as the improper framework for analyzing a retaliation claim, I recommend that the Court reject Defendants' argument that Plaintiff waived his claim regarding the allegedly false and retaliatory misbehavior reports by failing to appear at his disciplinary hearing. [50]

### b. *Regardless of retaliatory motive*

Defendants argue that there is "ample evidence" that Defendants "would have issued the misbehavior report[s] regardless of whether [P]laintiff threatened to sue them." (Dkt. No. 92–10 at 28, 30.)

"An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right ... states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have

received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citations and quotation marks omitted).

Here, the misbehavior reports by Defendants Nephew, Desotelle, and Snyder charged Plaintiff with creating a disturbance, committing an unhygenic act, refusing a direct order, and making threats. (Dkt. No. 92–5, Ex. 11.) As the Second Circuit explained in *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), the "most serious charge" in a misbehavior report that includes charges of creating a disturbance, making threats, and refusing a direct order is the direct order charge. *Hynes,* 143 F.3d at 655, 657. Here, Plaintiff admits that he did not put on his coat when Defendant Nephew ordered him to do so. (Dkt. No. 1 ¶ 15.) Thus, Defendants have met their burden of showing that Plaintiff would have received the same punishment even absent the allegedly retaliatory motive by demonstrating that there is no dispute that Plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claims against Defendants Nephew, Desotelle, and Snyder arising from the January 2, 2003, misbehavior reports.

 **\*25** The misbehavior report by Defendant Wright charged Plaintiff with committing an unhygenic act, harassment, and threats. [51] (Dkt. No. 92–5, Ex. 11.) The most serious of these charges was the threat charge.

Plaintiff admits that when Defendant Wright asked him to explain what happened in the frisk room, Plaintiff "responded that Wright would not believe his account of the incident, that Wright had unjustifiably interfered with [his] court trip ... and that [Plaintiff] would sue Wright and Snyder for their unlawful acts and actions." (Dkt. No. 1 ¶ 16.) This is certainly an admission to the harassment charge. DOCS Rule 107.11 provides as follows: "An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). However, it is not an admission to the threat charge, which requires that "[i]nmate[s] shall

not ... make any threat, spoken, in writing, or by gesture." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B) (3)(I). Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the retaliation claim against Defendant Wright.

5. *Failure to Intervene*

Plaintiff alleges that Defendant Bezio violated his constitutional rights by failing to intervene to protect Plaintiff from Defendants Duprat, Bogett, and Snyder. (Dkt. No. 1 ¶¶ 19–20.) Defendants move for summary judgment, arguing that there was no underlying constitutional violation with which to intervene. (Dkt. No. 92–10 at 36–37.)

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a jury could determine that Defendant Bezio failed to intervene to protect Plaintiff. Plaintiff's verified complaint states that on the day before the incident he asked Defendant Bezio to protect him while he was being transported to court. (Dkt. No. 1 ¶ 19.) Plaintiff alleges that Defendant Duprat made a threatening comment as he escorted Plaintiff to the transportation van and that Plaintiff informed Defendant Bezio of the threat before they reached the van. (Dkt. No. 1 ¶ 20.) Defendant Bezio merely shrugged his shoulders. *Id.* None of the

defendants has filed an affidavit contradicting Plaintiff's version of events. As discussed above, there is a triable issue of fact that a constitutional violation occurred with which Defendant Bezio could have intervened. Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the failure to intervene claim against Defendant Bezio. [52]

6. *Grievances*

**\*26** Plaintiff alleges that Defendants Brousseau, Donelli, Girdich, and Eagen violated his constitutional rights by refusing to allow him to file a grievance regarding the events of January 2 and 3, 2003. (Dkt. No. 1 ¶¶ 30–34.) Defendants move for summary judgment, arguing that Plaintiff has not stated a constitutional claim. (Dkt. No. 92–10 at 38.) As discussed above in Section III(B) (3), Defendants are correct. Therefore, I recommend that the Court grant Defendants' motion and dismiss the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding the handling of Plaintiff's grievances.

**D. Disciplinary Hearing/Sentence**

Plaintiff raises several claims regarding the conduct of his disciplinary hearing, his disciplinary sentence, and his appeal of the sentence. Specifically, he claims that (1) Defendant LaClair violated his right to due process by falsifying a misbehavior report against Plaintiff to avoid serving as Plaintiff's pre-hearing assistant (Dkt. No. 1 ¶ 35); (2) Defendant Bullis violated his due process rights by failing to call an inmate and Defendant LaClair as witnesses (Dkt. No. 1 ¶¶ 36–37); (3) Defendant Bullis violated his Eighth Amendment rights by sentencing him to a 21–day loaf diet (Dkt. No. 1 ¶ 36–37) and Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the loaf diet (Dkt. No. 1 ¶ 38); and (4) Defendant Selsky violated Plaintiff's right to due process by affirming Defendant Bullis' disposition (Dkt. No. 1 ¶ 40).

1. *LaClair*

Plaintiff alleges that Defendant LaClair falsified a misbehavior report against him in order to avoid serving as Plaintiff's pre-hearing assistant "and for the purpose of depriving Benitez of due process." [53] (Dkt. No. 1 ¶ 35.)

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly

suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000).

Punishment implicates a protected liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular punishment; and (2) the punishment imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, no liberty interest is implicated. As a result of being found guilty of the disciplinary charges, Plaintiff was sentenced to a loaf diet. The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant LaClair. [54]

### 2. *Failure to Call Witnesses*

**\*27** Plaintiff alleges that Defendant Bullis violated his right to due process by failing to call the witnesses that Plaintiff requested. (Dkt. No. 1 ¶ 37.) Defendants move for summary judgment, arguing that Plaintiff cannot state a due process claim because he was not deprived of a liberty interest. (Dkt. No. 92–10 at 39–40.) As discussed above, Defendants are correct. *McEachin,* 357 F.2d at 200. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

### 3. *Imposition of Loaf Diet*

Plaintiff alleges that Defendant Bullis violated his Eighth Amendment rights by imposing the loaf diet on him and that Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the punishment. (Dkt. No. 1 ¶¶ 37–38.) Defendants move for summary judgment of the claim, arguing that (a) Plaintiff failed to exhaust his administrative remedies; and (b) Defendants were not deliberately indifferent. (Dkt. No. 92–10 at 14–20.)

#### a. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff did not exhaust his administrative remedies regarding his Eighth Amendment claims against Defendant Bullis because he did not appeal the grievance he filed regarding Defendant Bullis' imposition of the loaf diet to the CORC. (Dkt. No. 92–10 at 14.) Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his Eighth Amendment claim against Defendants Weissman and Girdich because he did not file a grievance at all. (*Id.* at 15.)

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. N.Y. Comp.Codes R. & Regs. tit.7, § 701.3(e)(1)-(2). For Tier III superintendent hearings, such as Plaintiff's, the inmate must file an appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8. The appeal must be filed within 30 days of the inmate's receipt of the hearing officer's written disposition. N.Y. Comp.Codes R. & Regs. tit.7, § 254.8. Plaintiff raised the issue of the loaf diet in his appeal of the disciplinary sentence. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, Ex. D.) Defendant Selsky denied the appeal. *Id.* at Ex. E. Therefore, Plaintiff exhausted his administrative remedies as to his claim against Defendant Bullis.

Plaintiff declares that on January 18, 2003, he submitted a grievance to Defendant Brousseau complaining about Defendant Bullis' imposition of, and Defendants Weissman and Girdich's approval of, the loaf diet. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, ¶ 26.) He declares that Defendant Brousseau "deliberately refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27. Therefore, as discussed above, there is a question of fact that Defendants are estopped from asserting the exhaustion defense.

#### b. *Deliberate Indifference*

**\*28** Defendants argue that Plaintiff has not raised a triable issue of fact that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they ordered and approved that the loaf diet be imposed on Plaintiff. (Dkt. No. 92–10 at 15–20.) Defendants are correct.

Where a prisoner claims that punishment imposed following a disciplinary hearing violates his Eighth Amendment rights, the proper analysis of the subjective prong of the claim requires the court to "consider whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that ... context, whether the officials were deliberately indifferent to [the prisoner's] health and safety." *Trammell v. Keane,* 338 F.3d 155, 163 (2d Cir.2003).

Here, the order imposing the loaf diet on Plaintiff was reasonably calculated to restore prison discipline and security. DOCS regulation allow the imposition of the loaf diet as punishment where, *inter alia,* the inmate is found guilty of committing unhygenic acts in the SHU or the inmate is a long-term SHU inmate who is disruptive and who has lost all other available privileges. (Dkt. No. 92–8, Bezio Aff., ¶ 5.) Here, Plaintiff was found guilty of committing unhygenic acts in the SHU. Moreover, Plaintiff is a long-term SHU inmate (he will remain in the SHU until June 3, 2021, and in keeplock until July 1, 2025) who has lost package, commissary, and phone privileges and has lost 11 years worth of good time credits. (Bezio Aff., ¶ 6.) Therefore, the imposition of the loaf diet was reasonably calculated to restore prison discipline.

There is no evidence that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they imposed and approved of the loaf diet. To establish deliberate indifference, an inmate must prove that (1) the defendant was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the defendant actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702–703. Here, although Plaintiff told Defendant Bullis that the loaf diet would cause him severe abdominal pains and constipation due to his hepatitis (Dkt. No. 1 ¶ 36), his medical record did not support his assertion. Dr. Weissman declares that "there is nothing in his medical record that indicates that [Plaintiff] is medically unable to receive the restricted diet penalty ... [T]he fact that [P]laintiff is Hepatitis C positive does not mean he cannot receive the restricted diet because Hepatitis C is not a contraindication for the restricted diet." (Weissman Aff. ¶¶ 14–15.) Thus, there is no evidence in the record indicating that Defendants Bullis, Weissman, and Girdich were aware of facts from which the inference could be drawn that the loaf diet would harm Plaintiff or that they

drew that inference. Moreover, Plaintiff admits that he refused to eat the loaf diet. (Dkt. No. 1 ¶ 39.) Accordingly, any weight loss and pain that he experienced could not have resulted from the loaf diet itself. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment claims against Defendants Bullis, Weissman, and Girdich.

### 4. *Selsky*

**\*29** Plaintiff alleges that Defendant Selsky affirmed Defendant Bullis' "disciplinary determination, even though he knew or should have known that Bullis violated [Plaintiff]'s clearly established due process rights." (Dkt. No. 1 ¶ 40.) Defendants' motion for summary judgment does not directly address this claim. However, I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because, as discussed above, Defendant Bullis did not violate Plaintiff's due process rights. Therefore, I recommend that the Court dismiss the claim against Defendant Selsky.

### E. Five Points Health Care

Plaintiff alleges that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by failing to provide adequate medical care at Five Points Correctional Facility following the alleged beating by Defendants Snyder, Duprat, and Bogett. (Dkt. No. 1 ¶¶ 23–26.) Defendants move for summary judgment, arguing that (1) Plaintiff failed to serve Defendant Kuhlman; and (2) Plaintiff cannot raise a triable issue of fact that these Defendants violated his Eighth Amendment rights because Plaintiff did not suffer from a serious medical need and Defendants were not deliberately indifferent. (Dkt. No. 92–10 at 6, 20.)

### 1. *Failure to Serve Defendant Kuhlman*

Defendants argue that the claim against Defendant Kuhlman must be dismissed because she was not served within 120 days of the filing of the amended complaint on October 6, 2004. (Dkt. No. 92–10 at 6.) Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days [55] after the filing of the complaint. Fed.R.Civ.P. 4(m). The court "must" extend the time for service for an appropriate period if the plaintiff shows good cause for the failure to serve. *Id.*

Here, on June 24, 2005, the summons was returned unexecuted as to Defendant "Coleman." (Dkt. No. 21.) On May 22, 2007, the Clerk's office sent Plaintiff a letter informing him that the Marshals Service had not been able to serve the defendant because there was no one by that name at Five Points Correctional Facility. The Clerk's office provided Plaintiff with another USM–285 form and asked for more information about the defendant. (Dkt. No. 54.) Plaintiff states that he was not able to ascertain Defendant Kuhlman's correct identity until after I issued orders on May 2, 2007, and October 3, 2007, compelling defendants to respond to discovery. (Dkt. No. 109 at 7–8.) The docket shows that on January 31, 2008, Plaintiff attempted to file an amended complaint "correctly identif[ying] defendant Kulhman by substituting the name 'Coleman' ... for 'Kuhlman.'" (Dkt. No. 74.) On February 4, 2008, I ordered Plaintiff's motion stricken from the record because the deadline for filing motions to amend had expired on January 30, 2006. (Dkt. No. 75.) I find, therefore, that Plaintiff has demonstrated good cause for his failure to serve Nurse Kuhlman.

2. *Merits*

**\*30** Plaintiff claims that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by refusing to treat him for head pain, pain in his liver, pain in his left wrist, and severe body itch. Plaintiff also alleges that he informed Defendant Hensel that "he had ... lost blood from within his right ear." (Dkt. No. 1 ¶¶ 23–26.) Defendants argue that Plaintiff has not raised a triable issue of fact as to either the objective or subjective prong of his Eighth Amendment medical care claim. (Dkt. No. 92–10 at 20.)

As discussed above, the objective prong of an Eighth Amendment medical claim requires the court to determine whether the prisoner was deprived of adequate medical care and, if so, whether the inadequacy was sufficiently serious. *Salahuddin,* 467 F.3d at 279–80. Where the prisoner alleges that he was completely deprived of treatment, the court must examine whether the inmate's medical condition is sufficiently serious. *Id.* at 280. Here, because Plaintiff alleges that he was totally deprived of medical care, I must consider whether the bleeding in his inner right ear, head pain, pain in his liver, pain in his left wrist, and severe body itch are "serious medical conditions," in other words, whether they are conditions "of urgency that may produce death, degeneration, or

extreme pain." *Id.; Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990)) (Pratt, J. dissenting).

Defendants argue, without analysis, that none of Plaintiff's "conditions constitute a condition of urgency, one that may produce death, degeneration, or extreme pain." (Dkt. No. 92–10 at 20.) As discussed above in regard to Plaintiff's claims against Defendant Weissman and Richardson, I agree that Plaintiff's severe body itch is not a serious medical condition. However, Plaintiff's bleeding inner ear, head pain, and liver pain, as alleged, appear urgent and capable of producing extreme pain. *See Bjorkstrand v. DuBose,* No. CIV. S–08–1531, 2008 WL 5386617, at \* 3 (E.D.Cal. Dec.24, 2008)) (finding that dried blood in ear was not a serious medical condition because "there was no emergency problem with the left ear, such as active bleeding."). I therefore find that Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on the issue of whether Plaintiff suffered from a serious medical condition.

Defendants argue that Plaintiff cannot raise a triable issue of material fact as to deliberate indifference because the issue of "[w]hether or not [P]laintiff needed treatment or to be seen by a physician amounts to nothing more than a disagreement with the course of treatment—not deliberate indifference." (Dkt. No. 92–10 at 20.) As Plaintiff notes (Dkt. No. 109 at 37), none of the named Five Points Defendants has filed an affidavit supporting Defendants' motion for summary judgment. They have therefore not established that their treatment of Plaintiff was based on their medical judgment. The evidence, when viewed in the light most favorable to Plaintiff, indicates that he arrived at Five Points on January 3 complaining of severe pain inflicted through excessive force and that he received absolutely no treatment for his injuries until Nurse Gardner examined him on January 7. Therefore, I find that Plaintiff has raised a triable issue of fact that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment right to adequate medical treatment.

**\*31** **ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 92) be ***GRANTED IN PART AND DENIED IN PART;*** and it is further

**RECOMMENDED** that the following claims be dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet; and it is further

**RECOMMENDED** that the following claims be dismissed *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky; and it is further

**RECOMMENDED** that the following claims survive summary judgment and *sua sponte* review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello; and it is further

**ORDERED** that the Clerk provide Plaintiff with Form USM 285 for service on Defendant Kuhlman; and it is further

**ORDERED** that the Clerk serve copies of *Miller v. Bailey,* No. 05–CV–5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); *Odom v. Poirier,* No. 99 Civ. 4933, 2004 U.S. Dist. LEXIS 25059, 2004 WL 2884409 (S.D.N.Y. Dec.10, 2004); *Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004); *Bond v. Board of Educ. of City of New York,* 97–cv–1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar.17, 1999); *Medina v. Hunt,* No. 9:05–CV–1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008); *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); and *Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, 2002 WL 313796 (S.D.N.Y. Feb.27, 2002) on Plaintiff in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*32** Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e)).

### All Citations

Not Reported in F.Supp.2d, 2009 WL 3486379

---

Footnotes

1    Only two of the named Defendants filed affidavits supporting Defendants' motion for summary judgment. Only one of those affidavits-the affidavit of Defendant Dr. Evelyn Weissman—contradicts Plaintiff's version of events.

2    Plaintiff does not allege that the strip-frisk violated his constitutional rights. Even if he did, I would find that such a claim would not survive *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B). Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *Frazier v. Ward,* 528 F.Supp. 80, 81 (N.D.N.Y.1981). "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g., Iqbal v. Hasty,* 490 F.3d 143, 172 (2d Cir.2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino,* 967

F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley,* 712 F.2d 34, 35–36 (2d Cir.1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean–Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey,* No. 05–CV–5493, 2008 U.S. Dist. LEXIS 31863, at *1, 2008 WL 1787692, at *9 (E.D.N.Y. Apr. 17, 2008). Plaintiff does not allege, and the evidence does not show, that Defendants conducted the strip-frisk with an intent to intimidate, harass, or punish Plaintiff.

3   In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Bezio for these statements because (1) Plaintiff did not exhaust his administrative remedies regarding the statements; and (2) threats are not actionable constitutional violations. (Dkt. No. 92–10 at 35–36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Bezio based on the statements. Rather, he included this allegation in his complaint to provide relevant information for his failure to intervene claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

4   In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Duprat for this statement because (1) Plaintiff did not exhaust his administrative remedies regarding the statement; and (2) threats are not actionable constitutional violations. (Dkt. No. 92–10 at 35–36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Duprat based on the statement. Rather, he included it in his complaint to provide relevant information for his excessive force claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

5   The medical records produced by Defendants in support of their motion for summary judgment do not reflect that Plaintiff saw Nurse Hensel on January 3, 2003. However, as the Court has noted previously (Dkt. No. 99 at 3), a SHU log book entry for January 3, 2003, indicates that Plaintiff was "taken to strip frisk room for pictures and to be assessed by R/N Hensel." (Defs.' Resp. to P.'s 1st Req. for Prod. of Docs., Ex. E at 11.) This document corroborates Plaintiff's claim that he saw Defendant Hensel on January 3, 2003. I note, however, that none of the parties included the log book entry in their moving or opposing papers.

6   The complaint refers to this defendant as Nurse "Good." However, Defendants state that her name is actually Goodwin. (Dkt. No. 92–10 at 1 n. 1.) I will refer to her as Nurse Goodwin.

7   The complaint refers to this defendant as Nurse Coleman. As discussed further below, Plaintiff did not serve this defendant. In his opposition to the motion for summary judgment, Plaintiff states that he ultimately learned through discovery that her name is actually Nurse Kuhlman. (Dkt. No. 109 at 6 n. 2.) I will refer to this defendant as Nurse Kuhlman.

8   It is not clear what medications Nurse Kuhlman was distributing, since the Affidavit of Linda Bannister establishes that "nurses cannot give medications until they verify allergies and prescription orders" and that as of January 6, the day after Nurse Kuhlman saw Plaintiff, this verification had not been completed. (Bannister Aff. ¶ 8.)

9   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is properly made [by a defendant] and supported [as provided in this rule], the [plaintiff] may not rely merely on allegations ... of the [plaintiff's] pleading ....").

10  *Ross v. McGinnis,* No. 00–CV–0275, 2004 U.S. Dist. LEXIS 9367, at * 20–21, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) (internal quotations omitted) (emphasis added).

11  A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

12  *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

13  The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

14  *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ( "The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a) (2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74

(S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

15  See *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys., Inc.,* No. 02–CV–6205, 2004 U.S. Dist. LEXIS 23314, at *4–5, 2004 WL 2613993, at *1–2 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 333 F.Supp.2d 91, 101–102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* No. 01–CV–4430, 2002 U.S. Dist. LEXIS 1658, at *6–7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12(b)(6) motion—one aimed at the sufficiency of the pleadings under Rule 8(a), and the other aimed at the legal sufficiency of the claims).

16  *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see also Swierkiewicz,* 534 U.S. at 512 (citation omitted); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (citation omitted).

17  *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citation omitted).

18  *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95–CV–4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* No. 98–CV–0293, 1998 U.S. Dist. LEXIS 8750, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

19  *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

20  *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

21  "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* No. 96–CV–7544, U.S. Dist. LEXIS 18131 1997 WL 714878, at *1, n. 2, 1997 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138–39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

22    *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

23    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

24    *Yang v. New York City Trans. Auth.,* No. 01–CV–3933, 2002 U.S. Dist. LEXIS 20223, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

25    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted); *see, e.g., See Rhodes v. Hoy,* No. 05–CV–0836, 2007 U.S. Dist. LEXIS 48370, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report–Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance procedure-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* No. 07–CV–0166, 2008 U.S. Dist. LEXIS 62919, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) (citations omitted); *Hylton v. All Island Cab Co.,* No. 05–CV–2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* No. 00–CV–1309, 2001 U.S. Dist. LEXIS 737, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

26    *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06–1590, 2008 U.S.App. LEXIS 17113, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

27    *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

28    *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

29    *Stinson v. Sheriff's Dep't of Sullivan County.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

30    Defendants argue that Plaintiff's severe body itch was not a serious medical need because it was not a "condition of urgency, one that may produce death, degeneration, or extreme pain". (Dkt. No. 92–10 at 13.) Plaintiff argues that severe body itch was a symptom of his Hepatitis C, which is a serious medical need. (Dkt. No. 109 at 28–30.)

31    Dr. Richards did not file an affidavit supporting Defendants' motion for summary judgment.

**32** *See Sulton v. Wright,* 265 F.Supp.2d 292 (S.D.N.Y.2003) (holding that a prisoner stated an Eighth Amendment claim against a doctor and physician's assistant who pursued less vigorous treatment than they had originally recommended when their request for approval of knee surgery was denied).

**33** Plaintiff's complaint also asserts a retaliation claim against Defendants Weissman and Richards on these facts. (Dkt. No. 1 ¶ 12.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e) (2)(B) because the evidence does not establish that Defendants took adverse action. While the denial of medical care may establish adverse action, *see e.g. Odom v. Poirier,* No. 99 Civ. 4933, 2004 WL 2884409, at *4 (S.D.N.Y. Dec.10, 2004), I have found that Defendants Weissman and Richards did not deny Plaintiff medical care. Therefore, I recommend that the Court dismiss this claim.

**34** 42 U.S.C. § 1997e.

**35** *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

**36** 7 N.Y.C.R.R. § 701.7.

**37** 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York,* No. 00–CV–3434, 2002 WL 31235713, at *2 (S.D.N.Y. Oct.3, 2002).

**38** 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g., Croswell v. McCoy,* 01–CV–0547, 2003 U.S. Dist. LEXIS 3442, at *12, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03–CV–0671, Report–Recommendation, at 15–16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

**39** The inmate grievance procedures in place at the time of the incident required inmates to file grievances within 14, rather than 21, days.

**40** *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford. Chavis v. Goord,* No. 07–4787–pr, 2009 U.S.App. LEXIS 13681, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

**41** *Hemphill,* 380 F.3d at 686 (citation omitted).

**42** *Id.* (citations omitted).

**43** *Id.* (citations and internal quotations omitted).

**44** Defendants served this unpublished case on Plaintiff with their moving papers as required by Local Rule 7.1(a)(1). (Dkt. No. 92–11.)

**45** The complaint contains some language that could, very liberally construed, assert a claim against these Defendants for denial of Plaintiff's right of access to the courts on the theory that, at the time of these events, Plaintiff was being transported for a court appearance. Defendants addressed this possible claim in their motion for summary judgment. (Dkt. No. 92–10 at 40–42.) In his opposition to the motion, Plaintiff states that he did not intend to assert a claim for denial of access to the courts. (Dkt. No. 109 at 55.) I have therefore not addressed Defendants' arguments.

**46** Defendants characterize Defendants Wright and Snyder as the only defendants to the conspiracy claim. Read broadly, the complaint also alleges that Defendant Duprat conspired with Defendants Wright and Snyder by calling Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) I will include Defendant Duprat in my analysis of Plaintiff's conspiracy claim.

**47** Defendants also argue that to the extent Plaintiff's conspiracy claim is brought under 42 U.S.C. § 1985, he has not shown that Defendants were motivated by any class-based animus. (Dkt. No. 92–10 at 31–32.) In his opposition to Defendants' motion, Plaintiff states that he did not intend to raise a claim under 42 U.S.C. § 1985. (Dkt. No. 109 at 44 n. 15.) Therefore, I have not addressed Defendants' argument regarding class-based animus.

**48** *See Green v. Greene,* No. 9:07–CV–0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68186, 2009 WL 2424353 (N.D.N.Y. Aug.5, 2009); *Sebast v. Mahan,* No. 09–cv–98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, 2009 WL 2256949, at *3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse,* 603 F.Supp.2d 417 (N.D.N.Y.2009); *Lukowski v. County of Seneca,* No. 08–CV6098, 2009 U.S. Dist. LEXIS 14282, 2009 WL 467075 (W.D.N.Y. Feb.24, 2009); *Perrin v. Canandaigua City School Dist.,* No. 08–CV–61536, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241 (W.D.N.Y. Nov.21, 2008); *Rodriguez v. City of New York,* —— F.Supp.2d ——, No. 05–CV–5117, 2008 U.S. Dist. LEXIS 9966, 2008 WL 420015 (E.D.N.Y. Feb.11,

2008); *Crews v. County of Nassau,* No. 06–CV–2610, 2009 U.S. Dist. LEXIS 38354, 2007 WL 4591325 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York,* 487 F.Supp.2d 426 (S.D.N.Y.2007); *Clark v. City of Oswego,* No. 5:03–CV–202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, 2007 WL 925724 (N.D.N.Y. March 26, 2007); *Malone v. City of New York,* No. CV–05–2882, 2006 U.S. Dist. LEXIS 61866, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M & T Bank,* No. 5:05–CV–297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547 (N.D.N.Y. Mar.27, 2006).

49  Read broadly, the complaint also asserts an excessive force claim against Wright and retaliation claims against Defendants Snyder, Duprat, Bogett, and Wright. Defendants have not addressed these potential claims. I find that the claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

50  I note that *Howard v. Wilkerson,* 768 F.Supp. 1002 (S.D.N.Y.1991) holds that "[a]n inmate's refusal to attend a disciplinary hearing waives his *due process objections* ... only when it occurs through no fault of prison officials." *Howard,* 768 F.Supp. at 1006 (citation and quotation marks omitted) (emphasis added). *Howard* is cited in *Nance v. Villafranca,* No. 91–CV–717, 1994 U.S. Dist. LEXIS 11114 (N.D.N.Y. June 20, 1994), which Defendants cite for a different proposition. (Dkt. No. 92–10 at 39.)

51  Although Defendants assert that Wright charged Plaintiff with disobeying a direct order, the evidence before the court does not support that assertion. (Dkt. No. 92–5, Exs.11–12.)

52  Read broadly, the complaint asserts a retaliation claim against Defendant Bezio based on these same events and a failure to intervene claim against Defendant Duprat because he was present when Defendant Snyder initially beat Plaintiff. (Dkt. No. 1 ¶ 21.) Defendants have not moved for summary judgment of these claims. I find that these claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

53  The only version of the events between Defendant LaClair and Plaintiff in evidence before the Court is Defendant LaClair's misbehavior report. According to that report, when Defendant LaClair went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get [him] what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant LaClair "informed him then the interview was over and left the area." (Dkt. No. 92–5, Ex. 15 at 2–3.) Although Plaintiff states in his verified complaint that Defendant LaClair "intentionally and maliciously falsified" the report, he does not offer any other version of what happened. (Dkt. No. 1 ¶ 35.) He alleges that he asked Defendant Bullis to "interview inmate Rolan and LaClair regarding the acts and actions of LaClair that caused him not to provide Benitez pre-hearing assistance," but he does not provide any information about what those interviews might have revealed. (Dkt. No. 1 ¶ 36.) Due to Defendants' failure to provide Plaintiff with pages of the SHU log book for January 14, 2003, Plaintiff asks the Court to draw an adverse inference that "were Defendants to provide the Court with the missing pages of the ... log book ... such pages would not support any of the allegations of misconduct set out in the misbehavior report that LaClair filed against Benitez on that date." (Dkt. No. 109 at 41 n. 14.) Plaintiff does not explain, however, why such an inference is logical.

54  Although Defendants argue, in regard to Plaintiff's other claims regarding his disciplinary hearing, that due process was not required because no liberty interest was implicated by the imposition of the loaf diet, they did not assert that argument regarding the claim against Defendant LaClair. Rather, Defendants argue that Plaintiff waived Defendant LaClair's assistance by threatening him. (Dkt. No. 92–10 at 38–39.) Due process requires that prison officials provide pre-hearing assistance to a prisoner facing disciplinary charges who is confined to the SHU. *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988). "An assistant's role is to act as merely a surrogate for the inmate, not a legal advisor or advocate. [A]n assistant's role is to perform tasks like interviewing witnesses that the inmate would perform himself if her were in the general population." *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (citations and punctuation omitted). The assistance "must be provided in good faith and in the best interests of the inmate." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citation omitted). An "assigned assistant who does nothing to assist a ... prisoner ... has failed to accord the prisoner his limited constitutional due process right of assistance." *Eng,* 858 F.2d at 898. Defendants cite several cases holding that an inmate may waive his right to assistance by remaining silent when assistance is offered or by refusing to sign a form requesting assistance. (Dkt. No. 92–10 at 39, citing *inter alia, Jackson,* 30 F.Supp.2d at 619.) However, Defendants have not cited any cases holding that an inmate waives his right to assistance by threatening his assistant. In light of my finding that Plaintiff was not deprived of a liberty interest, it is not necessary to reach this issue.

55  This 120–day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within sixty (60) days of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) (emphasis added).

2015 WL 427942
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Arnold BROWN et al., Plaintiffs,
v.
The CITY OF NEW YORK and Jared Fox,
Joseph Gulotta, Ernest Kenner, Evan
Nielson, Patrick Quinlan, Beatrice Shafidiya,
George Tavares, Philip Williams, Frederick
Vanpelt, and Does 12–14, individually and
in their official capacities, Defendants.

No. 14 Civ. 2700(BMC).
|
Signed Feb. 2, 2015.

**Attorneys and Law Firms**

Bryant Cherry-Woode, Matthew Scott Porges, Law Office
of Matthew S. Porges, Esq., Brooklyn, NY, for Plaintiffs.

Matthew W. McQueen, Tobias Eli Zimmerman, New
York City Law Department, New York, NY, for
Defendants.

### *MEMORANDUM OPINION*

COGAN, District Judge.

**\*1** Plaintiffs bring this action, pursuant to 42 U.S.C.
§ 1983, claiming violations of their constitutional rights
resulting from police searches of a house in Brooklyn
(the "Premises"). Plaintiffs also allege a *Monell* claim and
related state law claims. This opinion sets forth the basis
for the Court's Order, dated December 31, 2014, granting
defendants' motion for summary judgment and denying
plaintiffs' motion for partial summary judgment.

### BACKGROUND

The following facts are not in dispute. On January 30,
2013, a man was shot on Chauncey Street in Brooklyn.
After receiving a radio call about the shooting at around 1
p.m., police officers from Brooklyn's 73rd Precinct, a few
of whom are defendants, responded to the scene. Upon

their arrival, the officers learned from several witnesses
that the shooter ran into the Premises, a three story
residential building where all plaintiffs were either residing
or visiting that day. Defendant Sergeant Shafidiya relayed
this message to defendant Deputy Inspector Gulotta,
the commanding officer of the 73rd Precinct, who was
not yet on scene. Deputy Inspector Gulotta ordered the
establishment of a perimeter around the Premises to
ensure that nobody entered or left. An Emergency Services
Unit ("ESU") team was brought in to search the Premises
for the shooter.

Prior to the ESU's initial search, one precinct member,
defendant Officer Van Pelt, was assigned to conduct
surveillance on a rooftop near the Premises. Before he
went up on the roof, another officer stationed in the park
behind the Premises reported to him that an unidentified
witness said that someone jumped over the back fence of
the Premises. Officer Van Pelt reported this information
to defendant Sergeant Tavares.

Once the ESU arrived, they conducted a "perp search",
which consisted of a floor-by-floor search of the rooms,
to locate and detain the shooter. All occupants (including
plaintiffs) were asked to leave the Premises and were
detained for a period of time. Plaintiffs Brown and Farrier
both resided at the Premises, but were not home at the time
of the search.

Defendants temporarily detained all plaintiffs. Although
plaintiffs Chambers and Dawkins saw and heard the
police escorting people out of the Premises, they returned
to Chambers' room and closed the door. When the officers
entered Chambers' room, both Chambers and Dawkins
were seated. Chambers jumped from his chair, which was
within arms' reach of the officer. The officer knocked
Chambers down with his shield, hitting Chambers' left
wrist. Plaintiff Dawkins also stood from his seat, and
was knocked to the floor by an officer's shield. Dawkins
suffered a cut to his lip.

While exiting the basement of the Premises, plaintiff
Martins was pushed down and bent over in order
to be handcuffed. He suffered no physical injuries.
Defendants encountered plaintiff Arnon while he was
exiting the basement. He informed the police that he was
in possession of a phone and a knife. As he was removing
an item from his pocket—his phone—police slapped it out
of his hand. Plaintiff Arnon suffered no physical injuries.

**\*2**  The initial "perp search" did not reveal the shooter. However, ESU officers observed contraband during their search and conveyed this information to Deputy Inspector Gulotta. Once the "perp search" concluded, control of the Premises was given to the 73rd Precinct.

After the ESU departed, and within 30 minutes after the initial sweep, officers from the Precinct conducted a "secondary search" of the Premises to make sure that the shooter was not still inside and to protect the Precinct officers instructed to remain at the Premises while a warrant was being obtained. During this sweep officers observed marijuana in the basement and three rooms on the first floor of the Premises. In addition, they observed a firearm in a basement hall closet accessible to all occupants. Rather than seize the contraband, Deputy Inspector Gulotta instructed the officers to leave it and continue sweeping the Premises for additional occupants.

Once it was determined that nobody remained in the building, defendants Sergeant Tavares and Officer Fox went to the District Attorney's office to secure a search warrant for the Premises based on the presence of the contraband. A warrant was obtained at approximately 11:15 p.m. and was executed at 11:50 p.m. The contraband was collected during this search.

All plaintiffs except Brown, Farrier, and Evony Howard were brought to the Precinct for questioning. Plaintiffs Lespierre, Arnon, Martins, Adam Howard, and Myles were arrested in connection with the seized contraband. Only plaintiffs Lespierre and Arnon were charged, but the charges were eventually dismissed or adjourned in contemplation of dismissal. The remaining plaintiffs were released without charge.

## DISCUSSION

### I

Summary judgment is appropriate where there are no genuine disputes of material fact, such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). No genuine factual issue exists when the moving party demonstrates, on the basis of the pleadings and admissible evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no reasonable jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen. Life Ins. Co.,* 92 F.3d 81, 86 (2d Cir.1996). A party may not defeat a motion for summary judgment by relying on unsupported assertions, conjecture, or surmise. *See Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). Rather, the nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

### II

The Fourth Amendment generally prohibits warrantless entry into a person's home. *See Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990). However, "[i]t is well settled ... that the warrant requirement must yield in those situations where exigent circumstances demand that law enforcement agents act without delay." *United States v. MacDonald,* 916 F.2d 766, 769 (2d Cir.1990). More specifically, the Fourth Amendment does not require police officers to delay their investigation if doing so "would gravely endanger the lives or the lives of others." *Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967). Therefore, "police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home." *Kirk v. Louisiana,* 536 U.S. 635, 638, 122 S.Ct. 2458, 2459, 153 L.Ed.2d 599 (2002). Where, as here, the facts are undisputed, the presence or absence of exigent circumstances presents a legal issue. *See e.g., Anthony v. City of New York,* 339 F.3d 129, 136 (2d Cir.2003).

**\*3**  "The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an urgent need to render aid or take action." *MacDonald,* 916 F.2d at 769 (internal quotation marks omitted). This is an "objective test" that "turns on [an] ... examination of the totality of the circumstances confronting law enforcement agents in the particular case." *Id.* Courts in this Circuit generally analyze six factors from *Dorman v. United States,* 435 F.2d 385, 391 (D.C.Cir.1970), to help determine whether exigent circumstances are present:

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause ... to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

See also *Harris v. O'Hare,* 770 F.3d 224, 234 (2d Cir.2014).

With respect to the initial search conducted by the ESU, it is undisputed that police responded to a report of a shooting, an undeniably serious offense by an armed perpetrator still at large. Police then learned that the shooter ran into the Premises. These circumstances are sufficient to constitute probable cause to search the Premises. See *Savino v. City of New York,* 331 F.3d 63, 76 (2d Cir.2003).

It was also reasonable for defendants to believe that there was an urgent need to search the Premises for the shooter. The police cannot be expected to take the time to obtain a warrant when a suspect in possession of a gun, who has already shot one person, is believed to be in a house. This was an active shooter incident. The need to protect both the public and the police officers who were giving chase constituted exigent circumstances sufficient to support the ESU's initial sweep of the Premises. See *Maryland v. Buie,* 494 U.S. 325, 334–36, 110 S.Ct. 1093, 1098–99, 108 L.Ed.2d 276 (1990) (upholding the propriety of a "protective sweep" to look for "individuals posing a danger to those on the arrest scene").

Nor did the unsubstantiated statement from a bystander dissipate these exigent circumstances. Again, this was an active shooter situation. Even if the witness was telling the truth, which there was no way for the police to know at that moment, there is no evidence that the "somebody" who allegedly jumped the fence was the shooter. See *United States v. Oguns,* 921 F.2d 442, 446–47 (2d Cir.1990) (upholding a security sweep of a suspect's apartment incident to his lawful arrest even where police were told that the suspect's brother was not in the apartment because

the police "still could have reasonably believed that others were in the apartment"). The police did not have to make that call with the potential of lives at stake.

**\*4** The closer question is whether the exigent circumstances dissipated after the first unsuccessful sweep. Plaintiffs argue that since the ESU team had not found the shooter, there was no basis for performing a subsequent sweep without a warrant.

I think the undisputed facts compel the opposite conclusion. A shooter was still at large and had been seen going into the Premises. This means that the exigency continued for a reasonable time necessary to obtain assurance that the shooter was not in the Premises. See *Bing v. City of Whitehall,* 456 F.3d 555, 565 (6th Cir.2006). The level of assurance required to dissipate the exigent circumstances was high because the police were trying to apprehend a suspect who had just shot someone.

Importantly, the Premises were a three-story building with multiple tenants. This meant there were multiple hiding places, and a risk that the ESU had missed the shooter—a risk with significant safety consequences because Precinct officers were instructed to remain at the Premises and guard it while a warrant was being obtained. Moreover, although the record is not precise as to the timing between the ESU sweep and the Precinct sweep, it is fair to conclude that no more than 30 minutes passed between the completion of the ESU sweep and the Precinct sweep. (The first search began at about 2 p.m. and concluded at 3:30 p.m. It is a bit hazy when the second search began, but the Precinct "secured" the building at 3:55 p.m.) See *United States v. Cruz,* No. 11 Cr. 377, 2012 WL 1564667, at \*2 (N.D.Ga. Apr.30, 2012) (upholding a second sweep of a house where exigent circumstances existed because a shooting suspect was not found during the initial sweep, and police had reason to believe the suspect was still in the house and was a safety threat). In practical terms, the Precinct sweep was effectively a continuation of the ESU sweep and was conducted to ensure the safety of the officers. Cf. *United States v. Sinclair,* No. 10 Cr. 6211, 2012 WL 5389729 (W.D.N.Y. Nov.2, 2012) (finding secondary sweep was essentially a continuation of the initial sweep).

The Precinct's final search was also constitutional because it was conducted pursuant to a valid warrant. During the initial two sweeps, conducted during

the exigency, defendants observed contraband, which included marijuana and a firearm, in plain view, as it was found on the first floor and in a basement closet, all locations where the shooter might have been hiding. There is no evidence that these initial searches were anything other than "protective sweeps". Once defendants saw the contraband in commonly accessible locations, they had probable cause to request a search warrant. *See United States v. Klump,* 536 F.3d 113, 118 (2d Cir.2008). The evidence seized during this search was pursuant to a valid warrant, and therefore reasonable.

### III

To state a claim for false arrest/false imprisonment under either New York or federal law, a plaintiff must show "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino,* 331 F.3d at 75; *see also Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (a § 1983 claim for false arrest premised on the Fourth Amendment is "substantially the same as a claim for false arrest under New York law"). The existence of probable cause is a complete defense to an action for false arrest. *See Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994).

**\*5** Based upon my conclusion that both the ESU sweep and the Precinct sweep were permissible under the exigent circumstances exception, it follows necessarily that plaintiffs' temporary detentions during these sweeps were not unreasonable because they were incident to a lawful search. [1] *See Muehler v. Mena,* 544 U.S. 93, 98, 125 S.Ct. 1465, 1470, 161 L.Ed.2d 299 (2005). In fact, plaintiffs do not dispute that their detentions were justified. Instead, they appear to take issue with the fact that they were detained even after the ESU's initial search. However, the exigent circumstances presented here gave defendants the authority to detain plaintiffs for a longer period in order to prevent further violence. *Id.* at 100, 1471 (ruling that an occupant's detention for two to three hours while a search was in progress was not unreasonable).

Probable cause existed to arrest all occupants inside the Premises, including plaintiffs, because defendants found contraband in plain view during the first and second sweeps and in areas accessible to all occupants. Under

the doctrine of constructive possession, probable cause existed to arrest all plaintiffs because each of them had access to the basement closet that housed the rifle. *See United States v. Zaleski,* 686 F.3d 90, 93 (2d Cir.2012). In addition, separate bases for probable cause existed for plaintiffs Lespierre, Arnon, Martins, Adam Howard, and Myles, because contraband was found in their living quarters during the searches.

### IV

Excessive force claims are governed by an objective "reasonableness inquiry that asks 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Moreover, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396, 1872 (internal citations omitted). Because defendants were trying to locate a fleeing shooter in a three-story residential building, the force they applied to plaintiffs in this case was reasonable and *de minimis.* [2] *See United States v. Walsh,* 194 F.3d 37, 49–50 (2d Cir.1999) (explaining that *de minimis* use of force will typically not amount to a constitutional violation).

Plaintiffs have offered no evidence of any injuries that they suffered. Plaintiffs Martins and Arnon concede that they suffered no physical injuries, and the injuries alleged in the complaint, Chambers' bruised wrist and Dawkins' cut lip, qualify as *de minimis. See Lemmo v. McKoy,* No. 08 Civ. 4264, 2011 WL 843974, at \*5 (E.D.N.Y. Mar.8, 2011) ("Injuries held to be *de minimis* for purposes of defeating excessive force claims include short-term pain, swelling, and bruising, brief numbness from tight handcuffing, claims of minor discomfort from tight handcuffing, and two superficial scratches with a cut inside the mouth.") (internal citations omitted). The excessive force claims brought by plaintiffs Chambers, Dawkins, Martins, and Arnon fail because no reasonable jury could find that the amount of force used was excessive and because any injuries they suffered were *de minimis.*

**\*6** Some of the plaintiffs raise an additional point concerning their treatment by the police during this detention. Specifically, they claim that they were not

allowed to obtain proper clothing during their detention. For example, plaintiff Chambers alleges that he was forced to wait outside without shoes. These claims do not rise to the level of constitutional violations. *See, e.g., Dawson v. City of Seattle,* 435 F.3d 1054, 1069–70 (9th Cir.2006) (finding plaintiffs' detentions incident to a lawful search to be constitutionally permissible even where a plaintiff was forced to wait without shoes on a patio containing broken glass).

**V**

Qualified immunity "shields public officials performing discretionary functions from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." *Bradway v. Gonzales,* 26 F.3d 313, 317–18 (2d Cir.1994) (internal citations omitted). This standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

As suggested above, the only close issue as to the violation of plaintiffs' constitutional rights is whether the completion of the first sweep by the ESU made a second sweep, conducted shortly thereafter, constitutionally impermissible. There is no authority in this Circuit as to when a secondary sweep is permissible. The continuation

of exigent circumstances is, by its nature, a judgment call. Here, where the shooter had not been located, the invocation of qualified immunity is appropriate to avoid second guessing the police officers on the scene who had the responsibility of ensuring that no one else got shot.

**VI**

Since there were no unconstitutional actions by the City's employees, plaintiffs' *Monell* claim must be dismissed. *See Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006). For the same reason, plaintiffs' state law claims must be dismissed. *See Shapiro v. Kronfeld,* No. 00 Civ. 6286, 2004 WL 2698889, at *24 (S.D.N.Y. Nov.24, 2004) (holding that there can be "no imposition of vicarious liability in the absence of underlying liability").

**CONCLUSION**

Based on the Court's Order of December 31, 2014 and this Memorandum Opinion, the Clerk is directed to enter judgment in favor of defendants, dismissing the complaint.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 427942

---

Footnotes

1       All plaintiffs bring this claim except Brown and Farrier.

2       Defendants' use of force in knocking plaintiff Arnon's cell phone out of his hand was also reasonable, particularly because he told defendants that he was in possession of a knife.

---

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

### *MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

### *REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

### *Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*
It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent inmates posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*
For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1      In light of this finding, there is no need to consider the defendant's qualified immunity argument.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.      4

2013 WL 71770
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jeffrey HAMM, Plaintiff,
v.
Richard HATCHER, and City
of New York, Defendants.

No. 05 Civ. 503(ER).
|
Jan. 7, 2013.

**Attorneys and Law Firms**

Jeffery Hamm, East Elmhurst, NY, pro se.

Kimberly D. Conway, Esq., New York City Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

### OPINION AND ORDER

RAMOS, District Judge.

**\*1** *Pro se* Plaintiff Jeffrey Hamm ("Hamm" or "Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against Defendants Richard Hatcher ("Hatcher")[1] and the City of New York (the "City," and collectively, "Defendants"). Plaintiff alleges that while he was incarcerated in Rikers Island, Defendants violated his rights under the Fourteenth Amendment to the U.S. Constitution when they suspended his antidepressant medications. Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 as to all of Plaintiff's claims. For the reasons set forth below, Defendants' motion is GRANTED.

## I. Background

### A. Undisputed Facts

Plaintiff is a 52 year-old man with a long history of substance addiction and criminal activity.[2] (Conway Decl. Ex. F ("Hamm Dep.") 9:19–23, 31:15–21, 36:24–37:6.) After serving in the military from 1980–1982, (*id.* 10:24–11:2, 35:2–8), Plaintiff and his ex-wife divorced.

(*Id.* 35:15–17.) At that time, he became addicted to crack cocaine and remained addicted through 2000, (*id.* 9:20–10:2, 10:24–11:6), when he completed a twenty-day rehabilitation program and enrolled in New York City College of Technology. (*Id.* 10:4–8.) In December of 2001, on his second day of college, Plaintiff was arrested and released. (*Id.* 11:24–12:2, 13:12–14.) He struggled with substance abuse at that time, and continued to relapse into early 2002. (*Id.* 11:7–17.)

Plaintiff was again arrested in March 2002. (*Id.* 13:15–17.) He was immediately taken into custody at the Manhattan Detention Center. (*Id.* 13:18–25.) On March 15, 2002, while incarcerated there, Plaintiff was issued two antidepressant medication prescriptions for fourteen days each—one for forty milligrams daily of Paxil and the other for fifty milligrams daily of Trazodone. (First Unnumbered Exhibit to the Third Amended Complaint ("TAC") at first unnumbered page.) Plaintiff states that he had been taking antidepressant medications before his arrest, as well.[3] (Hamm Dep. 15:22–16:8; Pl.'s Mem. Opp. Mot. Summ. J. ("Pl.'s Mem.") at first unnumbered page.)

In or about June 2002, Plaintiff was transferred to another detention facility,[4] but remained there for less than two months due to an incident involving an assault.[5] (*Id.* 14:11, 21–25 .) After this incident, in or about August 2002, he was transferred to segregated housing in the Central Punitive Segregation Unit of the Otis Bantum Correctional Center ("OBCC") on Rikers Island. (Conway Decl., Ex. A at 1, 2; Hamm Dep. 14:22–15:2.) On August 14, 2002, a mental health clinician, Michele Garden, Ph.D. ("Garden") evaluated Plaintiff, and reported that he presented antisocial behavior, mood changes, persistent anger, and withdrawal symptoms. (Conway Decl., Ex. A at 1.) Garden diagnosed Plaintiff with early onset dysthymic disorder, dependent personality disorder, and polysubstance dependence, and directed that Plaintiff was to undergo biweekly clinician visits. (*Id.* at 1, 2.) On August 14, 2002, Plaintiff was also seen by a psychiatrist, Roberto Caga-Anan, M.D. ("Caga–Anan") at OBCC, who noted that Plaintiff stated, "I am ok," and observed that he did not present a danger to himself or to others. (Conway Decl, Ex. B at 1.) Caga–Anan prescribed Plaintiff with forty milligrams daily of Paxil and fifty milligrams daily of Atarax. (*Id.*) Both prescriptions were to last for fourteen days. (*Id.,* Ex. C.)

**\*2** On August 22, 2012, Garden and Caga–Anan again observed and evaluated Plaintiff. (Conway Decl., Ex. E.) They confirmed their prior observations, and diagnosed him with opioid dependence and adjustment disorder with depressed mood. (*Id.* at 1.) They again directed that he was to undergo biweekly clinician and psychiatrist visits. (*Id.* at 2.) On August 28, 2002, Caga–Anan renewed Plaintiff's Paxil prescription and issued him an additional prescription for fifty milligrams of Trazodone daily. (*Id.,* Ex. C.) Caga–Anan discontinued Plaintiff's Atarax prescription. (*Id.*) Again, both prescriptions were to last Plaintiff for fourteen days-until September 11, 2002. [6] (*Id.*)

**B. Facts in Dispute**
In early September 2002, Plaintiff was transferred from segregated housing at OBCC to the George Motchan Detention Center ("GMDC") on Rikers Island. (Hamm Dep. at 15:18–21.) It is at this point where Plaintiff's and Defendants' versions of facts diverge.

**1. Defendant's Version of Facts**
Defendants assert that on September 12, 2002–the day after Plaintiff's prescriptions were due to expire—Vivia Francois, M.D. completed a Consultation Request form on Plaintiff's behalf and referred him to the Mental Health Department at GMDC. (Conway Decl., Ex. G.) There is no evidence in the record, however, that his prescriptions were renewed at that time. On September 13, 2002, Plaintiff was admitted to the Mental Health Department and screened by S. Hernandez ("Hernandez"), a clinical social worker. (*Id.*) Hernandez completed a mental health intake form for Plaintiff, and noted that he had a history of mental illness and that he was taking medication for depression. (*Id.,* Ex. I.) There is no evidence in the record that Plaintiff's prescriptions were renewed at that time, either.

On September 16, 2002, a clinical supervisor reported that Plaintiff's case had been assigned to Hernandez and that a psychological assessment had been scheduled to determine whether Plaintiff was "on the proper medication with the proper dosage." (*Id.,* Ex. J.) On the same day, Hatcher [7] first evaluated Plaintiff in the Mental Health Clinic at GMDC. (Conway Decl., Ex. K.) Hatcher reported that Plaintiff stated he had not received Paxil for *five* days, that he felt mildly to moderately depressed at times due to

his "legal problems and not recently getting his scheduled medications," and that Plaintiff stated, "I know I need the medication because as soon as I stop it I start feeling anxious, irritable and depressed." (*Id.*) However, Hatcher also noted that Plaintiff stated "I'm doing alright," that he denied experiencing any hallucinations or side effects of his medications, that he denied any suicidal or homicidal ideations, that his mood was calm and stable, that he was eating and sleeping well, and that he did not present any paranoia. (*Id.*) Hatcher diagnosed Plaintiff with Dysthymic Disorder, and stated that he would "re-start [Plaintiff's] regimen at 'start doses.' " (*Id.*)

**\*3** Hatcher prescribed Plaintiff twenty milligrams daily of Paxil for depression and fifty milligrams daily of Trazodone for sleep. (*Id.*) Hatcher issued prescriptions for one immediate dose of both of medications on September 16, 2002, (*id.,* Ex. L), and an additional prescription for both medications to being immediately thereafter and to last for fourteen days. (*Id.*) Thus, according to the prison medical records submitted by Defendants, Plaintiff was without his prescribed medications from September 11, 2002 through September 15, 2002–a total of five days.

On September 19, 2002, Hernandez evaluated Plaintiff again. (*Id.,* Ex. N.) A Clinical Assessment and Comprehensive Treatment Plan noting Plaintiff's symptoms, diagnosis, and treatment plan was completed and signed by Hernandez, Gerard Derisse, a psychiatrist, and Gilberto Matta, C.S.W., a clinical supervisor. (*Id.*) Plaintiff was thereafter periodically treated for his psychiatric conditions; the last record of his treatment submitted to the Court is dated January 1, 2003. (Third, Fourth, and Fifth Unnumbered Exhibits to TAC.)

**2. Plaintiff's Version of Facts** [8]
Plaintiff stated in his deposition testimony that when he was transferred from segregated housing at OBCC to GMDC in September 2002 and was first seen by Hatcher, Hatcher told him that GMDC maintained a policy that newly transferred inmates were required to wait ten days before receiving any medical prescriptions. (*Id.* 17:21–25, 22:2–7.) Hatcher then took Plaintiff off of Paxil and Trazodone for ten days despite Plaintiff's statements to Hatcher that he needed the medication. [9] (*Id.* 17:16–18, 22:2–13.)

Plaintiff further stated in his deposition testimony that once he stopped taking his medication, he began to experience the "side effects of withdrawal." (Hamm Dep. 23:2–4.) These symptoms included exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (*Id.* 23:5–16.) He avers that he made frequent attempts to alert the mental health staff to the side effects he experienced while not taking his medication [10] - including filing a grievance at GMDC, (*id.* 41:23–42:8, 42:22–43:4; TAC at 4)-but that he remained without his medication for the duration of his first ten days there. (Hamm Dep. 23:17–24:2, 24:10–11.) When the ten days expired, Plaintiff testified that Hatcher prescribed him half of his regular dosage of Paxil and his full dosage of Trazodone. (*Id.* 18:1–3, 28:1–8.) Hatcher later prescribed Risperidone to Plaintiff for impulse control. (*Id.* 29:4–8.)

Plaintiff testified in his deposition that he did not tell Hatcher the full extent of the symptoms he was experiencing as a result of going off of his medications. (*Id.* 19:10–14, 21:13–22, 24:8–19.) He believed that because he had recently come out of segregated housing as a result of his involvement in an assault, if he were to explain the nature and degree of his symptoms, he would be placed on suicide watch, be forcibly sedated, or be placed in segregated housing. (*Id.* 21:21–22:1, 24:8–19.)

**3. The Criminal Prosecution of Plaintiff**

**\*4** Pursuant to Plaintiff's guilty plea, he was convicted on February 6, 2003 of attempted criminal sale of a controlled substance in the third degree, and was sentenced to three to six years imprisonment. (First Unnumbered Exhibit to Second Amended Complaint ("SAC")at 12.) Plaintiff later attempted to withdraw his guilty plea, arguing that he was impaired by his state of withdrawal from medication. (SAC ¶ 6.) On February 6, 2003, Judge Ronald A. Zweibel of the Supreme Court of the State of New York, New York County denied Plaintiff's motion to withdraw his plea, and the Supreme Court, Appellate Division, First Department affirmed the denial of Plaintiff's motion on April 5, 2005. (First Unnumbered Exhibit to SAC at 12–13). In its Decision and Order, the Appellate Division stated that the record established that Hamm's plea "was knowing, intelligent, and voluntary, and [the record failed] to support his claim that he was incompetent to plead guilty because he had not received his antidepressant medication." (*Id.*) The Appellate Division also noted that the Plaintiff had "freely admitted his guilt, demonstrated

his understanding of the terms and consequences of his plea, and specifically denied using any drugs or medication," and that the trial court had "relied on its own recollection of [Hamm's] lucidity at the time of the plea" in rejecting his motion to withdraw his plea. (*Id.*) On June 18, 2005, The Court of Appeals of the State of New York denied Plaintiff's application for leave to appeal. (Second Unnumbered Exhibit to SAC at first unnumbered page.)

**II. Procedural History**

Plaintiff filed suit on May 17, 2004 in the Northern District of New York, from where this action was transferred to the Southern District of New York on January 14, 2005. (Doc. 1.) Then–Chief Judge Michael B. Mukasey determined that the Complaint was facially insufficient and ordered Plaintiff to amend, (*id.*), and Plaintiff filed an Amended Complaint on March 28, 2005. (Doc. 2.) The case was subsequently reassigned to the Honorable Colleen McMahon. (Doc. 3.) Plaintiff filed a Second Amended Complaint on July 31, 2006. (Doc. 9.) The case was again reassigned to the Honorable Kenneth M. Karas on August 6, 2007. (Doc. 18.) Plaintiff, who by that time had completed his prison term, moved for default judgment as to Hatcher on December 6, 2007. (Doc. 24.) On September 5, 2008, Defendants filed a motion to dismiss the Second Amended Complaint, (Doc. 22), and on September 8, 2008, Judge Karas denied Plaintiff's motion for default judgment. (Doc. 27.) On May 5, 2009, Judge Karas issued an Opinion and Order granting in part and denying in part Defendants' motion to dismiss, and granting Plaintiff leave to amend the complaint. [11] (Doc. 31.) On August 7, 2009, Plaintiff filed a Third Amended Complaint. (Doc. 33.) On January 23, 2012, this matter was reassigned to the undersigned, and on June 21, 2012, Defendants filed the instant motion. (Docs.61, 63 .)

**III. Applicable Legal Standards**

**A. Summary Judgment**

**\*5** Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."

*Senno v. Elmsford Union Free Sch. Dist.,* 812 F.Supp.2d 454, 467 (S.D.N.Y.2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir.2009)). A fact is "material" if it might affect the outcome of the litigation under the relevant law. *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.,* 575 F.3d 199, 204 (2d Cir.2009) (citing *Celotex Corp.,* 477 U.S. at 322–23). "In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Med. Ctr.,* 706 F.Supp.2d 494, 504 (S.D.N.Y.2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir.2008)). "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' " *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp.,* 477 U.S. at 322).

In deciding a motion for summary judgment, the Court must " 'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir.2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir.2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). A motion for summary judgment cannot be defeated on the basis of mere denials or unsupported alternative explanations of facts. *Senno,* 812 F.Supp.2d at 467. The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). "[T]he non-moving party must set forth significant, probative evidence on which a

reasonable fact-finder could decide in its favor ." *Senno,* 812 F.Supp.2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57 (1986)).

**B. Local Rule 56.1 and *Pro Se* Litigants**

**\*6** Under Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), a party moving for summary judgment pursuant to Fed.R.Civ.P. 56, must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local R. 56.1(a). In answering a motion for summary judgment, litigants in this District are required to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record. Local Rule 56.1(b), (d); *see also* Fed.R.Civ.P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). If the moving party seeks summary judgment against a *pro se* litigant, it is also required to notify the *pro se* litigant of the requirements of Federal Rule of Civil Procedure 56 and Local Rule 56.1. Local R. 56.2. Once served with a statement pursuant to Local Rule 56.2, "[*p*]*ro se* litigants are then not excused from meeting the requirements of Local Rule 56. 1." *Wali v. One Source Co.,* 678 F.Supp.2d 170, 178 (S.D.N.Y.2009) (citing *Vt. Teddy Bear Co. v. 1–800–BEARGRAM Co.,* 373 F.3d 241, 246 (2d Cir.2004)). Each factual statement set forth in the moving party's Rule 56.1 statement "will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local R. 56.1(c); *see also* *T.Y. v. N.Y. City Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir.2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."), *cert. denied,* 130 S.Ct. 3277 (2010).

In the instant case, the Defendants have complied with their obligations by submitting a Local Rule 56.1 Statement and providing Plaintiff with notice, pursuant to Local Rule 56.2, of his obligations. (Docs.63, 66.) Plaintiff has failed to submit an appropriate response. Instead, he filed an unsworn, handwritten memorandum of law in opposition to the instant motion with several

exhibits attached. (Doc. 60.) However, as the Second Circuit has made clear, "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment," *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) (quoting *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988)), and "where a *pro se* plaintiff fails to submit a proper [Local] Rule 56.1 statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." *Wali,* 678 F.Supp.2d at 178 (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001)). Moreover, courts are to read a *pro se* litigant's submissions "liberally and interpret them 'to raise the strongest arguments that they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

**\*7** Therefore, this Court has endeavored to discern from the record if there is any evidentiary support for the assertions contained in Plaintiff's opposition papers and the documents attached thereto, and to determine if there are any other material issues of fact based on the evidence in the record. *Geldzahler v. N.Y. Med. Coll .,* 746 F.Supp.2d 618, 620 n. 1 (S.D.N.Y.2010). The Court has considered the present motion in light of the entirety of the record to afford Plaintiff the special solicitude to which he is entitled, *Burke v. Royal Ins. Co.,* 39 F.Supp.2d 251, 257 (E.D.N.Y.1999), as well as the unsworn statements in his opposition papers-but only to the extent that they are based on personal knowledge or supported by other admissible evidence in the record—on the assumption that if his allegations were sufficient to raise an issue of fact, Plaintiff would be given an opportunity to submit an affidavit properly attesting to those allegations. *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 603 n. 1 (S.D.N.Y.2004). However, even in light of Plaintiff's *pro se* status, the Court cannot rely on any assertions for which he has failed to offer proper support. *Goenaga,* 51 F.3d at 18.

## IV. Discussion

### A. Plaintiff's Claim Against Hatcher

### 1. Cruel and Unusual Punishment
The Eighth Amendment to the U.S. Constitution guarantees convicted prisoners the right to be free from cruel and unusual punishment. U.S. Const. amend. VIII. A prisoner's Eighth Amendment rights are violated when he is denied adequate medical care due to a prison official's deliberate indifference to a substantial risk of serious harm. *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (quoting *Farmer v. Brennan,* 511 U.S. 825, 828 (1994)). Because the Eighth Amendment only applies where there has been a "formal adjudication of guilt," a pretrial detainee—such as Plaintiff, whose cause of action arose before he was convicted—enjoys a right to adequate medical care pursuant to the Due Process Clause rather than the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244 (1983). Nevertheless, the analysis is the same under the Due Process Clause and the Eighth Amendment in this Circuit, because "an unconvicted detainee's rights are at least as great as those of a convicted prisoner." *Weyant,* 101 F.3d at 856; *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000) (noting that the Second Circuit has "often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment"). Thus, an "official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant,* 101 F.3d at 856.

The standard for a cruel and unusual punishment claim under both the Eighth Amendment and the Due Process Clause includes an objective and a subjective component. *E.g., Mitchell v. Prison Health Services, Inc.,* 07 Civ. 8267(PKC), 2008 WL 5069075, at \*3 (S.D.N.Y. Nov. 20, 2008). First, the objective component requires the alleged deprivation of medical care to be sufficiently serious. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). A deprivation of medical care is sufficiently serious if two prongs are satisfied: (1) the prisoner was actually deprived of adequate medical care; and (2) the inadequacy in medical care was sufficiently serious. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006). An actual deprivation of adequate medical care occurs only if a prison official denies an inmate reasonable medical care, *Id.* (citing *Farmer,* 511 U.S. at 844–47), and it is sufficiently serious if "a condition of urgency ... that may produce death, degeneration, or extreme pain" is present. *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (internal quotation marks and citations omitted). Relevant factors

to this inquiry include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks, brackets, and citation omitted).

**\*8** Second, the subjective component requires the defendant to "act with a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66 (citing *Wilson,* 501 U.S. at 298). An official acts with the requisite deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. This is the "equivalent to the familiar standard of 'recklessness' as used in criminal law." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Phelps v. Kapnolas,* 308 F.3d 180, 186 (2d Cir.2002)).

In the instant case, Plaintiff is unable to satisfy both the subjective and objective components.

## 2. Plaintiff Did Not Sustain a Sufficiently Serious Deprivation of Medical Care.

When a prisoner alleges a complete denial of adequate medical care, courts must evaluate the seriousness of the prisoner's underlying medical condition. *Bellotto v. Cnty. of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (citing *Smith,* 316 F.3d at 184–86 .) Alternatively, when —as in the instant case—a prisoner alleges a temporary delay or interruption in the provision of otherwise adequate medical treatment, the seriousness inquiry is "narrower," *Salahuddin,* 467 F.3d at 280, and focuses on the particular risk of harm that resulted from the delay or interruption in treatment rather than the severity of the prisoner's underlying medical condition. *Id.* (citing *Smith,* 316 F.3d at 185); *see also Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1188–89 (11th Cir.1994) (explaining that the seriousness of a delay in medical treatment may be decided "by reference to the *effect* of delay in treatment .... [considering] the seriousness of the medical need [and] deciding whether the delay worsened the medical condition" (emphasis in original)). In the latter scenario, the court must examine all relevant facts and circumstances when determining whether a delay in treatment is sufficiently serious. *DiChiara v. Wright,* 06 Civ. 6123(KAM)(LB), 2011 WL 1303867, at \*7 (E.D.N.Y. Mar. 31, 2011) (quoting *Smith,* 316 F.3d at 187). Accordingly, because Plaintiff's claim against Hatcher is based on a short-term interruption in the treatment that is otherwise unchallenged, [12] the court must focus on the risk of harm from the challenged delay in analyzing whether the alleged deprivation was sufficiently serious.

"Courts have repeatedly held that treatment of a psychiatric or psychological condition may present a serious medical need." *Cuoco,* 222 F.3d at 106 (internal quotation marks and citation omitted). It is also true that "[f]requently missed doses [of medication] could readily result in adverse medical events." *Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009). Such a delay or interruption in treatment, however, only gives rise to a violation of a prisoner's constitutional rights if it "reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment." *Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at \*8 (S.D.N.Y. Mar. 29, 2002). Although adverse medical effects are not required to prove a constitutional violation, "the absence of ... physical injury will often be probative," and "in most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith,* 316 F.3d at 187, 188.

**\*9** Plaintiff contends that he was deprived of adequate medical care because his access to his medication was interrupted for ten days when he was transferred from OBCC to GMDC. (TAC at 3; Hamm Dep. 18:20–25.) He further avers that the delay was the result of a policy at GMDC that prevented all newly transferred inmates from taking any medication for their first ten days of treatment there. [13] (TAC at 3; Hamm Dep. 17:21–25, 21:13–15, 22:2–7.) Plaintiff relies exclusively on the alleged statement made by Hatcher to establish the existence of the ten-day policy. However, he cannot demonstrate that such a purported policy, as applied to him, caused a sufficiently serious deprivation of adequate medical care.

As a result of the delay in access to his medication, Plaintiff avers that he began to experience the "side

effects of withdrawal," including exacerbated depression, nightmares, hopelessness, and suicidal thoughts. (Hamm Dep. 23:1–4, 6–16.) Even assuming that Plaintiff's averments were substantiated by admissible evidence, the psychological consequences he alleges to have suffered are insufficient to show that he was subjected to a significant risk of serious harm. [14] Courts have repeatedly refused to find constitutional violations where the harm alleged as a result of a delay in medical care is similar to that alleged here. *Bellotto,* 248 F. App'x at 237 (plaintiff who alleged missed medication dosages and inadequate monitoring of medications did not sustain a constitutional violation "because the risk of harm [he] faced as a result of the alleged treatment was not substantial," and because the only medical consequence he alleged was an "anxiety attack," which resulted in no physical injuries or acute distress); *Barnard v. Beckstrom,* No. 07–CV–19, 2008 WL 4280007, at *16 (E.D .Ky. Sept. 17, 2008) (doctor's affidavit found no merit in plaintiff's claim that a ten-day delay in making alterations to psychiatric medication rose to the level of a serious medical need as he did not "suffer from any physical injury as the result of any alleged or actual delay in treatment"); *Caldwell v. McEwing,* No. 00–CV–1319, 2006 WL 2796637, at *11 (C.D.Ill. Sept. 28, 2006) (granting summary judgment to defendants where plaintiff saw a doctor for psychiatric assessments, refused to take psychiatric medication, and no physical harm resulted); *cf. Bilal v. White,* 10–4594–PR, 2012 WL 3734376, at *2 (2d Cir. Aug. 30, 2012) (plaintiff who suffered from epilepsy and arthritis—"arguably ... serious underlying conditions"-but failed to demonstrate that his condition worsened due to the delay, was unable to establish a sufficiently serious medical need); *Smith,* 316 F.3d at 181–82 (two separate delays of several days each in provision of medication to inmate with HIV-positive status—an indisputably serious medical condition—did not cause sufficiently serious injury where plaintiff suffered temporary itching, severe headaches, as well as stress due to the missed medication, but his HIV infection and overall health did not worsen).

**\*10** The relevant case law makes clear that a greater showing of harm is required in order to meet the high standard of a constitutional violation within the context of a delay in treatment. *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (dentist's one-year delay in treating a cavity—a condition tending to cause acute pain if left untreated—precluded summary judgment in defendant's favor because of the severity of the risk of harm involved);

*Demata v. N .Y. State Corr. Dept. of Health Servs.,* No. 99–0066, 198 F.3d 233 (Table), 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999) (a delay in providing necessary medical care may rise to the level of a constitutional violation, but the Second Circuit has reserved such a classification for cases involving deliberate delay of treatment as a form of punishment, disregard for a life-threatening and fast-degenerating condition, and extended delay of a major surgery) (collecting cases); *Hathaway,* 37 F.3d at 67 (plaintiff found to have serious medical need where he suffered from a degenerative hip condition that caused him to have difficulty walking and significant pain over an extended period of time, and corrective surgery was delayed over two years); *Silvera v. Conn. Dept. of Corr.,* 726 F.Supp.2d 183, 191–92 (D.Conn.2010) (plaintiff who suffered from severe mental health issues and was an acute suicide risk, and ultimately committed suicide due to acts and omissions of prison medical staff, was found to have demonstrated a sufficiently serious medical need). The absence of any physical injury to Plaintiff as a result of the ten-day delay underscores the Court's finding. *Smith,* 316 F.3d at 187.

There is no indication in the record that Hatcher's conduct "significantly increased [Plaintiff's] risk for medical injury or similar serious adverse consequences." *Wright v. Genovese,* 694 F.Supp.2d 137, 159 (N.D.N.Y.2010) *aff'd,* 415 F. App'x 313 (2d Cir.2011). Accordingly, Defendants' motion for summary judgment may be granted on this basis alone.

### 3. Hatcher Did Not Act With Deliberate Indifference.

However, even assuming *arguendo* that Plaintiff had been subjected to a "sufficiently serious" deprivation of medical care, his claim for cruel and usual punishment against Hatcher would still fail because he cannot prove that Hatcher acted with deliberate indifference. As discussed above, *see supra* Part IV.A.1, a prison official cannot be found to have acted with deliberate indifference unless a plaintiff can demonstrate that the official "knew of and disregarded the plaintiff's serious medical needs." *Chance,* 143 F.3d at 703 (citing *Farmer,* 511 U.S. at 837). "The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result," but he must be subjectively aware that his conduct creates a substantial risk of harm. *Salahuddin,* 467 F.3d at 280. Mere negligence, however, even if it gives rise to a medical malpractice claim, is insufficient to sustain a constitutional claim. *Salahuddin,* 467 F.3d at

280; *Hathaway,* 37 F.3d at 68. Thus, in order to establish liability, Plaintiff must demonstrate the Hatcher knew of and disregarded an excessive risk to his safety in delaying Plaintiff's access to his medication for ten days.

**\*11** While Plaintiff alleges that he was "severely depressed" when Hatcher first evaluated him, (First Unnumbered Exhibit to TAC, second unnumbered page), by his own testimony he never communicated that to Hatcher. (Hamm Dep. 19:10–15.) Indeed, Plaintiff admits that he *purposely* withheld the full extent of his symptoms from Hatcher in order to avoid being placed in segregated housing, on suicide watch, or being sedated. (Hamm Dep. 21:18–22:1, 24:8–21.) Rather, Plaintiff told Hatcher that he was "doing alright," that he was eating and sleeping well, and that he felt only "mild[ly] to moderately depressed due to his legal problems and not recently getting his scheduled medications." (Conway Decl., Ex K.) Hatcher noted that Plaintiff's mood was "calm and stable" at that time. (*Id.*) Therefore, Plaintiff has set forth no facts tending to prove that Hatcher knew of any risk to Plaintiff's health resulting from the short-term delay in his treatment, much less that he disregarded any such risk. Accordingly, any potential risk to Plaintiff's health as a result of the delay in receiving antidepressant medication would not be actionable, because Plaintiff did not properly advise Hatcher of his actual psychological condition.

As there is no evidence in the record before the Court that Hatcher acted with deliberate indifference by failing to prescribe Plaintiff his medications for the first ten days of his detention at GMDC, Plaintiff's claim against Hatcher would fail the subjective test, as well.

**B. Plaintiff's Claim Against the City ("*Monell* Claim")**

The Court need not reach the merits of Plaintiff's *Monell* claim. As the Second Circuit has stated, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) (emphasis in original). When a district court concludes that there is "no underlying constitutional violation," it need not address "the municipal defendants' liability under *Monell.*" *Id.* Therefore, the Court GRANTS Defendants summary judgment on Plaintiff's *Monell* claim against the City.

**V. Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal taken from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge V. United States,* 369 U.S. 438, 444–45 (1962). The Clerk of the Court is respectfully directed to teminate this motion (Doc. 63), enter judgment in favor of Defendants, and close this case.

It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 71770

Footnotes

1   Plaintiff has named "Richard Hatcher" as a Defendant in this action. It appears from Defendants' papers, however, that his correct name is "Richard Fletcher." Because the caption of this case names "Richard Hatcher" as a Defendant, the Court will continue to refer to him by what seems to be an incorrect name.

2   Plaintiff, by his own estimation, has been arrested at least 100 times and has been convicted of a crime at least fifty times. (Hamm Dep. 36:24–37:3.) Most of his arrests have been for the possession or sale of marijuana. (*Id.* 37:4–6.)

3   Plaintiff was first diagnosed with depression and anxiety by a psychiatrist in the Department of Corrections, though he does not specify when. (Hamm Dep. 16:8–9.) He believes he suffered from these psychological conditions for many years prior to his diagnosis and that they caused him to begin using narcotics in the first place. (*Id.* 16:10–14.)

4   Plaintiff refers to this detention facility as the "Beacon facility." (Hamm Dep. 14:1–4.)

5   The details of this assault are unclear in Plaintiff's deposition testimony, but it appears to have involved corrections officers. (Hamm Dep. 14:11, 24–25.)

6   Plaintiff states that he was medicated for the entire duration of his detention in segregated housing at OBCC. (Hamm Dep. 15:13–17.)

**7**    Hatcher's position is unclear from the record. According to a Progress Note and a Medication Order Sheet he completed upon treating Plaintiff, it appears Hatcher may be a Nurse Practitioner, as indicated by his signature "Richard Fletcher NP." (Conway Decl., Exs. K, L.) However, during Hamm's deposition, Defendants' attorney repeatedly referred to Hatcher as "Dr. Fletcher." (*E.g .* Hamm Dep. 17:16.)

**8**    As set forth more fully below, the Court finds that all such disputed facts are not material, and even construing the facts in a light most favorable to Plaintiff, he cannot defeat Defendants' motion.

**9**    Plaintiff's evidence regarding the time during which he went without his medication is inconsistent. In his memorandum of law in opposition to the instant motion, he states that he "hadn't had [his] medication in 5 days" when he was first transferred to GMDC and met with Hatcher. (Pl.'s Mem. second unnumbered page.) He further states that Hatcher "took it upon himself to lower [his] dosage" after learning of the five-day delay in receiving treatment. (*Id.*) The Court discusses these inconsistencies below. *See infra* n. 13.

**10**    Plaintiff's testimony is also inconsistent in this regard. For example, he also stated in his deposition testimony that he did *not* ask to speak to anyone on the mental health staff in his first ten days at GMDC when he was not medicated. (Hamm Dep. 25:25–26:3, 26:22–25, 27:17–19.)

**11**    In his opinion, Judge Karas dismissed Plaintiff's Fourteenth Amendment claim against Hatcher to the extent that it was based on allegations that Plaintiff received a lower dose of Paxil than he requested. (Doc. 31 at 21.) Accordingly, this Court only addresses herein the portion of Plaintiff's Fourteenth Amendment claim that has survived the motion to dismiss, i.e., that Defendants violated his constitutional rights by depriving him of antidepressant medication for some period of time.

**12**    To the extent that Plaintiff has argued that Hatcher prescribed him a dosage of Paxil that was too low—and thus inadequate—after the ten-day delay, such a claim has already been addressed and dismissed by Judge Karas. *See supra* n. 11.

**13**    As noted above, *see supra* n. 9, Plaintiff's evidence of GMDC's adherence to this policy is inconsistent. First, in his Third Amended Complaint, dated August 7, 2009, and again in his deposition testimony, dated December 30, 2009, Plaintiff stated that due to a GMDC policy, he was unable to receive his medications for the first ten days after being transferred there. In his opposition papers, dated October 17, 2011, however, Plaintiff states that after not receiving his medication for *five* days upon his transfer to GMDC-with no mention of a prison policy-Hatcher lowered his Paxil dosage. While the Court is well aware that on summary judgment, it may not resolve issues of credibility, it is also well settled that "a party cannot attempt to survive a summary judgment motion by contradicting factual allegations in his complaint" or in prior sworn testimony. *Rojas v. Roman Catholic Diocese of Rochester,* 783 F.Supp.2d 381, 407 (W.D.N.Y.2010) *aff'd,* 660 F.3d 98 (2d Cir.2011) (citing *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528–529 (2d Cir.1985).

   The Court is not required to accept Plaintiff's assertion that he was deprived of the medication for ten days, as opposed to five, given that his statements are both equivocal, *see id.,* and unsupported by admissible evidence, *see Wali,* 678 F.Supp.2d at 178 (citing *Holtz,* 258 F.3d at 73,), and in light of the uncontroverted documentary evidence submitted by Defendants. *See Celotex Corp.,* 477 U.S. at 322. However, because the allegations fail even if the Court accepts Plaintiff's assertion that the delay lasted ten days, the Court will analyze the claim based on that version of the facts.

**14**    Although the Court would have greatly benefitted from an affidavit from Hatcher or other medical professionals employed by the City's Department of Corrections—and is perplexed why Defendants failed to submit one—"summary judgment may not properly be based on an absence of a statement from an expert that the care given was [or was not] grossly negligent when inferences drawn from the record could support such a finding." *Pellum v. Burtt,* 9:05–3339–JFA–GCK, 2008 WL 759084, at *33 (D.S.C. Mar. 20, 2008) (citing *Miltier v. Beorn,* 896 F.2d 848, 852 (4th Cir.1990)).

---

**End of Document**                                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jonathan Mena, Plaintiff,
v.
City of New York, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently incarcerated and proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Correction Officer Benjamin Eason ("Defendant"), alleging violations of the Eighth Amendment. Now before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

On September 9, 2012, while incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, Plaintiff was placed in an intake cell in the OBCC's receiving area, which he shared with two other individuals. (56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell was extremely cold, vermin-infested, and too small to accommodate three men. (*See* Doc. No. 54-1 ("Compl.") 4, 8.) Plaintiff further alleges that these conditions, coupled with the constant noise made by the two other inmates, prevented him from sleeping for the entire 60-

hour period that he was held in the cell. (*See id.* at 4.) Consequently, he asked Defendant, who was on duty, to transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.) According to Plaintiff, Defendant responded that there was "nothing he could do" about the situation. (*Id.* ¶ 9; *see also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC to complain about his experience in the cell. (*See* Compl. at 7.) The New York City Department of Correction ("DOC") has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), for inmates housed at facilities such as the OBCC. The IGRP, which was available and in effect at all times relevant to this lawsuit, requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP Directive") § IV(D)(1).) The IGRC then attempts to resolve the grievance informally within five days, and if the grievance is not informally resolved, then the inmate may request a formal hearing before the IGRC. (56.1 Stmt. ¶ 12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may appeal the IGRC's decision to the commanding officer, or her designee, and subsequent appeals may be taken to the Central Office Review Committee ("CORC"). (56.1 Stmt. ¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's decision is the final and binding decision of the DOC; if an inmate disputes the decision of the CORC, he may independently appeal to the Board of Correction. (IGRP Directive at 47.) Finally, if an inmate does not receive a timely disposition at any point throughout the grievance process, he has the option of either granting an extension of time to the relevant decisionmaker (i.e., the IGRC, the commanding officer, or the CORC) or appealing and proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (*See* Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (*See* Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a

number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

### II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court

to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at *1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

### III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's

effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at *3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days [,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at *7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at *8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question," but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly

rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ___, ___, ___, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.'" *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no

response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D) (9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.*, *Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted.[2]

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 3948100

## Footnotes

1     The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

2     Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Arnett v. Shojaie,   C.D.Cal.,   November 8, 2011

2010 WL 1235591
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

James MURRAY, Plaintiff,

v.

R. PALMER; S. Griffin; M. Terry;
F. Englese; Sergeant Edwards; K.
Bump; and K.H. Smith, Defendants.

No. 9:03-CV-1010 (GTS/GHL).
|
March 31, 2010.

**Attorneys and Law Firms**

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy Mulvey, Esq., James Seaman, Esq., Assistant Attorneys General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se* by James Murray ("Plaintiff") pursuant to 42 U.S.C. § 1983, began with an evidentiary hearing before the undersigned on March 1, 2010, regarding the affirmative defense of seven employees of the New York State Department of Correctional Services-R. Palmer, S. Griffin, M. Terry, F. Englese, Sergeant Edwards, K. Bump, and K.H. Smith ("Defendants")-that Plaintiff failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act, before filing this action on August 14, 2003. At the hearing,

documentary evidence was admitted, and testimony was taken of Plaintiff as well as Defendants' witnesses (Darin Williams, Sally Reams, and Jeffery Hale), whom Plaintiff was able to cross-examine through *pro bono* trial counsel. At the conclusion of the hearing, the undersigned indicated that a written decision would follow. This is that written decision. For the reasons stated below, Plaintiff's Second Amended Complaint is dismissed because of his failure to exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford,* 548 U .S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-

step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7. [1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence. [2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

**\*2** Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply

to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied. [3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process. [4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number. [5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative. [6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim,[10] (b) the inmate was specifically informed that the claim

in question was grievable,[11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC,[12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion,[13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim,[15] and/or (b) the inmate did not appeal his disciplinary hearing conviction.[16]

**\*4** Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, \*4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances."[17]

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court.[18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury.[19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law.[20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.)[21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the

relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,* --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury. [22]

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

 **\*5** New York prison inmates are subject to an Inmate Grievance Program established by DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at \*4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d 108, 112-13 [2d Cir.1999] ). There are different circumstances under which the grievance procedure is deemed not to have been available to an inmate plaintiff. *Hemphill,* 380 F.3d at 687-88. For example, courts have found unavailability "where plaintiff is unaware of the grievance procedures or did not understand it or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Hargrove v. Riley,* 04-CV-4587, 2007 WL 389003, at \*8 (E.D.N.Y. Jan.31, 2007) (internal citations omitted). When testing the availability of administrative remedies in the face of claims that undue influence from prison workers has caused a plaintiff inmate to forego the formal grievance process,

courts employ an objective test, examining whether "a similarly situated individual of ordinary firmness [would] have deemed them available." *Hemphill,* 380 F.3d at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003, at \*8.

Here, after carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that administrative remedies were "available" to Plaintiff during the time in question. The Court makes this finding for the following four reasons.

First, in his sworn Complaint (which has the force and effect of an affidavit), Plaintiff stated, "Yes," in response to the question, "Is there a prisoner grievance procedure at this facility ." (Dkt. No. 1, ¶ 4.a.) [23] Second, both Darin Williams (the corrections officer in charge of the special housing unit during the relevant time period) and Sally Reams (the Inmate grievance program supervisor during the relevant time period) testified credibly, at the exhaustion hearing, that there was a working grievance program at Great Meadow Correctional Facility during the time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.) Third, Plaintiff testified, at the exhaustion hearing that, during this approximate time period (the August to November of 2000), he filed at least three other grievances Great Meadow Correctional Facility, to which he received responses from the inmate grievance clerk, the Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70; *see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [24] Fourth, the Court finds the relevant portions of Plaintiff's hearing testimony regarding the grievance at issue in this action to be incredible due to various omissions and inconsistencies in that testimony, and his demeanor during the hearing. (*Id.* at 127-34.) [25]

### B. Estoppel

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.)

Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals. [26]

**C. Special Circumstances**

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at *8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative

remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations, [27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order. [28]

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is **DISMISSED in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1235591

## Footnotes

1    *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

2    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

3    *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009) (Suddaby, J.).

4    7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g* ., DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step."); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.5, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

5    *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

6    *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure

to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

7   The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88-103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

8   *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

9   *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

10  *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

11  *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

12  *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

13  *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

14  *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

15     *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way investigated by prison officials.") [citations omitted].

16     *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

17     *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

18     *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

19     *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

20     *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing

be held" before a judge, to resolve this issue); *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.") [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

21 *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8, 2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

22 *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb. 4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied, ---* U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

23 The Court notes that, in his Complaint, Plaintiff also swore that his "grievance was denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during the exhaustion hearing, Plaintiff testified that he never received a response to his grievance from any member of DOCS.

24 In addition, the documentary evidence adduced at the hearing establishes that, in actuality, Plaintiff filed ten other grievances during this time period (and several appeals from the denials of those grievances). The first of these grievances (Grievance Number GM-30651-00), filed on August 25, 2000, regarded Plaintiff's request for medications. (Hearing Exs. D-4, D-5.) The second of these grievances (Grievance Number GM-30691-00), filed on September 1, 2000, regarded Plaintiff's request for copies. (Hearing Ex. D-4.) The third of these grievances (Grievance Number GM-30729-00), filed on September 11, 2000, regarded the use of full restrains against Plaintiff. (*Id.; see also* Hearing Ex. P-14.) The fourth of these grievances, filed on October 19, 2000 (Grievance Number GM-30901-00), regarded Plaintiff's request for the repair of his cell sink. (Hearing Exs. D-4, D-5.) The fifth of these grievances (Grievance Number GM-30901-00), also filed on October 19, 2000, regarded Plaintiff's request for the clean up of his cell. (Hearing Ex. D-4.) The sixth of these grievances (Grievance Number GM-31040-00), filed on November 17, 2000, regarded the review of records. (*Id.*) The seventh of these grievances (Grievance Number GM-31041-00), also filed on November 17, 2000, regarded Plaintiff's request for medical attention. (*Id.;* see also Hearing Ex. P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance

Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject). (*Id.*) The tenth of these grievances (Grievance Number GM-31070-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

25    For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

26    *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koenigsmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

27    *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

28    The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

2016 WL 540806
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Mohamed Musaid, Plaintiff,
v.
Conan Manka, Defendant.

13-cv-7880 (PKC) (MHD)
|
Signed 02/09/2016

MEMORANDUM AND ORDER

CASTEL, U.S.D.J.

Plaintiff Mohamed Musaid, proceeding _pro se_, commenced this action on November 4, 2013, bringing claims against various defendants under 42 U.S.C. § 1983. On April 10, 2014, the Court dismissed all but plaintiff's excessive force claim against unnamed officers at Mid-Hudson Forensic Psychiatric Center ("Mid-Hudson") or Kirby Correctional Facility. (Dkt. No. 9.) The Court held that it could not "conclude that no substantial claim could be asserted on [plaintiff's] behalf." (Id.) Pursuant to a Valentin order, the Office of the Attorney General for the State of New York identified one potential defendant, Conan Manka, a former staff member at Mid-Hudson Forensic Psychiatric Center ("Mid-Hudson"). (Dkt. No. 15.) Plaintiff served the defendant with a copy of the amended complaint, to which an Answer was filed on November 14, 2014. (Dkt. No. 22.)

With discovery concluded, defendant moved for summary judgment on August 28, 2015 (Dkt. No. 44) pursuant to Rule 56, Fed. R. Civ. P. Defendant provided plaintiff with the requirements for opposing summary judgment and copies of the text of Rule 56 and Local Civil Rule 56.1, as required by Local Civil Rule 56.2. (Dkt. No. 45.) Under the Court's scheduling order, plaintiff's response was due on October 2, 2015. No response was filed and no request for an extension to respond has been made in the over five month period since the making of the motion. Having failed to respond, the Court deems the motion fully briefed. Even where a summary judgment motion is unopposed, courts must determine whether the moving party has established its entitlement to judgment as a

matter of law. See Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 242 (2d Cir. 2004). For the reasons that will be explained, defendant's motion for summary judgment is granted.

COMPETENCY

This Court referred the action to Magistrate Judge Michael H. Dolinger for general pretrial supervision. (Dkt. No. 9.) In light of plaintiff's history of psychiatric evaluations, this Court also instructed Judge Dolinger that he "may include consideration of whether the appointment of a guardian ad litem is necessary to protect Musaid's interests in this case." (Id.) The Second Circuit has held that a court may be found to have abused its discretion by not considering whether Rule 17(c), Fed. R. Civ. P., applied if it were presented "with evidence from an appropriate court of record or a relevant public agency indicating that a party had been adjudicated incompetent." Ferrelli v. River Manor Health Care Center, 323 F.3d 196, 201 (2d Cir. 2003). Magistrate Judge Dolinger was kept informed of developments regarding plaintiff's competency, including requiring that reports be sent directly to him. (Dkt. No. 28, 30, 32.) At no time did the Magistrate Judge deem the appointment of a guardian ad litem to be necessary.

After reviewing the record, the Court does not believe that the appointment of a guardian pursuant to Rule 17(c) is necessary to protect the plaintiff's interests. A New York court determined that plaintiff was competent to stand trial on April 22, 2015. (Letter dated April 23, 2015, filed under seal). He was discharged from Mid-Hudson and transferred to Rikers Island—first, the Anna M. Kross Center and, subsequently, the George R. Vierno Center —to await trial. (Dkt. No. 38, 43.) Under New York law, a person who has been declared incompetent regains the capacity to sue once a court formally declares him competent to manage his affairs. See Rossi v. Rossi, 190 Misc. 978, 979, 76 N.Y.S.2d 302, 303 (Sup. Ct. 1948) (citing Hughes v. Jones, 116 N.Y. 67, 73 (1889))

**\*2** Furthermore, at the time the state court determined that plaintiff was competent to stand trial in a pending criminal case, discovery in the present action was still ongoing and plaintiff had a meaningful opportunity to participate. Plaintiff had more than two months to request documents, take depositions, and make interrogatory requests. (Dkt. No. 36.) Despite not making any of his own discovery requests, plaintiff's deposition was taken on

May 20, 2015. A review of a partial deposition transcript shows that plaintiff's answers were coherent and that he understood the questions defendant was asking. (Rosner Decl., Ex. B.) Although a court must protect incompetent persons, litigants also "possess liberty interest in avoiding the stigma of being found incompetent, and *in retaining personal control over the litigation.*" [Neilson v. Colgate-Palmolive Co., 199 F.3d 642, 651 (2d Cir. 1999)](emphasis added). He had an opportunity to participate in discovery in the case and to respond to defendant's motion for summary judgment. A state court has determined plaintiff to be competent to stand trial in a criminal matter and objective indicia in this case demonstrate his competence. There is no basis to deny him the right to personally control this action.

BACKGROUND

During the relevant time period, plaintiff was a patient at Mid-Hudson, a facility that treats patients that have been found incompetent to stand trial, as well as patients committed after having been found not guilty at trial by reason of mental disease or defect. (Rivas Decl. ¶ 5.) Plaintiff was a patient at Mid-Hudson because he was found to be incompetent to stand trial. (Id. ¶ 7; Rosner Decl., Ex. C-D.) Dr. Osiris Rivas, one of plaintiff's psychiatrist at Mid-Hudson, diagnosed him with schizophrenia, a "chronic psychiatric condition characterized by changes in personality, delusions, auditory hallucinations, grandiose and paranoid ideations, disorganized thinking, and inappropriate or bizarre behavior." (Rivas Decl. ¶ 9.) One symptom of plaintiff's schizophrenia is somatic delusions, which cause plaintiff to believe that his organs do not work and that his bones are broken. (Id. ¶¶ 10-12.)

While at Mid-Hudson, plaintiff often refused to take his prescribed medications. As a result, Dr. Rivas sought a court order permitting Mid-Hudson to medicate plaintiff over his objection. (Id. ¶ 13.) On June 26, 2013, the New York State Supreme Court held a hearing and determined that plaintiff lacked the capacity to consent to the administration of his medication, and authorized Mid-Hudson to treat plaintiff over his objection. (Id. ¶ 14 & Ex. A.) Subsequently, plaintiff had to be restrained from time to time to ensure the safe administration of his court-mandated medication. (Id. ¶¶ 15-16 & Ex. B.)

Defendant was employed as a Secure Hospital Treatment Assistant ("SHTA") at Mid-Hudson from February 21,

2013 to December 5, 2013. (Manka Decl. ¶ 4.) One of defendant's responsibilities was to restrain patients when necessary, including at a physician's request to ensure the proper administration of a patient's medication. (Id. ¶¶ 6-7.) On three occasions between September 2013 and October 2013, defendant was "directed to restrain [plaintiff] by the physician on the ward." (Id. ¶¶ 13-14, 16.) Two of those occasions were requested "in order to allow the nurse to administer court-ordered medication." (Id.) On the other occasion, defendant "was directed to restrain [plaintiff] because he posed an immediate danger to [defendant.]" (Id.)

Plaintiff alleges that during his commitment to Mid-Hudson, defendant used excessive force in violation of the Constitution, causing him severe injuries, including a broken thumb on his left hand and a broken right hand. (Am. Compl. at 3.) Although he does not indicate when or where these injuries occurred, it stands to reason that they occurred during one of his three physical interactions with the defendant. On September 23, 2013, plaintiff told Dr. Rivas that his thumb had been broken for four months, "but only started complaining about it for the past week." (Rivas Decl. ¶ 18.) Dr. Rivas examined plaintiff's thumb and noted that there was neither redness nor swelling. (Id. & Ex. D.) Plaintiff also did not accuse defendant of breaking his thumb at the time. (Id. ¶ 19.)

**\*3** Dr. Rivas referred plaintiff to an internist at Mid-Hudson, Dr. Tiong Hiap The. (Id. ¶ 18.) Dr. The examined plaintiff's thumb and found that "there was no swelling, effusion (increased amount of fluid in the area), crepitus, redness, or step-off." (The Decl. ¶ 13 & Ex. D.) In addition, Dr. The noted that plaintiff's complaint could be a somatic delusion, and was similar to a complaint that plaintiff lodged earlier in the year, which an x-ray confirmed to be unfounded. (Id. ¶¶ 14-15 & Ex. C.) In June 2014, plaintiff again complained of pain in his left thumb, in addition to injury to his right foot and toe. (Id. ¶ 16.) Dr. The examined plaintiff's thumb noting that there was "no tenderness, crepitus, step-off, swelling, and that [plaintiff] had full range of motion." (Id. & Ex. E.) Dr. The also ordered an x-ray, which confirmed that plaintiff did not have a broken thumb, and that "there was no prior fracture, dislocation, or focal bony lesion." (Id. ¶¶ 17-19 & Ex. F-H.)

SUMMARY JUDGMENT STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law ...." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation and quotation marks omitted). It is the initial burden of a movant to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief as a matter of law. Vt. Teddy Bear Co., 373 F.3d at 244. In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).

Pro se pleadings are reviewed liberally, and courts should interpret them "to raise the strongest arguments that they suggest." See e.g., Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (citations omitted). This is especially true in the context of summary judgment, because the claims of pro se plaintiffs are subject to final dismissal. See Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988) ("[S]pecial solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment.") (citation omitted). Despite liberally interpreting pro se pleadings, the litigant is not excused from his burden of coming forward with "concrete evidence from which a reasonable juror could return a verdict" in his favor. Jermosen v. Coughlin, 877 F. Supp. 864, 867 (S.D.N.Y. 1995) (citing Anderson, 477 U.S. at 256). In reviewing a motion for summary judgment, the court may scrutinize the record, and grant or deny summary judgment as the record warrants. Rule 56(c)(3), Fed. R. Civ. P.

## DISCUSSION

Construing plaintiff's complaint liberally, he alleges that defendant used excessive force in violation of

the Constitution, which resulted in significant injuries, including a broken thumb. (Am. Compl. at 3.) Because plaintiff is a pretrial detainee, the Court analyzes his claim under the Fourteenth Amendment rather than the Eighth Amendment. See Graham v. Connor, 490 U.S. 386, 395 n.10 (1989) ("[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment."). In Kingsley v. Hendrickson, the Supreme Court held that a pretrial detainee bringing a claim for excessive force under the Fourteenth Amendment must meet an *objective* standard by showing "only that the force purposely or knowingly used against him was objectively unreasonable." 135 S. Ct. 2466, 2473 (2015). Although the claim may be supported by a showing that the force used was "was taken with an 'expressed intent to punish'" may support such a claim, pretrial detainees may succeed in the absence of intent "by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." Id. at 2473-74.

**\*4** While objective reasonableness depends on the facts and circumstances of each case, courts may consider a number of factors, including:

> The relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id. at 2473 (citing Graham, 490 U.S. at 396).

Here, the evidence indisputably demonstrates that the force used by defendant was objectively reasonable. Any force used by defendant was rationally related to the government's interest in providing care for plaintiff, and defendant's actions were not excessive in relation to that interest.

It has long been held that "the State may have a compelling interest, under its parens patriae power, in providing care to its citizens who are unable to care for themselves because of mental illness." Rivers v. Katz, 67 N.Y.2d 485, 496 (1986) (citing Addington v. Texas, 441

U.S. 418, 426 (1979)). In the present case, the government's interest in providing care to the plaintiff is clear, and the use of occasional force to ensure that care is indisputable. Plaintiff was housed at Mid-Hudson because he was found incompetent to stand trial. (Rivas Decl. ¶ 7; Rosner Decl., Ex. C-D.) And because plaintiff often refused to take his medication, his psychiatrist, Dr. Rivas, applied for and received court authorization to forcefully medicate him. (Rivas Decl. ¶ 13-14, Ex A.) Pursuant to the court order, it became necessary to forcefully restrain plaintiff to ensure that he took his medication. (Id. ¶ 15.) The record, therefore, demonstrates that the use of force by Mid-Hudson employees was based on a compelling governmental interest to ensure plaintiff was properly medicated. Addington, 441 U.S. at 426 ("The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves.").

Nor is there any evidence that the force used by defendant under the circumstances was excessive to its purpose. Part of defendant's job was to restrain patients, which defendant was required to do on three occasions. (Manka Decl. ¶¶ 6-7, 13-17.) Defendant received training on "approved physical intervention techniques," and was only permitted to use force as a last resort. (Id. ¶ 6.) Furthermore, on all three occasions, defendant used force only after being instructed to do so by plaintiff's physicians, and only to ensure that plaintiff took his court-ordered medication or to prevent immediate danger. (Id. ¶¶ 14-16 & Ex. A-C.) Moreover, each time defendant restrained plaintiff, the force used was limited both temporally and in degree, each instance of restraint lasting one, two, and three minutes, respectively. (Id.) See Kingsley, 135 S. Ct. at 2473 (noting that a factor relevant to the excessive force inquiry is the "effort made by the officer to temper or to limit the amount of force"); see also Kash v. Honey, 38 F. App'x 73, 77 (2d Cir. 2002) (holding that the intentional elbowing of an individual that did not result in any injury did not amount to a Fourteenth Amendment violation).

**\*5** Medical records also rebut any assertion that the force used by defendant was excessive under the circumstances. Although plaintiff contends that he suffered broken bones, including a broken thumb—evidence that tends to support the proposition that the force used was excessive —contemporaneous medical examinations and progress notes show otherwise. (The Decl. ¶ 19, Ex. G, H.) Dr. The's and Dr. Rivas's contemporaneous progress notes show that there were no physical indications of injuries, and x-rays revealed that plaintiff did not suffer any broken bones in his hand. (Id. ¶ 19 & Ex. G-H; Rivas Decl. ¶ 18 & Ex. D.) The record is ultimately void of any indication that plaintiff suffered a significant injury as a result of defendant's use of force. See Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005) (affirming summary judgment, where medical records indicated plaintiff suffered only minor injuries); Husbands ex rel. Forde v. City of New York, 335 F. App'x 124, 129 (2d Cir. 2009) ("One punch causing no injury to a suspect who is resisting being put in handcuffs does not rise to the level of excessive force."); Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993) (holding that "a de minimis use of force will rarely suffice" to satisfy the objective element of an Eighth Amendment excessive force claim). Lastly, plaintiff's somatic delusions suggest a history of unfounded injury complaints. During his two stays at Mid-Hudson, plaintiff consistently complained of broken bones in both of his hands, despite x-rays determining that he suffered from no broken bones. (Rivas Decl. ¶ 12; The Decl. ¶¶ 8-10, 13, 16-19 & Ex. A-B, F-H.) In addition, plaintiff consistently claimed that his organs did not work, despite all objective testing showing otherwise. (Rivas Decl. ¶ 11; The Decl. ¶¶ 6-7.) While not dispositive, this unrebutted evidence further demonstrates that plaintiff's injuries were insignificant or nonexistent.

CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Dkt. No. 44) is GRANTED. The Clerk of the Court is directed to enter judgment for defendant and close the case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Slip Copy, 2016 WL 540806

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2401574
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Nicholas ROBLES, Plaintiff,
v.
Warden S. KHAHAIFA, et al., Defendants.

No. 09CV718.
|
June 25, 2012.

**Attorneys and Law Firms**

Nicholas Robles, Albion, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

**Order**

HUGH B. SCOTT, United States Magistrate Judge.

 **\*1** Before the Court is defendants' motion for summary judgment dismissing this action (Docket No. 37 [1]). Responses to this motion were due by April 3, 2012, and any reply was due by April 16, 2012 (Docket No. 47). After denying (Docket No. 53) plaintiff's motions (Docket No. 47) for appointment of counsel and to stay the defense summary judgment motion (Docket No. 50), responses were due by May 14, 2012, and replies by May 25, 2012 (*id.*). The parties consented to proceed before the undersigned as Magistrate Judge on August 15, 2011 (Docket No. 30).

Plaintiff filed a renewed motion to stay the defense motion (Docket No. 57); that motion is **denied.**

BACKGROUND

Plaintiff, proceeding *pro se,* commenced this action alleging that defendants were deliberately indifferent to his medical condition while he was incarcerated at the Orleans Correctional Facility ("Orleans") in 2009 (Docket No. 14, Am. Compl.; Docket No. 39, Defs. Statement ¶¶ 1, 3). The Amended Complaint alleges claims against

Superintendent S. Khuhaifa, Dr. Winston Douglas and Dr. Dwight Lewis, inmate grievance supervisor Fitts, Sergeant Austin, and corrections officer Wilson (Docket No. 14, Am. Compl.). He claims that Drs. Douglas and Lewis exhibited deliberate indifference to plaintiff's right shoulder from February 2009 to June 2010 by failing to treat his shoulder and depriving plaintiff of pain medication. He alleges that the original injury arose from a prison assault while he was at Fishkill Correctional Facility, but he alleges here only claims arising in this District surrounding the treatment he received (or did not receive) while at Orleans (*id.* ¶¶ 16–17). Since plaintiff did not receive what he believed to be adequate pain medication, he substituted illegal marijuana to self-medicate his pain and was disciplined for marijuana possession (*id.* ¶ 20). Plaintiff moved for leave to proceed *in forma pauperis* (Docket Nos. 2, 5) and leave was granted (Docket No. 7).

*Defense Motion for Summary Judgment*
According to defendants' Statement of Undisputed Facts (Docket No. 39), plaintiff alleges that defendants were deliberately indifferent to the condition of his right shoulder, alleging that Superintendent Khahaifa instituted a policy which forbade prescribing narcotics to inmates (Docket No. 39, Defs. Statement ¶ 3; *see also* Docket No. 14, Am. Compl. ¶ 21). Superintendent Khahaifa states that, because medical decisions are delegated to medical personnel, he disclaims any influence over that decision making and denies that a no antinarcotic policy exists at Orleans (Docket No. 39, Defs. Statement ¶ 4; Docket No. 42, Khahaifa Decl. ¶ 6). Narcotic pain medication is prescribed on a case-by-case basis as needed by an inmate patient (Docket No. 39, Defs. Statement ¶ 5). Khahaifa received five letters and numerous grievances from plaintiff regarding his medical treatment which he forwarded to appropriate office or, with the grievances, he considered the appeal and affirmed denial of relief, with these appealed grievances then appealed to Department of Corrections and Community Supervision ("DOCCS") Albany central office (*id.* ¶ 9; Docket No. 42, Khahaifa Decl. 12).

 **\*2** Defendant Fitts was employed as an inmate grievance resolution program supervisor at Orleans (Docket No. 39, Defs. Statement ¶ 11; Docket No. 41, Fitts Decl. ¶ 1). Plaintiff claims that Fitts circumvented the grievance process (Docket No. 39, Defs. Statement ¶ 12), but

Fitts claims that all grievances were filed and processed pursuant to DOCCS directives (*id.* ¶ 13).

Defendant Austin was a sergeant at Orleans during this time and plaintiff alleges that he mislead and misinformed unnamed DOCCS officials in Albany by incorrectly telling them that he saw plaintiff lift weights (*id.* ¶¶ 17–18). Austin denies contacting Albany about plaintiff and he disclaims ever seeing plaintiff exercise (*id.* ¶¶ 22, 23).

Defendant Wilson is a corrections officer at Orleans (*id.* ¶ 25) and plaintiff claims that Wilson interfered with plaintiff's medical care by collaborating with nursing staff and Sergeant Austin in misinforming Albany officials about plaintiff's ability to lift weights (*id.* ¶ 26). When Wilson was questioned by medical staff about plaintiff, Wilson told them that he saw plaintiff lift weights daily (*id.* ¶¶ 27–28). A member of medical staff then went to the gym but missed plaintiff because he finished there (*id.* ¶ 29). Wilson never contacted Albany about plaintiff; had such contact been made, it would have been memorialized in a memorandum (*id.* ¶ 31).

Plaintiff alleges that Dr. Douglas, Facility Health Services Director at Orleans, refused to prescribe narcotics to plaintiff and instead chose to treat plaintiff's shoulder differently (*id.* ¶ 35). Dr. Douglas was plaintiff's primary physician at Orleans (*see* Docket No. 43, Dr. Lewis Decl. ¶ 4). Dr. Douglas explains that plaintiff made repeated demands for Percocet and other narcotics that were not medically necessary and plaintiff was not compliant with medical instructions (Docket No. 39, Defs. Statement ¶ 39; *see id.* ¶¶ 36–38, 40–41; Docket No. 48, Dr. Douglas Decl. ¶¶ 17, 18, 15, 20). Knowing plaintiff's history of drug abuse and his medical condition, Dr. Douglas changed plaintiff's medication (Docket No. 39, Defs. Statement ¶ 40; Docket No. 48, Dr. Douglas Decl. ¶ 20). Plaintiff was prescribed a sling and physical therapy as treatment for his shoulder (Docket No. 39, Defs. Statement ¶ 43), but plaintiff did not regularly wear the sling or attend physical therapy sessions, seeking instead imaging of the shoulder (*id.* ¶¶ 44, 42). Plaintiff also lifted weights (*id.* ¶ 45; Docket No. 48, Dr. Douglas Decl. ¶¶ 12–13), despite being told by medical staff to refrain from lifting weights (Docket No. 48, Dr. Douglas Decl. ¶ 12). On plaintiff's almost daily sick calls, medical staff noted plaintiff's "bulky well defined deltoids and bicep muscles, which are signs indicative of continued exercise" (*id.*). Defendants point to plaintiff's failed November 2008 surgery by outside surgeon Dr.

Stegemann at Erie County Medical Center as the cause for plaintiff's rotator cuff damage (Docket No. 39, Defs. Statement ¶ 46; Docket No. 48, Dr. Douglas Decl. ¶ 24, Ex. A, at Bates No. 311).

**\*3** Plaintiff charges that Dr. Lewis, a facility physician at Orleans, was deliberately indifferent (Docket No. 39, Defs. Statement ¶¶ 49–50). Dr. Lewis asserts that plaintiff was given proper medical care for his shoulder while at Orleans, he was prescribed pain and antiinflammatory medicines, physical therapy, and a sling (*id.* ¶ 51; Docket No. 43, Dr. Lewis Decl. ¶ 3), as well as monitoring images of his shoulder and examinations by outside consulting physicians (Docket No. 39, Defs. Statement ¶ 52; Docket No. 43, Dr. Lewis Decl. ¶ 3).

Defendants argue that both the subjective and objective elements of a deliberate indifference claim are not met here. Subjectively, they argue that plaintiff has not proven a culpable state of mind for any of the defendants (Docket No. 38, Defs. Memo. at 8–13). Objectively, defendants contend that plaintiff was scheduled for shoulder surgery in 2007 but was released and that surgery was never performed. Plaintiff was again incarcerated in 2008 and had two surgeries on his shoulder (Docket No. 48, Dr. Douglas Decl. ¶ 6). In 2009, plaintiff was deemed not to be a candidate for surgery, and was prescribed anti-inflammatory medication instead. Plaintiff, however, was not compliant with medical advice. Plaintiff worked out extensively, with one routine on May 7, 2009, videotaped showing plaintiff lifting weights, punching a heavy bag, and playing basketball, despite medical instruction to avoid such strenuous activity (Docket No. 45, Defs. Atty. Decl. ¶¶ 5–10, Ex. A (videotape) [2]). Defendants conclude that plaintiff's complaints did not rise to the level of serious medical need to meet the objective prong of the deliberate indifference claim (Docket No. 38, Defs. Memo. at 5–7).

Defendants each deny conspiring against plaintiff (Docket No. 39, Defs. Statement ¶¶ 10, 16, 24, 33, 48, 54; Docket No. 38, Defs. Memo. at 19–21) and deny any deliberate indifference on their part to plaintiff's condition (*see* Docket No. 39, Defs. Statement ¶ 54). They also argue that plaintiff fails to establish the personal involvement of Superintendent Khahaifa, Austin, Fitts, or Wilson in plaintiff's medical care (Docket No. 38, Defs. Memo. at 13–19). Defendants alternately argue that they are entitled

to qualified immunity if a constitutional violation is found here (*id.* at 21–23).

Plaintiff responds that he complains that he continues to suffer pain in that shoulder due to not being prescribed pain medication (Docket No. 54, Pl. letter response dated Apr. 11, 2012, at 1–2), although he has not amended his Complaint to allege continuous liability. He was prescribed Ibuprofen 800 mg., but plaintiff states that he could not tolerate this medicine in his stomach (*id* . at 1). Plaintiff previously argued that there is conflicting testimony (Docket No. 51, Pl. Memo. in support of motion for appointment of counsel and stay of defense motion ¶¶ 2, 5) but does not identify these conflicts. Plaintiff denies that he alleges any conspiracy among the defendants (Docket No. 52, Pl. Aff. in support of appointment motion ¶ 3).

**\*4** Plaintiff also complains about an assault that allegedly occurred on April 4, 2012, seeking to have this Court and prison grievance official review videotape of the incident (Docket No. 54, Pl. letter, at 1–2). That incident and others he raises in his papers (some discussed below), however, are beyond the scope of this pending action [3].

In his "Affidavit of Truth" (Docket No. 55), plaintiff describes the injury to his shoulder that lead to the surgeries and pain he suffers (Docket No. 55, Pl. Aff., FACTS ONE, TWO, FOUR, Ex. B; Docket No. 57, Pl. Amend. ¶¶ 7–8) and complains that physical therapy ended with his transfer to Fishkill Correctional Facility prior to his imprisonment at Orleans (Docket No. 55, Pl. Aff., FACT SIX). He faults Dr. Douglas for relying upon other medical personnel in plaintiff's medical record rather than his own assessment (*id.* FACT TEN), in fact plaintiff claims that Dr. Douglas used a purported assessment of plaintiff from Erie County Medical Center in January or February 2011 which claimed that plaintiff was in the Attica Correctional Facility but plaintiff was not confined there at that time (*id.* FACT NINE). Plaintiff states that due to "the medical malpractice of Winston Douglas," plaintiff had undergone severe and excruciating pain (*id.* FACT ELEVEN). He claims that he was denied proper medical assistance at Orleans (*id.* FACT SEVEN) and that a Jane Doe, a nurse administrator at Orleans but not named as a defendant here, violated HIPAA [4] by having security personnel investigate plaintiff's medical claims (*id.* FACT EIGHT). Plaintiff then alleges that, on April 11,

2012, he was assaulted by prison guards during a cell search (*id.* FACT 14).

He submits Junior Cepeda's "Affidavit of Truth" about medical staff disregarding plaintiff's complaints on March 28, 2012 (Docket No. 55, Cepeda Aff. of Truth). Cepeda states that he saw unnamed medical personnel "refuse to listen" to plaintiff on March 28 to his complaints, stating that plaintiff would always "complain about the same right shoulder all the time and everyday" (*id.* FACT 3). Cepeda states that he overhead medical staff talking about plaintiff's medical condition with security personnel at Orleans (*id.* FACT 4). Cepeda also witnessed plaintiff being assaulted by security personnel on April 11, 2012 (*id.* FACT 6).

Because plaintiff was refused pain medication, he claims that he took marijuana and then plead guilty in a disciplinary proceeding to marijuana use when caught (Docket No. 57, Pl. Amend. ¶ 9). He states that he declined what he termed an experimental surgical procedure by Dr. Stegamann in January of 2011 (*id.* [first] ¶ 10). Plaintiff alleges that since his reassignment to Orleans, defendants has been denied appropriate pain medication (*id.* [second] ¶ 10; *see id.* ¶ 11). Plaintiff's condition worsened when he injured his right knee and was then denied pain medication (*id.* ¶ 12).

**\*5** In their reply, defendants note that plaintiff made "numerous irrelevant references (Docket No. 58, Defs. Atty. Reply Decl. ¶¶ 4, 6) and submitted an unsworn witness statement (*cf.* Docket No. 55, Cepeda Aff. of Truth) that he saw medical personnel walk from plaintiff on March 28, 2012 (Docket No. 58, Defs. Atty. Reply Decl. ¶ 5). Defendants argue that this statement is too vague and conclusory to create a material issue of fact, it does not identify any defendant as the medical personnel involved, and is outside the time period (2009–10) for this action (*id.*). They conclude that plaintiff has failed to raise a material issue of fact to preclude summary judgment (*id.* ¶ 7).

### DISCUSSION

I. Summary Judgment Standard

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations show

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); Fed.R.Civ.P. 56(a), (c)(1) (effective Dec. 2010). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. *Ford, supra,* 316 F.3d at 354. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,* 522 U.S. 864 (1997). While the moving party must demonstrate the absence of any genuine factual dispute, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original removed); *McCarthy v. American Intern. Group, Inc.,* 283 F.3d 121, 124 (2d Cir.2002); *Marvel Characters v. Simon,* 310 F.3d 280, 285–86 (2d Cir.2002). The opponent to summary judgment may argue that he cannot respond to the motion where it shows, by affidavit, "that, for specified reasons, it cannot present facts essential to justify its opposition," Fed.R.Civ.P. 56(d).

The Local Civil Rules of this Court require that movant and opponent each submit "a separate, short, and concise" statement of material facts, and if movant fails to submit such a statement it may be grounds for denying the motion, W.D.N.Y. Loc. Civ. R. 56(a) (1), (2) (effective Jan. 1, 2011). The movant is to submit facts in which there is no genuine issue, *id.* R. 56(a)(1), while the opponent submits an opposing statement of material facts as to which it is contended that there exists a genuine issue to be tried, *id.* R. 56(a)(2). Each numbered paragraph in the movant's statement will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the opponent's statement, *id.* Each statement of material fact is to contain citations to admissible evidence to support the factual statements and all cited

authority is to be separately submitted as an appendix to that statement, *id.* R. 56(a)(3).

**\*6** The pleading of a *pro se* plaintiff, however, is to be liberally construed, *see Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam).

> "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* [550 U.S. 544, 555], 127 S.Ct. 1955, 1964, (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint. *Bell Atlantic Corp., supra,* at [555], 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929, (citing *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974))."

*Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam). In *Erickson,* the Court held that the Tenth Circuit departed from the liberal pleading standards of Rule 8(a)(2) by dismissing a *pro se* inmate's claims.

> "The Court of Appeals' departure from the liberal pleading standards set forth by Rule 8(a)(2) is even more pronounced in this particular case because petitioner has been proceeding, from the litigation's outset, without counsel. A document filed *pro se* is 'to be liberally construed,' [*Estelle v. Gamble,* 429 U.S., 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ], and 'a *pro se* complaint, however inartfully pleaded, must be held to

less stringent standards than formal pleadings drafted by lawyers,' *ibid.* (internal quotation marks omitted). *Cf.* Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so construed as to do substantial justice").

551 U.S. at 94; *see* *Boykin v. KeyCorp,* 521 F.3d 202, 213–14 (2d Cir.2008). Thus, the *pro se* plaintiff's complaint has to be construed "more liberally" than one filed by counsel, *Boykin, supra,* 521 F.3d at 214.

"An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made with personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated," Fed.R.Civ.P. 56(c)(4) (2010) (formerly Rule 56(e)).

## II. Deliberate Indifference Standard
Under the Eighth Amendment, in order to state a claim for inadequate medical treatment, plaintiff must allege that defendants acted with "deliberate indifference to [a] serious medical need," *LaGrange v. Ryan,* 142 F.Supp.2d 287, 293 (N.D.N.Y.2001); *see* *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also* *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (the Eighth Amendment prohibits infliction of "cruel and unusual punishments" which includes punishments that "involve the unnecessary and wanton infliction of pain.") (citations omitted); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "To establish an unconstitutional denial of medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Hathaway, supra,* 37 F.3d at 66 (quoting *Estelle, supra,* 429 U.S. at 104). Mere negligent treatment or malpractice upon a suspect, however, does not create an Eighth Amendment violation, *see* *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972). This claim has two elements, an objective component, that the deprivation must be sufficiently serious; and a subjective component, that the defendant official must act with sufficiently culpable state of mind. *Hathaway, supra,* 37 F.3d at 66. "Sufficiently serious" for the objective component contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (quoted in *Hathaway, supra,* 37 F.3d at 66). Plaintiff needs to prove

that defendants wantonly intended to cause him to suffer. *Wilson v. Seiter, supra,* 501 U.S. at 302.

## III. Application

### A. Procedural Grounds
**\*7** Here, plaintiff did not submit his counterstatement of facts providing a point-by-point refutation or adoption of the defense statement of facts. Instead, plaintiff provides in moving papers an attempt to stay the hearing of this motion and in other documents alleging generally that there were contested issues of fact (Docket Nos. 51, 52) or stating specific facts (contested or not) that he is now asserting in response to the motion (Docket Nos. 55, 57). He lists various facts in the latter instances without clearly indicating which fact is material to this motion. Despite his *pro se* status, the fact plaintiff did not state what facts were contested (even if not in a formal counterstatement) and compels this Court to look exclusively at defendants' statement as the conceded facts in this case. Plaintiff does point to some minor discrepancies in facts (for example, Dr. Douglas relying upon medical findings in 2011 while plaintiff was in another facility, Docket No. 55, Pl. Aff. FACT NINE; *but cf.* Docket No. 48, Dr. Douglas Decl. ¶ 11, Ex. A Bates No. 277 (consultation with Dr. Stegamann occurred in *2010* )) but these are not material to oppose the defense motion.

First, plaintiff submits his own and a witness's "Affidavit of Truth" (Docket No. 55), but both are unsworn and not witnessed statements, *cf.* 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 362–63 (Civil 3d ed.1998) (affidavits submitted for or opposing a summary judgment motion need not be notarized, they may be made under penalty of perjury, but unsworn statements will be rejected). Plaintiff certified and swore "to my unlimited commercial liability that the testimony I give before this court is, to the best of knowledge and understanding, true, correct, and complete, not misleading, the truth, the whole truth, and nothing but the truth, so help me God," and concluded that he declared "under the Laws of the Constitution of the United States of America that the above stated facts are true, correct, and complete to the best of my knowledge and belief. So help me God" (Docket No. 55, Pl. Aff. of Truth at pages 1 of 3 and 3 of 3). Witness Cepeda, a "sovereign American," submits a similar "Affidavit of Truth," declaring that "the facts stated/listed below are true, correct, and complete to

the best of my understanding and belief so help me God," concluding that he "declares under the laws of the constitution of the United States of America (1787) as amended (1791) by the Bill of Rights that the above is true, correct, and complete, to the best of my belief and knowledge. And does declare that notary assistance was not possible upon time and date of submitting this Affidavit of Truth. So help me God" (*id.,* Cepeda Aff. of Truth). The handwriting for both Affidavits is similar as is the verbiage. Neither document is a declaration stating expressly that they were made under penalty of perjury, *cf.* 28 U.S.C. § 1746.

**\*8** Nevertheless, given that plaintiff is an inmate proceeding *pro se* and, as indicated by Cepeda, may have lacked notary assistance with these documents, this Court will consider them as part of the opposition to summary judgment. But even considering these papers, Cepeda's Affidavit of Truth is not admissible for the information it contains since it discusses events in 2012 that are beyond the scope of this action as currently plead, *see* 10B Wright, Miller & Kane, *supra,* § 2738, at 330, 341 (court excludes summary judgment affidavit if its irrelevance is clear). As currently plead, this case involves defendants' deficient treatment of plaintiff in 2009–10; plaintiff has not sought to amend this Complaint again to allege continuing harm. Further, Cepeda's statement accuses an unnamed medical staffer for ignoring plaintiff's pleas for treatment on his shoulder without any connection of that unnamed employee to the named defendants in this case.

Next, this Court addresses the substance of defense arguments.

B. Deliberate Indifference

As for the objective element of a deliberate indifference Eighth Amendment claim, at worst plaintiff alleges medical malpractice (if that) in not prescribing the medication he desired. He sought narcotic medication while the facility medical staff prescribed Ibuprofen. That allegation is not sufficient to state a constitutional deprivation. Mere negligent treatment or malpractice upon a prisoner does not create an Eighth Amendment violation. *Estelle, supra,* 429 U.S. at 106; *Corby, supra,* 457 F.2d at 254. Plaintiff also exercised his shoulder, engaging in weight lifting and hitting a heavy bag, stressful and strenuous activities on an injured rotator cuff. Defendants' motion for summary judgment on this ground is **granted.**

As for subjective element, plaintiff has not suggested that defendants wantonly wished to cause him to suffer or lay out that defendants had the sufficiently culpable state of mind to establish this element. On this ground, defendants' motion is also **granted.**

C. Personal Involvement

As alternative ground, defendants motion is **granted** as to certain supervisory defendants because plaintiff fails to establish the personal involvement of supervisory officials retired Superintendent Khahaifa, Austin, Fitts, or Wilson in the denial of the sought medical care. The medical decisions were made by medical staff, in particular defendant Doctors Douglas and Lewis. The administrators named here merely considered grievances raised by plaintiff regarding this care.

To state a § 1983 claim, plaintiff must allege the manner in which defendant was personally involved in depriving plaintiff of his rights, *see Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). There are several ways to allege personal involvement: plaintiff could claim that defendant had direct participation in the event; plaintiff could claim that defendant failed to remedy the violation after it was noticed; defendant created the policy which lead to the violation or allowed the policy to continue; defendant was grossly negligent in managing subordinates which caused the violation to occur; or defendant exhibited gross negligence or deliberate indifference to plaintiff's rights by failing to act on information indicating that unconstitutional acts were taking place, *Wright, supra,* 21 F.3d at 501. An allegation of personal involvement is a prerequisite for damages under a § 1983 claim in this Circuit, *e.g., Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001).

**\*9** Plaintiff here has not alleged any of these bases for personal involvement of the supervisory defendants. Plaintiff merely claims that they failed to intervene or grant his grievance regarding the quality of medical care he received or that the superintendent had a no narcotics policy for the inmates. He does not refute defendants' contention that the supervisory defendants had no role in the medical decision making for plaintiff's treatment or Khahaifa's denial of having a policy regarding prescribing narcotics to inmates. Defendants' motion for summary judgment on this ground is **granted.**

D. Qualified Immunity

When confronted by a claim of qualified immunity, one of the first questions for the Court to resolve is do the facts, taken in the light most favorable to the party asserting the injury, show the official's conduct violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Under *Saucier,* this Court first considers the constitutional question, then considers the qualified immunity question, *id.* But the Supreme Court, in *Pearson v. Callahan,* 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), overruled *Saucier* in mandating the order in which trial courts are to consider qualified immunity claims. In *Pearson,* the Court recognized that district and circuit courts had the discretion to determine the order of the *Saucier* steps they would consider first (either the substance of the constitutional claim or the immunity claim), 555 U.S. at 232.

Government officials performing discretionary functions generally are shielded by qualified immunity from liability in their individual capacities, *see Frank v. Reilin,* 1 F.3d 1317, 1327 (2d Cir.1993), "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "If it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996).

Given that no constitutional violation was found, this Court **need not address** defendants' alternative contention that they deserve qualified immunity for their actions.

IV. Post Script—2012 Allegations

During the pendency of this action, plaintiff has been transferred, first from Orleans to Attica Correctional Facility then to Groveland Correctional Facility and later back to Orleans. Plaintiff has written two letters to this Court and to the grievance officials complaining about conditions following his last transfer to Orleans (letter of plaintiff to Chambers, Apr. 30, 2012; letter of plaintiff to

Chambers, Apr. 30, 2012). In these letters (and in other papers he submitted in response to defendants' motion, Docket No. 54; *see also* Docket No. 57), plaintiff claims that he was harassed and beaten by prison guards when he refused to lift his arms for a frisk due to his shoulder injuries. He also alleges that medical staff at Orleans refused to treat him in 2012. In his responding papers, he also discusses an April 2012 incident that he seeks the Court to investigate (Docket No. 54; *see also* Docket No. 57).

**\*10** Since these letters and papers allege incidents that occurred in February 23, 2012, and April of that year, well after the incidents alleged in this pending action and unrelated to those in this action, this Court **declines** plaintiff's implied request to amend the Complaint to add these new allegations. Since plaintiff also sent these letters to the grievance authorities, any potential claims may not have been administratively exhausted.

CONCLUSION

For the reasons stated above, defendants' motion for summary judgment (Docket No. 37) is **granted.** Plaintiff's renewed motion to stay consideration of defendants' motion (Docket No. 57) is **denied** and plaintiff's attempted motion for leave to amend the Complaint to assert claims arising from the April 2012 incident is also **denied.**

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

The Clerk of Court is instructed to close this case.

So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2401574

Footnotes

1    In support of this motion, defendants submitted their Memorandum of Law, Docket No. 38; their Statement of Facts, Docket No. 39; the declarations of defendants sergeant Darin Austin, Docket No. 40; inmate grievance resolution program supervisor Brian Fitts, Docket No. 41; retired Superintendent Sibatu Khuhaifa, Docket No. 42; Dr. Dwight Lewis, Docket No. 43; corrections officer Todd Wilson, Docket No. 44; and a declaration of their counsel, with exhibit (videotape of May 7, 2009), Docket No. 45; the declaration of Dr. Winston Douglas with exhibits, plaintiff's medical record, filed under seal, Docket No. 48; their attorney's reply Declaration, Docket No. 58.

In opposition, plaintiff submits his motion to stay summary judgment and for appointment of counsel and its supporting papers, Docket Nos. 50, 51, 52; his letter to Chambers, dated Apr. 11, 2012, Docket No. 54; and his "Affidavit of Truth Amendment in Opposition to Respondents Summary Judgment," with enclosed Affidavit of Junior Lorenzo Cepeda and exhibit of a grievance, Docket No. 55; his amendment renewed motion for stay of defense motion, Docket No. 57.

2    Plaintiff reviewed the videotape, Docket No. 45, Defs. Atty. Decl., Ex. A, cover letter Feb. 13, 2012 (with written notation "tape reviewed: 2–16–12" and signed by plaintiff).

3    Plaintiff also sought production of his medical records from January 2012 to present, Docket No. 54, Pl. Letter at 3. Docket No. 48 is plaintiff's medical record during the relevant period for this action, from February 13, 2009, to June 1, 2010, *see* Docket No. 48, Dr. Douglas Decl. ¶ 4, Ex. A, at first page, cover letter of April 12, 2011; *see generally id.,* Ex. A.

4    Health Insurance Portability and Accountability Act, Pub.L. No. 104–191, 110 Stat.1936 (1996). As recently held by this Court, any violation of medical privacy under HIPAA is limited to enforcement by the Secretary of Health and Human Services, *Wright v. Szczur,* No. 11 CV 140, 2012 U.S. Dist. LEXIS 10872, at *15,2012 WL 268283 (W.D .N.Y. Jan. 30, 2012) (Skretny, Ch. J.). Thus, even if plaintiff were deemed to allege such a claim, it would have to be denied.

---

2010 WL 3418382
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Richard SIPE, Plaintiff,
v.
David HARDER, et al., Defendants.

No. 9:08–CV–1365 (FJS/ATB).
|
Aug. 4, 2010.

**Attorneys and Law Firms**

Richard Sipe, pro se.

Aaron J. Marcus, Asst. Broome County Attorney, for Defendants.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

 **\*1**  This matter has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N .Y. 72.3(c). [1]

In this civil rights complaint, plaintiff alleges that on October 4, 2008, while he was incarcerated in the Broome County Correctional Facility ("BCCF"), he was assaulted by another inmate, while the housing unit officer watched. (Compl. at 2) [2] (Dkt. No. 1). Plaintiff also alleges that he was denied his "constitutional right" to press charges against the inmate, denied his right to file a grievance against another officer, and suffered retaliation as a result of these actions. *Id.* Plaintiff seeks substantial monetary relief. (Compl. at 6). Presently before the court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 43). Plaintiff has responded in opposition to the motion, [3] and defendants have filed a reply. (Dkt.Nos.47, 48).

This court agrees that defendants have met their burden on summary judgment and finds that there is no genuine issue of material fact for trial on any of plaintiff's claims. Plaintiff has failed to exhaust his administrative remedies as to all of the grounds raised in his complaint. None of the defendants were responsible for the assault on plaintiff, defendants Petryszyn [4] and Brown did not violate any of plaintiff's constitutional rights, and defendant Kozina did not deny plaintiff's request for medical care or retaliate against plaintiff for the assertion of his constitutional rights. Thus, the court will recommend that defendants' motion for summary judgment be granted and the complaint dismissed in its entirety.

**DISCUSSION**

**I. *Facts***

**A. Plaintiff's Allegations**
Plaintiff alleges that on October 4, 2008, he was incarcerated in B-pod [5] at BCCF. [6] (Compl. at 2). At approximately 9:30 p.m ., plaintiff was assaulted by Fruquan Mable, [7] another inmate at the jail. *Id.* Plaintiff claims that Corrections Officer, Matt Rovente [8] allowed the assault to continue for approximately twelve minutes. *Id.* Plaintiff claims that he was "badly hurt," and he was "taken to medical," where he was treated. *Id .* Plaintiff claims that he was later placed in punitive housing for no reason, and that there were cameras that "saw the whole thing." *Id.*

Plaintiff then states that on October 5th, he "stayed in medical" because he was having headaches, he could not sleep, and he was having panic attacks and bad dreams as a result of the assault. (Compl. at 4). Plaintiff alleges that he was in the medical unit for two days. *Id.* On October 7, 2008, defendant Sergeant Petryszyn came to speak with plaintiff about the assault, but plaintiff claims that defendant Petryszyn refused to let plaintiff file criminal charges against the inmate who assaulted him. *Id.* Plaintiff states that he is suing Sergeant Petryszyn because it is plaintiff's constitutional right to file criminal charges against another individual. *Id.*

 **\*2**  Plaintiff states that he was moved to A–Pod on the same day that he spoke with Sergeant Petryszyn. Plaintiff claims that on October 8, 2008, he tried to file a grievance against Sergeant Petryszyn, but that defendant Officer Billy Brown would not let him do so because defendants Brown and Petryszyn were friends. *Id.* Plaintiff states that he is suing defendant Brown based on his failure to

allow plaintiff to file a grievance. *Id.* Plaintiff claims that defendant Officer Larry Kozina denied plaintiff's request for medical care in retaliation for "the trouble [plaintiff] stirred up" with his grievances and due to his request to press charges against the other inmate. *Id.*

Very liberally interpreted, plaintiff's complaint appears to allege four claims. [9]

    (1) Defendant Harder is responsible for a "lack of security" that caused plaintiff to be assaulted by another inmate.

      (2) Defendant Petryszyn failed to allow plaintiff to "press criminal charges" against the inmate who assaulted him.

      (3) Defendant Brown denied plaintiff the right to file a grievance against Sergeant Petryszyn.

      (4) Defendant Kozina retaliated against plaintiff by denying his request for medical care and by treating him in a harsh and racist manner. [10]

**B. Defendants' Evidence**
Along with counsel's affidavit and the required statement of material facts, defendants have each filed an affidavit in support of their summary judgment motion. (Dkt. No. 43–2, 43–5–43–8). Defendants have also filed the following in support of their motion:

    (1) The affidavits of Corrections Officers Joe Cornwell and Dave Creveling, two officers who responded to the October 4, 2008 incident involving plaintiff. (Dkt.Nos.43–3, 43–4).

    (2) The affidavit of Mark Smolinsky, the Jail Administrator of BCCF. (Dkt. No. 43–9).

Officer Rovente states that on October 4, 2008, he was working in B-pod, plaintiff's housing unit at BCCF. (Dkt. No. 43–8, Rovente Aff. ¶ 3). At approximately 9:35 p.m., he heard the door to cell 104 slam, and as he walked over to see what was happening, he noticed that inmate Mable was following plaintiff from the lower tier of cells. *Id.* ¶ 4. As Officer Rovente was watching, inmate Mable began to hit plaintiff. *Id.* Officer Rovente states that corrections officers are trained to handle such altercations by first notifying the control room of the fight in progress, referred to as calling a "code yellow." *Id.* ¶ 5 & 5(a). The

"code yellow" involves informing the control room where the incident is taking place and how many inmates are involved. *Id.* ¶ 5(a).

Next, the officers are told to maintain unit security by ordering a "lock in" and by ordering the fighting inmates to stop. *Id.* ¶ 5(b). The officers are instructed not to become directly involved in the disturbance, but to remain at a "safe tactical distance." *Id.* ¶ 5(c). In fact, as the pod officer, Officer Rovente was not even allowed to assist in the restraining process after the other officers arrived. *Id.* ¶ 7. Officer Rovente states that when he saw inmate Mable hitting plaintiff, he immediately ordered inmate Mable to stop fighting and used his shoulder radio unit to call the "code yellow." *Id.* ¶ 8. Officer Rovente then went back to the "bubble" and called for the rest of the unit inmates to "lock in." *Id.* at ¶ 9. He did not try to physically stop the fight himself because, according to his training, he was required to wait until other officers arrived to assist. *Id.* ¶ 8.

**\*3** Officer Rovente states that at a certain point, inmate Mable stopped hitting plaintiff and returned to his cell, where he locked in. *Id.* ¶ 9. Officer Rovente then ordered plaintiff into the program room to wait for the other guards to arrive. When the other guards arrived, they took both inmates out of the pod. *Id.* ¶ 10. According to Officer Rovente, the entire incident lasted less than one minute, and although inmate Mable threw a lot of punches, it appeared that plaintiff was struck only three or four times because he was running away from inmate Mable and dodging the punches. *Id.* ¶ 11. Officer Rovente asserts that prior to this altercation, he was not aware of any tension or other problems between plaintiff and inmate Mable. *Id.* ¶ 12.

Officers Cornwell and Creveling were "rovers" on the evening of October 4, 2008. (Dkt. No. 43–3 & 43–4) (Cornwell Aff.; Creveling Aff.) A "zone rover" is an officer who monitors inmate movement through the corridors of the facility and assists and relieves housing officers when needed. (Cornwell Aff. ¶ 2; Creveling Aff. ¶ 2). Zone rovers also respond to emergency situations in the housing pods, including the "code yellow" calls. *Id.* Both officers state that at approximately 9:35 p.m. on October 4, 2008, a "code yellow" call was made regarding a fight in B-pod. (Cornwell Aff. ¶ 3; Creveling Aff. ¶ 3). Officer Cornwell states that he does not recall exactly how long it took him to respond, but that generally it takes

him from a few seconds to about one minute, depending on where he is in the facility. (Cornwell Aff. ¶ 3). Officer Creveling also states that he does not remember how long it took him to respond, but it generally takes between one to two minutes, depending upon where he is in the facility. (Creveling Aff. ¶ 3).

Officers Cornwell and Creveling state that by the time they arrived at B-pod, both inmates had already been secured. (Cornwell Aff. ¶ 4; Creveling Aff. ¶ 4). When the officers arrived, they were directed to cell 102, where inmate Mable was already locked in. *Id.* Plaintiff was located in the program room. *Id.* Officer Cornwell secured inmate Mable, and Sergeant Jeff Katen and Officer Creveling escorted inmate Mable out of the pod. (Cornwell Aff. ¶ 5; Creveling Aff. ¶ 5). Sergeant Theresa Zenzel and Officer James McCombs took plaintiff out of B–Pod. (Cornwell Aff. ¶ 5). Officer Creveling states that he and Jeff Katan took inmate Mable to D–Pod, and while inmate Mable was being searched, he admitted to hitting plaintiff because plaintiff spit on the back of inmate Mable's head. (Creveling Aff. ¶ 6). Officers Cornwell and Creveling have attached copies of their respective incident reports as exhibits to their affidavits.[11] (Dkt. No. 43–15—Ex. C, Cornwell Report; Dkt. No. 43–16—Ex. D, Creveling Report). Officer Rovente's report states that plaintiff was seen by the medical staff after the incident for the injury to his mouth. (Dkt. No. 43–14, Ex. B).

**\*4** In his affidavit, defendant Petryszyn states that he investigated the altercation between plaintiff and inmate Mable. (Dkt. No. 43–7, Petryszyn Aff. ¶ 2). As part of the investigation, he reviewed a videotape of the incident, taken by the cameras positioned in the pod. *Id.* Defendant Petryszyn states that his review of the videotape revealed that inmate Mable did strike plaintiff "a few times," but that no more than a few seconds elapsed, as opposed to the ten or twelve minutes that plaintiff claims passed. *Id.* ¶ 3. Because of the "de minimis" nature of the event, the videotape was not retained beyond the normal thirty day holding period. *Id.* ¶ 4. No "Notice of Claim" or civil complaint was filed at the time that the recorder "rewrote itself." *Id.*

Defendant Petryszyn also states that Officer Rovente did not stand idly by, watching plaintiff's beating. *Id.* ¶ 5. Defendant Petryszyn confirms that when a disturbance takes place in the pod, the pod officer must call the "code yellow," maintain unit security and order a "lock in" of the rest of the inmates on the unit, and must not get physically involved in the altercation. *Id.* at ¶ 7. The reason for this final requirement is so that the pod officer can identify the inmates involved, observe and document all actions, and maintain the security of the rest of the unit by avoiding being ambushed or tricked. *Id.* Defendant Petryszyn determined that Officer Rovente handled the situation properly and in accordance with policy. *Id.* at ¶ 12. It took the "rovers" between thirty seconds and one minute to respond to the "code yellow" call. *Id.* ¶ 13.

Defendant Petryszyn states that he never refused to allow plaintiff to bring criminal charges against inmate Mable, although defendant Petryszyn does not remember plaintiff asking to do so. *Id.* ¶¶ 14–15. Defendant Petryszyn states that he does not have the power to restrict an inmate from pursuing the filing of criminal charges, and plaintiff could have notified the Broome County District Attorney's Office himself in order to request that charges be brought against inmate Mable. *Id.* ¶ 16.

Defendants have also "traditionally" filed plaintiff's medical records.[12] (Dkt. No. 43–25, Exs.L, M). In plaintiff's response to defendants' motion, he argued that the records provided by defendants were not complete, and that defendants refused to give plaintiff a list of witnesses to the event. (Dkt. No. 47 at 4). Defendants' reply includes excerpts from plaintiff's deposition. (Dkt. No. 48–1). Defendants have also included the medical records associated with medical visits from October 4 through 7, 2008. (Dkt. No. 48–2).

The progress notes from October 4th indicate that plaintiff was taken to the medical department after the fight. The nurse noticed that plaintiff's nose had bled, but the blood was "drying." *Id.* at 1. There was a small line of bruising seen on the left side of the nose, his eyes were tearful and reddened, and he complained of dizziness and blurred vision. *Id.* The nurse tested his eye sight, determined that he was alert and oriented, and performed a neurological check that produced results that were within normal limits. *Id.* The nurse did not notice any cuts or "open areas" outside of the bloody nose. *Id.* at 1.

**\*5** Because plaintiff complained of dizziness and chest pain, an EKG was performed. *Id.* at 1, 3. Although plaintiff complained of increased anxiety, his anxiety and heart rate decreased while he was being examined, and the EKG was normal. *Id.* at 1. After discussing potential

cardiac issues, plaintiff was returned to the housing unit. *Id.* Plaintiff went to "emergency sick call" on October 5, 2008, complaining that he was having feelings of "harming self." *Id.* Plaintiff told the nurse that "he didn't do anything and they put me in D–Pod, so I came over here." *Id.* at 2. He denied suicidal intent, but he was kept in the medical unit. *Id.* His main complaint was that his nose hurt across the bridge, and he was having trouble blowing out of it. *Id.*

With their reply, defendants submitted the affidavit of Stephen A. Barlow, a Corrections Sergeant and Supervisor of the Criminal Investigations Unit at BCCF. (Dkt. No. 48–4, Barlow Aff. ¶ 1). Sergeant Barlow interviewed Inmate Arthur Pellechia, who admitted being an eyewitness to the entire October 4, 2008 incident. *Id.* Inmate Pellechia, states that he saw the fight, which started in the Gallery. *Id.* Inmate Pellechia states that he saw plaintiff running away from Fruquan, and that plaintiff "took some punches," but that the "whole thing lasted about 5 mins." *Id.* "The officer called lock in when it started and called for help." *Id.*

## II. *Summary Judgment*

Defendants have moved for summary judgment, arguing that plaintiff has failed to exhaust his administrative remedies and has failed to raise any genuine issue of material fact regarding any of his substantive claims. This court finds that summary judgment should be granted in favor of all defendants, based both on plaintiff's failure to exhaust his administrative remedies and as to the merits of his claims.

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**\*6** In considering a motion for summary judgment, the court does not resolve contested issues of fact, but must rather determine the existence of any disputed issues of material fact. *Salahuddin v. Coughlin,* 999 F.2d 526, 535 (2d Cir.1998) (citations omitted). In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272. To evaluate a fact's materiality, the substantive law determines which facts are critical and which are irrelevant. *Salahuddin v. Coughlin,* 999 F.2d at 535 (citing *Anderson v. Liberty Lobby,* 477 U.S. at 248). While the court must extend "extra consideration" to pro se parties, this does not relieve the pro se of his duty to meet the requirements necessary to defeat the motion. *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003). A pro se party's bald assertion, "completely unsupported by the evidence," is not sufficient to overcome a properly supported motion. *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Carey v.. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

## III. *Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Scott v. Del Signore,* 2005 U.S. Dist. LEXIS 6070, *12–15 (W.D.N.Y. Feb. 18, 2005) (citing *inter alia Johnson v. Testman,* 380 F.3d 691,

695 (2d Cir.2004)). As an affirmative defense, it is the defendant's burden to establish that plaintiff failed to meet the exhaustion requirements. *Id.* at *12–13 (citing *Giano,* 380 F.3d at 675).

In *Jones v. Bock,* 549 U.S. 199, 218 (2007), the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. *Id.* (citing *Woodford v. Ngo,* 548 U.S. 81, 88 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must ***complete*** the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

Plaintiff was incarcerated in a County Facility, thus, the court must examine the grievance procedures applicable to BCCF. Major Smolinsky's affidavit states that he is the Corrections Facility Administrator, and he promulgates and reviews the rules and regulations of jail procedure. (Dkt. No. 43–9, Smolinsky Aff. ¶ 2). Upon admission to the facility, all inmates are provided with an Inmate Handbook, which advises them as to the availability of grievance forms. *Id.* The forms were readily available so that inmates could file their grievances within five days of the act or occurrence giving rise to the grievance. *Id.* The handbook also provides the proper deadlines pursuant to New York Regulations. *Id.* (citing 9 N.Y.Code Rules & Regs. ("NYCRR") §§ 7032.4(i)-(k) and 7032.5). All inmates are provided access to the grievance program. *Id.* ¶ 6.

**\*7** Defendants have included a page of the handbook, containing the description of the inmate grievance procedure used at BCCF. (Dkt. No. 43–18, Ex. F). In order to resolve a grievance, the inmate must first attempt to get the issue resolved with the housing officer. *Id.* If no resolution is reached, plaintiff must file his grievance within five business days. *Id.* The initial grievance should be filed with defendant Brown, the Grievance Coordinator at BCCF. [13] (Dkt. No. 43–2, Brown Aff. ¶¶ 1, 3). The grievance is investigated, and plaintiff receives a written determination from defendant Brown within five days. *Id.* If plaintiff is not satisfied with the result, he may appeal to the Corrections Facility Administrator (Major Smolinsky). *Id.* If the inmate is not satisfied with this result, he must appeal within three days,

and the grievance will be sent to the State Commission of Correction. *Id.*

The Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir, 2004)). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.*

### A. Failure to Protect

Based on Major Smolinsky's affidavit and Exhibit F, it is clear that administrative remedies were available to plaintiff. [14] It is also clear that there is no record of plaintiff bringing an initial grievance regarding the failure to protect him from inmate Mable's assault, either against Officer Rovente, who plaintiff has not been named as a defendant, or against defendant Sheriff Harder, who was not personally involved in the incident, but upon whom the plaintiff apparently wishes to blame the assault. There is no claim that anyone prevented plaintiff from filing a grievance about the assault itself. Thus, the defendants would not be estopped from asserting this defense. Plaintiff has shown no special circumstances that would excuse his failure to grieve the alleged failure to protect plaintiff. Thus, plaintiff's first claim may be dismissed because he did not exhaust his administrative remedies.

### B. Failure to Allow Plaintiff to Press Criminal Charges and Right to File Grievances

Plaintiff second claim alleges that defendant Petryszyn refused to allow plaintiff to press criminal charges against inmate Mable. The grievance procedure was certainly available to plaintiff, but plaintiff did not file a grievance against defendant Petryszyn. For this claim, plaintiff alleges that he "filed or tried to file a grievance" against defendant Petryszyn, but defendant Brown "denied [his] grievance" because the defendants were "friends." Plaintiff alleges this as a separate claim against defendant Brown.

**\*8** Plaintiff appears to be alleging that defendant Brown somehow prevented plaintiff from filing a grievance

against defendant Petryszyn. Since defendant Brown states in his affidavit that part of his job is to collect the initial grievances from inmates, (Brown Aff. ¶ 3), if he did prevent plaintiff from filing a grievance against defendant Petryszyn, plaintiff could argue that defendant Brown's conduct should estop him from asserting the lack of exhaustion as a defense.

However, even assuming that defendant Brown would not accept plaintiff's initial grievance against defendant Petryszyn, plaintiff was able to submit a complaint about both defendant Brown and defendant Petryszyn. On November 21, 2008 plaintiff wrote a letter to Major Smolinsky. [15] (Dkt. No. 43–21, Ex. I). In that letter, plaintiff stated that he wished to file a grievance regarding visitation, but that defendant Brown "stopped allowing me to file them." *Id.* Plaintiff claimed that the visitation was denied "in retaliation" for an unspecified lawsuit. [16] It is unclear from plaintiff's letter when defendant Brown allegedly stopped allowing plaintiff to file grievances. Plaintiff also included his claim that defendant Petryszyn refused to allow plaintiff to file criminal charges against inmate Mable and included a non-specific claim that his "medical care" was denied. *Id.*

In his affidavit, Major Smolinsky states that when he received plaintiff's Novmeber 2? letter, [17] he directed Lieutenant Hill to investigate the matter and respond. (Dkt. No. 43–9, ¶ 9). Lieutenant Hill investigated plaintiff's complaints and responded by memorandum dated December 4, 2008. (Dkt. No. 43–22, Ex. J). Lieutenant Hill's memorandum denied plaintiff's complaints. *Id.* The memorandum addresses and denies any staff wrongdoing regarding the visitation/retaliation claim, the claim against defendant Petryszyn, and defendant Brown, even though plaintiff's November 2? letter does not specify what grievances defendant Brown stopped plaintiff from filing. Lieutenant Hill's memorandum also cites all of the instances in which plaintiff was examined by medical personnel. *Id.* Plaintiff never attempted to appeal this determination to the Commission of Correction.

If plaintiff were following the grievance procedure as stated in the Inmate Handbook, the first level would have required a decision by defendant Brown. If defendant Brown were preventing plaintiff from filing grievances, an appeal to Major Smolinsky would have been the

second level of review, and the final appeal would have been the Commission of Correction. Plaintiff bypassed [18] defendant Brown by writing to Major Smolinsky and Sheriff Harder, and although plaintiff received a decision from Lieutenant Hill on behalf of Major Smolinsky, plaintiff never appealed or even attempted to appeal Lieutenant Hill's findings. To the extent that plaintiff began the available administrative process, he never completed it. Therefore, he has failed to exhaust his administrative remedies as to both his claim against defendant Petryszyn and his claim against defendant Brown.

**\*9** In the alternative, as discussed below, even if the court were to assume that plaintiff exhausted his administrative remedies, neither claim rises to the level of a constitutional violation, and both claims may be dismissed on the merits.

### C. Retaliation

Plaintiff alleges that defendant Kozina "retaliated" against plaintiff for the "trouble" he "stirred up" by denying his "request for medical care." (Compl. at 4). Defendants have included two formal grievances filed by plaintiff; one filed on November 3, 2008 against Officer Kozina, claiming that defendant Kozina made plaintiff take his medication by threatening him with confinement if he refused to comply; and the second, filed on January 14, 2009, complaining about an unnamed officer who was very rude and who was shouting plaintiff's "legal business" in the open. (Dkt.Nos.43–19, 43–23, Exs.G, K). Both grievances were addressed and denied at each level of the appeal process. *Id.*

However, the grievance that actually mentioned defendant Kozina did not allege that he refused plaintiff's request for medical care. In fact, plaintiff's grievance complaint against defendant Kozina was that he told plaintiff that he had to take his medications as directed or plaintiff would be locked in his cell. (Dkt. No. 43–19, Ex. G). Nowhere in the grievance does plaintiff claim that he requested medical care that he did not receive. [19] The grievance was filed on November 3, 2008, long after the October 4th incident, and before plaintiff signed or filed his federal complaint. *Id.* Thus, no claim of retaliation against defendant Kozina has been exhausted by plaintiff. In any event, as with plaintiff's other claims, his claim against defendant Kozina fails on the merits.

#### IV. *Personal Involvement*

Defendants argue that defendant Harder, the Sheriff of Broome County, was not personally involved in any of the conduct alleged by plaintiff, and that plaintiff's claim that defendants failed to protect him from the attack of another inmate fails on the merits. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

**\*10** In this case, defendant Harder argues that plaintiff has failed to allege sufficient personal involvement to sustain a constitutional claim against him. Plaintiff states that he named Sheriff Harder because of a lack of security at the facility that allegedly resulted in the assault by inmate Mable. Plaintiff does not allege that Sheriff Harder was personally responsible for any other conduct. Plaintiff's general statement that defendant Harder was responsible because of a "lack of security" alleges neither a policy or a custom of allowing such attacks, nor does he allege gross negligence in managing Officer Rovente.

Plaintiff was deposed in this action. The deposition focused on the danger from inmate Mable. In their reply brief, defendants have filed portions of plaintiff's deposition. (Dkt. No. 48–1). During his deposition, plaintiff testified that he had never had any misunderstandings with inmate Mable prior to the incident, but he then attempted to explain why he feared

this inmate. (Dkt. No. 48–1 at 2). [20] Plaintiff was asked why he did not have inmate Mable on a "keep-apart list" prior to the incident, and plaintiff stated that he "did have, the day before the altercation ... I let the [corrections officers] know...." *Id.* Letting corrections officers know about a potential enemy the day before an altercation is insufficient to establish that somehow defendant Harder would be aware of the situation. Later in the deposition, plaintiff testified that prior to the altercation, he had no problem with inmate Mable. *Id.* at 4. Plaintiff stated that "[w]e were cool in the cell until he got the word." [21] *Id.*

Plaintiff was asked how Sheriff Harder was involved in the altercation or what happened prior to the altercation. *Id.* at 8. Plaintiff answered that Sheriff Harder was involved because plaintiff "wrote him" the day before the altercation. *Id.* There is absolutely no basis upon which to find that Sheriff Harder knew about any danger to plaintiff, particularly when plaintiff states he had no problem with inmate Mable prior to the incident, and he did not "alert" either the corrections officers or defendant Harder until the day before the incident. [22] In any event, the failure of a supervisory official to investigate a letter of protest written by an inmate is insufficient to establish personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006). Thus, to the extent that plaintiff claims that Sheriff Harder should have done something to protect plaintiff from inmate Mable's assault itself, there is no personal involvement.

The court must interpret plaintiff's pro se complaint as raising the strongest argument that it suggests. *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Very liberally construed, the complaint can be read as including two failure to protect claims. One claim includes the failure to anticipate the risk of, and protect plaintiff from, assault by inmate Mable. The second claim would be that Officer Rovente watched the altercation without "helping" plaintiff. Plaintiff does not name Officer Rovente as a defendant. Because plaintiff was unaware of the proper protocol for responding to inmate altercations, he does not appear to be challenging the "policy" or the "protocol" which requires the housing officer to refrain from physically interfering in an inmate altercation and waiting for the "code yellow" back-up to arrive. However, if the court interprets the complaint as including a challenge to the "policy" or official "protocol" of the facility, and Sheriff Harder was involved in creating

or enforcing that policy, then there could arguably be sufficient personal involvement by defendant Harder for that claim alone. The court does not have to make this determination, because regardless of personal involvement, plaintiff's failure to protect claims fail on the merits as discussed below.

## V. *Failure to Protect*

**\*11** An inmate has a right under the Eighth and Fourteenth Amendments to be spared "the 'unnecessary and wanton infliction of pain.' " *Hendricks v. Coughlin, 942 F.2d 109, 112 (2d Cir.1991)* (citation omitted). An inmate's allegation that a defendant was deliberately indifferent in failing to protect him from the violence of other inmates states a claim under section 1983. *Id. at 113.*

In order to establish an Eighth Amendment claim for failure to protect, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, ***and*** prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan, 511 U.S. 825, 836 (1994).* The plaintiff must show that prison officials ***actually knew of and disregarded*** an excessive risk of harm to the inmate's health and safety. *Id. at 837.* The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists, and the defendant must also draw that inference. *Id.*

An isolated omission by corrections officers generally does not support a claim for deliberate indifference, absent circumstances involving evil intent, recklessness, or deliberate indifference. *Coronado v. Goord,* 99 Civ. 1674, 2000 U.S. Dist. LEXIS 13876, \*10–11 (citing *Ayers v. Coughlin, 780 F.2d 205, 209 (2d Cir.1985)*). Plaintiff may allege a constitutional claim by alleging that the substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and that the officials being sued were exposed to information concerning the risk and thus, must have known about it. *Id.* (citing *Farmer,* 511 U.S. at 842–43).

As stated above, even assuming that plaintiff wrote to Sheriff Harder the day before the incident, this bit of information is completely insufficient to establish that Sheriff Harder was aware of and disregarded a substantial risk to plaintiff. Thus, to the extent that plaintiff is attempting to raise a claim of failure to protect him from

the assault itself against Sheriff Harder,[23] that claim may be dismissed.

Plaintiff's claim that Sheriff Harder was responsible for a lack of security in general would also not rise to the level of a constitutional claim. Such conclusory allegations are insufficient to state a claim under section 1983. *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987). Negligence is also not actionable under section 1983. *Daniels v. Williams,* 474 U.S. 327 (1986); *Davidson v. Cannon,* 474 U.S. 344 (1986).

Finally, to the extent that plaintiff's complaint may be read to challenge the policy or "protocol" that prevents the housing officer from becoming physically involved in an inmate altercation and requires him to wait for back-up to arrive, that claim also fails on the merits. It is well settled that the realities of running a penal institution are "complex and difficult," and the policies instituted by prison administrators are entitled to great deference by the court. *Washington v. Harper,* 494 U.S. 210, 223–24 (1990). The Supreme Court standard for evaluating any regulation that infringes upon an inmate's constitutional rights involves determining whether the regulation or policy is " 'reasonably related to legitimate penological interests.' " *Id.* (quoting *Turner v. Safely,* 482 U.S. 78, 89 (1987)). The standard applies even when the constitutional right allegedly infringed is fundamental. *Id.* (citing *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)). In order to make this determination, the court must consider whether there is a vital connection between the policy and the legitimate governmental interest supporting the policy; the impact that any accommodation of the constitutional right will have on guards and other inmates, and on the allocation of prison resources in general; and the absence of ready alternatives. *Id.*

**\*12** In this case, although plaintiff believes that Officer Rovente failed to intervene in the fight to help plaintiff, the evidence submitted by defendants shows that Officer Rovente did exactly as he should have in the situation. It may have appeared to plaintiff that Officer Rovente was standing by while plaintiff was being assaulted. As stated above, however, the officers have been trained not to become involved in an inmate altercation. They must wait for back-up to protect the security of the entire housing unit. Officer Rovente immediately called for back up, and within minutes, officers arrived. It may have seemed a long time to plaintiff, but in reality, only one or two minutes

passed, and according to inmate Pellecchia, the "whole thing" only lasted five minutes.

The policy articulated by defendants to explain Officer Rovente's actions is certainly related to legitimate penological interests. The security risk of the only officer on a housing unit becoming involved in an inmate altercation is substantial for the guard as well as the rest of the inmates in the unit. The "code yellow" is called, and the rovers arrive within seconds or minutes to assist in ending the disturbance. Although plaintiff may believe that this was not the proper procedure, the defendants have advanced a very legitimate security reason for the protocol followed by Officer Rovente, and plaintiff's substantive claims of failure to protect may be dismissed.

### VII. *Criminal Charges and Grievances*

#### A. Defendant Petryszyn
The source of some frustration for plaintiff appears to be his belief that defendant Petryszyn refused to allow plaintiff to press criminal charges against inmate Mable. Plaintiff asserts that he has some constitutional right to press charges against another individual, and that this defendant prevented plaintiff from doing so. Although defendant Petryszyn denies refusing to ***allow*** plaintiff to press charges, stating that plaintiff could have always contacted the District Attorney himself, there simply is no constitutional right to press charges against another individual. *Marsh v. Kirschner,* 31 F.Supp.2d 79, 81 (D.Conn.1998) (citing *inter alia Leeke v. Timmerman,* 454 U.S. 83, 87 (1981) (per curiam); *Linda R.S. v. Richard D.,* 410 U.S. 614, 619 (1973)). *See also Bourguignon v. Lantz,* No. 3:05–CV–245, 2006 WL 214009, *6–7 (D.Conn. Jan. 25, 2006) (citations omitted) (no right to compel the prosecution of criminal activity, and court dismissed plaintiffs' claims that defendants failed to press charges or failed to assist other inmates in pressing charges against inmates involved in an altercation). Thus, even if defendant Petryszyn had refused to allow or help plaintiff to press charges against inmate Mable, plaintiff's claim against defendant Petryszyn would have to be dismissed.

#### B. Defendant Brown
Plaintiff alleges that defendant Brown refused to allow plaintiff to file a grievance against defendant Petryszyn, complaining about his failure to allow plaintiff to press criminal charges against inmate Mable. To the extent that this allegation could have excused a failure to exhaust, it is discussed above. The court also interprets plaintiff complaint as an attempt to bring a separate constitutional claim against defendant Brown for his alleged refusal to allow plaintiff to file an institutional grievance against his "friend" defendant Petryszyn.

**\*13** Courts have consistently held that because grievances procedures are undertaken voluntarily by the New York and other states, they are *not constitutionally required. See Ramos v. Hanslmaier,* 96 Civ. 744, 1997 U.S. Dist. LEXIS 6082, *6–7 (S.D.N.Y. Feb. 19, 1997) (multiple citations omitted). *See also Bullock v. Horn,* CV–99–1402, 2000 U.S. Dist. LEXIS 21573, *22–23 (M.D.Pa.2000) (plaintiff claimed improper refusal to process grievance); *Hoover v. Watson,* 886 F.Supp. 410, 418–19 (D.Del.), *aff'd,* 74 F.3d 1226 (3d Cir.1995); *Muhammad v. McMickens,* 86 Civ. 7376, 1988 U.S. Dist. LEXIS 552, *8–9 (S.D.N.Y. Jan. 25, 1988). Because the grievance procedures are not constitutionally required, a violation of those procedures, or the failure to enforce them, does not give rise to a claim under section 1983. *Id.* Thus, plaintiff's claim against defendant Brown may be dismissed.

### VIII. *Retaliation*
Plaintiff's final claim is that defendant Kozina retaliated against plaintiff for the grievance and the "pressing charges ordeal" by subjecting plaintiff to "harsh and racist treatment." (Compl. at 4, 5). As stated above, plaintiff vaguely states that the alleged retaliation included some denial of medical treatment. Plaintiff's claims are completely conclusory and unsupported by any of the evidence.

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)). Finally, even if plaintiff makes the

appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett,* 343 F.3d at 137.

The Second Circuit has defined "adverse action" in the prison context, as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

In this case, plaintiff alleges that defendant Kozina retaliated against plaintiff for the assertion of his right to have criminal charges filed against inmate Mable and his right to file a grievance against defendant Petryszyn. Even assuming that plaintiff has validly asserted that he engaged in constitutionally protected conduct, there is no indication that defendant Kozina took any "adverse" action against plaintiff or that any action taken by defendant Kozina was in any way related to the assertion of plaintiff's alleged constitutional rights.

 ***14** Plaintiff does not describe any instance in which defendant Kozina denied plaintiff's request for medical care. [24] In his complaint plaintiff states that he filed a grievance against defendant Kozina for this conduct. Thus, the court has examined the grievance filed by plaintiff against defendant Kozina in order to determine

what plaintiff might be claiming. As stated above, the only grievance plaintiff filed against defendant Kozina involved defendant Kozina telling plaintiff to stop arguing with a nurse, who was telling plaintiff to take his medications as prescribed by medical personnel, and to stop disrupting the housing unit. Plaintiff does not describe what he means by "harsh and racist treatment," and this court cannot find that any such "treatment" would deter a similarly situated individual of ordinary firmness from exercising his constitutional rights. [25] Thus, this court will recommend dismissal of the conclusory claim of retaliation as to defendant Kozina.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 43) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3418382

Footnotes

1    The case was originally referred to the Honorable Gustave J. Di Bianco and was assigned to me upon Judge Di Bianco's retirement on January 4, 2010. (Dkt. No. 41).

2    The court will cite to pages of the CM/ECF document because plaintiff has not numbered his pages and has inserted pages into the civil rights complaint form.

3    Although plaintiff has labeled this document a "motion," it is more appropriately considered a response in opposition to defendants' motion and has been filed as such. (Dkt. No. 47).

4    In the complaint, plaintiff misspelled this defendant's name "Petrician." (Dkt. No. 1). However, the court will refer to this defendant with the proper spelling, "Petryszyn." *See* (Dkt. No. 43–7) (Petryszyn Aff.).

5    A "pod" is a housing unit at the facility.

6    Plaintiff was incarcerated at BCCF from September 9, 2008, until February 3, 2009. (Dkt. No. 43–9, Smolinsky Aff. ¶ 4).

7    Plaintiff originally named Fruquan Mable as a defendant, but on January 6, 2009, Senior District Judge Scullin dismissed the complaint against defendant Marble because he did not act under color of state law as required to sustain a section 1983 action. (Dkt. No. 6 at 3). Although plaintiff continues to refer to Fruquan Mable as a defendant, he has been terminated from this action.

8    Plaintiff has not named Officer Rovente as a defendant in this case.

9    In determining the claims that plaintiff is attempting to raise, the defendants and the court have considered the entire complaint because plaintiff's "Causes of Action" do not all appear to actually state causes of action. Where a plaintiff is proceeding pro se, the court must interpret the pleadings liberally "to raise the strongest arguments they suggest." *Bussey v. Phillips,* 419 F.Supp.2d 569, 579 (S.D.N.Y.2006) (quoting *Graham v. Henderson* 89 F.3d 75, 79 (2d Cir.1996)) (internal quotation marks omitted)).

10    The court notes that in plaintiff's response to defendants' summary judgment motion plaintiff lists his "causes of action" as defendants have interpreted them, but plaintiff includes an additional statement in his fourth cause of action relating to a "denial of the right to practice his religion." (Dkt. No. 47, ¶ 9). Plaintiff then states that "[w]hen [the] complaint was received by defendants, Retaliation was placed on plaintiff by locking him in F pod with no heat, no hot water, denial of medical care, and refusal to allow him to practice his religion of Islam." (Dkt. No. 47, ¶ 11). He also states that "[p]laintiff was placed in F pod in retaliation for "suit". (Dkt. No. 47, ¶ 20). Plaintiff appears to be attempting to state that after the defendants received the ***federal complaint,*** "they" did all these things to plaintiff. Nowhere in the complaint are any facts that support these final allegations, and it appears that they relate to actions that some unknown individuals committed after the federal complaint was filed. Plaintiff has not moved to supplement his complaint. Thus, the court will not consider any of these last allegations.

11    Defendants have also included a copy of Officer McCombs's report. (Dkt. No. 43–17—Ex. E, McCombs Report).

12    Exhibit 25, filed electronically, is simply defense counsel's letter, requesting that he be allowed to file the medical records "traditionally." (Dkt. No. 43–25). The court has been provided hard copies of the medical records for its review.

13    Defendant Brown states that as part of his duties as the Grievance Coordinator, he tours the facility daily, Monday through Friday, discussing facility issues with inmates and accepting their grievances, if any. (Dkt. No. 43–2, Brown Aff. ¶ 3). Defendant Brown states that he knows plaintiff, has spoken to him on various occasions, and has received two grievances from him. *Id.* ¶ 4.

14    It is clear that plaintiff had the Inmate Handbook, since his November 21, 2008 letter to Major Smolinsky cites the Inmate Hanbook and "NYS Minimum Standards" as support for plaintiff's alleged right to visitation. (Dkt. No. 43–21, Defs.Ex. I).

15    Plaintiff wrote substantially the same letter to Sheriff Harder. (Dkt. No. 43–20, Ex. H).

16    Plaintiff may be referring to this action because his complaint is signed was November 12, 2008, and the letters defendant Harder and Major Smolinsky were written on November 21, 2008, it is unlikely that any of the defendants were aware of plaintiff's lawsuit because it was not received in the Northern District until December 22, 2008, notice of the action was not sent to Sheriff Harder until January 16, 2009, and the case was not served on defendants until March of 2009. The acknowledgments of service were not returned until July of 2009. (Dkt.Nos.31–34).

17    Major Smolinsky received plaintiff's letter on December 1, 2008. (Dkt. No. 43–9, ¶ 9).

18    Generally, bypassing the first step of the grievance process would not be considered properly exhausting the grievance process. *Jones v. Bock, supra.* However, if defendant Brown had really been preventing plaintiff from filing grievances, plaintiff's letter to Major Smolinsky (and Sheriff Harder) would have been the appropriate step to take.

19    The court notes that the grievance was investigated. The investigation showed that plaintiff wanted to take medications "his way," not as prescribed by the doctor. (Dkt. No. 43–19, Ex. G at 3–4). Defendant Kozina only got involved because plaintiff was having an argument with the nurse and was beginning to disrupt the housing unit. *Id.* at 4. The nurse was interviewed as part of the investigation. Defendant Kozina told plaintiff to stop arguing "or be locked in." *Id.* The investigation also showed that defendant Kozina declined to look at pictures of plaintiff's children, and plaintiff took offense. *Id.* Lieutenant Hill wrote plaintiff a memorandum explaining the results of the investigation and denying the grievance. *Id.* Plaintiff appealed to the Commission of Correction, and his appeal was denied January 21, 2009.

20    Defendants did not submit a copy of the entire deposition, thus, the pages of the transcript are not consecutive. The court will cite to the CM/ECF page of the document.

21    During the deposition, plaintiff testified that inmate Mable had a "contract" out on plaintiff, due to another inmate, who was on plaintiff's "keep-apart" list. (Dkt. No. 48–1 at 2). "[T]hat's why I was assaulted." *Id.* Plaintiff also testified that he put inmate Mable on plaintiff's "keep-apart" list "the day before the altercation" because he "felt bad vibes ...." *Id.*

22    The only letter to Sheriff Harder from plaintiff in the record is the letter, filed by defendants, dated November 21, 2008 (after the October 4th incident) that is substantially identical to the letter plaintiff wrote to Major Smolinsky. (Dkt. No 43–20). The claims made in that letter were investigated by Lieutenant Hill.

23    A claim against Sheriff Harder or any of the other defendants in their "official capacities," would be a suit against the municipality by which the individual is employed. A section 1983 action against municipal officers in their official capacity is treated as an action against the municipality itself. *Coon v. Town of Springfield,* 404 F.3d 683, 687 (2d Cir.2005) (citing

*Brandon v. Holt,* 469 U.S. 464, 471–73 (1985)). In order to state a claim against Broome County, plaintiff would have to show that the allegedly unconstitutional conduct resulted from a "policy" or "custom" of the municipality. *Anthony v. City of New York,* 339 F.3d 129, 139 (2d Cir.2003). Since the case fails against the individual defendants for lack of a constitutional violation, any claim against the municipality would also be dismissed. This court has also discussed plaintiff's complaint as it could be interpreted to allege a challenge to a policy, and finds that the complaint should be dismissed either as against the defendants in their individual or "official" capacities.

24    In response to plaintiff's claim that he has been denied medical care, defendants have submitted plaintiff's medical records for this court's review. (Dkt. No. 43, Exs.L, M). In his response to defendants' motion, plaintiff still makes vague claims regarding his medical care, but he does not relate this allegations to any existing defendant. As stated above, any attempt that plaintiff makes to include new issues regarding religion or any other claims will not be considered.

25    *See, e.g, Davis v. Goord,* 320 F.3d at 353 (insulting, disrespectful, sarcastic, or hostile comments directed at an inmate generally do not rise to the level of adverse action) (citing *inter alia, Dawes v. Walker,* 239 F.3d at 492 (calling inmate a "rat" not a constitutional violation).

---

**End of Document**            © 2016 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by    Mena v. City of New York,    S.D.N.Y.,    July 19, 2016

2016 WL 3729383
Only the Westlaw citation is currently available.
United States Court of Appeals,
Second Circuit.

Mark Williams, Plaintiff–Appellant,

v.

Correction Officer Priatno, Correction
Officer Gammone, Defendants–Appellees,
Correction Officer John DOE, State of New
York, New York State Department of Corrections
and Community Service, Defendants. [*]

Docket No. 14-4777
|
August Term, 2015
|
Argued: February 29, 2016
|
Decided: July 12, 2016

**Synopsis**

**Background:** Former state inmate brought § 1983 action against two corrections officers, alleging that they violated his Eighth Amendment rights by beating him for talking back to another officer when he was incarcerated at state corrections facility. The United States District Court for the Southern District of New York, Seibel, J., dismissed the action. Inmate appealed.

**[Holding:]** The Court of Appeals, Katzmann, Chief Judge, held that prisoner satisfied Prison Litigation Reform Act's (PLRA) exhaustion requirement.

Reversed and remanded.

West Headnotes (7)

**[1]    Federal Courts**

🔑 Dismissal or nonsuit in general

Court of Appeals reviews a grant of a motion to dismiss de novo.

Cases that cite this headnote

**[2]    Federal Courts**

🔑 Imprisonment and incidents thereof

Issue of whether a plaintiff has exhausted administrative remedies under Prison Litigation Reform Act (PLRA) is a question reviewed de novo. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[3]    Federal Courts**

🔑 Pleadings; Dismissal

In reviewing district court's grant of motion to dismiss, the Court of Appeals accepts all factual allegations in the complaint as true.

Cases that cite this headnote

**[4]    Federal Civil Procedure**

🔑 Pro Se or Lay Pleadings

On a motion to dismiss for failure to state a claim, where the complaint was filed pro se, it must be construed liberally with special solicitude and interpreted to raise the strongest claims that it suggests. Fed. R. Civ. P. 12(b)(6).

2 Cases that cite this headnote

**[5]    Prisons**

🔑 Pleading

Failure to exhaust administrative remedies is an affirmative defense under the Prison Litigation Reform Act (PLRA), not a pleading requirement. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

2 Cases that cite this headnote

**[6]** **Prisons**

👉 Exhaustion of Other Remedies

Although inmates are not required to specially plead or demonstrate exhaustion in their complaints, a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the Prison Litigation Reform Act (PLRA) exhaustion requirement. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

1 Cases that cite this headnote

**[7]** **Prisons**

👉 Particular cases

Prison grievance procedures that were technically available to state inmate who claimed he was beaten by correction officers were so opaque and confusing that they were incapable of use, and therefore, inmate exhausted all administrative remedies that were available to him, as required before filing suit under Prison Litigation Reform Act (PLRA), by giving his complaint to a correction officer to forward to the grievance clerk; confusing grievance process that provided an appeal "to the next step" did not contemplate inmate's situation in which correction officer did not file the grievance, which made it practically impossible for him to ascertain whether and how he could pursue his grievance. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a); N.Y. Comp. Codes R. & Regs. tit. 7, § 701.7.

3 Cases that cite this headnote

Plaintiff–Appellant Mark Williams appeals from an order of the District Court for the Southern District of New York that dismissed his claim under 42 U.S.C. § 1983 and the Eighth Amendment for failure to exhaust all available administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). We conclude that administrative remedies beyond the

submission of his initial complaint were unavailable to Williams because the applicable grievance procedures are "so opaque" and confusing that they were, "practically speaking, incapable of use." *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, 1859, ––– L.Ed.2d ––– (2016). Accordingly, we reverse the decision of the district court and remand for further proceedings consistent with this opinion.

**Attorneys and Law Firms**

BRIAN M. FELDMAN (Michael J. Rooney, on the brief), Harter Secrest & Emery LLP, Rochester, NY, for Plaintiff–Appellant.

HOLLY A. THOMAS (Barbara D. Underwood and Anisha S. Dasgupta, on the brief), for Eric T. Schneiderman, Attorney General of the State of New York, New York, NY, for Defendants–Appellees.

Before: Katzmann, Chief Judge, Sack and Lohier, Circuit Judges.

**Opinion**

Katzmann, Chief Judge:

**\*1** Plaintiff–Appellant Mark Williams alleges in this 42 U.S.C. § 1983 case that Defendants–Appellees Correction Officer Priatno and Correction Officer Gammone violated his Eighth Amendment rights when they brutally beat him for talking back to another officer when he was an inmate at Downstate Correctional Facility ("Downstate") in New York. We are presented with the threshold question of whether Williams exhausted all available administrative remedies prior to filing this lawsuit in the United States District Court for the Southern District of New York, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). More specifically, we must decide whether the prison's grievance process was actually "available" to Williams in light of the extraordinary circumstances of his case. We conclude that that process was not available to Williams because the applicable grievance procedures are "so opaque" and confusing that they were, "practically speaking, incapable of use." *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, 1859, –––L.Ed.2d ––– (2016). We reverse the decision of the district court that granted defendants' motion to dismiss and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

*A. Department of Corrections and Community Supervision Grievance Procedures*

The New York State Department of Corrections and Community Supervision ("DOCCS") regulations outline the procedures that apply to the Inmate Grievance Program ("IGP") at Downstate. The grievance process begins with the filing of a complaint within 21 days of an alleged incident. N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.5(a)(1). Typically, inmates file grievances with the grievance clerk. *Id.* However, if an inmate is housed in the special housing unit ("SHU"), and therefore segregated from the regular prison population, he may give the grievance complaint to a correction officer to file for him. *See id.* § 701.7. Upon filing, the grievance clerk numbers and logs the grievances. *Id.* § 701.5(a)(2).

Ordinarily, there are three levels of review of a grievance. The first is by the inmate grievance resolution committee ("IGRC"); the second is by the facility superintendent; and the third is by the central office review committee ("CORC"). *Id.* §§ 701.1(c), 701.5. However, "harassment grievances"—those that involve "employee misconduct meant to annoy, intimidate or harm an inmate," *id.* § 701.2(e)—are subject to expedited first-level review by the facility superintendent, *id.* § 701.8. When the grievance clerk identifies a harassment grievance, the clerk must forward the grievance to the superintendent on the same day that the grievance was filed. *Id.* § 701.8(b). If the grievance presents a bona fide harassment issue, then the superintendent must initiate an investigation, render a decision on the grievance, and inform the inmate of the decision within 25 days of receipt of the grievance. *Id.* § 701.8(d), (f). "If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC." *Id.* § 701.8(g); *see also id.* § 701.6(g)(2) (stating generally that matters not decided within designated time limits "may be appealed to the next step").

**\*2** If an inmate is transferred to another facility while a grievance is pending, a response to the grievance shall be mailed to the inmate at the new facility. *Id.* § 701.6(h)(1). "If the grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed within seven calendar days after receipt." *Id.* § 701.6(h)(2). If an inmate wishes to file a new grievance about an incident that occurred prior to a transfer, he must file the grievance in the facility where he is currently housed, "even if it pertains to another facility." *Id.* § 701.5(a)(1).

*B. Facts and Procedural History*

Williams was formerly incarcerated at Downstate. He alleges that, on December 31, 2012, he was in a search room (also known as a "drafting" room) while his personal items were being searched. A correction officer was "thoroughly probing [his] legal work" and he asked her to stop. Joint App. at 32. Williams explains that the legal papers were related to a separate action seeking damages for an assault he experienced while an inmate at Rikers Island. The officer instructed Williams to sit down, which he did while "admonishing" her. *Id.* At that point, defendant correction officers Priatno and Gammone approached Williams. They grabbed Williams and dragged him to another room that had no cameras, where they were out of eyesight of the other 15 to 20 inmates who were seated in the drafting room. Williams alleges that the officers proceeded to assault him—thrusting his forehead against the wall, causing him to fall to the ground, and then kicking and stomping on any uncovered part of his body. Defendant Gammone allegedly picked him up and said, "this is what running your mouth gets you," and punched him on his right eye. *Id.* at 37. Williams fell to the floor again, and defendant Priatno allegedly kicked his face and head. Following the assault, the officers sent him to the infirmary. He suffered injuries to his head, knee, eye, elbow, lower back, jaw, and nose, and he now takes medication for anxiety and panic attacks.

Williams alleges that on January 15, 2013, while he was housed in the SHU at Downstate, he drafted a grievance detailing the officers' misconduct.[1] He gave the grievance to a correction officer to forward to the grievance office on his behalf, in accordance with DOCCS grievance procedures that apply to inmates in the SHU. *See* NYCRR tit. 7, § 701.7. One week later, Downstate superintendent Ada Perez was making rounds in the SHU. Williams told her about the incident and said he had not yet received a response to his grievance. Perez told him she had no knowledge of the grievance and that she would look into it. About a week after that conversation, Williams was transferred to another facility. He never received a response to the grievance and alleges that the

correction officer in the SHU never filed it for him. There is no dispute that Williams never appealed the grievance.

Proceeding pro se, Williams filed a complaint in the United States District Court for the Southern District of New York on January 13, 2014, asserting a claim under 42 U.S.C. § 1983 and the Eighth Amendment. The initial complaint named as defendants Correction Officer Priatno, Correction Officer John Doe, the State of New York, and DOCCS. Pursuant to screening procedures that apply to pro se complaints under 28 U.S.C. § 1915A, the district court dismissed the claims against the State and DOCCS and directed the Attorney General's Office to ascertain the identity of defendant John Doe and provide that information to Williams. Williams filed an amended complaint on February 19, 2014, naming correction officers Priatno and Gammone as defendants.

**\*3** Defendants moved to dismiss the complaint on the basis that Williams failed to exhaust administrative remedies as required by the PLRA, citing records that show Williams never filed an appeal. In a decision dated December 10, 2014, the district court (Seibel, *J.*) granted defendants' motion. The court reasoned that, even if Williams's grievance had never been filed, he still could have appealed the grievance to the next level because the regulations allow an appeal in the absence of a response. The district court also *sua sponte* denied Williams leave to file a second amended complaint, concluding that "better pleading would not lead to a different result." Joint App. at 66.

Williams filed a timely notice of appeal and subsequently moved for appointment of pro bono counsel. In granting his motion, we directed pro bono counsel to brief, among other issues, the following questions:

> (1) whether the framework in *Hemphill v. New York*, 380 F.3d 680 (2d Cir.2004) for excusing non-compliance with exhaustion of administrative remedies is still good law in light of *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); and (2) if so, whether a prison's failure to respond to a grievance renders an administrative remedy "unavailable" so as to excuse

the prisoner's non-compliance with administrative exhaustion.

Motion Order, filed Mar. 18, 2015, Docket No. 33. While this case was pending, the Supreme Court decided *Ross v. Blake*, ⸺ U.S. ⸺, 136 S.Ct. 1850, ⸺ L.Ed.2d ⸺ (2016), which clarified the framework under which courts should assess whether a prisoner has complied with the PLRA exhaustion requirement. Because that framework can be easily applied to the parties' arguments and the record on appeal, we review the district court's decision under *Ross* and conclude that the court erred in granting defendants' motion to dismiss. Accordingly, we reverse and remand for further proceedings.

## II. DISCUSSION

**[1]** **[2]** **[3]** **[4]** We review a grant of a motion to dismiss *de novo*. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir.2011). Specifically, the issue of "[w]hether a plaintiff has exhausted administrative remedies under the [PLRA] is also a question reviewed *de novo*." *Amador v. Andrews*, 655 F.3d 89, 94–95 (2d Cir.2011). For purposes of this review, we accept all of the factual allegations in the complaint as true, *see Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), and, because Williams appeared pro se before the district court, we are "constrained to conduct our examination with 'special solicitude,' interpreting the complaint to raise the 'strongest claims that it suggests,' " *Hill*, 657 F.3d at 122 (alterations omitted) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir.2006) (per curiam)).

**[5]** **[6]** The PLRA instructs that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Failure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir.2013). Accordingly, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216, 127 S.Ct. 910. However, a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff

did not satisfy the PLRA exhaustion requirement. *See id.* at 215, 127 S.Ct. 910.

In *Hemphill v. New York*, 380 F.3d 680 (2d Cir.2004), we set forth a three-part inquiry to guide our analysis of whether a plaintiff has satisfied the PLRA. *See id.* at 686–91. The first part involves an assessment whether administrative remedies were in fact available to the plaintiff; the second part instructs courts to consider whether defendants forfeited the affirmative defense of exhaustion by failing to preserve it or should be estopped from raising it because their own actions inhibited the plaintiff's ability to exhaust administrative remedies; and the third part directs courts to determine whether special circumstances existed that justified a plaintiff's failure to exhaust remedies that were available and not subject to estoppel. *See Amador*, 655 F.3d at 102 (summarizing *Hemphill* inquiry).

**\*4** Two years later, in *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), the Supreme Court weighed in on the importance of the PLRA exhaustion requirement without directly opining on the validity of the exceptions we outlined in *Hemphill*. In *Woodford*, a prisoner's grievance was denied because it was not timely filed. *Id.* at 86–87, 126 S.Ct. 2378. He then filed a lawsuit in federal court and argued he should be relieved from the PLRA exhaustion requirement on the basis that, as a result of his untimely filing, the grievance process was no longer available to him. *Id.* The Court rejected this position, emphasizing that the PLRA "requires proper exhaustion," *id.* at 93, 126 S.Ct. 2378, "which 'means using all steps that the [prison grievance system] holds out, and doing so *properly* (so that the [prison grievance system] addresses the issues on the merits),' " *id.* at 90, 126 S.Ct. 2378 (emphasis in original) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). "Proper exhaustion demands compliance with [a prison grievance system's] deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90–91, 126 S.Ct. 2378.

In the aftermath of *Woodford*, we were left to determine the extent to which our *Hemphill* framework remained intact. The text of the statute convinced the court that the first part of our inquiry—the determination of whether an administrative remedy was in fact "available" to the inmate—was still valid. *See, e.g.*, *Macias v.*

*Zenk*, 495 F.3d 37, 44–45 (2d Cir.2007) (discussing *Woodford* and analyzing whether the grievance process was actually available to the plaintiff); *Johnston v. Maha*, 460 Fed.Appx. 11, 15 n. 6 (2d Cir. 2012) (summary order) ("Although [*Woodford*] requires that prisoners 'properly' exhaust the available remedies under the PLRA, it certainly does not abrogate the unavailability defense to nonexhaustion."); *see also Woodford*, 548 U.S. at 85, 126 S.Ct. 2378 (focusing its analysis on "all 'available' remedies"). However, the continued viability of *Hemphill*'s inquiries regarding estoppel and special circumstances was less clear. *See, e.g.*, *Amador*, 655 F.3d at 102; *Macias*, 495 F.3d at 43 n. 1; *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir.2006).

The Supreme Court's recent decision in *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, ––– L.Ed.2d –––– (2016), squarely addresses that ambiguity and guides our decision here. In *Ross*, the Court held that, aside from the "significant" textual qualifier that "the remedies must indeed be 'available' to the prisoner," there are "no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.' " *Id.* at 1856. The Court stressed "the mandatory nature of [the PLRA's] exhaustion regime," *id.* at 1857, noting that the text of the PLRA and its legislative history refute the existence of a special circumstances exception to the statute's exhaustion requirement, *id.* at 1857–58. Therefore, to the extent that our special circumstances exception established in *Giano v. Goord*, 380 F.3d 670, 675–76 (2d Cir.2004), and *Hemphill*, 380 F.3d at 689–91, permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*. Indeed, *Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate. *See Ross*, 136 S.Ct. at 1858–59.

Accordingly, we will shift our focus to an analysis of whether the PLRA's textual "unavailability" exception applies here. Our decision in *Hemphill* touches on that question, noting that "the behavior of the defendants may render administrative remedies unavailable." 380 F.3d at 686. But we are significantly aided by *Ross* in interpreting the meaning of the word "available" as used in the PLRA. In *Ross*, the Court highlights "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable

of use to obtain relief." *Ross*, 136 S.Ct. at 1859. [2] First, an administrative remedy may be unavailable when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* In other words, "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

**\*5** **[7]** Turning to the facts of this case, we assume for purposes of our analysis that an administrative remedy was "officially on the books." *Id.* at 1859. Prison regulations provide that inmates in the SHU may file grievances by giving the complaint to a correction officer to forward to the grievance clerk. *See* NYCRR tit. 7, § 701.7. The regulations also provide that an inmate may appeal a grievance "to the next step" if he does not receive a timely response. *Id.* § 701.6(g)(2); *see also id.* § 701.8(g). Defendants assert that, even if Williams's grievance had not been filed and despite the fact that he had been transferred to a new facility prior to receiving a response, he still could have attempted to appeal the grievance in accordance with sections 701.6(g)(2) and 701.8(g).

However, even if Williams technically could have appealed his grievance, we conclude that the regulatory scheme providing for that appeal is "so opaque" and "so confusing that ... no reasonable prisoner can use [it]." *Ross*, 136 S.Ct. at 1859 (quoting Tr. of Oral Arg. 23). The regulations simply do not contemplate the situation in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance.

We accept as true Williams's allegation that the correction officer never filed his grievance. [3] *See Erickson*, 551 U.S. at 94, 127 S.Ct. 2197. Under that circumstance, the regulations do not adequately outline the process to appeal or otherwise exhaust administrative remedies. On their face, the regulations only contemplate appeals of grievances that were actually filed. For example, if the grievance had never been filed, the superintendent would never have received it and the timeline for her to provide a response within 25 days "of receipt of the grievance"

would never have been triggered. NYCRR tit. 7, § 701.8(f). In turn, the textual provision allowing a grievant to appeal to the CORC would never have come into effect. *See id.* § 701.8(g) ( "If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC."). Accordingly, the regulations give no guidance whatsoever to an inmate whose grievance was never filed.

Defendants assure us, however, that if Williams had attempted to appeal his grievance, it would have "allow[ed] the facility to alert the inmate that his original complaint ha[d] not been received, and to inform him about how to proceed with his complaint." Post–Argument Letter from Holly A. Thomas, Special Counsel to the Solicitor Gen., State of N.Y. Office of the Attorney Gen. ("Defendants' Post–Argument Letter") (Mar. 16, 2016), Docket No. 97, at 1. At oral argument, counsel for defendants stated that there is no time limit to appeal to the next step if an inmate does not receive a response to a grievance. *See* Oral Arg. Recording at 1:59:13–38. In their post-argument letter, defendants explain how this would work in practice by outlining three options that would be presented to an inmate following his appeal of an unfiled grievance: (1) if it is still within 21 days of the incident, the inmate can re-file the complaint; (2) if it is beyond 21 days but within 45 days of the incident, the inmate can request an exception to the 21–day time limit if he can show mitigating circumstances; or (3) if it is more than 45 days since the incident, the inmate may file a separate complaint grieving the denial of an extension to the time limit. Defendants' Post–Argument Letter, at 2–3; *see also id.*, App. 1b, 2c. [4]

**\*6** These options are pieced together from various provisions in the regulations that do not involve appeals of grievances but provide instructions on the timelines that apply to the filing of new complaints. *See* NYCRR tit. 7, § 701.5(a)(1); *id.* § 701.6(g)(1)(i)(a); *id.* § 701.6(g)(1)(ii). A close review of the regulations shows, contrary to defendants' assertions at oral argument, that an "appeal" in Williams's circumstance is, indeed, subject to time limitations and procedural hurdles that in all but the rarest of circumstances would preclude him from pursuing his unfiled and unanswered grievance, and that are, in any event, "so confusing that ... no reasonable prisoner can use them." *Ross*, 136 S.Ct. at 1859 (quoting Tr. of Oral Arg. 23).

Looking at the first option, an inmate does not even have the right to appeal a grievance to the next step until the time for the superintendent to respond has already passed —a date which, in the case of a harassment grievance, is already well beyond 21 days of the incident. *See id.* §§ 701.5(a)(1), 701.8(g). Regarding the second option, for similar reasons, the window to request an extension between 21 and 45 days of the incident will occur only where the inmate took less than the allowed 21 days to submit his original complaint. If the inmate took full advantage of the time the regulations give him to act and then had to wait 25 days for a response, 46 days will have passed before he learns with certainty that the superintendent failed to respond.[5] Finally, where options one and two are unavailable, the third option is wholly inapplicable as a mechanism to appeal an unfiled grievance, because the regulations state unequivocally that "[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence." *Id.* § 701.6(g)(1)(i)(a). Therefore, even though option three suggests that an inmate could file a separate complaint grieving the denial of an exception to the filing deadline, such a grievance would be futile given that the regulations do not give the IGP supervisor authority to grant an exception beyond 45 days of the initial incident.

In sum, the regulations plainly do not describe a mechanism for appealing a grievance that was never filed. Moreover, the purported options for relief provided by defendants, to the extent they are even available to an inmate in Williams's situation, only increase confusion regarding the avenues available to pursue an appeal. For these reasons, the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it.[6]

**\*7** Furthermore, if the regulations outlined above, as applied to a prisoner in Williams's situation, were not already "so confusing" that "no ordinary prisoner can discern or navigate [them]," *Ross,* 136 S.Ct. at 1859, their

obscurity was compounded by the fact that Williams was transferred to another facility approximately two weeks after giving his grievance to the correction officer. Defendants contend that a transfer does not affect an inmate's ability to appeal his grievance to the next step, pointing to a provision in the regulation that provides: "If the [transferred] grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed within seven calendar days after receipt." *NYCRR tit. 7, § 701.6(h)(2).* However, this provision presumes not only that the grievance was actually filed, but also that the inmate received an appeal form that he can sign and mail back. The regulations plainly do not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response.

For the foregoing reasons, we conclude that the grievance procedures that were technically available to Williams are so opaque and confusing that they were, "practically speaking, incapable of use." *Ross,* 136 S.Ct. at 1859. Accordingly, in giving his grievance to the correction officer, Williams exhausted all administrative remedies that were available to him. *42 U.S.C. § 1997e(a).*[7] To avoid confusion going forward, we recommend that DOCCS revise its grievance procedures to instruct inmates how to appeal grievances that were not properly filed by prison staff, and how to appeal a grievance, to which the inmate never received a response, after being transferred.

### III. CONCLUSION

Having concluded that Williams satisfied the PLRA's exhaustion requirement, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings in accordance with this opinion.

**All Citations**

--- F.3d ----, 2016 WL 3729383

---

Footnotes

\*    The Clerk of Court is directed to amend the caption to conform to the listing above.

1    Some allegations concerning the circumstances of Williams's attempted filing of his grievance are taken from his pro se opposition to the motion to dismiss, which we may consider in resolving this appeal. *See Wright v. Comm'r of Internal Revenue,* 381 F.3d 41, 44 (2d Cir.2004) (construing pro se submissions "liberally"); *Ortiz v. McBride,* 323 F.3d 191, 194 (2d Cir.2003) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

2   We note that the three circumstances discussed in *Ross* do not appear to be exhaustive, given the Court's focus on three kinds of circumstances that were "relevant" to the facts of that case. *Ross,* 136 S.Ct. at 1859. Because those circumstances are also relevant to the facts of this case, we do not opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use.

3   We consider this claim to be plausible given Williams's allegations that he asked superintendent Perez about his grievance one week after giving it to the correction officer and Perez said that she had no knowledge of it. There is no question that Williams's grievance was a harassment grievance. *See* NYCRR tit. 7, § 701.2(e) (defining harassment grievances). Had the correction officer filed it, it should have been forwarded to Perez the same day in accordance with procedures that govern the processing of harassment grievances. *See* NYCRR tit. 7, § 701.8(b). At the motion to dismiss stage, the allegation that she had no knowledge of the grievance supports Williams's allegation that it was not filed.

4   Defendants offer a fourth option for an inmate to address an unfiled grievance: submitting "a new complaint grieving the alleged willful mishandling of his original complaint by DOCCS's personnel." Defendants' Post–Argument Letter at 3. However, because such a grievance would not itself address the substantive allegations in the original unfiled grievance —and it is unclear how prevailing on the former would affect the ability to pursue the latter—under the circumstances of this case, it is at a minimum a roundabout, if not ineffectual, means for an inmate to attain relief.

5   Even when an inmate submits his initial grievance before the 21–day deadline specified in section 701.5(a)(1), and, therefore, it is possible that he could have filed a request for an extension under the second option, he would still not learn of that option until the prison responds to his "appeal" of the unanswered grievance and informs him of these options. In the examples provided by defendants, the amount of time the prison takes to provide a response to these types of inquiries varies. *See, e.g.,* Defendants' Post–Argument Letter, App. 1 (1 day); App. 2 (7 days); App. 3 (3 days); App. 4 (1 day); App. 5 (17 days).

6   Defendants argue that an inmate's claim that he submitted a grievance that was unfiled and unanswered (which the district court would accept as true at the motion to dismiss stage), and that was not appealed, cannot excuse compliance with the PLRA's exhaustion requirement. If the inmate's allegation to that effect alone sufficed for purposes of the PLRA, he could thereby "avoid the prison grievance process altogether ... without the administrative process ever having been initiated." Defendants' Br. at 22–23. Indeed, many district courts have concluded that a "nonresponse" to a grievance "must be appealed" in order to exhaust administrative remedies under the PLRA. *See, e.g., Smith v. Kelly,* 985 F.Supp.2d 275, 281 (N.D.N.Y.2013); *see also id.* at 281 n. 8 (collecting cases). Nonetheless, defendants bear the initial burden of establishing the affirmative defense of non-exhaustion "by pointing to 'legally sufficient sources' such as statutes, regulations, or grievance procedures" which demonstrate that "a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't,* 788 F.3d 54, 59 (2d Cir.2015) (alteration omitted) (quoting *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003)). Because, as we explained above, the process of appealing an unfiled grievance is practically unavailable to inmates under current DOCCS regulations, defendants have not met their initial burden here.

7   In light of this conclusion, we need not decide whether administrative remedies also may have been unavailable to Williams for other reasons, such as officer misconduct. *See Ross,* 136 S.Ct. at 1860.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by  Kravitz v. Fischer,    N.D.N.Y.,    August 22, 2014

2008 WL 2263191
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Tyrone WINSTON, Plaintiff,
v.
Richard WOODWARD, Nicholas
Valhos, Charles Starley, Rene
Hernandez, and John Does, Defendants.

No. 05 Civ. 3385(RJS).
|
May 30, 2008.

**Attorneys and Law Firms**

Tyrone Winston, pro se.

Judy Prosper, Esq., Kevin P. McCaffrey, Esq., Office of
the New York State Attorney General, New York, NY,
for Defendants.

MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge.

 **\*1**  Plaintiff Tyrone Winston brings this *pro se* civil rights
action pursuant to 42 U.S.C. § 1983 against Richard
Woodward, Nicholas Valhos, Charles Starley, Rene
Hernandez, and John Does ("Defendants"), claiming that
he was subjected to excessive force in violation of the
Eighth and Fourteenth Amendments. On July 9, 2007,
Defendants moved for summary judgment pursuant to
Rule 56(c) of the Federal Rules of Civil Procedure on the
ground that Plaintiff failed to exhaust his administrative
remedies as required by the Prison Litigation Reform
Act ("PLRA"), 42 U.S.C. § 1997e(a). Plaintiff opposes
summary judgment, arguing that he is excused from
satisfying the PLRA's exhaustion requirement because: 1)
any administrative remedies were functionally unavailable
to him as a result of Defendants' misconduct; 2)
Defendants are estopped from asserting a defense of non-
exhaustion due to their prior misconduct; and 3) special

circumstances precluded Plaintiff's compliance. (Pl.'s Opp.
¶¶ 3, 6, 7.)

For the reasons set forth below, Defendants' motion for
summary judgment is granted.

I. BACKGROUND

A. The Facts

At all times relevant to the Complaint, Plaintiff was
an inmate in the custody of the New York State
Department of Correctional Services ("DOCS") at the
Fishkill Correctional Facility ("Fishkill"). (Defendants'
Rule 56.1 Statement ("Defs.' 56.1") ¶¶ 1, 16.) Plaintiff
alleges that on May 29, 2004, while he was in his cell,
Plaintiff was approached by Defendant Starley, who
informed him that his cell was going to be searched.
(Transcript of October 24, 2005 Deposition of Tyrone
Winston ("Winston Dep. Tr.") at 34.) Defendant Starley
then requested that Plaintiff place his hands out so that
they could be handcuffed. (*Id.*) Plaintiff admits that
he initially refused to comply with Defendant Starley's
orders. (*Id.*) Upon his refusal Plaintiff was moved into
the recreation pen, which was connected to the cell. (*Id.*)
After being notified that Plaintiff refused to cooperate
with the cell search, Defendant Woodward then entered
the recreation pen and directed Plaintiff to put his hands
on the wall. (*Id.* at 31.) Plaintiff claims that he complied
with Defendant Woodward's orders. (*Id.*)

Plaintiff further alleges that, notwithstanding his
compliance with the officers' directions, Defendants
physically searched him. (*Id.* at 32.) He also claims that
Defendant Valhos hit him in his testicles and that he was
forcefully thrust onto the floor. (*Id.*) While on the floor,
Plaintiff alleges that Defendant Woodward bent his left
pinky finger backwards while he was being handcuffed,
thereby dislocating it. (*Id.* at 32-33.) Additionally, he
alleges that Defendant Valhos put his hand over Plaintiff's
mouth to prevent him from shouting as a result of the
pain he felt from his finger being dislocated, whereupon
Plaintiff bit down on Valhos' finger. (*Id.* at 33.) Plaintiff
asserts that following this altercation he was sent to receive
medical treatment for his injury. (*Id.*) Thereafter, Plaintiff
commenced a grievance proceeding against Defendants.

**\*2** Under the PLRA, an inmate must exhaust his administrative remedies prior to initiating a suit in federal court. *See Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *see also Macias v. Zenk,* 495 F.3d 37, 40 (2d Cir.2007); *Ruggiero v. County of Orange,* 467 F.3d 170, 173 (2d Cir.2006); *Brownell v. Krom,* 446 F.3d 305, 310 (2d Cir.2006). DOCS has established an Inmate Grievance Program ("IGP"), the purpose of which is to provide inmates with an "orderly, fair, simple and expeditious method of resolving grievances ...." 7 N.Y.C.R.R. § 701.1(a); *see also Abney v. McGinnis,* 380 F.3d 663, 668-69 (2d Cir.2004); *Cruz v. Jordan,* 80 F.Supp.2d 109, 117-18 (S.D.N.Y.1999).

It is uncontested that the particular grievance procedure available to Plaintiff at the time of the incident involved a three-step process.[1] (Defs.' 56.1 ¶ 5.)[2] First, the formal grievance process is initiated by the filing of a written complaint with the Inmate Grievance Resolution Committee ("IGRC") within fourteen work days from the date of the alleged incident.[3] (*Id.*) If the IGRC does not grant the requested relief, the second step of the administrative procedure is the filing of an appeal with the Superintendent of the facility within four days after receipt of the IGRC's written response. (*Id.*); *see also* 7 N.Y.C.R.R. § 701.1(b). If the Superintendent does not grant the requested relief, the third step is to appeal to the Central Office Review Committee ("CORC") within four working days after receipt of the Superintendent's written response. (Defs.' 56.1 ¶ 5.) It is only after exhausting all three levels of this administrative review process that a prisoner may file a federal action and seek relief pursuant to § 1983, though failure to exhaust may be later deemed justified under several exceptions. *Porter,* 534 U.S. at 524; *see also Giano v. Goord,* 380 F.3d 670, 677-78 (2d Cir.2004).

There are also special procedures that a prisoner must follow when his or her grievance involves a claim of harassment, to ensure that harassment claims are submitted directly to the Superintendent. *See* 7 N.Y.C.R.R. § 701.11. Harassment is broadly defined in the IGP as any allegation involving employee misconduct-specifically "[e]mployee misconduct meant to annoy, intimidate, or harm an inmate ...." § 701.11(a). In such instances, the inmate is required to report the occurrence to the immediate supervisor of the employee alleged to have engaged in the misconduct. (Defs.' 56.1 ¶ 7.)

After the grievance is filed, it is forwarded, along with supporting documents, to the Superintendent by the close of the same business day on which it was filed, in order to accelerate the grievance procedure. *See* 7 N.Y.C.R.R. § 701.1(b). Upon review of the harassment grievance, if it is determined that there is a *bona fide* harassment issue, the Superintendent may initiate an in-house investigation, request an investigation by the Office of the Inspector General or request an investigation by the State Police. *See* 7 N.Y.C.R.R. § 701.11(b)(4). Regardless of whether an investigation is initiated, the Superintendent must render a decision within twelve business days. *See* 7 N.Y.C.R.R. § 701.11(b)(5). If the Superintendent fails to respond within the time limit, the inmate may then appeal to the CORC. *See* 7 N.Y.C.R.R. § 701.11(b)(6), (7).

**\*3** Additionally, DOCS regulations require that a representative of IGRC visit Plaintiff's housing unit at Fishkill at least once a week. (*See* Defs.' 56.1 ¶ 17); *see also* 7 N.Y.C.R.R. § 304.14(b); N.Y.C.R.R. § 701.13(c). During such a visit, the IGRC representative is required to announce his presence at the units and to respond to any inquiries by inmates regarding grievances. (Declaration of Michelle Stone ("Stone Decl.") ¶ 30.) If an inmate advises an IGRC representative that he had attempted to appeal a grievance to the CORC but his mail was tampered with, he would be advised that he could re-submit his appeal. (*See* Defs.' 56.1 ¶ 31.)

On June 16, 2004, within fourteen days of the alleged May 29, 2004 incident, Plaintiff timely filed a grievance, claiming that the Defendants used excessive force against him, causing his left pinky to be fractured as well as asserting claims of harassment, mail tampering, and excessive searches of his cell. (*See* Defs.' 56.1 ¶ 8; Stone Decl. ¶ 8, Ex. A.) Since Plaintiff's grievance involved a charge of harassment, it was forwarded to the Superintendent's office for investigation on the day in which it was filed. (*See* Defs.' 56.1 ¶ 9.) An investigation was conducted, which included an interview of Plaintiff as well as the collecting of statements from all personnel allegedly involved in the incident. (*See id.* ¶ 10.)

On June 29, 2004, prior to receiving an initial determination from the grievance office, Plaintiff attempted to "appeal" his case on the grounds that he had not yet received such an initial determination. (*See id.* ¶ 12; *see also* Stone Decl. ¶ 13, Ex. E.) Specifically, he filed his appeal on an Inmate Grievance Compliant form,

describing his problem as wanting to "appeal" his initial June 14, 2004 grievance. (See Defs.' 56.1 ¶ 12.) In response, Plaintiff was advised of the proper procedure to appeal and also that he would receive the Superintendent's timely response. (See id. ¶ 13; see also Stone Decl. ¶ 14, Ex. F.) [4]

On June 30, 2004, the Superintendent rendered his decision denying Plaintiff's grievance. [5] (See Defs.' 56.1 ¶¶ 11, 14; see also Stone Decl. ¶ 11, Ex. D.) Plaintiff does not dispute that he received the decision on or about June 30, 2004. (Defs.' Mem. at 6.) Plaintiff had four business days thereafter to file an appeal to the CORC. (Defs.' 56.1 ¶ 14.) There is nothing in the record demonstrating that Plaintiff filed that appeal, or made any other attempts to appeal the Superintendent's decision to the CORC. (Id. ¶ 15.)

According to Fishkill's visitor logbook entries, between June 30, 2004 and August 31, 2004, IGRC representatives engaged in regular visits to the facility. [6] There is nothing in the record indicating that Plaintiff notified the IGRC representative that he was prevented from filing an appeal. (Id. ¶ 22.) Additionally, there is nothing in the record indicating that Plaintiff expressed a concern regarding his grievance to other Fiskhill employees including medical personnel, corrections counselors or watch commanders. (Id. ¶ 26.)

**\*4** Plaintiff made a request for information regarding his appeal on August 3, 2005, over one year after he submitted his initial grievance. (Id. ¶ 27; see also Stone Decl. ¶ 17, Ex. G.) In response, Plaintiff was provided with a copy of the June 30, 2004 decision and informed that the time granted to him to appeal the Superintendent's judgment had expired. (Defs.' 56.1 ¶ 28; see also Stone Decl. ¶ 18, Ex. F.)

### B. Procedural History

Plaintiff commenced this suit on March 30, 2005. On January 19, 2006, the Honorable Kenneth M. Karas, District Judge, issued an Order instructing the Office of the Attorney General to investigate Plaintiff's allegations, take appropriate steps to ensure Plaintiff's safety, and provide a detailed report regarding the status of this inquiry to the Court. (See Jan. 19, 2006 Order.) DOCS responded to the Court's order on January 30, 2006, stating that there was no validity to these claims.

(Letter from Donald Delaney, dated Jan. 30, 2006.) On September 4, 2007, this case was reassigned to the undersigned.

Defendants filed the instant motion for summary judgment on July 9, 2007, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, on the grounds that Plaintiff failed to exhaust his administrative remedies under the PLRA. Plaintiff opposes the motion, arguing that he should be excused from adhering to the PLRA exhaustion requirements for three reasons. (Pl.'s Opp. ¶¶ 6-7.) First, he claims that he was subject to routine mail tampering and threats of retaliation by prison staff which caused the remedies to be unavailable to him. (Id. ¶¶ 3, 6.) Second, he contends that Defendants are estopped from asserting their defense by virtue of their misconduct in this case. (Id. ¶ 6.) Third, Plaintiff argues that special circumstances justify his failure to comply with the PLRA's procedural requirements. (Id. ¶ 7.) Plaintiff has not filed or produced any evidence in support of his opposition.

### II. STANDARD OF REVIEW

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265; Bronx Household of Faith v. Bd. of Educ. of City of N.Y., 492 F.3d 89, 96 (2d Cir.2007). The party moving for summary judgment has the initial burden to establish that no genuine issue of material fact exists. Celotex, 477 U.S. at 323. The Court must view the evidence "in the light most favorable to the party opposing the motion." Id.; see also Addickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Rivkin v. Century 21 Teran Realty LLC, 494 F.3d 99, 103 (2d Cir.2007). Failure to meet this burden requires the court to deny the motion. Celotex, 477 U.S. at 323.

**\*5** If the moving party meets this initial burden, however, the burden then shifts to the non-moving party to produce admissible evidence demonstrating that there is a genuine issue of material fact. Id. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could

return a verdict for the non-moving party." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[O]nly when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). As such, the role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

In reviewing a *pro se* litigant's pleadings, courts are compelled to construe such claims liberally. *See Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007); *Ferran v. Town of Nassau,* 471 F.3d 363, 369 (2d Cir.2006); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006); *Brownell,* 446 F.3d at 310.

### III. DISCUSSION

#### A. The PLRA Exhaustion Requirement

Plaintiff brings this action pursuant to 42 U.S.C. § 1983. Section 1983 provides that "[e]very person who, under color of any statute ... subjects, or causes to be subjected, any citizen of the United States or other person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ...." In response to the sharp rise in federal prisoner litigation under § 1983, Congress enacted the PLRA. *See Porter,* 534 U.S. at 524. Specifically, in enacting the PLRA, Congress sought to "reduce the quantity and improve the quality of prisoner suits ... [as well as to provide] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id.* at 524-25; *Brownell,* 446 F.3d at 310; *see also Ruggiero,* 467 F.3d at 174; *Abney,* 380 F.3d at 667.

The PLRA states that "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any ... correctional facility until such administrative remedies as are available are exhausted." *See* 42 U.S.C. § 1993e(a). The exhaustion requirement applies with equal force to actions concerning corrections officers' use of excessive force. *Porter,* 534 U.S. at 520; *see also Ruggiero,* 467 F.3d at 173 (holding that under *Porter,* excessive force claims are subject to the

PLRA's exhaustion requirement). Failure to exhaust administrative remedies is an affirmative defense. *Giano,* 380 F.3d at 675.

While the Second Circuit has recognized the exhaustion requirement, certain exceptions have also been acknowledged. *See Ruggiero,* 467 F.3d at 175; *see also Giano,* 380 F.3d at 677. In *Hemphill v. New York,* 380 F.3d 680, 686 (2004), the Second Circuit held that courts should undertake a three-pronged inquiry in cases in which a "prison plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available remedies as required by the PLRA ...." *See, e.g., Macias,* 495 F.3d at 43 (applying the *Hemphill* three-party inquiry).

**\*6** Under *Hemphill,* a court should first consider "whether the administrative remedies were in fact 'available' to the prisoner." 380 F.3d at 686. Second, a court must determine whether "the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* Third, a court should examine whether there were "special circumstances" that excused plaintiff's failure to adhere to the administrative procedural requirements. *Id.*

The Supreme Court held in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 2386, 165 L.Ed.2d 368 (2006), that prisoners must properly exhaust administrative remedies prior to pursuing a federal action under the PLRA by strictly "[adhering to] the system's critical procedural rules." Specifically, proper exhaustion "means using all steps that the agency holds out, and doing so *properly."* *Id.* at 2385. In the Court's view, prisoners would have little incentive to participate in the established grievance system unless "noncompliance carries a sanction." *Id.* at 2388.

The Second Circuit has not yet addressed the effect, if any, of *Woodford* on the *Hemphill* three-part inquiry. "Several courts within the circuit have acknowledged uncertainty caused by the tension between *Hemphill* and *Woodford,"* noting, for example, that "the [Second Circuit] has at least partly retreated from its established exhaustion jurisprudence, recognizing the irreconcilable tension between *Woodford* and its earl[ier] decision[s] ... and acknowledging that under *Woodford* mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural exhaustion requirement." *Chavis v. Goord,* No. 00 Civ.

1418(LEK), 2007 WL 2903950, at *9 n. 8 (N.D.N.Y. Oct.1, 2007) (citations omitted); *see also Lawyer v. Gatto,* No. 03 Civ. 7577(RPP), 2007 WL 549440, at *4 n. 4 (S.D.N.Y. Feb.21, 2007) (noting that "[t]he Second Circuit has not yet addressed *Woodford* 's impact, and [that] the district courts in this circuit have continued to apply the caveats to cases involving the PLRA"); *Sloane v. Mazzuca,* No. 04 Civ. 8266(KMK), 2006 WL 3096031, at *5 (S.D.N.Y. Oct.31, 2006) ("The Second Circuit has not addressed how [*Hemphill* 's] three-part approach ... has been affected by *Woodford*" and "[u]ntil such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Hernandez v. Coffey,* No. 99 Civ. 11615(WHP), 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006). As such, this Court adheres to clear Second Circuit authority, as well as the approach followed by other district courts in this Circuit and applies the *Hemphill* three-part inquiry to Plaintiff's exhaustion claims.

## B. Analysis

### 1. Availability of Administrative Remedies

**\*7** Pursuant to § 1997e(a), exhaustion is required only where "such administrative remedies ... are available." *See Mojias v. Johnson,* 351 F.3d 606, 609 (2d Cir.2003); *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). To determine whether administrative remedies were in fact available, the court must consider whether, from an objective point of view, a similarly situated person of ordinary resilience and intelligence would have deemed the remedies available. *Hemphill,* 380 F.3d at 688 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). The Second Circuit has held that "threats or other intimidation by prison officials may well deter a prisoner of ordinary firmness from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *Hemphill,* 380 F.3d at 688 (citation omitted).

Plaintiff claims that threats of retaliation made by several corrections officers at Fishkill, including Defendants, made his ability to pursue his grievance "functionally unavailable" pursuant to the first *Hemphill* element. (Pl.'s

Opp. ¶ 6.) Additionally, Plaintiff claims that he suffered harassment and that his mail was routinely tampered with, thus preventing him from successfully appealing the Superintendent's ruling within the four-day period permitted under 7 N.Y.C.R.R. § 701.1(b). (*Id.* ¶¶ 3, 6.) Specifically, with regard to his mail-tampering claim, Plaintiff asserts that he mailed out his initial grievance under a fellow inmate's name, which was received by the Superintendent. (*Id.* ¶ 3.) He further contends that additional grievances that he sent under his own name were not received, thereby "prov[ing]" that the Fishkill staff was tampering with his mail. (*Id.*)

Defendants respond that, even assuming the truth of those allegations, Plaintiff had ample opportunity to file an appeal. (Defs.' Mem. at 12.) With regard to Plaintiff's mail fraud claims, Defendants cite several ways in which Plaintiff could have sought relief, including filing an appeal to CORC, the presence of IGRC representatives during routine rounds as well as the availability of other medical and corrections officers at Fishkill who Plaintiff could have advised of any mail tampering or threatening behavior. (*Id.*) Additionally, Defendants claim that if Plaintiff had informed any IGRC representative or other staff member of such alleged tampering, he would have been advised that he could re-submit his appeal. (*Id.*) Yet, as previously stated, no such record of Plaintiff submitting an appeal or notifying an IGRC or other Fishkill employee exists. (*Id.*) Defendants also challenge Plaintiff's assertion that he should be excused from exhaustion, pointing out that he not only filed an initial grievance on June 16, 2004, but also a second additional grievance that was later consolidated with it, and also an "attempted" appeal prior to the Superintendent issuing his decision. (*Id.* at 13.) As such, Defendants contend that Plaintiff cannot claim, under *Hemphill,* that a similarly situated individual of "ordinary firmness" would have deemed the ordinary grievance procedures unavailable. (*Id.*) This Court agrees.

**\*8** Plaintiff does not dispute that adequate administrative remedies were in place at Fishkill. Thus, as an initial matter, the Court finds that adequate administrative remedies were initially available to Plaintiff, in that grievance procedures were in place and generally made available to prisoners, including Plaintiff. *See Cruz,* 80 F.Supp.2d at 117 (observing that "New York provides an elaborate administrative grievance process for prisoners in New York State correctional facilities"); *see*

*also* 7 N.Y.C.R.R. § 701 *et. seq.* (establishing the inmate grievance procedure).

As for Plaintiff's claims that administrative relief was functionally unavailable to him, even taking the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff fails to meet the "ordinary firmness" standard as set forth in *Hemphill,* 380 F.3d at 688. Although Plaintiff alleges that Defendants' threats and retaliation prevented him from appealing his grievance, he also, by his own admission, filed an "appeal" using the Inmate Grievance Complaint form, on the day prior to the Superintendent rendering his decision, thus undercutting his claims that an appeal was functionally unavailable to him.

The case of *Amador v. Superintendents of Department of Correctional Services* is particularly instructive. No. 03 Civ. 0650(KTD), 2007 WL 4326747, at *1 (S.D.N.Y. Dec. 4, 2007). In *Amador,* seventeen plaintiffs asserted claims of sexual abuse and harassment against prison officials. *Id.* In response, the defendants brought a motion to dismiss the case, which the court converted into a motion for summary judgment, arguing that the plaintiffs failed to exhaust all administrative remedies. *Id.* at *7. The plaintiffs contended that the administrative remedies were unavailable due to threats made against them by prison officials. *Id.* at *8. In granting the defendants' motion, the court rejected the plaintiff's claims, noting that three of the plaintiffs were in fact able to file formal grievances, a fact which "directly [cut] against" the plaintiffs' argument that such administrative remedies were unavailable. *Id.*

Here, Plaintiff was able to file an "appeal" on June 29, 2004. While this attempt was premature, it demonstrates that Plaintiff was able to submit a formal appeal, despite his alleged claims of misconduct and harassment. As such, it is apparent from not only an objective point of view of a reasonable person of ordinary firmness in Plaintiff's position, but also the actual subjective viewpoint of Plaintiff himself, that administrative remedies were in fact available to him during the relevant time period. Therefore, Plaintiff's attempted appeal directly cuts against his contention that administrative remedies were functionally unavailable to him. *See id.*

Nor has Plaintiff produced any evidence to withstand summary judgment. As noted above, in response to a motion for summary judgment, "a plaintiff ... must do more than make broad factual allegations and invoke

the appropriate statute." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). Rather, the plaintiff must show that there are genuine issues of fact that may only be resolved at trial. *Id.; see also Anderson,* 477 U.S. at 250. While all reasonable inferences are drawn in favor of the non-moving party, courts in this Circuit have reviewed claims of retaliation by prisoners "with skepticism" because of the "ease with which a retaliation claim may be fabricated ...." *Nunez v. Goord,* 172 F.Supp.2d 417, 431 (S.D.N.Y.2001). *See also Colon,* 58 F.3d at 872 ("[W]e examine prisoners' claims of retaliation with skepticism and particular care."); *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

**\*9** Here, Plaintiff claims that he should be excused from the PLRA's exhaustion requirement because he suffered retaliation for bringing his initial grievance, which included claims of harassment, misconduct and mail tampering, thereby preventing him from properly and timely appealing the Superintendent's decision. However, he does not specify the dates of the alleged misconduct, the details of the particular incidents of threats and harassment, the officers who allegedly made threatening or harassing statements, or a copy of the alleged appeal that Plaintiff claims he sent through the mail that was, as he claims, fraudulently tampered with. Thus, Plaintiff's allegations "stand alone and unsupported." *Veloz v. New York,* 339 F.Supp.2d 505, 516 (S.D.N.Y.2004); *see also Curry v. Mazzuca,* No. 05 Civ. 1542(NRB), 2006 WL 250487, at *6 (S.D.N.Y. Feb.2, 2006) (dismissing plaintiff's claim that he should be excused from the exhaustion requirement on the grounds that prison officials failed to respond to his allegedly filed grievance as "there [was] no evidence whatsoever that such a grievance was actually filed with a grievance clerk or ignored by prison officials"); *Davidson v. Talbot,* No. 01 Civ. 473(CJQ), 2006 WL 1877144, at *7 (N.D.N.Y. July 5, 2006) (upholding the Magistrate's recommendation that plaintiff's "unsupported and unsubstantiated" claims of retaliation should be dismissed); *Nunez,* 172 F.Supp.2d at 432 ("[Plaintiff's] assertions, standing alone, do not provide sufficient evidence of retaliation.").

Accordingly, in the absence of *any* direct or circumstantial evidence to substantiate Plaintiff's claims that administrative remedies were unavailable to him, the Court finds that Plaintiff has failed to satisfy the PLRA's exhaustion requirement.

### 2. Estoppel

Pursuant to the second prong of *Hemphill,* involving estoppel, this Court must consider whether defendants' actions estop them from asserting plaintiff's failure to exhaust as an affirmative defense. *Ziemba v. Wezner,* 366 F.3d 161, 163 (2004). Estoppel will be found where "an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible." *Carini v. Austin,* No. 06 Civ. 5652(NRB), 2008 WL 151555, at *3 (S.D.N.Y. Jan.14, 2008); *see also Finger v. Superintendent McFinnis,* No. 06 Civ. 5652(LTS), 2004 WL 1367506, at *4 (S.D.N.Y. June 16, 2004); *Berry v. City of New York,* No. 00 Civ. 2834(RMB), 2002 WL 31045943, at *8 (S.D.N.Y. June 11, 2002). As such, the Second Circuit has held that a plaintiff's failure to exhaust all administrative remedies may be excused on the grounds of estoppel where the plaintiff was misled, threatened, or otherwise deterred from fulfilling the requisite procedures. *See Hemphill,* 380 F.3d at 688-89; *Ziemba,* 366 F.3d at 163-64.

Plaintiff claims that "the actions by prison staff inhibiting [Plaintiff's] exhaustion of his administrative remedies might estop the staff members from raising the defense of failure to exhaust said remedies." (Pl.'s Opp. ¶ 6.) Defendants fail to further respond to this contention, other than to assert that they are, in fact, not estopped from arguing exhaustion. (Defs.' Reply Mem. at 4.)

**\*10** In light of Plaintiff's failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering, discussed *supra,* the Court finds, even taking the evidence in the light most favorable to Plaintiff, that he has not put forth sufficient evidence to sustain his burden of demonstrating estoppel.

### 3. Plaintiff Has Not Shown the Existence of Special Circumstances

Finally, courts must consider whether any "special circumstances" exist to justify Plaintiff's failure to comply with the administrative procedural requirements pursuant to the PLRA. *See Giano,* 380 F.3d at 675; *Hemphill,* 380 F.3d at 690. To determine whether "special circumstances" exist, a court must consider the "circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." *Giano,* 380 F.3d at 678. Findings of special circumstances have been primarily established where plaintiffs acted pursuant to reasonable interpretations of the regulations, thus preventing exhaustion. For example, in *Hemphill,* the Court remanded the case to the district court to consider the plaintiff's arguments that regulations were manifestly unclear and that he justifiably interpreted rules as permitting him to appeal directly to the Superintendent. 380 F.3d at 689.

Here, Plaintiff claims that he should be excused from exhausting such administrative procedural requirements due to "special circumstances," and relies on *Giano* for the proposition that the plaintiff contended that the relevant DOCS Directive was unclear and that a reasonable person interpreting the rule would not have understood the requirements it put forth regarding the appropriate appeal procedure. (Pl.'s Opp. ¶ 7.) Plaintiff, however, fails to put forth any further arguments to support to support his contention that "special circumstances" should be found to alleviate his failure to comply with the exhaustion requirement. Despite this omission, the Court must construe a *pro se* litigant's pleadings liberally and read their claims as "rais[ing] the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

Therefore, even assuming Plaintiff misinterpreted the appeals process, Plaintiff's contentions fail to demonstrate "special circumstances" that would justify Plaintiff's failure to exhaust his administrative remedies. Plaintiff has failed to present any arguments regarding what he believed the appropriate procedural requirements to be. Moreover, unlike in *Giano,* Plaintiff did not take any affirmative steps to appeal the Superintendent's decision based upon some erroneous, yet "reasonable," interpretation of the grievance procedures. Rather, Plaintiff offers a wholly conclusory and vague assertion that "special circumstances" should excuse his non-compliance with the exhaustion requirements. *See Giano,* 380 F.3d at 677-78. Therefore, without any evidence to demonstrate what Plaintiff's alleged interpretation of the instructions for appeal was or any alternative efforts he undertook to appeal the claim based on such an interpretation, the Court finds that Plaintiff has failed to

meet his burden under *Hemphill* of demonstrating "special circumstances."

 **\*11** Because none of the exceptions outlined in *Hemphill* apply to the facts of this case, the Court finds that Plaintiff has failed to satisfy the PLRA's exhaustion requirement. Accordingly, Plaintiff's claims are barred pursuant to 42 U.S.C. § 1997c(a). [7]

          V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to enter judgment in favor of Defendants and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2263191

Footnotes

1     Since the filing of this suit, the IGP, pursuant to 7 N.Y.C.R.R. § 701, has been amended, effective May 23, 2007. All references to the IGP are therefore made with respect to the provisions in effect at the time the Plaintiff instituted this action.

2     Despite the Defendants' filing of the required documents giving notice to Plaintiff of the need to submit facts in support of his opposition, Plaintiff has not filed a 56.1 Opposition or 56.1 Statement of his own. All references are therefore to Defendants' 56.1 Statement.

3     The fourteen-day requirement may be waived upon a showing of "mitigating circumstances." 7 N.Y.C.R.R. § 701.1(a).

4     In the memorandum responding to Plaintiff's attempted appeal, he was also advised that the Inmate Grievance Complaint forms were not the proper method of appealing Supervisor's decisions. (*See* Defs.' 56.1 ¶ 13; *see also* Stone Decl. ¶ 14, Ex. F.)

5     Specifically, the Superintendent's decision stated, "[Plaintiff's] grievance is found to be without merit and therefore is denied." (Defs.' 56.1 ¶ 11; *see also* Stone Decl. ¶ 11, Ex. D.) Below the formal opinion was a section, labeled "appeal statement" that further advised "[i]f you wish to refer the above decision of the Superintendent, please sign below and return this copy to your Inmate Grievance Clerk. You have four working days from receipt of this notice to file your appeal." (Stone Decl. ¶ 11, Ex. D)

6     The logbook of entries of all visitors to Fishkill between June 1, 2004 and August 31, 2004 reflects that rounds were conducted by IGRC representatives on June 29, 2004; July 15, 2004; July 20, 2004; July 23, 2004; July 27, 2004; July 29, 2004; August 3, 2004; August 6, 2004; August 10, 2004; August 17, 2004; August 20, 2004; August 24, 2004; and August 31, 2004. (*See* Defs.' 56.1, ¶ 20.; Stone Decl. ¶¶ 26-29, Ex. H.)

7     Following the completion of briefing on Defendants' summary judgment motion. Plaintiff filed two motions: (1) a "motion to dismiss" Defendant's summary judgment motion (filed on October 16, 2007); and (2) a motion for appointment of counsel (filed on December 19, 2007). Plaintiff's motions are denied as moot, given the above findings of the Court

**End of Document**                                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1033395
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

James Martin WITZENBURG, Plaintiff,

v.

Charles Herman JURGENS, individually and as
Executor of the Estate of Louise Jurgens, Defendant.

No. CV–05–4827 (SJF)(AKT).
|
April 14, 2009.

West KeySummary

**1**     **Executors and Administrators**
          👉 Time for making distribution

In a dispute between relatives, the executor of the decedent's estate did not breach his fiduciary duties by failing to distribute estate assets on the ground that he was not required to distribute the assets under New York law until there was a final accounting. The executor made certain distributions to beneficiaries of the decedent's will. The executor had not made any distributions to himself or taken any fees. It was the conduct of the cousin bringing the suit, including his failure to pay the outstanding judgment that he owed to the estate totally over $750,000, that prevented the executor from conducting a final accounting and in turn making the final distributions under the will. McKinney's EPTL 11–1.5(c).

Cases that cite this headnote

**Attorneys and Law Firms**

James Martin Witzenburg, Kemah, TX, League City, TX, pro se.

**OPINION & ORDER**

FEUERSTEIN, District Judge.

**\*1** Before the Court are objections by plaintiff to a Report and Recommendation of United States Magistrate Judge A. Kathleen Tomlinson dated March 16, 2009 ("the Report") that recommends: (1) granting defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and dismissing plaintiff's amended complaint in its entirety; (2) denying plaintiff's motion to amend the amended complaint to add Patrick McCarthy, Esq. as a defendant; and (3) denying plaintiff's motion to compel discovery responses and to impose sanctions upon defendant. For the reasons stated herein, the Report of Magistrate Judge Tomlinson is accepted in its entirety.

I

Rule 72 of the Federal Rules of Civil Procedure permits magistrate judges to conduct proceedings on dispositive pretrial matters without the consent of the parties. Fed.R.Civ.P. 72(b). Any portion of a report and recommendation on dispositive matters, to which a timely objection has been made, is reviewed *de novo.* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). The court, however, is not required to review the factual findings or legal conclusions of the magistrate judge as to which no proper objections are interposed. *See, Thomas v. Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). To accept the report and recommendation of a magistrate judge to which no timely objection has been made, the district judge need only be satisfied that there is no clear error on the face of the record. *See,* Fed.R.Civ.P. 72(b); *Baptichon v. Nevada State Bank,* 304 F.Supp.2d 451, 453 (E.D.N.Y.2004), *aff'd,* 125 Fed.Appx. 374 (2d Cir.2005); *Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985). Whether or not proper objections have been filed, the district judge may, after review, accept, reject, or modify any of the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b).

II

Plaintiff contends that Magistrate Judge Tomlinson erred, *inter alia,* in: (1) not understanding that he is a "double first cousin once removed," to the decedent Louise Jurgens ("decedent"), (Plaintiff's Opposition to Report and Recommendation [Plf. Obj.], ¶ 1); (2) finding that the purported false will was filed in New York Surrogate's Court, as opposed to New York Supreme Court, (Plf Obj., ¶ 2); (3) finding that plaintiff moved to Texas on or about April 17, 2002, when he actually moved on August 22, 2003, (*id.*); (4) failing to recognize that he was willing to be deposed in Texas, or by remote means, but not in New York because he has a "genuine fear for his safety [which] precluded [his] attendance in New York," (Plf.Obj., ¶ 3); (5) assuming that he had access to the records of the Suffolk County Supreme Court and received a copy of the final accounting, (Plf.Obj., ¶¶ 4, 11); (6) failing to recognize that he "moved in Federal court [for relief from the final accounting] as soon as [he] could," (Plf. Obj ., ¶ 5); (7) finding that defendant did not breach his fiduciary obligation to decedent's estate notwithstanding (a) that defendant did not require McCarthy, the guardian of decedent's property, to reconcile his final account with the inventory of assets prepared by defendant, which showed a monetary difference in excess of eight hundred thousand dollars ($800,000.00), and (b) that defendant did not account for and identify "the properties returned to the Estate from Federated Securities," (Plf.Obj., ¶¶ 6–8, 11); (8) finding that defendant "pays for the various law suits and the proceedings in which the estate is involved," (Plf.Obj., ¶ 7); (9) discounting the "Jurgens Conspiracy" theory he asserts in his amended complaint, (Plf.Obj., ¶ 9); (10) finding that because defendant had no authority to oversee or supervise McCarthy, as decedent's property guardian, he had a right to abandon his fiduciary duty to account for and locate assets of the estate, (Plf.Obj., ¶ 10); and (11) "rendering [her] decision on facts which are not proven, not evidence in this case and beyond the power of [the] court to consider under the doctrine of judicial notice but on figments of the Courts [sic] imagination," (Plf.Obj., ¶ 13).

 **\*2**  Upon *de novo* review of the Report and consideration of plaintiff s objections and defendant's response thereto, plaintiff's objections are overruled and the Report is accepted in its entirety as an order of the Court. [1]

II. Conclusion

Upon *de novo* review of the Report, plaintiff's objections are overruled, the Report is accepted in its entirety, defendant's motion for summary judgment is granted and the amended complaint is dismissed in its entirety with prejudice. Plaintiff's motions to amend the amended complaint and to compel discovery responses or to impose sanctions are denied. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff and to close this case.

SO ORDERED.

### *REPORT AND RECOMMENDATION*

A. KATHLEEN TOMLINSON, United States Magistrate Judge.

This action arises out of the role of Defendant Charles Herman Jurgens ("Defendant" or "Jurgens") as Executor of the Estate of Louise Jurgens ("Louise" or "Decedent"). Several motions are presently before the Court. Plaintiff James Martin Witzenburg ("Plaintiff" or "Witzenburg"), a beneficiary of Louise's estate, brought this action against Defendant for, *inter alia,* (1) breach of fiduciary duty, seeking to recover damages in the amount of his inheritance under Louise's Will, (2) alleged mismanagement and/or conversion of funds of Louise's estate, and (3) interest and costs. Defendant moves here for summary judgment seeking dismissal of the remaining claims. By separate motion, Plaintiff moves to add a party defendant, namely, Patrick McCarthy, Esq., who served as a court-appointed property guardian of Louise's property for thirteen months before her death. Finally, Plaintiff moves to compel Defendant to respond to outstanding document requests and interrogatories and for the imposition of sanctions. District Judge Feuerstein has referred these three matters to me for a Report and Recommendations.

### I. *BACKGROUND*

#### A. *Factual Background*
The facts of this case are set forth in substantial detail in Judge Feuerstein's March 1, 2007 Order granting in part and denying in part Defendant's motion to dismiss [DE 73]. Only the facts necessary for the analysis contained in this Report will be recited here.

Plaintiff and Defendant are apparently both cousins, in varying degrees, of the Decedent Louise Jurgens ("Louise" or the "Decedent"). [1] In and around July 1999, Jurgens obtained a "full" power of attorney from Louise. On September 9, 1999, Defendant Jurgens commenced a guardianship proceeding on behalf of Louise in the Supreme Court, Suffolk County, pursuant to Article 81 of the New York Mental Hygiene Law (*Jurgens v. Jurgens,* Index No. 20414–99) (the "Suffolk Supreme Court Action"). (Schmidt Decl. [2] ¶ 4.) On December 28, 1999, the Suffolk Supreme Court appointed non-party attorney Patrick McCarthy ("McCarthy") as guardian of Louise's property and named Jurgens as Louise's personal needs guardian (*id.;* Jurgens Aff. [3] ¶ 3; Def.'s 56.1 Stat. [4] ¶ 2). As Louise's personal guardian, Jurgens attended to her medical and personal needs. (Jurgens Aff. ¶ 3; Def.'s 56.1 Stat. ¶ 5.) However, during the period from December 1999 until Louise's death in January 2001 (the "guardianship period"), Jurgens did not have any control over Louise's finances or property, as those were under the control of Attorney McCarthy as the property guardian. (Jurgens Aff. ¶ 11; Schmidt Decl. ¶ 28; Def.'s 56.1 Stat. ¶ 5.) Moreover, Jurgens had no authority to oversee or supervise McCarthy's conduct as property guardian. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 25; Def.'s 56.1 Stat. ¶ 25.)

**\*3** Pursuant to the April 14, 2000 order of the Supreme Court, Suffolk County, McCarthy retained two Smith Barney stockbrokers as independent financial consultants to advise McCarthy with respect to managing Louise's portfolio, among other things [DE 73 at 3]. In general, McCarthy's conduct as property guardian was supervised and reviewed by the Suffolk County Supreme Court. McCarthy accounted for his actions as property guardian in a formal accounting filed with that Court (the "McCarthy Accounting"), in which he was represented by counsel. That Accounting was reviewed by McCarthy's representatives, the attorney for the Estate, the Supreme Court's accounting department, the Supreme Court Examiner, and a bonding company. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 26; Def.'s 56.1 Stat. ¶ 26.) Although Jurgens received a copy of McCarthy's Accounting, he had no role in its preparation. (Jurgens Aff. ¶ 10; Schmidt Decl. ¶ 27; Def.'s 56.1 Stat. ¶ 27.)

On January 6, 2001, Louise died and both guardianships ceased. (Jurgens Aff. ¶ 4; Schmidt Decl. ¶ 6; Def.'s 56.1

Stat. ¶ 6.) Jurgens was appointed Preliminary Executor of Louise's estate (the "Estate") on January 30, 2001, and was appointed Permanent Executor on December 30, 2001. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 9.) Thereafter, Jurgens filed Louise's Last Will and Testament dated October 16, 1995 and Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) Upon reviewing the Will, Witzenburg executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Will was admitted to probate by the Suffolk County Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

In his capacity as Executor of Louise's Estate, Jurgens took steps to liquidate her assets and sell her house, all of which was accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In the course of performing his duties as Executor, which included locating and accounting for various assets of the Estate, Jurgens discovered that Witzenburg had withheld certain of Louise's money and personal property valued at $789,039.04, which Witzenburg had obtained through specific withdrawals, transfers and check negotiations between March 1997 and June 2000. (Jurgens Aff. ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 11.)

Following this discovery, on December 5, 2001, Jurgens, in his capacity as Executor, commenced a special proceeding in Suffolk County Surrogate's Court, pursuant to Section 2103 of New York Surrogate's Court Procedure Act, alleging that money and personal property belonging to Louise, valued at $789,039.04, had been withheld by Plaintiff (the "Surrogate's Court Action") (Jurgens Aff ¶ 5; Schmidt Decl. ¶ 7; Def.'s 56.1 Stat. ¶ 12.) On January 14, 2002, Jurgens filed an affirmation with the Surrogate's Court identifying the specific withdrawals, transfers and check negotiations in which Plaintiff had engaged between Marcy 1997 and June 2000. (Schmidt Decl. ¶ 7.)

**\*4** On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr., granted Jurgens' motion (made on behalf of Louise's Estate) for summary judgment on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the

"Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> Sufficient concerns having been raised before this Court to question the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the Surrogate's Court is directed to serve a copy of the Court's decision upon the Suffolk County District Attorney for further investigation[.]"

(Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.) The Judgment is a final judgment and was not appealed by Witzenburg. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens alleges, upon information and belief, that Witzenburg left New York shortly after entry of the Judgment on August 22, 2003. (Schmidt Decl. ¶ 12.) To date, Witzenburg has not made any payment to satisfy the Judgment, and it is Jurgens' understanding that Witzenburg has resisted all efforts to enforce the Judgment. (Jurgens Aff. ¶ 6; Def.'s 56.1 Stat. ¶ 19.) However, once the Estate files its final accounting (which it cannot do until after resolution of the instant action), it will ultimately be able to offset the amount of the Judgment against Witzenburg's share. (Jurgens Aff. ¶ 12.; Schmidt Decl. ¶ 12.)

Since his preliminary appointment in January 2001 and continuing through the present date, Jurgens, in his capacity as Executor, avers that he has consistently acted in the interests of the Estate. (Jurgens Aff. ¶¶ 7, 15; Schmidt Decl. ¶¶ 22, 31; Def.'s 56.1 Stat. ¶ 22.) For example, Jurgens maintains the Estate accounts, files and pays fiduciary taxes, and assists and pays for the various lawsuits and proceedings in which the Estate is involved. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 23.) In addition, Jurgens oversaw certain distributions of Louise's Will to beneficiaries during the period December 2001 through January 2004, pending a final accounting in Surrogate's

Court. Jurgens has not made any distribution to himself personally and has not taken any Executor fees. (Jurgens Aff. ¶ 7; Schmidt Decl. ¶¶ 23, 24.)

To date, the Estate remains open, pending the outcome of the instant action. Once this case is resolved, Jurgens intends to render a final accounting of the Estate's property (the proceeds of which are currently held in the Estate accounts at Citibank or Smith Barney) in Surrogate's Court. (Jurgens Aff. ¶ 16; Schmidt Decl. ¶ 16.) As part of the final accounting, Witzenburg's share of the Estate will be determined, against which the Suffolk County Judgment can be applied. Then, according to Jurgens, the Estate can render final distributions of the Estate property and he can close the Estate in Surrogate's Court and complete his duties as Executor. (Jurgens Aff. ¶¶ 8, 12, 16.)

### B. *Procedural Background*
**\*5** The procedural background of this action is also set forth in substantial detail in Judge Feuerstein's March 1, 2007 Order [DE 73] granting in part and denying in part Defendant's motion to dismiss. Only the procedural background germane to this Report will be repeated here.

On December 21, 2004, Plaintiff filed the instant action against Defendant Jurgens, individually and as Executor of the Estate, as well as against Merrill Lynch Pierce Fenner & Smith, Inc. (Merrill Lynch) and Solomon Smith Barney Citigroup ("Smith Barney") in the United States District Court for the Southern District of Texas. On April 27, 2005, Plaintiff filed a First Amended Verified Complaint (the "Amended Complaint"). With respect to Jurgens, Plaintiff alleges that Jurgens and his attorneys were a "corrupt enterprise" and that they depleted Louise's assets, converted assets, committed "frauds" and breached a "fiduciary duty." (Amended Complaint, dated April 27, 2005 "Am.Compl."), at 4.) On September 15, 2005, Jurgens' motion to transfer venue was granted and the action was transferred to this Court [DE 45].

### 1. *Defendant's Prior Motion To Dismiss*
By motion dated February 3, 2006 [DE 62–65], Defendant Jurgens moved to dismiss the Complaint as against him on the grounds that the Court: (1) lacked subject matter jurisdiction under the *Rooker–Feldman* doctrine and the probate exception to diversity jurisdiction; or in the alternative, (2) should abstain from hearing this dispute

because it concerns the administration of an estate; or in the alternative, (3) should dismiss the amended complaint for failure to comply with Rule 8 of the Federal Rules of Civil Procedure.

By Order dated March 1, 2007 [DE 73], Judge Feuerstein held that, "pursuant to the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over plaintiff's claims relating to the alleged conversion or improper removal of assets from the Merrill Lynch, Federated Securities or First Securities Investors brokerage accounts and those claims are dismissed" [DE 73 at 8]. Moreover, Judge Feuerstein explained that, to the extent Plaintiff seeks damages resulting from a diminished inheritance, he lacks standing because "legatees and beneficiaries thereof have no independent cause of action either in their own right or in the estate to recover estate property." (*Id.* at 21 (citing cases).)

On the other hand, Judge Feuerstein did not dismiss Plaintiff's claims for breach of fiduciary duty and mismanagement of assets, holding that those claims were not directly addressed in the Surrogate's Court proceeding and are not "inextricably intertwined" with the prior state court determination and. thus, are not barred by the *Rooker–Feldman* doctrine. (*Id.* at 8–9.) In addition, Judge Feuerstein held that the probate exception to diversity jurisdiction does not apply to Plaintiff's breach of fiduciary duty claims. (*Id.* at 12.) In sum, the Court found that to the extent Plaintiff requests damages "to the heirs of the estate of Louise" and for "the depletion of the estate of Louise" based upon causes of action for breach of fiduciary duty, mismanagement of assets and fraud, the probate exception does not deprive this Court of subject matter jurisdiction over those claims. (*Id.* at 12 (citing cases)).

 **\*6** Likewise, the Court denied the portion of Jurgens' motion requesting that the federal court abstain from exercising jurisdiction on the grounds that, even if the Court were to assume the existence of parallel proceedings in this Court and Surrogate's Court, the balance of factors nonetheless weighs against abstention. (*Id.* at 14–17.)

The Court also denied the portion of Jurgens' motion seeking dismissal of the Amended Complaint pursuant to Rule 8 of the Federal Rules of Civil Procedure on the grounds that Plaintiff's *pro se* complaint, although "not a model of clarity or brevity," satisfied the requirements of

Rule 8(a) by providing fair notice of what plaintiff's claims are and the grounds upon which they rest. (*Id.* at 17–19.)

With regard to Plaintiff's claims against Smith Barney and Citibank, the Court granted Smith Barney's motion and dismissed the Amended Complaint as against it in its entirety, and *sua sponte* dismissed the entirety of the Amended Complaint against Merrill Lynch for lack of subject matter jurisdiction. (*Id.* at 19–22, n .6.)

In sum, the only claim against Jurgens which is before this Court on summary judgment is whether Jurgens, in his capacities as power of attorney and executor, breached his fiduciary duties to Louise's Estate, including whether he mismanaged Louise's or the Estate's funds, thereby causing "the depletion of the estate of Louise" and causing harm "to the heirs of the estate of Louise" [DE 73 at 12].

### 2. *The Preclusion Order Against Plaintiff*

On multiple occasions during the course of the present action, specifically between October 2007 and February 2008, Plaintiff failed to appear for his properly-noticed deposition, despite the Court's denial of his two motions for protective orders [DE 90, 100] and several opportunities to appear. (Schmidt Decl. ¶ 19.) During this time, the Court explicitly warned Plaintiff as to the consequences of his failure to appear for deposition. By Order dated February 4, 2008 [DE 100], Judge Boyle cautioned Plaintiff that

> [s]hould he fail to be deposed in this action on or before February 27, 200 [8] he faces a preclusion order barring him from filing any affidavit in favor or in opposition to any motion for summary judgment, and further barring him from testifying at trial."

[DE 100.] Between February 4 and February 25, 2008, Defendant made several attempts to schedule Plaintiff's deposition, but Plaintiff nonetheless refused to appear. (DE 106, 107; Schmidt Decl. ¶ 21.) As a result, by Order dated March 4, 2008 (the "Preclusion Order") [DE 109], Judge Boyle held that

> [c]onsistent with the cautionary advice set forth in the order dated February 4, 2008, the *pro*

*se* plaintiff, James Witzenburg, is hereby precluded from offering any affidavit in support of or in opposition to any motion for summary judgment and is also precluded from testifying at trial in this action unless, within ten (10) business days, he submits to a deposition at a mutually agreed date and time at the placed noticed by counsel for the defendants.

**\*7** [DE 109.]

On March 4, Defendant's counsel sent a letter to Plaintiff by fax, e-mail, and regular mail, enclosing a copy of the Court's March 4, 2008 Order, and offering to depose Plaintiff on March 7, 12, 14, 17, or 18, 2008. (Schmidt Decl. ¶ 22.) Plaintiff did not respond to the letter of Defendant's counsel in any traditional or electronic medium. Moreover, Plaintiff did not appear for his deposition by March 18 as directed by Judge Boyle's March 4 Order. (DE 106, 107; Schmidt Decl. ¶ 22; Def.'s 56.1 Stat. ¶ 33.) Accordingly, by operation of the March 4, 2008 Order, Plaintiff is precluded from offering any affidavit in opposition to the current summary judgment motion and from offering any testimony at trial. Judge Boyle's decision on this issue is now the law of the case.

## C. *Summary Of Plaintiff's Allegations*

In the Amended Complaint, Plaintiff seeks monetary damages as follows: (1) $106,714.43 for funds converted by Jurgens, acting alone or in concert with others, and the Merrill Lynch and Smith Barney brokers, from a brokerage account allegedly owned by Plaintiff; (2) $2,293,225 for which Jurgens is liable "to the heirs of the estate of Louise Jurgens, including Plaintiff," for breach of fiduciary duties to the Estate and/or conversion of Louise's assets; (3) $1,299,175 for which Jurgens is liable because "[b]y placing an unwarranted guardianship on Louise ... Jurgens initiated the frenzy of activity that resulted in ... depletion of the estate of Louise ..." in that amount; (4) $350,000 in inheritance to which Plaintiff is allegedly entitled pursuant to Louise's "true will," including a $300,000 specific bequest and $50,000 which he claims is his share of the residual value of the Estate (his inheritance per stirpes via his mother's inheritance of 40% of the residual value of the Estate); and (5) interests and costs. (Am. Compl. at 33–34). [5]

As discussed above, in the Order granting in part Defendant's motion to dismiss, Judge Feuerstein found that "pursuant to the *Rooker–Feldman* doctrine, the Court lacks subject matter jurisdiction over plaintiff's claims relating to the conversion or improper removal of assets from the Merrill Lynch, Federated Securities or First Securities Investors brokerage accounts and those claims are dismissed." [DE 73 at 8.] Moreover, Judge Feuerstein explained that to the extent Plaintiff is seeking damages resulting from a diminished inheritance, he has no standing to do so because "legatees and beneficiaries thereof have no independent cause of action either in their own right or in the estate to recover restate property," [DE 73 at 21 (citing cases).] Accordingly, Plaintiff's claims for $106,714.43 for funds allegedly converted by Jurgens and the Merrill Lynch and Smith Barney brokers (No. (1) listed above) and $1,299,175 for depletion of Louise's assets during the guardianship period (No. (3) listed above) were dismissed pursuant to Judge Feuerstein's Order and need not be considered here. Likewise, Plaintiff's claim for $2,293,225 (No. (2) listed above) was dismissed to the extent it was based on alleged conversion of Louise's assets. The issues remaining before this Court are whether Jurgens breached his fiduciary duties to the Estate and is thus liable to Louise's heirs for $2,293,225 (No. (2) listed above), and whether Plaintiff is entitled to $350,000, or any portion thereof, in inheritance, pursuant to Louise's "true will" (No. (4) listed above).

**\*8** Insofar as the allegations in the Amended Complaint relate to Defendant Jurgens and are currently before this Court, Plaintiff alleges that Jurgens, in his capacity as executor of Louise's Estate, "committed five separate acts of fraud and many breaches of fiduciary duty." (Am. Compl. at 20). These acts of fraud and breaches of fiduciary duty, as distilled by the Court from the Amended Complaint, are as follows:

- Jurgens knowingly filed a false Last Will and Testament of Louise, which was prepared by Jurgens' counsel in the Surrogate's Court Action, thereby causing the Suffolk Supreme Court Action and/or the Surrogate's Court Action to be "premised upon the filing of a false document which was a fraud on the court," as well as on Louise, her estate, and her beneficiaries, including Plaintiff. (*Id.* at 20–21, Exs. 7, 8.)

- McCarthy was not an independent property guardian and he, together with the Smith Barney experts, "mismanaged" Louise's assets, and filed a false final accounting in the Suffolk Supreme Court Action. (*Id.* at 21–22, Ex. 1.)

- Jurgens' counsel in the Surrogate's Court Action hired a forensic accounting firm to prepare "a report" for which the Estate paid a fee of $53,428.94. However, no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions. Thus, the $53,428.94 "expense" "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (*Id.* at 24.)

- Jurgens' counsel in the Surrogate's Court Action caused the final accounting prepared by McCarthy, which was sent by the Court to the forensic accounting firm, to be sent to a non-existent person at the firm so that the firm would not be in the position of having to approve McCarthy's fraudulent final accounting. (*Id.* at 24–25.)

- In arranging the Estate's sale of Louise's residence, Jurgens did not conduct the sale as an "arm's length" transaction; the only appraisal submitted was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager." (*Id.* at 25.) Moreover, Jurgens submitted an affidavit to the Surrogate's Court affirming that the sale was an "arm's length" transaction. (*Id.*) Jurgens' conduct constituted a breach of his fiduciary duty to Louise's Estate. (*Id.*)

- Jurgens filed a fraudulent bond with the Surrogate's Court and such bond does not actually exist, thereby conferring a fraud on the court and Louise's beneficiaries. (*Id.* at 25–26, Ex. 9.)

In addition, Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting (filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in

concert with all parties ... to deplete and convert the assets of" Louise's Estate. (*Id.* at 9.) Finally, Plaintiff claims that Jurgens brought the Suffolk Supreme Court Action against him "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy served as Louise's guardians. (*Id.*)

## II. *THE SUMMARY JUDGMENT MOTION*

### A. *Standard of Review*

**\*9** In reviewing a motion for summary judgment, the Court is guided by the tenets set forth in Federal Rule of Civil Procedure 56(c), which provides, in part:

> ... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law ....

Fed.R.Civ.P. 56; *Globecon Group, LLC v. Hartford Fire Ins. Co ., 434 F.3d 165, 170 (2d Cir.2006); Gray v. Lutheran Social Servs. of Metro. New York., Inc.,* No. 04–2843, 2006 WL 1982859, at *3 (E.D.N.Y. Jul.13, 2006). The moving party bears the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).* In addition, to determine whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising from that inference in the light most favorable to the non-moving party. *Id . at 157; Fischl v. Armitage,* 128 F.3d, 50, 55 (2d Cir.1997).

Where the movant shows prima facie entitlement to summary judgment, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir.2006).* "[T]he nonmovant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment." *Id. See also McPherson v. N.Y. City Dep't Of Educ., 457 F.3d 211, 215 n. 4 (2d Cir.2006)* ("[S]peculation alone is insufficient to defeat a motion for summary judgment.");

*Byrnie v. Town of Cromwell, Bd. Of Educ.,* 243 F.3d 93, 101 (2d Cir.2001) ("[e]ven where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor").

"If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Fischl,* 128 F.3d at 56 (citing *Hetchkop v. Woodlawn at Grassmere, Inc.,* 116 F.3d 28, 33 (2d Cir.1997)). On the other hand, Rule 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to material fact and that the movant is entitled judgment as a matter of law." *Fed.R.Civ.P. 56(e)(2).* In other words, summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Dobbs v. Dobbs,* No. 06 CV 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) (the Court's goal should be to "isolate and dispose of factually unsupported claims ...").

**\*10** However, because Plaintiff is proceeding *pro se,* the Court is compelled to "read [*pro se* plaintiff's] supporting papers liberally, and ... interpret them to raise the strongest arguments they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nevertheless, "the nonmoving party may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful." *Morris v. Lindau,* 196 F.3d 102, 109 (2d Cir.1999) (quotation omitted).

**B.** *Procedural Issues*

On June 17, 2008, Defendant Jurgens served his motion for summary judgment on Plaintiff Witzenburg by e-mail and regular mail [DE 122]. With his summary judgment motion, Defendant also served Plaintiff with a cover letter providing the requisite Notice to *Pro Se litigant* which, in accordance with Local Rule of the Eastern District of New York 56.2, stated:

> [y]ou are required to serve any opposition papers on my office **within 10 days of my service of**

**this motion,** without filing any of your opposition papers with the Court .... Accordingly, to the extent you intend to oppose this motion, please send me within the requisite 10 days a service copy of your papers as well as an additional copy of your papers for me to send to the Court.

[DE 126] Plaintiff did not file any opposition papers or attempt any communication with Defendant or the Court by the June 27, 2008 due date. By letters dated July 1 and July 14, 2008, Defendant asked the Court to grant the summary judgment motion without opposition [DE 128, 133].

By Order To Show Cause dated July 15, 2008, the Court gave Plaintiff one final opportunity to demonstrate why Defendant's motion for summary judgment should not be treated as unopposed. The Court directed Defendant (i) to submit a written explanation to the Court no later than August 6, 2008 setting forth good cause why Plaintiff had failed to oppose Defendant's summary judgment motion; and (ii) to file any opposition papers to Defendant's summary judgment motion no later than August 6, 2008 [DE 134].

Plaintiff served his opposition to Defendant's motion for summary judgment on August 5, 2008 [DE 136], but did not submit a written explanation why he had failed to file his opposition by the original due date. (Schmidt Reply Dec. [6] ¶ 2.) Plaintiff's opposition, styled "Plaintiff's Response in Opposition to Defendant Charles Jurgens' Motion for Summary Judgment" (the "Response"), is, in effect, an unsworn affidavit. Unsworn affidavits are not competent summary judgment evidence unless they meet the requirements of 28 U.S.C. § 1746 or, at minimum, "substantially compl[y] with the[ ] statutory requirements [of 28 U.S.C. § 1746] ...." *LeBoeuf, Lamb, Greene & MacRae, LLP v. Worsham,* 185 F.3d 61, 65 (2d Cir.1999); *see also Nissho–Iwai Amer. Corp. v. Kline,* 845 F.3d 1300, 1306 (5th Cir.1988). Although Plaintiff signed the Response, it is not a sworn affidavit. Likewise, there is no statement that the contents are "true and correct" or made "under penalty of perjury" as required under 28 U.S.C. § 1746 and Second Circuit case law.

**\*11** Moreover, Plaintiff is precluded from submitting any affidavits in support of his opposition to Defendant's

motion for summary judgment based upon Judge Boyle's March 4, 2008 Order, which the Court finds is law of the case on this issue. Under the "law-of-the-case doctrine, a court has discretion to re-examine an issue in certain circumstances." *Public Employees Retirement Association of New Mexico v. PriceWaterhouseCoopers LLP,* No. 07–3756–cv, 2009 WL 27704, at * 3 (2d Cir. Jan.6, 2009). However, "[c]ourts are understandably reluctant to reopen a ruling once made, especially when one judge or court is asked to consider the ruling of a different judge." *Ali v. Mukasey,* 529 F.3d 478, 490 (2d Cior.2008) A court's decision whether to apply law-of-the-case is "informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine." *Prisco v. A & D Carting Corp.,* 168 F.3d 593, 607 (2d Cir.1999) (internal quotation marks omitted).

With regard to law-of-the-case doctrine, the Second Circuit has noted that

> [t]he law of the case doctrine ... while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.

*ATSI Communications, Inc. v. the Shaar Fund, Ltd.,* 547 F.3d 109, 112 n. 3 (2d Cir.2008) (citing *Ali v. Mukasey,* 529 F.3d at 490). I find that the law-of-the-case doctrine applies in the current circumstances. Plaintiff has provided no argument or rationale here that there has been some "intervening development of law or fact that renders reliance on [Judge Boyle's] earlier ruling inadvisable." *Calabrese v. CSC Holdings, Inc.,* No. 02–CV–5171, 2009 WL 425879, at * 6 (E.D.N.Y. Feb. 19, 2009). Plaintiff has never presented any good faith reason for his failure to show up at his duly noticed deposition, in the face of specific Orders from the court to do so. The law of the case will be disregarded "only when the court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1991) (quoting *Zdanok v. Glidden,* 327 F.2d 944, 953 (2d Cir.1964)). Here, Plaintiff presents no new evidence or facts to serve as any

reasonable justification for his prior conduct or any basis whatsoever to disturb Judge Boyle's prior rulings.

In addition to the applicability of the law-of-the-case doctrine here, the Court also observes that because Plaintiff's Response constitutes an unsworn declaration, it is inadmissible for purposes of Rule 56 and cannot be considered by the Court in rendering a decision on the present motion. *Nissho–Iwai Amer. Corp.,* 845 F.3d at 1306; *Hale Propeller LLC v. Ryan Marine Prods. Pty., Ltd.,* 151 F.Supp.2d 183, 200–01 (D.Conn.2001) (disregarding affidavit where it failed to conform to the standard for unsworn declarations set forth by 28 U.S.C. § 1746); *compare LeBoeuf, Lamb, Greene & MacRae, LLP,* 185 F.3d at 65–66 (defendant's unsworn affidavit could be considered on summary judgment where it stated that "under penalty of perjury I make the statements contained herein" and was signed and dated). Accordingly, Plaintiff's Response cannot be considered on this motion. [7]

**\*12** In addition, Plaintiff did not include in the Response a contravention of Defendant's Statement of Undisputed Material Facts [DE 125] or a separate statement of additional material facts for which there exists a genuine dispute, as required under Local Civil Rule 56.1(b). [8] Pursuant to Local Rule 56.1(c), each numbered paragraph in the moving party's statement of material facts "will be deemed admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Accordingly, for purposes of this motion, the statements contained in Defendant's Statement of Undisputed Material Facts [DE 125] are hereby deemed admitted as unopposed.

Nevertheless, where, as here, the motion for summary judgment is unopposed, "the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law ." *Vermont Teddy Bear Co. v. Beargram Co.,* 373 F.3d 241, 242 (2d Cir.2004); *Layachi v. Minolta Bus. Sys., Inc.,* 00 Civ. 731, 2001 WL 1098008, at *3 (S.D.N.Y. Sept.18, 2001) (where "non-moving *pro se* party has failed to submit papers in opposition, summary judgment should not be granted automatically") (internal citations omitted). The Second Circuit has stated:

> the failure to oppose a motion for summary judgment alone does not

justify the granting of summary judgment. Instead, the district court must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law.

*Vermont Teddy Bear Co.,* 373 F.3d at 244. Plaintiff's failure to oppose summary judgment in any legally meaningful way allows the Court to accept Defendant's factual assertions as true; however, the court "must be satisfied that the citation to evidence in the record supports the assertion." *Id.*

## C. *Breach of Fiduciary Duty Claims*

As discussed above, Plaintiff seeks monetary damages against Jurgens in the amount of $2,293,225 on the grounds that, in his role as executor of Louise's Estate, Jurgens breached his fiduciary duties through various acts, including mismanaging the Estate's assets. New York law vests executors of estates with broad powers to dispose of and manage the decedent's interests in real property. Specifically, under the Fiduciaries' Powers Act, "every fiduciary is authorized" *inter alia:*

- with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein;

- to employ any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York as custodian of any stock or other securities held as a fiduciary, and the cost thereof;

**\*13** • to cause any stock or other securities (together, "securities") held by any bank or trust company to be registered and held in the name of a nominee of such bank or trust company without disclosure of the fiduciary relationship; and to direct any bank or trust company incorporated in New York, any national bank located in New York or any private banker duly authorized to engage in business in New York to register and hold any securities deposited with such bank, trust company or private banker in the name of a nominee of such bank; and

- to contest, compromise or otherwise settle any claim in favor of the estate, or in favor of third person and against the state.

*See* N.Y. EPTL § 11–1.1(5)(B), (9), (10), (13).

Notwithstanding this broad authority, the Fiduciaries' Powers Act also requires executors to strictly adhere to their fiduciary duties. The following is a brief review of executors' fiduciary duties as relevant to the present case.

Pursuant to the duties of loyalty, care and safekeeping, an executor must collect and preserve the assets of the estate. *In re Estate of Donner,* 82 N.Y.2d 574, 584, 606 N.Y.S.2d 137, 141, 626 N.E.2d 922 (N.Y.1993) (noting that the executors "were fiduciaries who owed a duty of undivided loyalty to the decedent and had a duty to preserve the assets that she entrusted to them") (citing *Meinhard v. Salmon,* 240, N.Y. 458, 464 (N.Y.1928)); *Bender v. City of Rochester,* 765 F.2d 7, 12 (2d Cir.1985) (administrator of an estate has "the legal duty to collect and preserve [decedent's] assets, [and] to pay [decedent's] debts"); *In re Estate of Skelly,* 284 A.D.2d 336, 725 N.Y.S.2d 666, 667 (2d Dep't 2001) (executor "has a duty to preserve the assets of the estate ....") (internal citation omitted). Likewise, an executor is prohibited from commingling estate assets with any other assets. *See* N.Y. EPTL § 11–1.6 ("[e]very fiduciary shall keep property received as fiduciary separate from his individual property"). The Fiduciary Powers Act authorizes an executor to protect the estate's assets by employing "any broker-dealer which is registered with the [SEC] and the department of law in the state of New York ... as a custodian for a fiduciary of any stock or other securities ... [and] to register such securities in the name of such broker." N.Y. EPTL § 11–1.10.

An executor's duty of diligence and prudence requires him to administer and manage the estate assiduously in the interest of the beneficiaries. This includes "employing such diligence and prudence in the care and management of the estate assets and affairs as would a prudent person of average discretion and intelligence." *In re Robinson,* 282 A.D.2d 607, 724 N.Y.S.2d 424, 426 (2d Dep't 2001) (finding no basis to deny executors' commissions where executors adequately explained reasons for waiting to sell decedent's property and objectant did not present any evidence to refute the explanations) (internal citations omitted); *In re Bello,* 227 A.D.2d 553, 554, 642 N.Y.S.2d

953, 954 (2d Dep't 1996) (concluding that executor met the standard of care under difficult circumstances); *In re Scott,* 234 A.D.2d 551, 651 N.Y.S.2d 592, 593 (2d Dep't 1996 (finding executors' delay in paying tax deficiencies, where resulting accrued interest exceeded amount earned by the estate, constituted breach of duty of diligence and care).

**\*14** The duties of diligence and prudence also relate to the executor's authority to invest the assets of an estate. Under the Prudent Investment Act, [9] the executor must make investment decisions pursuant to the prudent investor standard, which requires the executor to "exercise reasonable care, skill and caution to make and implement investment and management decisions as a prudent investor would for the entire portfolio, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(2). The Prudent Investment Act sets out specific requirements for an executor's investment strategy. N.Y. EPTL § 11–2.3(b) (3). For example, executors are required to "pursue an *overall* investment strategy to enable the trustee to make appropriate present and future distributions to or for the benefit of the beneficiaries under the governing instrument, in accordance with risk and return objectives reasonably suited to the *entire* portfolio." *In re Heller,* 6 N.Y.3d 649, 653, 2006 Slip Op 3469, at \*3 (N.Y.2006) (emphasis in original) (quoting N.Y. EPTL § 11–2.3(b)(3) (A)). The statute also provides, in relevant part, as follows:

> [t]he prudent investor rule requires a standard of conduct, not outcome or performance. Compliance with the prudent investor rule is determined in light of facts and circumstances prevailing at the time of the decision or action of a trustee. A trustee is not liable to a beneficiary to the extent that the trustee acted in substantial compliance with the prudent investor standard or in reasonable reliance on the express terms and provisions of the governing instrument.

N.Y. EPTL § 11–2.3(b)(1). Moreover, an executor is obligated to "diversify assets unless the trustee reasonably determines that it is in the interests of the beneficiaries not to diversify, taking into account the purposes and terms and provisions of the governing instrument." N.Y. EPTL § 11–2.3(b)(3)(C) (quoted in *In re Janes,* 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997).

Also, under New York law, an executor has discretion whether to pay any testamentary disposition or distributive share before the completion of the publication of notice to creditors or, if no such notice is published, before the expiration of seven months from the time letters testamentary or of administration are granted. Thereafter, the executor is required to pay any testamentary disposition or distributive share no more than seven months following the date the letters testamentary are granted. N.Y. EPTL § 11–1.5(a). If the executor fails to make such disposition, an heir may bring a proceeding against the executor. However, for the purpose of computing the time for the heir to commence the proceeding against the executor, the cause of action does not accrue until the executor's account "is judicially settled." N.Y. EPTL § 11–1.5(c).

Typically, the determination of whether the executor's conduct "measures up to the appropriate standards of prudence, vigilance, and care" is an issue of fact to be decided by the court. *Donner,* 82 N.Y.2d at 585, 606 N.Y.S.2d at 142, 626 N.E.2d 922; *Janes,* 90 N.Y.2d at 50, 659 N.Y.S.2d at 169, 681 N.E.2d 332 (internal citations omitted).

### III. *DISCUSSION*

**\*15** The issue to be decided by this Court is whether there exists any genuine issue of material fact which would preclude summary judgment in favor of Defendant on Plaintiff's claims that (1) Defendant, in his role as executor of Louise's estate, breached his fiduciary duties through various acts, including mismanaging the Estate's assets, thereby depleting the Estate's assets and harming Louise's heirs; and (2) Plaintiff is entitled to an inheritance in the amount of $350,000 pursuant to Louise's "true will."

In determining whether there are any genuine issues of material fact, the Court remains mindful of Judge Boyle's Preclusion Order which prohibited Plaintiff from submitting "any affidavit in support of or in opposition to any motion for summary judgment" [DE 109]. The Court is also cognizant that, based upon Plaintiff's failure to oppose Defendant's motion for summary judgment in a substantively meaningful way, including his failure to submit a Local Rule 56.1(b) statement contravening Defendant's statement of undisputed facts, Defendant's factual assertions must be accepted as true. *See* Local Rule 56.1(c).

**A.** *Jurgens' Conduct As Executor*

Accepting Jurgens' Rule 56.1 Statement as admitted facts, as the Court must, the record shows that Jurgens fulfilled his fiduciary duties as executor of Louise's estate. Pursuant to the duties of loyalty, care and safekeeping, Jurgens was required to collect and preserve the assets of the estate. *See, e.g.* Donner, 82 N.Y.2d at 584, 606 N.Y.S.2d at 141, 626 N.E.2d 922. Thus, following his appointment as Executor of Louise's Estate, Jurgens took steps to liquidate Louise's assets and sell her house, all of which were accomplished within a few months. Thereafter, Jurgens continued to work to ensure that all bills and taxes, including personal, fiduciary and estate taxes were paid. (Jurgens Aff. ¶ 4; Def.'s 56.1 Stat. ¶ 10.) In addition, since his appointment, Jurgens has continued to maintain the Estate accounts, has filed and paid fiduciary taxes, and has assisted and paid for the various lawsuits and proceedings involving the Estate. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 23 .)

Although Plaintiff alleges that Jurgens has breached his fiduciary duties by failing to distribute the assets of the Estate, Jurgens is not actually required to do so until there is a final accounting. Jurgens made certain distributions to beneficiaries of Louise's Will between December 2001 and January 2004. (Jurgens Aff. ¶ 7; Def.'s 56.1 Stat. ¶ 24.) Moreover, Jurgens has not made any distributions to himself or taken any Executor fees to date. (*Id.*)

Jurgens will only be required to distribute the Estate's assets when the Estate "is judicially settled." *See* N.Y. EPTL § 11–1 .5(c). In fact, it is Plaintiff's conduct, including the failure to pay the outstanding Surrogate's Court Judgment against him in the amount of $789,039.04, that has prevented Jurgens from conducting a final accounting and in turn making the final distributions under the Will. (Jurgens Aff. ¶ 8; Def.'s 56.1 Stat. ¶ 24.)

**B.** *Breach Of Fiduciary Duty Claims*

*1. The Purported False Will*

**\*16** Plaintiff alleges that Jurgens knowingly filed a false Last Will and Testament of Louise, thus committing fraud on the court, Louise, her estate, and her beneficiaries, including Plaintiff. (Am. Compl. at 20–21, Exs. 7, 8.) Furthermore, Plaintiff claims that pursuant to Louise's

"true will," he is entitled to an inheritance in the amount of $350,000.

Contrary to Plaintiff's assertions, Defendant Jurgens states that in his role as executor of the Estate, following Louise's death, he duly filed Louise's Last Will and Testament dated October 16, 1995 as well as the Codicil dated July 28, 1998 (together, the "Will") (Jurgens Aff. ¶ 13; Def.'s 56.1 Stat. ¶ 6.) The Will was admitted to probate by the Suffolk County Surrogate's Court on December 3, 2001. (Schmidt Decl. ¶ 6; Jurgens Aff. ¶ 13.)

Moreover, prior to the admission of the Will to probate, Plaintiff reviewed the Will and executed a Wavier and Consent thereto dated October 22, 2001. (Jurgens Aff. ¶ 13, Ex. A; Def.'s 56.1 Stat. ¶ 8.) The Waiver and Consent provides that Plaintiff "consents that the court admit to probate the decedent's Last Will and Testament dated October 16, 1995 (and codicils, if any, dated July 28, 1998), a copy of each which testamentary instrument has been received by me and that Letters Testamentary issue to Charles Jurgens." (Jurgens Aff., Ex. A.) Notably, at no time during the Surrogate's Court proceedings did Plaintiff raise any objection to the Will, despite having had ample opportunity to do so. Plaintiff raised this issue for the first time only upon bringing this action, long after the admission of the Will to probate.

If Plaintiff were seeking to withdraw his Waiver and vacate the decree admitting Louise's Will to probate in order to contest the Will (for which he has not so moved), such motion would have to be made before the Surrogate's Court, where the Waiver was entered. It is well-established that the jurisdiction to administer the probate of wills, including entry of waivers, falls within the ambit of the Surrogate's Court. *See* Groman v. Cola, 07 CV 2635, 2007 WL 3340922, at *4 (S.D.N.Y. Nov.7, 2007) (noting that federal jurisdiction is barred under the probate exception if the action requires "the probate or annulment of a will [or] the administration of a decedent's estate") (citing Marshall v. Marshall, 547 U.S. 293, 311–12, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)); *Lefkowitz v. Bank of N.Y .,* 528 F.3d 102,106 (2d Cir.2007) (affirming dismissal of certain tort claims against executor because "[w]ith these claims, Plaintiff seeks to mask in claims for federal relief her complaints about the maladministration of her parent's estates, which have been proceeding in probate courts") (citation omitted); *see also* DE 73 at 10. Here, any request by Plaintiff to set aside his Waiver must properly

be made before the Surrogate's Court and such request would be subject to the applicable statute of limitations in that court.

However, even if Plaintiff were to make such a motion, it is unlikely he would succeed based on the record currently before this Court. Under New York law, "[a] party seeking to set aside a probate decree entered upon his consent must show that such consent was obtained by fraud or overreaching, [or] was the product of misrepresentation or misconduct, or that newly-discovered evidence, clerical error or other sufficient cause justifies the reopening of the decree." *Moser v. Pollin,* 294 F.3d 335, 342 (2d Cir.2000) (overruled on other grounds by *Marshall v. Marshall,* 547 U.S. 293, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006)) (quoting *In re Hall,* 185 A.D.2d 322, 322, 586 N.Y.S.2d 285, 286 (2d Dep't 1992)); *In re Coccia,* 2008–0802, 2009 N.Y. Slip Op 1477, 2009 App. Div. LEXIS 1463, at *1 (citations omitted). In other words, the party challenging the probate decree must establish "sufficient cause ... to justify reopening the decree." *Coccia,* 2009 App. Div. LEXIS 1463, at *2 ("appellant's unsubstantiated and conclusory allegations that he did not appreciate or understand the significance of the waiver and consent were insufficient to satisfy this standard").

**\*17** Here, not only has Plaintiff not moved to set aside the Waiver, but he has not even addressed the fact that he submitted the Waiver to the Surrogate's Court. Moreover, based on the record now before this Court, no evidence has been introduced which would allow a court to determine that Jurgens had a fraudulent will admitted to probate. Nowhere does Plaintiff submit any evidence showing that he signed the Waiver as a result of fraud, overreaching, misrepresentation or misconduct on the part of any party involved in the Surrogate's Court proceeding. Neither has Plaintiff submitted newly-discovered evidence, or evidence of a clerical error or other sufficient cause which would justify the reopening of the decree. In fact, the extent of Plaintiff's assertions on this point, other than in the Amended Complaint, is found in his Summary Judgment Response, where he takes issue with Paragraph 6 of the Schmidt Declaration for, among other things, not addressing "the presence of 2 wills" which were annexed to the Amended Complaint. (Pl. Opp'n Summ. J. at 4.)

In sum, there no evidence that Plaintiff's Waiver was fraudulently obtained and should be withdrawn or that

Jurgens had a false will admitted to probate. Accordingly, the Court finds that there is no genuine issue of material fact as to whether Defendant breached his fiduciary duty as Executor in regard to the admission of the Will to probate. Likewise, Plaintiff's claim that he is entitled to an inheritance in the amount of $350,000 under a will other than the Will that was admitted to probate in the Surrogate's Court Action is without merit.

### 2. McCarthy's Final Accounting

Plaintiff alleges that Jurgens breached his fiduciary duty because the court-appointed property guardian for Louise, Patrick McCarthy, was not functioning independently and McCarthy, together with the Smith Barney experts, "mismanaged" Louise's assets, ultimately filing a false Final Accounting in the Suffolk Supreme Court Action. (Am. Compl. at 21–22.)

However, Jurgens has stated that he had "absolutely no authority to oversee, let alone supervise, [McCarthy's] actions while he served as Louise's property guardian." (Jurgens Aff. ¶ 10; Def.'s 56.1 Stat. ¶ 25.) Specifically, during the guardianship period, Jurgens did not have any control over Louise's finances or property. (Jurgens Aff. at ¶ 11; Def.'s 56.1 Stat. ¶ 28.) Moreover, at the conclusion of the guardianship period, McCarthy accounted for his actions as Louise's Property Guardian in a formal accounting which was approved by the Suffolk County Supreme Court. (Jurgens Aff. ¶ 10.) Despite having had ample opportunity to do so, Plaintiff at no time objected to McCarthy's Final Accounting and only raises this issue for the first time in the current action, several years after the entry of McCarthy's Final Accounting.

If Plaintiff had been seeking to challenge McCarthy's Final Accounting (for which he has not so moved), he would necessarily have had to bring that information to the attention of the Suffolk County Supreme Court, which previously approved the Final Accounting. *See, e.g., In re Hunter,* 4 N.Y.3d 260, 270, 794 N.Y.S.2d 286, 292, 827 N.E.2d 269 (N.Y.2005) (Explaining that res judicata principles "apply with equal force to judicially settled accounting decrees. As a general rule, an accounting decree is conclusive and binding with respect to all issues raised and as against all persons over whom Surrogate's Court obtained jurisdiction.") (citations omitted).

**\*18** Notwithstanding these purported facts, however, this allegation does not pertain to Jurgens, as he played no role in McCarthy's conduct as guardian. (Jurgens Aff. ¶ 11.) In fact, the conduct at issue here occurred before Louise's death, and thus prior to Jurgens' appointment as executor of Louise's estate and prior to his undertaking the corresponding fiduciary duties which Plaintiff claims were breached. (*Id.*) Moreover, McCarthy is not a party to this action.

Because this allegation relates solely to events that occurred prior to Jurgens' appointment as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact as to whether Defendant breached his fiduciary duties in regard to McCarthy's conduct as Property Guardian and/or McCarthy's Final Accounting.

### 3. The Purported Fraudulent Forensic Accounting Report

Plaintiff contends that, in either the Suffolk Supreme Court Action or the Surrogate's Court Action, Jurgen's attorney hired a forensic accounting firm to prepare "a report" for which Louise's Estate was billed $53,428.94. Plaintiff contends that no such report appears in the files of the Suffolk County Supreme Court or Surrogate's Court Actions and thus, Plaintiff argues, the $53,428.94 "expense" ... "is a fraud and unlawful conversion against Louise Jurgens, Plaintiff, and all other heirs of the estate of Louise Jurgens." (Am. Compl. at 24.)

At first glance, it is unclear whether Plaintiff is alleging that the fraudulent forensic accounting report was prepared during the guardianship period in the course of the Suffolk Supreme Court Action, or following Louise's death in the course of the Surrogate's Court Action. However, based on Plaintiff's assertion that the accountant who was hired to prepare this report informed Plaintiff's attorney (presumably in one of these earlier actions) that he did not know McCarthy, the Court concludes that the conduct alleged here occurred during the guardianship period, because that is the only time McCarthy was involved with Louise. Specifically, Plaintiff contends that the accountant stated that "he did not know the property manager Patrick McCarthy had never spoken with Patrick McCarthy, and was hired by James Klein." (Am. Compl. at 24.) Plaintiff also adds that the accountant made this statement "after he was paid" for the report. (*Id.*)

Insofar as this allegation pertains to the guardianship period, there is no claim against Jurgens and thus nothing for the Court to consider because this conduct occurred prior to Jurgens' appointment as executor of Louise's estate—and prior to his assuming the corresponding fiduciary duties which Plaintiff claims were breached. (*Id.*)

Even if the Court were to presume that this claim alleges conduct which occurred following Louise's death—and thus while Jurgens was the executor—there is no support, beyond Plaintiff's conclusory and unsubstantiated statements, to show that Jurgens fraudulently billed the Estate for an accounting report that was not received. Thus, the Court finds that there is no genuine issue of material fact whether Defendant caused his counsel to hire a forensic accounting firm to prepare a fraudulent report or to pay an impermissible fee to such firm.

### 4. The Alleged Non–Existent Forensic Accountant

**\*19** Plaintiff alleges that in the Surrogate's Court Action, Jurgens, through his counsel, caused the Final Accounting prepared by McCarthy to be sent by the Court to a non-existent person at a forensic accounting firm so that the accounting firm would not be in the position of having to approve McCarthy's fraudulent Final Accounting. (Am. Compl. at 24–25.) However, as noted above, Jurgens did not play any role in McCarthy's conduct as the property guardian. Moreover, beyond these conclusory and unsubstantiated allegations, the only evidence offered by Plaintiff is a copy of an envelope addressed to "Ernest Patrick Smith, CPA" at a street address in Melville. Contrary to Plaintiff's proffer, the envelope does not indicate that it is directed to the accounting firm of Callahan Nawrocki. (*Id.* at 25, 794 N.Y.S.2d 286, 827 N.E.2d 269.) Further, the envelope was returned by the post office bearing the stamped notation "Attempted Unknown" (not "addressee unknown" as stated by Plaintiff). (*Id .;* Am. Compl. Ex. 11.)

Because there is no evidence of Jurgens having played any role in this alleged conduct, the Court finds that Plaintiff has failed to raise a genuine issue of material fact to support his contention that Jurgens caused McCarthy's Final Accounting to be sent to a non-existent forensic accountant.

### 5. Sale Of Decedent's Residence As An Arm's Length Transaction

With regard to the sale of Louise's residence, Plaintiff alleges that Jurgens breached his fiduciary duties as executor because the only appraisal obtained for Louise's house was from a company allegedly "under the exclusive control of Patrick McCarthy, even though McCarthy was no longer actively serving as property manager[,]" and thus the sale was not an "arm's length" transaction. (Am. Compl. at 25.) As noted above, the New York Fiduciary Powers Act provides the executor with broad authority with regard to the sale of decedent's property. The applicable statutory provision authorizes an executor "with respect to any property ... owned by an estate ... to sell the same at public or private sale, and on such terms as in the opinion of the fiduciary will be most advantageous to those interested therein." N.Y. EPTL § 11–1.1(5).

Plaintiff's only support for his claim that Jurgens breached his fiduciary duty in the sale of the residence is his assertion that the appraisal was submitted by a company with whom McCarthy had ties, thereby resulting in a transaction which was not at arm's length. However, Plaintiff does not specify McCarthy's connection to that company or offer any proof to show that any unlawful conduct occurred as a result of this purported connection. Nor does Plaintiff offer any proof to show that Jurgens knew or believed this sale was not "most advantageous" to Louise's beneficiaries, as required under New York law.

Significantly, by Order dated February 21, 2001, the Surrogate's Court granted Jurgens' application for permission to sell Louise's home in accordance with the terms of the contract which Jurgens had provided to the Court (Am.Compl., Ex. 9). In the Order, the Surrogate noted that Jurgens had "proffered a copy of a contract of sale for $270,000.00 and state[d] that the sale of the premises minimizes the estate's obligation to pay taxes and carrying charges on the property during the pendency of the probate proceeding." (Id.) The Surrogate found that Jurgens had satisfied his fiduciary duties with regard to the sale of Louise's home, and Plaintiff has not presented any evidence here to convince this Court otherwise. Accordingly, the Court finds there is no genuine issue of material fact regarding Defendant's conduct in the sale of Louise's home.

### 6. The "Fraudulent Bond" Allegation

*20 Plaintiff maintains that Jurgens filed a fraudulent bond with the Surrogate's Court and that no true bond actually exists, thereby resulting in a fraud on the court and Louise's beneficiaries. (Am. Compl. at 25–26, Ex. 9.) In support of this allegation, Plaintiff claims that, pursuant to the order of the Surrogate's Court requiring Jurgens to file a bond on his performance, Jurgens filed "several unbound unexecuted pages purporting to represent an executor's performance bond underwritten by Fidelity and Deposit Company of Maryland" ("F & DC"), and that in 2003, an F & DC representative informed him that "no bond exists or ever existed on the performance of Charles H. Jurgens. (Id. at 25–26, 794 N.Y.S.2d 286, 827 N.E.2d 269.)

In his summary judgment motion, Jurgens explains that F & DC insured Louise's Estate for $3,353,000, based on Jurgens' preliminary estimate of the value of the Estate at the time he filed the Preliminary Executor's Bond with the Surrogate's Court. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 29.) The value of the Estate was ultimately determined to be higher than the face value of the bond. However, by the time that determination was made, the Will had already been admitted to probate and an increase in the the bond was not necessary. (Jurgens Aff. ¶ 14; Def.'s 56.1 Stat. ¶ 30.)

In support of his allegation that Jurgens breached his fiduciary duties by filing a false bond, Plaintiff cites to Exhibit 9 annexed to the Amended Complaint. (Am. Compl. at 25–26.) However, Exhibit 9 is neither the purported bond nor any document even suggesting that Jurgens fraudulently obtained the bond. Rather, Exhibit 9 consists of the FD & C's power of attorney dated August 25, 2000, F & DC's statement of financial condition dated May 24, 2000, and FD & C's New York State Insurance Certificate dated April 12, 2001. These documents do not in any way support Plaintiff's contention that Jurgens committed fraud in obtaining the bond, thereby breaching his fiduciary duties.

As a result, Defendant has provided no more than conclusory allegations here regarding the supposed fraudulent nature of the bond, and those allegations are not supported by the irrelevant papers included in Exhibit 9. Accordingly, the Court finds that Plaintiff has failed to carry his burden to establish a genuine issue of material fact regarding the bond filed by Jurgens with the Surrogate's Court.

### 7. Purported Accounting Discrepancies

Plaintiff alleges that the difference of $897,115.27 between the listed value of assets contained in Jurgens' Inventory dated October 12, 2001 (filed on November 7, 2001) and McCarthy's Final Accounting (filed in August 2002), both of which pertain to the value of Louise's assets as of the date of her death (January 6, 2001), and Jurgens' alleged failure to address this discrepancy, reveal that Jurgens committed some type of unspecified fraud and that he "continues to act in concert with all parties ... to deplete and convert the assets of" Louise's Estate. (Am. Compl. at 9.)

**\*21** The conduct alleged here refers to actions taken during the guardianship period. As explained above, during this time, Jurgens had no authority over McCarthy, who was solely in charge of managing Louise's assets. Moreover, Plaintiff had ample opportunity to challenge McCarthy's accounting, including this alleged discrepancy, during the course of the Suffolk Supreme Court Action. Because this allegation relates solely to events that occurred prior to the commencement of Jurgens' role as executor of Louise's Estate, the Court finds that there is no genuine issue of material fact regarding any alleged breach by Jurgens of his fiduciary duties as Executor.

### 8. Jurgens' Purported Improper Motives

Finally, Plaintiff claims that Jurgens brought the Suffolk Surrogate's Court action against Plaintiff "to conceal and obfuscate the conversion of the property" of Louise and her Estate during the period in which Jurgens and McCarthy served as Louise's guardians. (Am. Compl. at 9.) Plaintiff explained that, following his appointment as preliminary executor of Louise's estate in January 2001:

> In the course of performing my duties as executor, I attempted to locate and preliminarily account for various assets of the Estate. In that capacity, I learned that Plaintiff had withheld certain of Louise's money and personal property valued at $789,039.04, obtained through specific withdrawals, transfers and check negotiations in which Plaintiff engaged during the period prior to

> Louise's death from March 1997 through the time that Mr. McCarthy was appointed as Louise's property guardian. As a result, I commenced a special proceeding in Suffolk County Surrogate's Court in my capacity as Executor, seeking to discover property withheld by Plaintiff.

(Jurgens Aff. ¶ 5.)

On June 13, 2003, Suffolk County Surrogate, Honorable John M. Czygier, Jr. granted Jurgen's motion for summary judgment (made on behalf of Louise's Estate) on the grounds that no triable issue of fact existed as to whether Witzenburg was in wrongful possession of specific assets belonging to the Estate. (Jurgens Aff ¶ 6; Schmidt Decl. ¶ 10; Def.'s 56.1 Stat. ¶ 17.) By Decree and Judgment entered on August 22, 2003 (the "Judgment"), Witzenburg was ordered to deliver such assets, if in his possession or control, or to pay Jurgens, as the Executor, $789,039.04, representing the total amount of withdrawals and transfers of Louise's assets resulting from the transactions conducted by Plaintiff between March 1997 and June 2000. (Jurgens Aff. ¶ 6; Schmidt Decl. ¶ 10, Ex. A; Def.'s 56.1 Stat. ¶ 17.) Moreover, in the Judgment granting the Estate's motion for summary judgment, Surrogate Czygier stated as follows:

> sufficient concerns having been raised before this Court to question the nature of the subject transfers it is further ORDERED, ADJUDGED AND DECREED that the Clerk of the Surrogates' Court is directed to serve a copy of the Court's decision upon the Suffolk County District Attorney for further investigation[.]"

**\*22** (Schmidt Decl. ¶ 11, Ex. A; Def.'s 56.1 Stat. ¶ 18.) The Judgment is a final judgment and was not appealed by Plaintiff. (Schmidt Decl., Ex. A; Def.'s 56.1 Stat. ¶ 20.)

Jurgens believes that shortly after entry of the Judgment in August 2003, Plaintiff left New York. (Schmidt Decl. ¶ 12.) To date, Plaintiff has not made any payment to satisfy the Judgment, and it is Jurgens' understanding that Plaintiff has resisted all efforts to enforce the Judgment.

(Jurgens Aff. ¶ 6; Def.'s 56.1 Stat. ¶ 19.) However, once the Estate files its final accounting (which it cannot do until after resolution of the present action), it will ultimately be able to offset the amount of the Judgment against Plaintiff's share. (Jurgens Aff. ¶ 12.; Schmidt Decl. ¶ 12.)

Notwithstanding that the history of the Surrogate's Court Action strongly suggests that Plaintiff brought the instant case in an effort to further elude the Judgment entered in Surrogate's Court, Jurgens, as Executor, was well within his authority to bring that case against Plaintiff. The New York Fiduciary Powers Act specifically provides that "every fiduciary is authorized ... [t]o contest, compromise or otherwise settle any claim in favor of the estate ...." N.Y. EPTL § 11–1.1(13). Thus, once Jurgens obtained information that Plaintiff had withheld funds which properly belonged to Louise's Estate, he acted properly in brining the Surrogate's Court Action against Plaintiff to recover those funds.

### C. *Conclusion*

For the foregoing reasons, Plaintiff has not provided any evidentiary basis which would enable this Court to find that Jurgens breached his fiduciary duties in his role as executor of Louise's Estate and that Jurgens' actions caused Witzenburg or any other beneficiary to incur damages. Accepting Jurgens' Rule 56.1 Statement as admitted facts, as the Court must, the record shows that Jurgens' conduct as executor "measures up to the appropriate standards of prudence, vigilance, and care" as required by New York law. *See Donner,* 82 N.Y.2d at 585, 606 N.Y.S.2d at 142, 626 N.E.2d 922.

Having reviewed all of the papers submitted in support of and in opposition to Defendant's Motion for Summary Judgment on the remaining claims in this action, and reviewing the evidence in the light most favorable to Plaintiff as the non-moving party, the Court concludes that Defendant has met his burden of showing that there is no genuine issue of material fact to be tried in this case regarding Plaintiff's claims that Defendant breached his fiduciary duties to the Estate of Louise Jurgens and that he mismanaged the Estate's assets.

Accordingly, I respectfully recommend to Judge Feuerstein that Defendant's motion for summary judgment on the remaining claims in this action be GRANTED and that the Amended Complaint be dismissed in its entirety.

### IV. *PLAINTIFF'S MOTION TO AMEND THE COMPLAINT*

Plaintiff Witzenburg also moves to amend the Amended Complaint pursuant to Fed.R.Civ.P. 15 to add Patrick McCarthy, Esq. as a party defendant. McCarthy served as the court-appointed property guardian of Louise's property for thirteen months before her death. Defendant's motion papers [DE 117] do not include a proposed Second Amended Complaint containing the requested changes. Counsel for Patrick McCarthy filed a letter [DE 119] requesting permission to oppose the motion and to extend the time to submit his opposition. By Order dated June 20, 2008 [DE 120], Judge Boyle granted McCarthy's motion without objection from Plaintiff and extended the deadline for the opposition to July 15, 2008. Defendant Jurgens has not filed papers in opposition to Witzenburg's motion to amend.

**\*23** Plaintiff seeks to amend his pleading for a second time on the grounds that, as guardian of Louise's property, McCarthy "created a false business document identified as 'The Final Accounting,' and filed said false business document with the New York State Supreme Court." [DE 117] Because the deadline to amend the pleadings has expired, [10] the amendment is permissible only if it "relates back" to the original Complaint as defined in Rule 15(c). Under Rule 15(c)(1), an amendment "relates back" to the original pleading when, *inter alia,*

> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out— or attempted to be set out—in the original pleading; or

> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and

> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Thus, subsection (C) governs the relation back of newly added parties, as opposed to newly added claims and claims and defenses, which is governed by subsection

(B) (although under the terms of (C), Plaintiff must also satisfy (B).) *See Sidney v. Wilson,* 228 F.R.D. 517, 520 (S.D.N.Y.2005).

In order for Plaintiff to amend the Amended Complaint to add McCarthy as a party Defendant, he must show that McCarthy originally would have been named as a defendant "but for a mistake concerning the proper party's identity." Under Second Circuit law, "a 'mistake' in identifying a defendant occurs for purposes of Rule 15(c) when it is the result of 'misnomer or misidentification' " or when a plaintiff omits the individual defendant altogether in the erroneous belief that suing a government department will suffice. *Messer v. Fahnestock & Co. Inc.,* 03–4989, 2008 WL 4934608, at *20 (E.D.N.Y. Nov.18, 2008) (internal citation omitted) (quoting *Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 469–70 (2d Cir .1995)); *Colombo v. S.C. Dep't of Soc. Servs.,* 221 F.R.D. 374, 376 (E.D.N.Y.2004). "However, the relation-back doctrine does not apply where defendants were not originally named merely 'because plaintiff did not know their identities.' " *Colombo,* 221 F.R.D. at 376 (quoting *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999)). Nor does the relation-back doctrine apply where plaintiff does not allege he would have sued the proposed defendant in the original complaint but for a mistake in identity. *See Cornwell v. Robinson,* 23 F.3d 694, 705 (2d Cir.1994) (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake"); *see also* Fed.R.Civ.P. 15(c) (3)[11] Advisory Committee's note (1991 Amendment) (this provision was revised to address "the problem of the misnamed defendant").

**\*24** In his motion papers, Plaintiff asserts that the proposed amendment "asserts a claim that arose out of the conduct, transaction, or occurrence set out— or attempted to be set out—in the original pleading." Plaintiff further contends that McCarthy will not be prejudiced because he "knew or should have known that this action would have been brought against him but for a mistake concerning the proper party's identity ...." [DE 117] Other than these conclusory statements, however, Plaintiff gives no explanation as to any mistake on his part concerning McCarthy's identity. There is no evidence that Defendant's failure to name McCarthy as a defendant in the original Complaint was a result of a "misnomer or

misidentification," as required under Second Circuit law. *See, e.g., Messer,* 2008 WL 4934608, at *20, *Colombo,* 221 F.R.D. at 376. In addition, given the history of the related Suffolk Supreme Court and Surrogates' Court Actions that occurred before Plaintiff filed the Complaint in the present case, it is implausible for Plaintiff to assert that he was uncertain of Patrick McCarthy's identity. Rather, Plaintiff chose not to name McCarthy as a defendant in the present action—a mistake which does not allow the proposed amendment to "relate back" to the Complaint. *See Cornwell,* 23 F.3d at 705 (amendment to add defendants did not relate back where plaintiff knew at the time of her original complaint the "identities of the ... employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake").

Moreover, even if the Court were to accept Plaintiff's contention that McCarthy "knew or should have known that the action would have been brought against [him], but for a mistake concerning the proper party's identity [,]" Plaintiff must show that McCarthy received timely notice of this action so as to avoid prejudice in defense of the action on the merits. *See* Fed.R.Civ.P. 15(c)(2)(C) (ii); *Colombo,* 221 F.R.D. at 377. To this end, Plaintiff states:

> [a]s Patrick McCarthy was represented by Donald J. Farrinacci when he was the Guardian of Louise Jurgens' Property, as Donald J. Farrinacci had been employed at Cozin O'Conner and is an associate of Michael Schmidt, attorney for Charles H. Jurgens, Patrick McCarthy knew or should have know that this action would have been brought against him, but for a mistake concerning the proper party's identity ...."

[DE 117] The Court understands Plaintiff's assertion to mean that McCarthy was on notice of the present action, and therefore will not be prejudiced by being added as a defendant, because, for at least some portion of the time he served as Louise's property guardian (December 1999– January 2001), he was represented by counsel who at one time had worked with Jurgens' current counsel.

Rule 15(c) requires a showing that the defendant who is to be added to the complaint "received such notice of the action that it will not be prejudiced in defending on the merits[.]" Rule 15(c) (2)(C)(ii). Knowledge of the pendency of the action may be imputed to a party to be added as a defendant to that action where there has been "some showing that the proposed defendant's attorney knew that the additional defendant would be added to the existing suit." *Colombo,* 221 F.R.D. at 377 (granting motion to add individual defendants under *Rule 15(c)* where county attorney's office represented the named defendants, including county police department and correctional facility, and was also counsel for the proposed defendants, including individual police and correction officers, the attorneys "should have known that, despite the deficiencies in the original complaint, these individual officers should have been named, and would be added when the mispleading became evident"); *Gleason v. McBride,* 869 F.2d 688, 693 (2d Cir.1989) (holding that notice of a lawsuit cannot be imputed to a proposed defendant based on sharing of counsel with a named defendant; "there must be some showing that the attorney(s) knew that the additional defendants would be added to the existing suit") (citation omitted).

**\*25** Plaintiff's allegation that McCarthy was on notice of the present action because he was, in a prior case, represented by counsel who had at one time worked with Jurgens' current counsel, is insufficient to constitute notice under Rule 15(c)(2)(C)(ii). Plaintiff does not provide the Court with any evidence regarding the relationship between McCarthy's attorney and Jurgens' former attorney. [12] Moreover, Plaintiff has not made any showing that McCarthy or his attorney knew that McCarthy would be added to the existing suit before Plaintiff filed this motion. For the foregoing reasons, Plaintiff has not satisfied the requirements of Rule 15(c) and therefore should not be permitted to amend his pleading for a second time for this purpose. Accordingly, I respectfully recommend to Judge Feuerstein that Plaintiff's motion to add Patrick McCarthy as a party defendant be DENIED.

## V. *PLAINTIFF'S MOTION TO COMPEL*

Plaintiff also moves to compel Defendant to respond to outstanding discovery requests. By motion dated June 26, 2008 [DE 130], Plaintiff requests an order requiring Defendant to respond to outstanding document requests

and interrogatories, which Defendant has previously refused to answer on the grounds that the application of the *Rooker–Feldman* doctrine excused them from doing so. The motion is titled "Plaintiff's Motion & Notice of Motion For Sanctions," but nowhere in the body of the motion does Plaintiff request the imposition of sanctions or provide a legal basis for doing so. Accordingly, the Court will treat this request for relief as a motion to compel and to impose sanctions upon Defendant.

By letter dated July 8, 2008 [DE 131], Defendant states that, to the extent the meaning of Plaintiff's motion can be discerned, and to the extent the motion seeks to compel Defendant's further responses to discovery requests, Defendant opposes the motion on the grounds that (1) the Court had already denied an earlier motion to compel by Plaintiff, and (2) there is no basis for an award of sanctions against Defendant.

In a previous motion filed on January 31, 2008 [DE 95–97], Plaintiff moved to compel Defendant "to file adequate responses to Plaintiff's discovery requests." Specifically, Plaintiff objected to Defendant's responses to Interrogatories 4, 6, 13, and 14, and Requests for Admissions ("RFAs") numbered 1, 8, 9, 16, and 17 as being "incomplete," and requested that the Court order Defendant to respond further to the Interrogatories and to deem as admitted the specified RFAs [DE 96]. In opposition, Defendant filed the Declaration of Michael C. Schmidt, dated February 4, 2008 [DE 99], objecting to Plaintiff's motion to compel. By Order dated February 4, 2008 [DE 100], Judge Boyle ruled that, after reviewing the motion to compel, he found Defendant's response[s] "adequate." The Order also stated that the "plaintiff is advised that he may further pursue those request[s] which do not relate to dismissed parties and causes of action, at the deposition of defendant Jurgens."

**\*26** Thus, Judge Boyle unequivocally denied Plaintiff's motion to compel on the grounds that Plaintiff's responses were sufficient and any further information could be obtained by deposing Defendant. Plaintiff's current motion to compel is essentially a more vague repetition of his earlier motion. However, Plaintiff does not provide any basis, let alone a legally sufficient one, for reconsidering Judge Boyle's Order denying that motion, and the Court declines to do so. For all of the reasons stated previously in this Report, Judge Boyle's February 4, 2008 Order on this topic is also law-of-the-case and

Plaintiff has not met any of the criteria to exempt that Order from such a finding.

To the extent Plaintiff's motion seeks the imposition of sanctions upon Plaintiff, the Court interprets the motion to be requesting sanctions for "Failure to Disclose, to Supplement an Earlier Response, or to Admit," under Rule 37(c). Here, Judge Boyle previously determined that Defendant's responses were adequate. Since that time, Plaintiff has not served any additional discovery requests and Defendant has not incurred any additional obligation to respond to the original discovery requests. Consequently, there is no basis for the Court to impose sanctions on Defendant.

For the foregoing reasons, I respectfully recommend to Judge Feuerstein that Plaintiff's motion to compel and for sanctions be DENIED.

## V. *CONCLUSION*

For the reasons discussed above, I respectfully recommend to Judge Feuerstein that: (1) Defendant's motion for summary judgment on the remaining claims be GRANTED and that Plaintiff's Amended Verified Complaint be dismissed in its entirety; (2) Plaintiff's motion to amend the Amended Complaint to add Patrick McCarthy, Esq. as a party defendant be DENIED; and (3) Plaintiff's motion to compel discovery responses and to impose sanctions upon Defendant be DENIED.

Pursuant to 28 U.S.C. § 636(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report and Recommendation to file written objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections shall be filed with the Clerk of the Court via ECF, *except in the case of a party proceeding pro se. Pro Se Plaintiff James Witzenburg must file his objections in writing with the Clerk of the Court within the prescribed time period noted above. A courtesy copy of any objections filed is to be sent to the chambers of the Honorable Sandra J. Feuerstein, and to my chambers as well. Any requests for an extension of time for filing objections must be directed to Judge Feuerstein prior to the expiration of the (10) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Beverly v. Walker, 118 F.3d 900, 901 (2d Cir.), cert. denied, 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); Savoie v. Merchants Bank, 84 F.3d 52, 60 (2d Cir.1996).*

**\*27** Defendants' counsel is directed to serve a copy of this Report and Recommendation forthwith upon Plaintiff *Pro Se* by overnight mail and first class mail at Plaintiff's last known address. Defendant's counsel is further directed to file proof of service of the same upon ECF.

## **SO ORDERED.**

## **All Citations**

Not Reported in F.Supp.2d, 2009 WL 1033395

## Footnotes

1   Plaintiff has not objected to the branches of Magistrate Judge Tomlinson's Report as recommended denying his motions to amend the amended complaint and to compel discovery responses or impose sanctions. Upon review of those branches of the Report, the Court is satisfied that the Report is not facially erroneous. Accordingly, the Court accepts and adopts those branches of the Report.

1   The record is unclear as to Plaintiff's exact relationship with Louise, as it is variously stated that he is her first cousin once removed (Compl. at 2; Jurgens Aff., Ex. A), her second cousin (Jurgens Aff. ¶ 1), or her nephew (Schmidt Decl. ¶ 4).

2   Citations to "Schmidt Decl." are to the June 17, 2008 Declaration of Michael C. Schmidt, Esq., in Support of Defendant Jurgens' Motion for Summary Judgment [DE 123].

3   Citations to "Jurgens Aff." are to the June 10, 2008 Affidavit of Charles Herman Jurgens in support of Motion for Summary Judgment [DE 124].

4   Citations to "Def.'s 56.1 Stat." are to the Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 [DE 125].

5   The Amended Complaint does not contain separately numbered paragraphs and does not identify specific "causes of action." Accordingly, citations are to page numbers within the Amended Complaint. Moreover, the Court affords the Amended Complaint, filed by *pro se* Plaintiff "as liberal a reading as circumstances permit." *Hardie v. Grenier*, No. 84

Civ. 4710, 1987 U.S. Dist. LEXIS 12664, at *6 (S.D.N.Y. Jan. 15, 1988); *see also Lerman v. Board of Elections in the City of N.Y.,* 232 F.3d 135, 140 (2d Cir.2000).

6    Citations to "Schmidt Reply Decl." are to the August 7, 2008 Reply Declaration of Michael C. Schmidt, Esq., in Further Support of Defendant Jurgens' Motion for Summary Judgment [DE 137].

7    Even if Plaintiff's Response were considered, the substance of the Response falls far short of the threshold necessary to support a showing of genuine issue of material fact with regard to the remaining claims. Rather, the Response contains conclusory and unsubstantiated statements, most of which purport to address "the numerous factual inaccuracies and misleading statements" in the Schmidt Declaration [DE 136 at 3], and none of which provide any evidentiary support for Plaintiff's claims.

8    Local Rule 56.1(b) provides: "The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."

9    The Prudent Investor Act applies to investments "made or held" by a trustee on or after January 1, 1995, and thus applies to the present matter. *See In re Estate of Janes,* 90 N.Y.2d 41, 49, 659 N.Y.S.2d 165, 169, 681 N.E.2d 332 (N.Y.1997) (citing N.Y. EPTL § 11–2.3(b) (3)(C).)

10    Pursuant to the Scheduling Order [DE 22] in this action, the deadline to amend the pleadings was May 6, 2005.

11    Although numbered differently from the current version of Rule 15(c), the wording is the same.

12    In addition, the Court notes that, based on preliminary research, Plaintiff's statement appears to be incorrect. No attorney by the name of Donald J. Farrinacci presently works at the law firm of Cozen O'Connor, where Jurgens' attorney, Michael J. Schmidt, currently works. However, Schmidt's biography on the Cozen O'Connor website states that until 2005, Schmidt worked at Fischbein Badillo Wagner Harding, a firm that represented McCarthy for at least some portion of his tenure as guardian. *See* http://www.cozen.com/attorney_detail.asp?d=1 & atid=835.

---

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.